# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Alliance for Retired Americans, et al., <br><br> Plaintiffs, <br><br> v. <br><br> Scott Bessent, in his official capacity as Secretary of the Treasury, et al., <br><br> Defendants. | Civil Action No. 25-313 (CKK) |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

Norman L. Eisen
(DC Bar No. 435051)
State Democracy Defenders Fund
600 Pennsylvania Avenue SE
#15180
Washington, DC 20003

Nandan M. Joshi
(DC Bar No. 456750)
Nicolas Sansone
(DC Bar No. 1686810)
Allison M. Zieve
(DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

Dated: February 5, 2025

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

    Statutory Framework ............................................................................................... 3

    The Bureau's Operations ........................................................................................ 5

    DOGE and DOGE's access to the Bureau's systems ........................................... 7

LEGAL STANDARD ..................................................................................................... 11

ARGUMENT ................................................................................................................ 11

I.    Plaintiffs are likely to succeed on the merits. .................................................... 11

    a.    Defendants' action giving DOGE access to the Bureau's records
        is contrary to law and in excess of their statutory authority. .................. 11

    b.    Defendants' action is arbitrary and capricious. ....................................... 13

II.    Plaintiffs will suffer immediate, irreparable injury if Defendants
    continue to allow unlawful access to the agency's records on
    individuals. ......................................................................................................... 15

III.    The balance of equities and the public interest support grant of a
    TRO. ................................................................................................................... 18

CONCLUSION............................................................................................................... 19

# TABLE OF AUTHORITIES

## CASES

*Beattie v. Barnhart,*
663 F. Supp. 2d 5 (D.D.C. 2009) ............................................................................ 15

*C.G.B. v. Wolf,*
464 F. Supp. 3d 174 (D.D.C. 2020) ........................................................................ 18

*Cause of Action v. IRS,*
125 F. Supp. 3d 145 (D.D.C. 2015) ........................................................................ 16

*Chaplaincy of Full Gospel Churches v. England,*
454 F.3d 290 (D.C. Cir. 2006) ............................................................................... 11

*Chrysler Corp. v. Brown,*
441 U.S. 281 (1979) ............................................................................................... 12

*Church of Scientology of California v. IRS,*
484 U.S. 9 (1987) ................................................................................................... 16

*Council on American-Islamic Relations v. Gaubatz,*
667 F. Supp. 2d 67 (D.D.C. 2009) .......................................................................... 16

*Center for Biological Diversity v. Trump,*
453 F. Supp. 3d 11 (D.D.C. 2020) .......................................................................... 12

*D.A.M. v. Barr,*
474 F. Supp. 3d 45 (D.D.C. 2020) .......................................................................... 11

*Department of Homeland Security v. Regents of the University of California,*
591 U.S. 1 (2020) ................................................................................................... 13

*Doe v. Stephens,*
851 F.2d 1457 (D.C. Cir. 1988) ............................................................................. 13

*FAA v. Cooper,*
566 U.S. 284 (2012) ............................................................................................... 17

*Hall v. Johnson,*
559 F. Supp. 2d 1 (D.D.C. 2009) ........................................................................... 11

*Hospitality Staffing Solutions, LLC v. Reyes,*
736 F. Supp. 2d 192 (D.D.C. 2010) ........................................................................ 16

*Medical Imaging & Technology Alliance v. Library of Congress,*
103 F.4th 830 (D.C. Cir. 2024) .............................................................................. 11

*Michigan* v. *EPA*,
  576 U.S. 743 (2015) ................................................................................ 14

*Motor Vehicle Manufacturers Ass'n of United States, Inc. v. State Farm*
  *Mutual Automobile Insurance Co.*,
  463 U.S. 29 (1983) .................................................................................. 14

*National Treasury Employees Union v. U.S. Department of Treasury*,
  838 F. Supp. 631 (D.D.C. 1993) ............................................................ 16

*Open Communities Alliance v. Carson*,
  286 F. Supp. 3d 148 (D.D.C. 2017) ....................................................... 18

*Pursuing America's Greatness v. FEC*,
  831 F.3d 500 (D.C. Cir. 2016) ............................................................... 11

*Wilcox v. Bastiste*,
  No. 2:17-cv-122, 2017 WL 2525309, at *3 (E.D. Wash. 2017) ............... 17

**STATUTES**

5 U.S.C. § 552a ............................................................................................ 2

5 U.S.C. § 552a(a)(4) .................................................................................. 12

5 U.S.C. § 552a(a)(7) .................................................................................... 4

5 U.S.C. § 552a(b) ........................................................................................ 4

5 U.S.C. § 552a(b)(1) ............................................................................. 4, 12

5 U.S.C. § 552a(b)(3) .................................................................................... 4

5 U.S.C. § 552a(e)(10) ................................................................................ 15

5 U.S.C. § 552a(e)(11) .................................................................................. 3

5 U.S.C. § 552a(e)(4) ................................................................................ 3, 4

5 U.S.C. § 3161 ............................................................................................. 7

18 U.S.C. § 202(a) ........................................................................................ 8

26 U.S.C. § 6103 ........................................................................................... 2

26 U.S.C. § 6103(a) ................................................................................... 4, 5

26 U.S.C. § 6103(b)(1) .................................................................................. 4

26 U.S.C. § 6103(b)(2)(A) ................................................................ 4

26 U.S.C. § 6103(i)(7)(B)(i) ............................................................ 5

26 U.S.C. § 6103(u)(3) .................................................................... 5

31 U.S.C. § 3301 ............................................................................. 5

31 U.S.C. § 3321 ............................................................................. 5

Privacy Act of 1974,
   Pub. L. No. 93-579, 88 Stat. 1896

  § 2(a)(1) ...................................................................................... 3

  § 2(a)(5) ...................................................................................... 3

  § 2(b)(4) ...................................................................................... 3

## FEDERAL REGISTER

85 Fed. Reg. 11766 (Feb. 27, 2020) .................................... 1, 6, 7

## OTHER

Andrew Duehren et al., *Treasury Official Quits After Resisting Musk's
   Requests on Payments*, N.Y. Times, Jan. 31, 2025 ............................... 9, 10

*Brian Schwartz, Elon Musk's DOGE Getting Access to Payment System
   Doling Out Trillions to Americans*, Wall St. J., Feb. 1, 2025 ................... 9

Executive Order, Establishing and Implementing the President's
   "Department of Government Efficiency" (Jan. 20, 2025) ........................ 8

Jack Newsham, *Some members of Elon Musk's DOGE squad aren't
   sharing their last names as they attempt to remake the federal workforce*,
   Business Insider, Feb. 4, 2025 ................................................................ 14

Jake Bleibeg et al., *US Treasury Brings In Two Members From Musk's
   DOGE Team*, Bloomberg, Feb. 4, 2025 ................................................. 11

Jeff Stein et al., *Senior U.S. official to exit after rift with Musk allies over
   payment system*, Wash. Post, Jan. 31, 2025 ........................................... 9

Michael Stratford et al., *Trump administration gives Musk allies access to
   Treasury payment system*, Politico, Feb. 1, 2025 ............................. 10, 11

Nandita Bose & Steve Holland, *Trump makes Musk, the world's richest man, a 'special government employee'*, Reuters (Feb. 3, 2025) ................................. 8

Rebecca Kheel, *'Infinite Nightmares at Once': Veterans Data Swept Up in Musk's Takeover of Treasury System*, Military.com, Feb. 4, 2025 ........................ 14

Treasury Department Letter to Members of Congress Regarding Payment Systems (Feb. 4, 2025) ............................................................................. 11

U.S. Dep't of Treas., Bur. of Fiscal Serv., Final Monthly Treasury Statement, Receipts and Outlays of the United States Government for Fiscal Year 2024 Through September 30, 2024, and Other Periods....................... 6

Vittoria Elliott et al., *A 25-Year-Old With Elon Musk Ties Has Direct Access to the Federal Payment System*, Wired, Feb. 4, 2025 .................................. 10

v

**INTRODUCTION**

The Bureau of the Fiscal Service (the Bureau) is an agency within the Department of the Treasury (the Department) that manages the federal government's payment and collections system. The Bureau is not a policymaking body and has no discretion to decide what payments the federal government should make or what revenues it should collect—that is the work of federal agencies charged by Congress with implementing federal programs. The Bureau's primary function is to ensure that the federal government's financial transactions are processed in an orderly manner.

To fulfill its processing function, the Bureau collects and maintains sensitive personal and financial information about every individual—every citizen, every retiree, every taxpayer, every employee, every company—who makes a payment to or receives a payment from the federal government. The Bureau has recognized the sensitivity of the information it maintains on individuals, and has assured the public that "[o]nly employees whose official duties require access are allowed to view, administer, and control these records." 85 Fed. Reg. 11766 (Feb. 27, 2020).

Until last week.

On Tuesday, January 28, 2025, Scott Bessent was sworn in as Secretary of the Treasury. By Friday, January 31, he had disregarded the Bureau's privacy safeguards and authorized individuals associated with the so-called "Department of Government Efficiency" (DOGE) to access the Bureau's payment systems. Secretary Bessent did not publicly announce this new policy—what is known is based on media reporting—or attempt to justify it. He simply decided behind closed doors to allow

1

individuals not involved in the processing of the government's financial transactions to root around in the Bureau's records.

Giving access to those records is unlawful. Congress has enacted laws to assure the public that, when they submit their personal information to the federal government, their information will be protected from improper and unnecessary disclosure to third parties—whether within or outside the government. Two such laws are implicated here. The Privacy Act of 1974 bars agencies from sharing records about individuals with third parties. 5 U.S.C. § 552a. The Internal Revenue Code is even more protective, requiring personal information related to taxes to be kept "confidential." 26 U.S.C. § 6103. None of the targeted exceptions in these laws allows individuals associated with DOGE to obtain people's personal information. Secretary Bessent should have denied them access. Instead, he appears to have rushed ahead by immediately opening up the Bureau's records to provide DOGE with ongoing access to individuals' personal and financial information.

Plaintiffs are a membership organization of retirees and two labor unions, whose members rely on the Bureau's financial systems to receive Social Security and pension benefits, disability payments, and salaries and wages, as well as to pay federal taxes and receive tax refunds. These individuals have no choice in whether the Bureau will collect and maintain their personal and financial information—it must have that information to do its job. But by giving DOGE full access to the Bureau's systems, Secretary Bessent has given unknown individuals access to the personal information of Plaintiffs' members without those members' knowledge or

consent. And the harm that decision has caused is happening right now, because individuals associated with DOGE are already in the Bureau's system. In these circumstances, a temporary restraining order (TRO) is vital to protect the individual privacy of Plaintiffs' members until this Court can undertake an orderly resolution of this dispute.

## BACKGROUND

**Statutory Framework**

**1. *Privacy Act.*** Recognizing that "the privacy of an individual is directly affected by the collection, maintenance, use, and dissemination of personal information by Federal agencies," Congress enacted the Privacy Act to "regulate the collection, maintenance, use, and dissemination of information by such agencies." Pub. L. No. 93-579, §2(a)(1), (5), 88 Stat. 1896, 1896 (1974). The Privacy Act provides "safeguards for an individual against an invasion of personal privacy by requiring Federal agencies … to … collect, maintain, use, or disseminate any record of identifiable personal information in a manner that assures that such action is for a necessary and lawful purpose [and] that adequate safeguards are provided to prevent misuse of such information." *Id.* § 2(b)(4).

Under the Privacy Act, an agency that has a system of records about individuals must publish a notice in the Federal Register "of the existence and character" of that system. 5 U.S.C. § 552a(e)(4). This notice is referred to as a System of Records Notice (SORN). An agency must give the public 30 days' notice of a new or revised SORN and must provide an opportunity to comment on the proposed SORN. *Id.* § 552a(e)(11). A SORN must disclose, among other things, "the categories of

3

individuals on whom records are maintained in the system," "the categories of records maintained in the system," "each routine use of the records contained in the system, including the categories of users and the purpose of such use," and "the policies and practices of the agency regarding storage, retrievability, access controls, retention, and disposal of the records." *Id*. § 552a(e)(4). A "routine use" of a record is "the use of such record for a purpose which is compatible with the purpose for which it was collected." *Id*. § 552a(a)(7).

The Privacy Act also safeguards against disclosure of records. Absent the consent of the individual to whom a particular record pertains, agencies may not disclose a record "to any person, or to another agency." *Id*. § 552a(b) . The Privacy Act lists 13 exceptions to the bar on disclosure, only two of which are relevant to the discussion here. First, an agency may disclose the records it maintains within the agency "to those officers and employees of the agency … who have a need for the record in the performance of their duties." *Id*. § 552a(b)(1). Second, an agency may disclose a record pursuant to a "routine use" identified in its SORN. *Id*. § 552(b)(3).

**2. *The Internal Revenue Code.*** Congress has enacted heightened protections for information that taxpayers submit in connection with tax filings. Under 26 U.S.C. § 6103(a), "[r]eturns and return information shall be confidential." A "return" includes "any tax or information return" or "claim for refund." *Id*. § 6103(b)(1). "Return information" includes "a taxpayer's identity" and "or any other data, received by, recorded by, prepared by, furnished to, or collected" in connection with federal taxes. *Id*. § 6103(b)(2)(A). A taxpayer's identity is defined to include not just the

4

taxpayer's name but also mailing address and taxpayer identifying number. *Id*. § 6103(b)(6). Section 6103(a) makes clear that "no officer or employee of the United States" may disclose return or return information if the disclosure is not expressly authorized.

Section 6103 lists detailed exceptions to the confidentiality requirement. With respect to the Department of the Treasury, one exception permits disclosure to "officers and employees … whose official duties require such inspection or disclosure for tax administration purposes." *Id*. § 6103(h)(1); *see also id*. § 6103(h)(1) (defining "tax administration"). Two other exceptions for the Treasury Department relate to terrorism, *id*. § 6103(i)(7)(B)(i), and economic forecasting, *id*. § 6103(j)(3) .

**The Bureau's Operations**

The Treasury Department is responsible for managing the finances of the United States Government. Its responsibilities include collecting receipts owed to the government and making payments to recipients of public funds. 31 U.S.C. §§ 3301, 3321. In fiscal year 2024, the Department processed nearly $5 trillion in receipts, including $2.4 trillion from individual income taxes, $1.7 trillion from social security taxes, and $530 billion from corporate income taxes. In that fiscal year, the Department handled $6.752 trillion in outlays, including $1.46 trillion for social security payments and $874 billion in defense spending. U.S. Dep't of Treas., Bur. of Fiscal Serv., Final Monthly Treasury Statement, Receipts and Outlays of the United States Government for Fiscal Year 2024 Through September 30, 2024, and Other

5

Periods 4. It is the largest collections, payments, cash management, and financial operation in the world.

The Bureau is the component of the Treasury Department charged with carrying out the U.S. government's financial transactions. As the Bureau explains on its website, it "collect[s] revenue, delinquent debt, and disburse[s] funds to millions of Americans ensuring their timely receipt of benefit payments." https://www.fiscal.treasury.gov/public/. The Bureau also provides "electronic options for paying federal taxes, charges, and fees." https://www.fiscal.treasury.gov/about.html.

To carry out these functions—that is, to send money and receive money—the Bureau needs to collect and maintain extensive personal and financial information about individuals. The Bureau has therefore published SORNs describing its systems of records, the types of information it collects, and the policies it has adopted about the routine uses and safeguards applicable to that information. 85 Fed. Reg. 11776. The Bureau has 20 systems of records in total, but three exemplify the nature of the personal information that the Bureau uses to carry out its functions.

SORN .002 concerns payment records, which are records "collected from federal government entities that are requesting disbursement of domestic and international payments to their recipients and is used to facilitate such payments." 85 Fed. Reg. at 11779. This system applies to "[i]ndividuals who are the intended or actual recipients of payments disbursed by the United States Government." *Id*. Personal information contained in these records include "a payee's name, Social

Security number, employer identification number, or other agency identification or account number; date and location of birth, physical and/or electronic mailing address; telephone numbers; [and] payment amount," as well as "financial institution information, including the routing number of his or her financial institution and the payee's account number at the financial institution." *Id.*

SORN .012 concerns records about individuals who owe a debt to the government. 85 Fed. Reg. at 11793. This system of records contains personal information similar to SORN .002, plus other information such as "information concerning the financial status of the debtor and his/her household, including income, assets, liabilities or other financial burdens, and any other resources from which the debt may be recovered"; and the name of employer or employer contact information. *Id.* at 11794. SORN .013 concerns records "about individuals who electronically authorize payments to the Federal Government," which may contain driver's license numbers; bank account information; credit and debit card numbers; individual payment information; and user names and passwords. *Id.* at 11796–97.

**DOGE and DOGE's access to the Bureau's systems**

On the day of his inauguration, President Trump issued an executive order establishing a so-called "Department of Government Efficiency." Under the executive order, the United States Digital Service was renamed the United States DOGE Service (USDS) and a "temporary organization" was established under 5 U.S.C. § 3161 entitled "the U.S. DOGE Service Temporary Organization." The executive order directs the USDS Administrator to "work with Agency Heads to promote inter-

operability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization." It also directs agency heads to "take all necessary steps, in coordination with the USDS Administrator and to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems." The executive order "displaces all prior executive orders and regulations, insofar as they are subject to direct presidential amendment, that might serve as a barrier to providing USDS access to agency records and systems as described above." *See* Executive Order, Establishing and Implementing the President's "Department of Government Efficiency" (Jan. 20, 2025).

Although no formal announcement has been made by the White House, billionaire entrepreneur Elon Musk has been widely reported to have played a leadership role in DOGE. Mr. Musk was recently made a special government employee. Nandita Bose & Steve Holland, *Trump makes Musk, the world's richest man, a 'special government employee'*, Reuters (Feb. 3, 2025); *see also* 18 U.S.C. § 202(a).

President Trump had proposed DOGE during the presidential campaign, and after the election, individuals associated with DOGE reportedly approached officials in the Department seeking access to the agency's payment systems. Initially, DOGE's requests for access were reportedly rebuffed by David A. Lebryk, the highest-ranking career official at the agency and the individual who had been in charge of the Bureau.

Jeff Stein et al., *Senior U.S. official to exit after rift with Musk allies over payment system*, Wash. Post, Jan. 31, 2025.

That changed after Secretary Bessent was sworn in as Treasury Secretary on January 28, 2025. Secretary Bessent and his chief of staff Dan Katz reportedly had a meeting with Mr. Lebryk later that week, after which Mr. Lebryk was placed on administrative leave. On Friday, January 31, Mr. Lebryk announced that he was retiring from the Treasury after 35 years in federal service. Andrew Duehren et al., *Treasury Official Quits After Resisting Musk's Requests on Payments*, N.Y. Times, Jan. 31, 2025 (Duehren Article). Shortly, thereafter, it was reported that "[t]he Treasury Department has agreed to give Elon Musk's Department of Government Efficiency access to a payment system that distributes trillions of dollars in entitlement benefits, grants and tax refunds to Americans each year." *Brian Schwartz, Elon Musk's DOGE Getting Access to Payment System Doling Out Trillions to Americans*, Wall St. J., Feb. 1, 2025.

The Department has not released the full list of DOGE-affiliated individuals who have been provided access to the Treasury's payment systems, or whether those individuals are employees of the Bureau, the Department, another agency, or a private enterprise. Secretary Bessent has reportedly "signed off on a plan to give access to the payment system to a team led by" Tom Krause, the Chief Executive Officer of Cloud Software Group (according to that company's website, *see* https://www.cloud.com/leadership (Feb. 5, 2025)), who is identified as "a liaison to Musk's DOGE group that operates out of" the USDS. Michael Stratford et al., *Trump*

9

*administration gives Musk allies access to Treasury payment system*, Politico, Feb. 1, 2025. Defendants have not publicly provided the details of the "plan" for access that Secretary Bessent reportedly signed off on or disclosed the members of Mr. Krause's team. On February 4, Defendants asserted that Mr. Krause is a "special government employee" working with "staff members" who will have "read-only access to the coded data" in the Bureau's system. Treasury Department Letter to Members of Congress Regarding Payment Systems (Feb. 4, 2025), https://home.treasury.gov/news/press-releases/sb0009. But reporting indicates that at least one member of DOGE, who does not appear to be an agency staff member, has "direct access" to the Bureau's systems, which include "the ability not just to read but to write code on two of the most sensitive systems in the U.S. government" that "control, on a granular level, government payments that in their totality amount to more than a fifth of the US economy." Vittoria Elliott et al., *A 25-Year-Old With Elon Musk Ties Has Direct Access to the Federal Payment System*, Wired, Feb. 4, 2025; Jake Bleiberg et al., *US Treasury Brings In Two Members From Musk's DOGE Team*, Bloomberg, Feb. 4, 2025 (identifying "Tom Krause, the chief executive of Cloud Software Group Inc. and Marko Elez, an engineer who has worked for SpaceX and social-media platform X" as "two people connected to the so-called Department of Government Efficiency" who had been brought into the Department, "although their exact roles are unclear to much of the department's staff"). The Department, moreover, has not denied that DOGE members will be able to read sensitive information about individuals contained in the Bureau's records.

10

## LEGAL STANDARD

To obtain a temporary restraining order, "the moving party must show: (1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable injury if the [temporary restraining order] were not granted; (3) that [such an order] would not substantially injure other interested parties; and (4) that the public interest would be furthered" by the order. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citations omitted); *see also Hall v. Johnson*, 559 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009) ("[T]he same standard applies to both temporary restraining orders and to preliminary injunctions." (citation omitted)). "When the movant seeks to enjoin the government, the final two TRO factors— balancing the equities and the public interest—merge." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (D.D.C. 2020) (citing *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

## ARGUMENT

I.    **Plaintiffs are likely to succeed on the merits.**

    a.   **Defendants' action giving DOGE access to the Bureau's records is contrary to law and in excess of their statutory authority.**

"Agencies must operate within the legal authority conferred by Congress," and "courts have the responsibility to determine whether 'individual rights' have been infringed 'by the exertion of unauthorized administrative power." *Med. Imaging & Tech. All. v. Libr. of Cong.*, 103 F.4th 830, 838 (D.C. Cir. 2024). Under the Administrative Procedure Act (APA), when an agency's action is "not in accordance with law," courts have a duty to set it aside. 5 U.S.C. § 706(2)(A). Even apart from

the APA, courts may enjoin *ultra vires* actions by an agency that are in excess of its statutory authority. *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 50 (D.D.C. 2020). An agency's decision to disclose information in violation of law is the type of agency action for which the courts can provide redress. *Chrysler Corp. v. Brown*, 441 U.S. 281, 318–19 (1979) (discussing reverse-FOIA actions).

Here, any statutory authority Defendants would otherwise have to authorize individuals associated with DOGE to access the sensitive personal and financial information stored in the Bureau's records is constrained by the Privacy Act and section 6103 of the Internal Revenue Code. There is no question that the records at issue here are records about individuals covered by the Privacy Act: "information about an individual that is maintained by an agency" and that identifies the individual. 5 U.S.C. § 552a(a)(4). Indeed, the Bureau published SORNs in the Federal Register precisely because it recognized that the personal information that it needs to effectuate financial transactions for the government is protected by the Privacy Act.

The Privacy Act prohibits Defendants from disclosing the Bureau's records on individuals to any person or any agency without the consent of the individual affected, unless an express exception applies. Defendants manifestly did not obtain individual consent before allowing DOGE-affiliated individuals to access the Bureau's records, and none of the statutory exceptions applies to DOGE's activities. For instance, one exception allows disclosure to "officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties." *Id.*

12

§ 552a(b)(1). Although Defendants have not been transparent about how much access DOGE representatives have, or whether those with access include individuals who are not agency officers or employees, DOGE representatives reportedly began requesting access to the Bureau's systems before the changeover in the administration. The timing indicates that DOGE's interest in the Bureau's payment systems is unrelated to the job duties of any agency officer or employee.

Similarly, the routine-use exception does not apply. The Bureau last published its list of routine uses in 2020, well before DOGE was conceived by President Trump or Elon Musk as a tool for the administration to use to make changes to the operation of federal agencies and programs. And in any event, "agencies covered by the Privacy Act may not utilize the 'routine use' exception to circumvent the mandates of the Privacy Act." *Doe v. Stephens*, 851 F.2d 1457, 1466 (D.C. Cir. 1988).

With respect to tax records protected by section 6103, the prohibition on sharing of information is even more straightforward. Section 6103 permits the Department to use returns and return information exclusively for tax administration, as well as terrorism-related activities and economic forecasting. To the extent that the Department has authorized disclosure of tax information for other purposes or to individuals outside of the Department, its action is unlawful under section 6103.

### b. Defendants' action is arbitrary and capricious.

Plaintiffs are also likely to succeed on their claim that Defendants' decision to permit DOGE-affiliated individuals to access restricted information is arbitrary and capricious. The APA "requires agencies to engage in 'reasoned decisionmaking.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020) (quoting

*Michigan* v. *EPA*, 576 U.S. 743, 750 (2015)). An agency's decision is arbitrary if the agency "failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Here, Secretary Bessent, within a week of being sworn in, reversed the Department's longstanding policy fully protecting individuals' personal information, which led the Bureau to bar individuals affiliated with DOGE from accessing the Bureau's systems and the records about individuals contained therein under the prior administration. In doing so, he failed to engage in reasoned decisionmaking. Not only did Defendants fail to take account of their legal obligations under federal law to protect personal information contained in their records, they ignored the reliance and expectation interests that retirees, employees, taxpayers, and millions of others have with respect to the privacy of the personal information they must share with the government to receive benefits, pay taxes, receive their salaries and wages, and otherwise engage in financial transactions with federal agencies. *See* Rebecca Kheel, *'Infinite Nightmares at Once': Veterans Data Swept Up in Musk's Takeover of Treasury System*, Military.com, Feb. 4, 2025. Even putting aside that Defendants lack authority to invite DOGE into the Bureau's systems to view people's personal data for their own purposes, giving access to this sensitive information to the nebulous DOGE entity, *see* Jack Newsham, *Some members of Elon Musk's DOGE squad aren't sharing their last names as they attempt to remake the federal workforce*, Business Insider, Feb. 4, 2025 ("Elon Musk's federal efficiency team is shielding the identities

14

of some of its members during meetings with federal workers"), lacks a rational basis and is unreasonable.

## II.    Plaintiffs will suffer immediate, irreparable injury if Defendants continue to allow unlawful access to the agency's records on individuals.

Plaintiffs are suffering, and will continue to suffer, irreparable injury from Defendants' ongoing exposure of their sensitive personal and financial data to third-party access. "An irreparable harm is an imminent injury that is both great and certain to occur, and for which legal remedies are inadequate." *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 9 (D.D.C. 2009). Defendants have allowed third parties unlawful access to Plaintiffs' members' private information and, unless enjoined, will continue to grant such access. Plaintiffs' injury, then, is not only imminent and certain—it is already occurring. Moreover, equitable relief is needed to end Defendants' ongoing exposure of highly vulnerable information, such as the Social Security numbers, bank account details, and home addresses and telephone numbers of Plaintiffs' members. Every additional moment that this information remains accessible to unauthorized third parties compounds the injury to individual privacy by increasing the opportunity for further dissemination. *See* Decl. of Steven K. Ury ¶ 10 (explaining continuing harm to SEIU members from Elon Musk's and DOGE's access to members' data).

The protections enshrined in the Privacy Act and the Internal Revenue Code reflect Congress's sound judgment that individuals have a right to expect that access to the sensitive information that they share with the government will be strictly limited. 5 U.S.C. § 552a(e)(10) (requiring agencies to "insure the security and

confidentiality" of federal records subject to the Privacy Act to protect against "substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom" the records are maintained); *see Cause of Action v. IRS*, 125 F. Supp. 3d 145, 163 (D.D.C. 2015) (noting that the "'core purpose' of section 6103" of the Internal Revenue Code "is to 'protect[] taxpayer privacy.'" (alteration in original; quoting *Church of Scientology of Cal. v. IRS*, 484 U.S. 9, 16 (1987)). By allowing third parties access to confidential information that Congress sought to protect, Defendants have established a total and ongoing injury to the privacy rights of Plaintiffs' members. *Council on Am.-Islamic Relations v. Gaubatz*, 667 F. Supp. 2d 67, 76 (D.D.C. 2009) (observing that if "proprietary, privileged, and confidential information" were "used and/or continue[d] to be disclosed" during the pendency of a lawsuit challenging such use and disclosure, "the very rights [the lawsuit] seeks to protect will have been destroyed"); Decl. of Everett Kelley ¶ 8 ("Such access violates the privacy of AFGE members, none of whom consented to have their personal and financial data shared with Mr. Musk, members of DOGE, or other third parties.").

This injury—which is not only imminent but actively occurring already—cannot be remedied after the fact. "Obviously, once … highly personal information is disclosed …, the revelation cannot be undone." *Nat'l Treasury Emps. Union v. U.S. Dep't of Treasury*, 838 F. Supp. 631, 640 (D.D.C. 1993); *see also Hospitality Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 200 (D.D.C. 2010) ("This Court has recognized that the disclosure of confidential information can constitute an irreparable harm because such information, once disclosed, loses its confidential

nature."); *Wilcox v. Bastiste*, No. 2:17-cv-122, 2017 WL 2525309, at *3 (E.D. Wash. 2017) ("In the age of the internet, when information is made public quickly and without borders, it is nearly impossible to contain an impermissible disclosure after the fact ...."). And the longer that the private information of Plaintiffs' members remains accessible to unauthorized third parties, the greater the irreparable injury is. After all, as long as the sensitive data of Plaintiffs' members remains accessible to Mr. Musk and other members of DOGE, the more opportunity there is for that data to be disclosed to still more unauthorized third parties, either accidentally or deliberately. *See* Decl. of Richard J. Fiesta ¶ 9 (expressing concern of risk to members of Alliance for Retired Americans of "increased risk of identity theft, fraudulent financial activities, further unconsented disclosures to additional third parties, and other misuse of their sensitive personal and financial data").

What is more, many of Plaintiffs' members who are presently experiencing progressively worsening injury to their privacy rights would not even be eligible for retrospective monetary damages if they were required to seek relief in that form. Under *FAA v. Cooper*, 566 U.S. 284 (2012), damages for a Privacy Act violation are available only to those individuals who can establish "proven pecuniary or economic harm," *id.* at 299, because Congress declined to waive sovereign immunity for claims of "nonpecuniary harm, even if such harm can be proved," *id.* at 301. For those individuals whose privacy rights have been—and continue to be—violated by Defendants but who have not experienced resultant economic losses, damages are not

17

even arguably a means of ameliorating the irreparable injuries that Defendants are presently inflicting.

Ultimately, absent a temporary restraining order from this Court, Plaintiffs will continue to experience invasions to their members' privacy that are incapable of being undone.

## III.    The balance of equities and the public interest support grant of a TRO.

As against the certain and irreparable injury that innumerable members of the public—including Plaintiffs' members—are presently experiencing as a result of Defendants' unlawful actions, Defendants would suffer no cognizable harm if enjoined from continuing to perpetrate those actions. After all, "[i]t is well established that the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quoting *Open Cmties. Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017)). Moreover, Defendants would suffer no injury from remaining bound by the same confidentiality restrictions that bound them as recently as last month, before DOGE came into existence—and certainly no reason why Defendants would suffer injury from being temporarily barred from granting DOGE access to confidential materials during the period in which this Court assesses whether such access is lawful. The balance of equities thus tips decisively in favor of granting temporary relief here.

Meanwhile, a temporary restraining order would serve the public interest. "There is generally no public interest in the perpetuation of an unlawful agency action." *Open Cmties. Alliance*, 286 F. Supp. 3d at 179 (citation omitted). "To the

18

contrary, there is a substantial public interest in having governmental agencies abide by the federal laws." *Id.* (citation omitted).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion and enter a temporary restraining order enjoining Defendants from disclosing information about individuals to individuals affiliated with DOGE, and enjoining Defendants to retrieve and safeguard any such information that has already been obtained by DOGE or individuals associated with it.

Dated: February 5, 2025

Respectfully submitted,

/s/ Nandan M. Joshi
Nandan M. Joshi (DC Bar No. 456750)
Nicolas Sansone (DC Bar No. 1686810)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

Norman L. Eisen (DC Bar No. 435051)
State Democracy Defenders Fund
600 Pennsylvania Avenue SE
#15180
Washington, DC 20003

19