```
1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2

3      * * * * * * * * * * * * * *    )
       ALLIANCE FOR RETIRED AMERICANS,  )    Civil Action
4      et al.,                        )    No. 25-00313
                                      )
5                      Plaintiffs,    )
                                      )
6        vs.                          )
                                      )
7      SCOTT BESSENT, et al.,         )    Washington, D.C.
                                      )    February 5, 2025
8                      Defendants.    )    3:13 p.m.
                                      )
9      * * * * * * * * * * * * * *    )

10

11              TRANSCRIPT OF SCHEDULING CONFERENCE
           BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
12              UNITED STATES SENIOR DISTRICT JUDGE

13

14     APPEARANCES:

15     FOR THE PLAINTIFFS:      NANDAN M. JOSHI, ESQ.
                                NICOLAS SANSONE, ESQ.
16                              PUBLIC CITIZEN LITIGATION GROUP
                                1600 20th Street, Northwest
17                              Washington, D.C. 20009

18     FOR THE DEFENDANTS:      BRADLEY P. HUMPHREYS, ESQ.
                                UNITED STATES DEPARTMENT OF
19                                JUSTICE
                                1100 L Street, Northwest
20                              Washington, D.C. 20005

21     REPORTED BY:            LISA EDWARDS, RDR, CRR
                               Official Court Reporter
22                             United States District Court for the
                                 District of Columbia
23                             333 Constitution Avenue, Northwest
                               Room 6706
24                             Washington, D.C. 20001
                               (202) 354-3269
25
```

```
1              THE COURT:  This is Judge Kollar-Kotelly.  Good

2     afternoon, everybody.

3              So this is --

4              MR. SANSONE:  Good afternoon, your Honor.

5              THE COURT:  -- 25-CV-313.  And the Plaintiffs are

6     the Alliance for Retired Americans, Plaintiff, American

7     Federation of Government Employees, and the Service

8     Employees International Union.

9              If you could identify yourself as counsel for the

10    Plaintiffs, indicating which organization you're associated

11    with.  These would be the speakers.

12             MR. JOSHI:  Yes.  Nandan Joshi, Public Citizen

13    Litigation Group, for Plaintiffs.

14             THE COURT:  Anybody else for the Plaintiffs that

15    would be speaking?

16             MR. SANSONE:  Nick Sansone for Plaintiffs.  I

17    won't be speaking.

18             THE COURT:  Okay.  I have three names.  I just

19    want to make sure I know which one -- who is actually

20    speaking.  Okay.

21             And then the Defendant is the --

22             MR. HUMPHREYS:  Good afternoon, your Honor.

23    Bradley Humphreys for Defendants.

24             THE COURT:  All right.  Which is the Department of

25    the Treasury and the Secretary of the Department of the
```

1  Treasury.

2  So let me just mention a couple of rules of the

3  road:  This is a scheduling conference; it's not a motions

4  hearing at this point.  So although I'm going to be asking

5  you some questions and getting some information, you'll

6  certainly have an opportunity when there is a motions

7  hearing to make your full arguments.  It's to gather

8  information from my perspective in order to be able to set a

9  schedule that will work for everybody.

10  I'd ask since we can't see you that you not

11  interrupt others or me.  I will call on you in terms of

12  allowing everybody to respond.  I would ask the attorneys to

13  mute their own phones so we don't wind up with somebody

14  calling at your end.

15  I'd also ask that when you speak, if you would

16  give your last name and make whatever comments you want.

17  That allows the court reporter to ascribe the comments to

18  the correct attorney.

19  So let me start with the background information.

20  The Plaintiffs, which I've already identified,

21  filed the complaint in this case on Monday, February 3rd,

22  seeking declaratory and injunctive relief against

23  Defendants, Treasury Secretary Scott Bessent -- hopefully

24  I'm pronouncing that name correctly -- the Department of the

25  Treasury and the Bureau of the Fiscal Service, or BFS.

1          In terms of the Defendants, I want to clarify for

2     the record -- and I will ask at the end whether this is

3     accurate in terms of figuring out all the entities.  So the

4     Bureau of Fiscal Service is an agency within the Department

5     of the Treasury.  And the Secretary of the Treasury was

6     sworn in on January 28th.

7          Now, prior to that time, President Trump issued an

8     executive order establishing and implementing the

9     president's Department of Government Efficiency.

10          The U.S. Digital Service had already existed and

11     was a component of the Executive Office of the President.

12          Another executive office publicly renamed the U.S.

13     Digital Service as the United States DOGE, D-O-G-E,

14     capitalized, Service, within USDS.

15          So the U.S. DOGE Service is a temporary

16     organization, and it is within the Executive Office of the

17     President.

18          Now, if I could ask Mr. Humphreys, am I accurate

19     about where everybody is in terms of within Treasury or

20     outside of Treasury?

21          MR. HUMPHREYS:  Yes.  I believe you have that all

22     right, your Honor.

23          THE COURT:  Okay.  Just to make sure.

24          All right.  This case was assigned to me

25     yesterday.  So the summary of the allegations -- and this is

1    in very summary form -- Plaintiffs allege that the

2    Defendants have implemented a system by which Elon Musk and

3    other individuals associated with the U.S. DOGE Service --

4    or I'm going to call it USDS in the future -- may access the

5    BFS records and obtain personal information about

6    individuals and taxpayers that's contained in those records.

7            A summary of the relief that was requested -- and

8    this is in the -- is they seek a declaration that the

9    Defendants acted unlawfully in implementing that system of

10    access to BFS records.  They also seek an injunction

11    preventing the Defendants from, quote, "continuing to

12    permit," unquote, individuals associated with USDS to have

13    access to BFS records or obtain personal information from

14    those records.

15            Finally, they seek an injunction to, quote,

16    "ensure that future disclosure of individual records will

17    occur only in accordance with the Privacy Act, the Internal

18    Revenue Code and the system of records notices applicable to

19    the system of records that are at issue."

20            Now, at approximately 8:30 this morning, the

21    Plaintiffs filed a motion for temporary restraining order.

22    So a summary of that relief is that -- to enjoin the

23    Defendants from disclosing information about individuals to

24    individuals or other individuals associated with USDS and

25    enjoining Defendants to retrieve and safeguard any such

1    information that has already been obtained by USDS or

2    individuals associated with it.

3          As far as the procedural posture, counsel for the

4    Defendants entered a notice of appearance after they

5    filed -- Plaintiffs filed this motion.

6          So I want to start with just a few questions.  I'm

7    going to start with the Defendants.  These are informational

8    questions which would make it a little easier to get a sense

9    of the context for some of this and some factual information

10   which may make a difference in terms of how lengthy and

11   complicated the briefing would be.

12         So if I could just ask Mr. Humphreys, which

13   individuals have been granted new access to BFS records or

14   the system of records after January 31st of 2025, the date

15   when at least Plaintiffs allege the Treasury Department gave

16   new access to representatives of USDS?

17         And I would just point out the complaint and

18   motion focused on two individuals, Elon Musk and Tom Krause,

19   K-R-A-U-S-E.  So one question would be whether those

20   individuals have been given access to the BFS records or

21   system of records.

22         So, Mr. Humphreys, if you could answer that

23   question, I'd appreciate it.

24         MR. HUMPHREYS:  Yes, your Honor.  And if you would

25   permit me, I do want to make a caveat at the beginning that

1    obviously we just got this TRO motion this morning and we've

2    been diligently trying to understand the facts.  But as best

3    as I understand them, that is incorrect.  There is one

4    person who has been given access to the systems, and that's

5    Mr. Elez, who is named in the complaint.

6            THE COURT:  Okay.

7            MR. HUMPHREYS:  He is actually a Treasury

8    employee -- excuse me -- in the motion.  Excuse me.  Yes.

9    He is a Treasury employee.

10            Also, he briefs and reports to Mr. Krause, who,

11   although he does not have direct access to the system, is

12   provided information from the system.  He is also a Treasury

13   employee.

14            THE COURT:  Okay.  Are there any others that have

15   been granted, well, what we'll call new access based on the

16   way the Plaintiffs have described it?  So those are the two

17   individuals that I take it would not in the past have had

18   access to this or any reason to have access to it, the two

19   individuals you identified?

20            MR. HUMPHREYS:  That's accurate, your Honor.  Not

21   until being brought on as special government employees at

22   Treasury.  That's correct.

23            THE COURT:  So the category is "special

24   employees."  Is that what you're saying?

25            MR. HUMPHREYS:  "Special government employees."

1    Yes.

2              THE COURT:  "Special government employees."

3              MR. HUMPHREYS:  Yes, your Honor.

4              THE COURT:  Besides those two individuals, my

5    understanding -- and this is obviously strictly from media,

6    so I'm not sure it's accurate -- but that there appear to be

7    other individuals associated with Mr. Musk that would have

8    access.  Is that correct or incorrect?

9              MR. HUMPHREYS:  Our understanding is that it's

10   incorrect, your Honor.  Only those two individuals have been

11   given access as far as we know.  And we are not aware of any

12   disclosures of the information that they have had access to

13   being made outside of Treasury.

14              I'd also note, your Honor, that as special

15   government employees, they are subject to ethics and

16   confidentiality requirements that would prevent the

17   disclosure of information outside of the Department.

18              THE COURT:  Okay.  So if I understand it

19   correctly, then, these two individuals are special

20   employees, and they're the only ones that -- so they

21   basically are government workers in their own way.  And

22   they --

23              MR. HUMPHREYS:  Yes, your Honor.

24              THE COURT:  -- they're the only ones who have had

25   access to the information that's at issue, the records that

1    are at issue.  Is that correct?

2              MR. HUMPHREYS:  Yes.  That's our understanding,

3    your Honor.

4              THE COURT:  Okay.  And have they disseminated any

5    of that information to anybody else that you know?

6              MR. HUMPHREYS:  As far as we're aware, no, they

7    have not, outside of the Treasury Department.

8              THE COURT:  So within Treasury, to other Treasury

9    employees that work there?  Or other special employees that

10   have been hired at the Treasury Department?

11             MR. HUMPHREYS:  I don't know specifically the

12   answer to that question.  We were focused on whether or not

13   there had been any disclosures outside of the Treasury

14   Department.  It strikes me as likely that they may have

15   discussed information they've seen with other Treasury

16   employees, but I'm not sure.

17             THE COURT:  What I was getting at is whether there

18   are new employees that -- special employees at Treasury that

19   are having access.  My understanding, which may or may not

20   be correct, was that Mr. Musk is considered a special

21   employee.  If that's not correct, let me know.

22             MR. HUMPHREYS:  That is correct, your Honor.  He

23   is a special government employee, but not of the Treasury

24   Department.

25             THE COURT:  Okay.  So he has nothing to do with

1    the records if he's not at Treasury?  Or he's not at the

2    Treasury.  But would he be then associated with the

3    Executive Office of the President?

4         MR. HUMPHREYS:  He is associated with the United

5    States DOGE Service and with the Executive Office of the

6    President as a special government employee.

7         However, our understanding is information derived

8    from the systems at issue in this case is not being

9    transmitted to him outside of the Treasury Department.  He

10   is not within the Treasury Department.

11        THE COURT:  So I guess the question is, does he

12   have access to it?  Can he go look at it?  Has he gone and

13   looked at it?

14        MR. HUMPHREYS:  No, your Honor.  To our -- as to

15   our knowledge, he does not.

16        THE COURT:  Okay.  At this point, there are two

17   special employees that are working at Treasury that now have

18   access to the information that we're talking about, these

19   records.  Is that accurate?

20        MR. HUMPHREYS:  That's correct, your Honor.

21        THE COURT:  Okay.  And is there a purpose for

22   these people to have been made special employees and having

23   access to it?  Is there some sort of plan for what they're

24   supposed to be doing with these records?

25        MR. HUMPHREYS:  Yes, your Honor.  Our

1    understanding is that the DOGE sets high-level priorities in

2    terms of preventing waste, fraud and abuse and protecting

3    taxpayer dollars.  But the special government employees are

4    working at Treasury with the high-level direction to prevent

5    significant payment fraud that had been previously

6    identified by the Government Accountability Office and

7    continue work that had actually begun in the prior

8    administration.

9            THE COURT:  So maybe you need to walk me through

10   this a little more.  I'm sorry to be dense about it at this

11   point.

12           But we have the -- in terms of the various

13   organizations, we've got the Bureau of Fiscal Services,

14   which is now the United States DOGE Service, the temporary

15   organization.

16           MR. HUMPHREYS:  No, your Honor.  The Bureau of

17   Fiscal Services is within the Department of Treasury.

18           THE COURT:  Right.  I understand that.  Correct.

19           MR. HUMPHREYS:  And the United States DOGE

20   Service --

21           THE COURT:  Is within the executive office.

22           MR. HUMPHREYS:  Right.

23           THE COURT:  Right.  Okay.

24           So we have two people that are within Treasury

25   that have access to this information.  And then we have

1    people that are in the executive office of the White House

2    who have access to this information.  Is that correct or

3    not?

4              MR. HUMPHREYS:  No, your Honor.  As far as we

5    know, the people sitting in the Executive Office of the

6    President do not have access to the information within the

7    Treasury Department systems.

8              THE COURT:  So the plan that you talked about of

9    fraud, waste, et cetera, et cetera, that's a plan going

10   forward and nothing has been done with the records relating

11   to that to date?

12             MR. HUMPHREYS:  I don't know that I can say that

13   nothing has been done, your Honor.  I guess my point is that

14   the allegations that the information contained within

15   payment systems in the Department of Treasury -- the

16   allegations that that information is being shared with third

17   parties outside of Treasury is incorrect as far as we know,

18   your Honor.

19             THE COURT:  But I think what they were thinking of

20   is the -- so the USDS, what role do they have if they're not

21   part of the Treasury Department?

22             MR. HUMPHREYS:  As I mentioned, your Honor, I

23   think setting sort of high-level priorities, say, you know,

24   you, the Treasury Department, identify fraud, waste and

25   abuse and ensure the integrity of payment systems.  And then

1    special government employees within the Treasury Department

2    carry out those goals, but without sharing the information

3    that they see in the payment systems with third parties,

4    without sharing them outside of Treasury.

5              THE COURT:  So Treasury has BFS and Mr. Krause and

6    Mr. Elez, and they hold the records.  Right?  And then we

7    have DOGE in the Executive Office of the President that sets

8    the policy.  Is that it?  One group has the records; the

9    other group sets the policy.  Is that a good way to describe

10   the distinction?

11             MR. HUMPHREYS:  I think that's accurate, your

12   Honor.  The group outside of Treasury, the United States

13   DOGE Service, sets the high-level policy.

14             THE COURT:  So that's the policy group.  And at

15   this point, they're working on a plan to set it out, but

16   that has not been implemented.  Is that accurate?

17             (No audible response.)

18             THE COURT:  Hello?  Did you fall off?

19             MR. HUMPHREYS:  Can you hear me, your Honor?

20             THE COURT:  Yes.  That's better.  If you need to

21   consult with anybody, I don't have a problem with that.  I

22   want accurate information.  So just tell me you need a

23   pause, and that's not a problem.  I know you have other

24   people there.  I'm asking factual questions in some sense.

25   So that's not a problem for me.

1          MR. HUMPHREYS:  Well, we hope it will -- we hope

2     we'll get an opportunity to oppose in writing Plaintiffs'

3     motion and set things out more clearly there.

4          THE COURT:  We will definitely be able to do that.

5     I'm trying to get a sense of what is involved because we

6     don't have many facts in terms of -- other than what's out

7     in the media, which obviously is not necessarily accurate.

8     So I just wanted to get a sense of how complicated this was

9     in making a decision about how quickly you need to brief

10    this.

11         So --

12         MR. HUMPHREYS:  I mean, I think -- if I may, your

13    Honor, I mean, the crux of Plaintiffs' complaint, I believe,

14    is that this information in Treasury payment systems is

15    being improperly disclosed to third parties.

16         THE COURT:  Right.

17         MR. HUMPHREYS:  And again, my understanding is

18    that that is not accurate.  And so, you know, beyond that,

19    I'm not sure that other DOGE activities are necessarily

20    relevant to Plaintiffs' claims.

21         THE COURT:  Well, as I said, I need to get a sense

22    of what is related to the records.

23         So Mr. Elez, in what form has he had the

24    disclosure of the records made to him?  Does he have access

25    to them?  He's gotten copies of them?  What?

1          MR. HUMPHREYS:  I believe that he has read-only

2     access to the system, your Honor.

3          THE COURT:  Okay.  And has anybody received any

4     copies of the records?

5          MR. HUMPHREYS:  Not that I'm aware of, or at least

6     not that I'm aware of outside of the Treasury Department,

7     your Honor.

8          THE COURT:  Let me ask one other question for a

9     second.  What's the focus of any opposition on your part?

10    In other words, whatever you're going to be briefing, is

11    there a particular focus that -- obviously, you're going to

12    be responding to what they have put in their motion relating

13    to a TRO.  But is there a particular focus that you have in

14    the briefing?

15         MR. HUMPHREYS:  Well, certainly, your Honor.  I

16    think there's very serious jurisdictional questions here as

17    to whether Plaintiffs can establish standing as an

18    organization or associational standing.  You know, we think

19    on the merits -- we think fatally on all counts, your Honor.

20    We don't think they can establish irreparable injury that

21    would be required to entitle them to a TRO or that they're

22    likely to succeed on the merits.

23         THE COURT:  What I was trying to get at is

24    sometimes there's a particular focus.  Obviously, you're

25    going to go through the four elements that are required,

1    although two merge.  But I just was wondering whether there

2    was anything specific that you wanted to set out.

3              I guess the other question is --

4              MR. HUMPHREYS:  I guess --

5              THE COURT:  Go ahead, sir.

6              MR. HUMPHREYS:  I would point out, your Honor, we

7    don't think that the APA is an appropriate vehicle to bring

8    these claims.  I mean, these are -- they're Privacy Act and

9    Internal Revenue Code 6103 claims.  And those statutes set

10   out comprehensive schemes to bring claims such as these, you

11   know, for injunctive relief.  And therefore, some broad

12   injunctive relief under the APA we think would be

13   unavailable.  So that would be in addition to the other

14   arguments that I've put forth.

15             THE COURT:  And you would do it in the context of

16   an opposition, then --

17             (Interference on telephone line.)

18             THE COURT:  There's an echo which makes me think

19   that at some point obviously it's not being put on mute or

20   something for it to happen.  As I said, if you need to stop

21   for a moment, I don't have a problem.

22             MR. HUMPHREYS:  I don't believe that's on my end,

23   your Honor.  I've not been muted.

24             THE COURT:  Are you going to be raising these

25   jurisdictional issues in the context of the TRO or in some

```
1     other context?
2               MR. HUMPHREYS:  I think we would want to put all
3     of our arguments forward, your Honor, to try to, you know,
4     convince you that Plaintiffs are not entitled to preliminary
5     injunctive relief or a TRO.  So we would make those standing
6     arguments and also on the merits.
7               THE COURT:  So you're going to do it as an
8     opposition to the TRO?  You're not planning a motion to
9     dismiss or anything in addition?
10              MR. HUMPHREYS:  As you prefer, your Honor.
11    We could --
12              THE COURT:  No.  No, I don't.  But I'm just trying
13    to find out.  This is all -- somebody has not muted at the
14    other end.  There's a lot of noise.  So you need to mute,
15    whoever, double-check it, because that's why we're getting
16    the reverberation.
17              I'm just trying to find out whether I'm getting
18    two documents or one.  So if you're not filing one, that's
19    fine.  You can certainly make those arguments within the
20    elements of a TRO.
21              Okay.  Let me --
22              MR. HUMPHREYS:  Yes.  We --
23              THE COURT:  Go ahead, sir.
24              MR. HUMPHREYS:  I would make the argument in the
25    context of a TRO and then also, you know, when the time for
```

1    our response to the complaint is due, if the Court hasn't

2    already ruled on those issues, then file a separate motion.

3              THE COURT:  That's fine.  That answers my

4    question.

5              So for the Plaintiffs, if I could just ask in a

6    nutshell, this is not a motions argument.  So what's your

7    theory of Article III injury in fact in this case?

8              MR. JOSHI:  Our theory -- our Plaintiffs are

9    associations with -- collectively known to members.  They

10   regularly depend on payments to and from the Treasury

11   Department.  They get their salaries, their Social Security

12   checks, their pensions and benefits from the government.

13   And so their information is compromised by the failure to

14   maintain the security of the Bureau's payment systems for

15   purposes of -- for use in transfers of funds.  I think

16   there's still some lack of clarity about whether these two

17   individuals who were [indiscernible] --

18             THE COURT:  If I could ask you to repeat that, the

19   last part.

20             MR. JOSHI:  Of course, your Honor.  Is this

21   better?

22             THE COURT:  Yes.

23             MR. JOSHI:  Okay.  Great.

24             Yes.  So, you know, the statutes we rely on, they

25   don't let even any government employee to access personal

1    data that is entrusted in the government's files to anybody.

2    There are very limited exceptions that allow access.

3           And, you know, I will point out that the Treasury

4    does not -- only last night responded to the allegations

5    about, you know, allowing -- opening up the Bureau's systems

6    for DOGE purposes.  And they mentioned in their response,

7    which we cite on Page 11 of our TRO memo -- they mentioned

8    Mr. Krause.  They do not mention Mr. Elez at all.  And they

9    do not -- I think this is the first confirmation today that

10   they in fact do have access, or at least Mr. Elez, to

11   personal information.

12          So I think it's -- they don't -- so anyway, we are

13   very concerned that the records -- the personal information

14   of our associations' members are still compromised.

15          And the problem is with this system, which is a

16   complex computer system database, once -- if there's a

17   compromise, it's impossible to unbreak the egg.  And that's

18   why we're here seeking a TRO, to sort of maintain the status

19   quo that existed before the current DOGE operations started

20   up in Treasury until the lawfulness of the Treasury's

21   actions can be determined by this Court.

22          THE COURT:  Do you envision presenting any

23   evidence in support of your motion apart from the

24   declarations you've already provided?

25          MR. JOSHI:  Treasury has not been very forthcoming

1    as to what's going on.  We would appreciate the opportunity

2    to engage in some discovery if there are factual disputes

3    about what the role of these two individuals are at Treasury

4    and how they relate to the DOGE.

5          We don't take it as a given that they will -- the

6    two individuals by themselves without outside assistance

7    will manage the supposed task of rooting out fraud, waste

8    and abuse, as counsel mentioned, in a system that handles

9    over a billion payments a year and over a trillion dollars

10   of payments.

11         And so we'd love the opportunity.  But at this

12   point, what we have is based on media reporting and then the

13   letter that Treasury issued late last night, which provides

14   slightly more detail.

15         THE COURT:  So I think the letter as I understand

16   it -- this is back to Mr. Humphreys -- that the secretary in

17   a letter to Congress said that Mr. Krause, and not Mr. Elez,

18   has access.  And today you said that Mr. Elez, not Krause,

19   had access.

20         So is this evolving or which -- are they both

21   doing it at this point or what?  Mr. Humphreys?

22         MR. HUMPHREYS:  I imagine both, your Honor.  I

23   mean, as the letter says to Congress, it says:  Treasury

24   staff members are working with Mr. Krause, a Treasury

25   employee.  And Mr. Krause is overseeing Mr. Elez, from what

1       I understand.

2                   THE COURT:  Okay.

3                   MR. HUMPHREYS:  I don't think there's anything --

4                   THE COURT:  I'm going to leave the discovery

5       issue.  It's a TRO at this point.  We're not doing

6       discovery.  You can have whatever the record is.  I'm just

7       trying to figure out whether there would be any additional

8       evidentiary issues either with declarations or some sort of

9       evidence or something, just to figure out when we have the

10      hearing what would be involved.

11                  All right.  In terms of facts -- although I need

12      to think through how this is all going to work, because it's

13      not exactly as I had understood the relationships between, I

14      guess, the special employees and the regular Treasury

15      people.

16                  What I'd like to do is I want to take a quick

17      pause and get out the calendar.  I may make some shifts in

18      terms of what I was planning on setting out as a briefing

19      schedule.  So hang on for a second.  I'll be right back.

20                  (Brief pause in the proceedings.)

21                  THE COURT:  I'm back.  Is everybody on still?

22      Hello?

23                  MR. HUMPHREYS:  Yes, your Honor.

24                  MR. JOSHI:  Yes, your Honor.

25                  THE COURT:  So in terms of -- from the Defendants,

1    have you already started briefing this?  I mean, obviously

2    you've had some notice of it.  Have you started to put

3    something together or not?

4         MR. HUMPHREYS:  No, your Honor.  It came in this

5    morning.  We've been gathering facts today in preparation

6    for the hearing.

7         THE COURT:  Well, I have a suggestion.  And we'll

8    see whether we can get -- as I understand it, we have

9    Mr. Krause and Elez as special employees at Treasury who

10   would have access to the records at issue as well as present

11   employees of Treasury that are there, that have been not

12   special employees, but the regular employees.

13        And then we have over in the Executive Office of

14   the President DOGE and the individuals associated with that.

15        So at this point, one is -- the one in the

16   Executive Office is developing whatever strategies they have

17   about policy or checking or fraud or waste or whatever they

18   want in that.  Once that's done, then it would be presumably

19   implemented by Krause, Elez and other people in Treasury.

20   Am I accurate so far?

21        MR. HUMPHREYS:  I'm not sure that is accurate.

22        THE COURT:  Okay.

23        MR. HUMPHREYS:  I just don't have -- I'm not -- I

24   just don't have the information.

25        THE COURT:  What part is potentially not accurate?

```
1    I'm not trying to pin you to the wall; I'm just trying to
2    figure this out.  There may be a way of doing this in terms
3    of if we can come to an agreement about one thing, then
4    maybe we could have a longer period for you to file your
5    briefing.  If not, then it'll be a shorter period.
6              MR. HUMPHREYS:  Sure.  May I have a moment to
7    confer with my colleagues, your Honor?
8              THE COURT:  Sure.
9              MR. HUMPHREYS:  Thank you.
10             (Pause in the proceedings.)
11             MR. HUMPHREYS:  Your Honor, again, this is Bradley
12   Humphreys.  Thank you for the time.
13             THE COURT:  No problem.
14             (Interference on telephone line.)
15             THE COURT:  Somebody doesn't have it muted.
16             Mr. Humphreys, go ahead.
17             No.  Somebody still isn't muted.
18             Mr. Humphreys?  No?
19             MR. JOSHI:  Hello.  This is Nandan Joshi.  I lost
20   you for approximately 30 seconds.
21             MR. HUMPHREYS:  This is Brad Humphreys again.  I'm
22   not getting feedback now.  I was hearing my own voice.  I'll
23   continue.
24             I mean, I think the allegations in the complaint
25   are about whether or not information is being improperly
```

1    disclosed under the Privacy Act and Section 6103.  And, you

2    know, sort of our factual confirmation so far this morning

3    has been, you know, to try to assure ourselves and the Court

4    that information is not being illegally disclosed to our

5    knowledge.

6           In terms of the structure and planning, you know,

7    at a higher level between U.S. DOGE Service and Treasury, I

8    just can't speak to that, your Honor.  And I guess what we

9    would suggest is an opportunity just to respond to the

10   allegations that -- you know, as Plaintiffs have presented

11   them in their motion.

12          THE COURT:  Well, part of it is there is very

13   little information.  And you have to -- I have to say that

14   the arrangement of the different entities is not easily

15   discerned, which is why I've been asking the question.  It

16   does make a difference in terms of -- and the paucity of

17   information, frankly, in the public sector makes it more

18   difficult to figure this out, which is why I've been asking

19   the question.

20          And I'm asking it at the moment, not what's going

21   to happen in the future.  So at the moment, my understanding

22   was that there were -- in Treasury, you have Mr. Elez and

23   Mr. Krause in BFS and they have access to the material.

24          And then you have the Executive Office of the

25   President and you have USDS or DOGE there with Mr. Musk and

1    others that he has presumably hired.  They're doing policy.

2    And the Treasury individuals, including the special

3    employees, are the ones that hold the records.

4         And as I understand it, at present, the records

5    have not been disclosed to USDS.  So am I accurate about

6    that, at least?

7         MR. HUMPHREYS:  Yes, your Honor, so far -- that's

8    correct to our understanding.

9         THE COURT:  And then so what is a little iffier

10   from your perspective is how this is going to work in the

11   future as to once DOGE comes up with whatever plans they

12   have -- and I'll leave it as "plans" -- whether they then

13   would have access to the records at Treasury.  Would that be

14   accurate?

15        MR. HUMPHREYS:  Well, I'm not aware, your Honor,

16   of any plan in which the employees who are located in the

17   Treasury Department, Mr. Krause and Mr. Elez, you know,

18   would share those with the Executive Office of the President

19   of the United States DOGE Service.  My understanding is that

20   they are the ones who will be reviewing the records and that

21   they will not leave the Treasury Department.

22        THE COURT:  So let me ask it this way.  Let me ask

23   the Plaintiffs whether this -- so let's suppose we had sort

24   of an agreement between the parties to grant the motion in

25   part as follows:  The Defendants would be enjoined from

1    giving new access to BFS systems to anyone apart from

2    Mr. Krause, Mr. Elez or any other current Treasury employee.

3    It would put it in a pause, so to speak.  And we would

4    obviously go forward with the briefing.  But a little bit

5    more time could be provided to the parties to be able to do

6    it and nothing new would happen.

7         So it wouldn't stop Mr. Krause and Mr. Elez in

8    Treasury from looking at the records as special employees,

9    but they would not be sharing it.  So I don't know whether

10   the Plaintiff would agree, or the Defendant.  But let me

11   start with the Plaintiffs.  That's for a short period to get

12   it briefed.

13        MR. JOSHI:  Sure.  This is Nandan Joshi for the

14   Plaintiffs.

15        Your Honor, when we filed the complaint, we did

16   not have the assertion that Mr. Krause and Mr. Elez were

17   employees.  That was only revealed definitively in the last

18   24 hours, Mr. Krause last night when Treasury issued its

19   letter and then just on this call with respect to Mr. Elez.

20        So part of our claim was that they might have been

21   outsiders who were obtaining this information.  We do not

22   know when they were actually designated special government

23   employees either.

24        But given the representation that they are

25   currently governmental employees, we would for purposes of a

1    TRO be okay with a pause that -- a clear firewall between

2    them and any outsiders to prevent any spillage or

3    compromising of personal data.

4         THE COURT:  Which is what I am suggesting, which

5    is the current position.  So all we're doing is preserving a

6    status quo, which would give defense -- the Defendants and

7    ultimately the Plaintiffs who are responding a little bit

8    more time to develop and figure out some more factual

9    information as well as frankly to respond to a number of

10   issues that obviously are raised in the TRO.

11        So I'm not suggesting we wouldn't go forward with

12   the full-blown TRO.  But it would give us a period in here

13   for you all to get an opportunity to spend a little more

14   time on the briefing.  Otherwise, you're going to get a very

15   short timeframe.

16        So Mr. Humphreys, where are you?

17        So basically, it would be -- there would be no new

18   access to BFS or any  other -- the BFS systems apart from

19   whoever is a current Treasury employee and Mr. Krause and

20   Mr. Elez.

21        Now, the DOGE group could do whatever they want,

22   all their planning or whatever else.  It doesn't prevent

23   them from doing anything other than not getting the records

24   or having access to them.  We'd have to write this up.  But

25   that's what I would propose.

```
 1              And then I would have you give me a schedule that

 2     is a little more -- that probably would give you more time

 3     to get something developed if you have not obviously already

 4     started.

 5              I can tell you at this point, without this, you're

 6     going to be doing it tonight and tomorrow; and the hearing

 7     will be tomorrow afternoon.  So my suggestion is all you're

 8     doing is keeping it in a status quo position to give

 9     everybody a little bit more time.  It ultimately gives me

10     more time, too.  But frankly, I want better -- I want the

11     best of the pleadings that you can give me in making this

12     decision.

13              So, Mr. Humphreys, do you need to talk to

14     somebody?

15              MR. HUMPHREYS:  Well, I think, your Honor, I'm not

16     authorized at the moment to agree to anything.  I think for

17     the reasons you've stated, it's worth discussing with my

18     client.  I think if it's amenable to the Court and the

19     Plaintiffs, perhaps Plaintiffs and Defendants could confer

20     and submit a notice at some point tomorrow.  It sounds like

21     Plaintiffs have learned some new information, too, since

22     filing their motion this morning.

23              THE COURT:  How about if we set it up that you'd

24     let us know by 6:00, which I might actually either do it --

25     it would be best to do it by consent, or I could do
```

 1    something short to allow you a longer period of time to do

 2    the briefing.  Otherwise, as I said, it's going to be a very

 3    short turnaround in terms of doing it because there would be

 4    no -- at this point, if they don't have access, there's

 5    nothing to say they won't in the future unless something --

 6    assuming Plaintiffs can sustain the TRO, you would want to

 7    preserve it for a longer period of time in terms of its

 8    present posture as opposed to having it move forward and

 9    potentially the records.  Because what you've represented,

10    Mr. Humphreys, doesn't preclude in the future the DOGE

11    people or others to be able to get access to it.

12            So why don't you hold on for a second.  Let me

13    look at something in terms of how I want to word something

14    in terms of proposing something.  So just hang on while I

15    write something up.

16            (Brief pause in the proceedings.)

17            THE COURT:  So how about this proposal:  I'll

18    write something up that indicates what this temporary

19    injunction is, which is basically to just keep the status

20    quo for a short period of time.  So in other words, nothing

21    new would be happening.  You don't go back to anything.  You

22    basically keep the present posture of where everybody is in

23    terms of the records and everything else.

24            I would send it to you and would do it

25    immediately.  And by 6:00, you'll let us know as parties

1    whether you agree or not.

2           If you agree, my suggestion would be instead of

3    the briefing being around a TRO that we actually do a

4    preliminary injunction.  It makes no sense to do two sets of

5    pleadings.  I don't know what I would -- whether I would

6    agree with the TRO or not.  But the question is, we could

7    move to having it briefed fully.  You'd have additional time

8    to make sure you knew factually everything you needed to

9    know, develop your arguments and be able to file something.

10   And we could set up a PI with the idea that I would also

11   rule quickly on it.

12          So that's an option in terms of -- for you to

13   consider.

14          Go ahead if you have any questions.  Mr. Humphreys

15   or Mr. Joshi?  Hello?

16          MR. JOSHI:  Yes.  Hello?  Your Honor, this is

17   Nandan Joshi.

18          We're amenable -- we're certainly willing to look

19   at what you propose to protect the status quo while this

20   case is briefed.  I think the 6:00 deadline is -- would work

21   well.  We understand -- as we understand it, these two

22   employees are in the systems, in the system right now.  So

23   we, I think, would be cautious about any --

24          THE COURT:  It's not anybody else.  But it leaves

25   them doing whatever it is that they're doing now.  So it

1    doesn't -- you know, they're special employees at Treasury,

2    so they would remain there.  And there would be -- as I

3    said, the access to the BFS systems would be Mr. Krause and

4    Mr. Elez and any other current Treasury employee that's

5    actually there.  So they would have the access.

6            Then what I would do is have you propose a

7    schedule for a preliminary injunction and not go the TRO

8    route, but basically -- which focuses more on the merits,

9    frankly, in terms of the briefing.  We can still do the TRO,

10   but I think it makes more sense, frankly, to move to a

11   preliminary injunction.

12           Mr. Humphreys, do you understand what I'm

13   proposing or do you have any questions?

14           MR. HUMPHREYS:  Yes.  I understand, your Honor.

15   And we are happy to take that back and we'll --

16           THE COURT:  So as I said, we would send you

17   something in writing so you have something to show.  And I

18   would -- if you do agree to it -- you can propose the

19   schedule you want for the preliminary injunction.  Our local

20   rules do have limits on timing here in terms of when you

21   have to -- when the Court has to rule, when the briefing has

22   to be done and the ruling.  So it's still a fast turnaround,

23   but it's not as fast a turnaround as it is with the TRO.

24           So are you familiar, Mr. Humphreys, with the

25   timing of our local rule or not?

1        MR. HUMPHREYS:  Yes, your Honor, I am.

2        THE COURT:  Mr. Joshi, are you?

3        MR. JOSHI:  I'm familiar.  Yes, your Honor.

4        THE COURT:  So we'll send that off.  What I would

5   ask is that we'll convene again.  I think talking, not

6   getting something in writing, is better.  We'll have another

7   conference call shortly after 6:00.  And we'll see.  If you

8   agree, then it'll be quick, other than actually setting out

9   the schedule.  It'll be a quick call.  We're either setting

10  a new schedule and I'm putting together something or we're

11  doing the TRO one.  So I'm not -- I don't have any other

12  questions or anything else.  It's really, truly going to be

13  scheduling.  So it should take five, ten minutes at the

14  most.  Okay?

15        Any other questions, Mr. Humphreys?  Anything from

16  you?

17        MR. HUMPHREYS:  Yes, your Honor.  Will you be

18  sending this proposal just by email?  Should we look for it

19  on the docket?

20        THE COURT:  We'll do it by email so it's a more

21  informal thing.  Eventually, if it's agreed to, obviously,

22  it'll be on the docket.  But email is faster than trying to

23  docket this thing.

24        Mr. Joshi, do you have anything else you want to

25  ask?  If not, I'll move to writing.

```
 1              MR. JOSHI:  No, your Honor.

 2              THE COURT:  Thank you.  I'll wait to hear back.

 3      Hopefully this proposal would be what you'd want to do.  I

 4      think it's a good way.  Everybody takes a pause here and you

 5      get the briefing and the preliminary injunction.  So you get

 6      it fully briefed on the merits, because that's going to be

 7      the principal focus for the PI.

 8              All right?  Everybody take care, and I'll talk to

 9      you later.  Bye.

10              MR. JOSHI:  Thank you, your Honor.

11              MR. HUMPHREYS:  Thank you, your Honor.

12              (Thereupon a recess was taken, after which the

13      following proceedings were had:)

14              THE COURT:  Good afternoon, or I guess good

15      evening.

16              Who do we have on the phone?  Can you identify

17      yourself as Plaintiffs' counsel?  Hello?

18              MR. JOSHI:  Plaintiffs' counsel, Nandan Joshi, is

19      here.

20              THE COURT:  And for defense counsel?

21              MR. HUMPHREYS:  Brad Humphreys is here, your

22      Honor.  Thank you.

23              THE COURT:  So we received a Plaintiffs' version,

24      a defense version.  Have you had an opportunity to look at

25      each other's versions?
```

 1              MR. JOSHI:  Plaintiffs' counsel here.  Yes.  I

 2     just -- I received it a few moments ago.

 3              THE COURT:  Do you need some time to take a look

 4     at it?

 5              How about you, Mr. Humphreys?  Have you had a

 6     chance to look at Plaintiffs'?

 7              MR. HUMPHREYS:  We have maybe 15 minutes ago, your

 8     Honor.  I mean, there hasn't been any time to confer with

 9     Defendants about the proposed --

10              THE COURT:  My suggestion is that -- it looks like

11     just a couple of things that you might focus on.

12              Whether you use the language "enjoined," I don't

13     have a problem if you don't want to use specifically that

14     language.  The rest of it makes the same point without

15     having to have -- since I'm not issuing a TRO as such.  So I

16     don't have any problem with that.

17              The other issue seems to be whether Mr. Krause is

18     included or not, which would seem to have something to do

19     with whether he has access or not, which I thought was

20     somewhat disputed as to whether he has any access to it or

21     what his role was.  So I'll leave that there.

22              And Marko Elez, it talks about read-only, not

23     copying, downloading, et cetera, which I thought as a

24     practical matter it was read-only.  But anyway, I'll leave

25     it to you to figure that out.

1          And then the next bullet down, so the third one

2    down, is about any person who is an employee other than

3    special government employees of the Department of Justice,

4    blah, blah, blah.  So that's the other additional aspect of

5    it at least in terms of looking at things.

6          So do you have enough time to -- we can take some

7    time here to have you look and see if you can work something

8    out.  It looks like you're willing to at least go with the

9    concept of doing the PI and sort of putting it in a pause

10   status quo thing.  If I gave you a little bit of time this

11   evening, not a lot, but a little, do you think you can work

12   it out?  Is it worth it?

13         MR. JOSHI:  Your Honor, this is Plaintiffs'

14   counsel, Nandan Joshi.

15         I did -- when you went through the list of

16   Plaintiffs' edits, I just wanted to flag we did also request

17   that "new access" be just changed to "access."  And we

18   provided a reason for that.

19         THE COURT:  Yes.  You have captured what I was

20   getting at, frankly.  The "new" isn't necessary.

21         MR. JOSHI:  Okay.

22         THE COURT:  That's why I left it out.

23         MR. JOSHI:  And our intent, as I think we -- as

24   was discussed at the earlier hearing, is to preserve the

25   status quo as much as possible.  It was our understanding

 1    that it was represented that Krause did not have access.

 2    And perhaps I misunderstood that.  So that was the

 3    genesis -- I mean, that was the basis for that comment.

 4         If he does currently have access to the records,

 5    then we would be comfortable with the same conditions on him

 6    as on Elez.

 7         THE COURT:  Perfect.

 8         MR. JOSHI:  So I think as I see it, the main point

 9    of dispute -- and perhaps -- at least from our end -- is how

10    to deal with employees that -- how to lock that in place,

11    given that there are already two individuals that we know of

12    that were special government employees.  We don't know if

13    that's the universe of people who have been on-boarded from

14    DOGE or from -- for purposes other than sort of routine

15    hiring at Treasury.  And so we wanted to preserve the status

16    quo on the employees that have access at least during the

17    short period while we brief the preliminary injunction

18    motion.

19         So that's -- I think that's our main ones, both

20    with the third and fourth bullet points.

21         The exception to the Privacy Act would also --

22    that was added in there by Defendants -- would also allow

23    any new employee to come in and get access to the

24    information.  So it wouldn't [indiscernible] -- I'm getting

25    an echo here.

1          THE COURT REPORTER:  Sir, would you repeat your

2     last sentence, please?

3          THE COURT:  There's a problem with the -- again,

4     somebody must not be muted, because there's an echo.

5          We're back.  We still have somewhat of an echo.

6          Mr. Humphreys, where are you on this?  Is it worth

7     talking?  I think the idea was not to add any new people to

8     the new special government employees that would be carrying

9     out this mission, to not add to it, but to leave it with the

10    present whoever is there working at Treasury, which at this

11    point is the two special people and then the usual people

12    that Treasury has.

13         And so I think whatever language you want, the

14    idea was not to have some additional special employees added

15    where we wouldn't know whether they have access or what

16    their role would be in conjunction with the DOGE group.

17         So, Mr. Humphreys, where are you?  But we need --

18    somebody's muted.  You need to mute back there.  We can't

19    hear you clearly.

20         MR. HUMPHREYS:  I have been on mute.  I just

21    unmuted to respond, your Honor.

22         THE COURT:  Okay.  Terrific.

23         MR. HUMPHREYS:  So, you know, there are layers of

24    review here that we just have not had time to go through

25    this evening.  In theory, I think it's worth it to continue

1    to try to work this out if we can.

2            I do want to note as to the third bullet how we

3    eliminated in our proposed draft the time restraints.  And

4    currently, it is very important because, you know, these are

5    huge systems and there could be, you know, contractors or

6    whatever who need access in order to fix potential problems

7    that come up.  Or the systems, payment systems, are also

8    used by other components, other agencies.  And they may need

9    to swap out people.  So the Defendants need some

10   flexibility, given the practical nature of the --

11           THE COURT:  I think the focus is more on special

12   employees.  Contractors, for that kind of work, that's the

13   ordinary work that's not something that appears to be what

14   the Plaintiffs are concerned about.  But obviously, you need

15   to work out the wording.  It doesn't sound like there's a

16   problem with the concept.

17           MR. HUMPHREYS:  Your Honor, as to Mr. Krause, just

18   to respond to that:  He does not -- my understanding is he

19   does not have, like -- he does not actually work in the

20   system.  But information is provided to him through

21   Mr. Elez.  So I think to avoid ambiguity or, you know, to

22   avoid potentially running afoul of your order, we would want

23   to include him there.

24           I mean, I guess, just to cut to the chase, your

25   Honor, we think it is worth it to continue to do that.  If

1      we need some more time, I'd propose allowing the parties to

2      continue to discuss and maybe get back by noon tomorrow.

3              THE COURT:  The problem is whatever schedule we

4      set in terms of, you know, doing it.  It sounds like you're

5      close enough.  I would try and resolve it this evening one

6      way or the other.  Either we do a PI or we set a very quick

7      schedule.  I mean, Thursday, Friday and then you've got the

8      weekend in terms of getting briefing and the Court making a

9      ruling on the TRO.  So that's what I was trying to get this

10     done this evening.

11             It sounds like you've got -- unless you have to go

12     back and check with people, with somebody, it sounds like

13     you're very close.  The wording is slightly different, but

14     the concepts don't seem to be at odds with each other.

15             How is Plaintiffs' counsel on this issue?

16             MR. JOSHI:  I think you're right, your Honor, in

17     terms of what we'd like to get done.

18             I think the complexity of the system that they

19     were talking about, Mr. Humphreys was talking about, is part

20     of our concern.  I mean, once there's a spillage or damage,

21     it's going to be hard to claw that back.  And that's why we

22     wanted to try to preserve the status quo as quickly as

23     possible.

24             I can -- I'm happy to continue to work with

25     counsel on wording.  But it sounds -- I'm not -- we do want

1    either a TRO -- the TRO process to move forward as quickly

2    as possible.  What we don't want -- I guess we don't want a

3    long delay, including going to tomorrow and trying to

4    negotiate something that might not come to fruition.  So

5    that would be our concern if we're just pushing things back.

6          THE COURT:  So one question would be, it sounds

7    like -- is it Bullet 2 that has the language that you have

8    some issues with?  I mean Krause, it sounds like we would

9    put him in, because whatever he's doing now, it would allow

10   him to continue doing it.

11         What you want to do is to make sure that

12   additional work doesn't get done that's not covered here,

13   which was the intention of it, is to try and sort of freeze

14   it in terms of what's going on now.

15         I'm not sure -- unless, Mr. Humphreys, you feel

16   that that's not what you want to do, because I'm assuming

17   the schedule you're going to come up with isn't going to be

18   pushing this out months or something.  It's just that it'll

19   be a longer schedule.  And the more important thing is the

20   preliminary injunction really focuses on the legal issues so

21   that there's more of a focus and there's more time to

22   develop that area.

23         But I --

24         MR. HUMPHREYS:  I mean -- go ahead.

25         THE COURT:  No.  Go ahead.  I mean, the other way

```
1    we can do this is to set the two schedules and you agree, in
2    which case you produce the stuff at the preliminary
3    schedule, which I'll set out; or you don't agree this
4    evening, and therefore you're left having to file on the
5    schedule I set for a TRO.  I mean, that's one way of doing
6    it.
7              So you decide whether you can reach an agreement.
8    I'll set out the schedule, and you either fit into one or
9    you fit into the other schedule.
10             MR. HUMPHREYS:  Your Honor, this is Mr. Humphreys.
11             I just don't have my client in the room with me.
12   I need to run this all by them, and it's very hard to do
13   this sort of on the phone and not being able to have
14   sufficient time to run Plaintiffs' proposed edits by them.
15   So we're absolutely going to keep engaging.  I just would
16   need some more time.
17             THE COURT:  Give me a few minutes for my next
18   proposal.  Hang on.
19             MR. HUMPHREYS:  Your Honor, [indiscernible] --
20             (Telephone call drops.)
21             THE COURT:  We got disconnected.  So let me -- are
22   you all back on?  Are you on, Mr. Humphreys?
23             MR. HUMPHREYS:  Yes.
24             THE COURT:  Give me a few minutes to do the
25   schedule and I'll get back to you.  So hang on.
```

```
 1              (Brief pause in the proceedings.)
 2              THE COURT:  All right.  Somebody still has
 3      their -- either you're speaking through some other
 4      microphone or there's something that's giving the backlash,
 5      which makes it very hard to get a record.
 6              In terms of -- how we would do this, the two of
 7      you can decide when is sort of a drop-dead time that you
 8      either agree to the language that we've been discussing or
 9      not.
10              If we're going forward with the TRO, the
11      Government would file by noon tomorrow, a reply by 4:00, and
12      Friday a hearing at 2:30.  We should make it 3:30.  I'm
13      sorry.  I have something else on.
14              You didn't give me a schedule for the PI.  So do
15      you have a schedule for it?  Which would mean that the
16      Plaintiff would want to supplement, because they'll want to
17      make some additional -- whatever additional arguments.  So
18      we have Plaintiff, Defendant and Plaintiff again.  So have
19      you discussed any schedule?  You'll either do the TRO
20      schedule I put out or you do the PI.  Anything from the PI?
21      Did you have any discussions about that?
22              MR. JOSHI:  This is Nandan Joshi.
23              We have not had a discussion about the PI
24      schedule.  We have reached an agreement tonight.  We would
25      like an order tonight at least to prevent anything from
```

1    happening before your Honor can rule on something more

2    permanent.

3                THE COURT:  Well, I can leave it to the two of

4    you.  You don't need me.  My point is, you don't need me if

5    you can reach an agreement.  You can file it tomorrow.  And

6    they either file -- they either agree to it or they file an

7    opposition by noon tomorrow and then you're left filing a

8    reply at 4:00.  That's why I said the two of you need to

9    figure out a time by which it's either up or down on

10   whatever the language is in the agreement.

11               Then if you're not doing the TRO, we need to set

12   the schedule for the PI because -- in terms of the

13   advantages it gives.

14               So, Plaintiff, why don't you tell me, if you're

15   going to go the PI route, assuming you have an agreement,

16   what is the timeframe that you can do it?  We still need --

17   it's a fairly short turnaround.  Tell me under the rule.  We

18   need to pick dates.

19               Then I hope, Mr. Humphreys, you'd be able to get

20   ahold of somebody.

21               MR. JOSHI:  Sorry, your Honor.  I was on mute.

22               I think we would turn around the PI by early next

23   week.

24               THE COURT:  Okay.  That's fine.

25               MR. JOSHI:  We don't have a lot of new

1    information, so it would be similar to our TRO.

2          THE COURT:  Well, you either can go with the TRO

3    schedule if you cannot reach an agreement or if you can, go

4    with the PI schedule.  So I'll put both of them out and

5    it'll depend on whether you can reach an agreement or not.

6    I would encourage you to reach an agreement in terms of

7    having just one set of -- I know that there are a lot of

8    motions for PIs that -- for TROs that have been filed.  So

9    it would seem to me that having one briefing would probably

10   be beneficial.  It would be beneficial for the Court.

11         So we're looking at dates according to the rule.

12         MR. HUMPHREYS:  Your Honor, if I may.

13         THE COURT:  Sure.

14         MR. HUMPHREYS:  I mean, I think Mr. Joshi just

15   said they really don't have much information, additional

16   information to include in their TRO motion.  One option we

17   think that would make sense would be to convert that to a PI

18   and then just have -- you know, in a week it would occur,

19   yeah, a schedule.

20         THE COURT:  It's up to you all what you want.  If

21   you want to take -- my only question is whether -- a PI does

22   have more issues relating to standing, jurisdiction,

23   et cetera, that you may want to develop more fully in terms

24   of putting it in as opposed to what you have.

25         But, Plaintiff, you're the one who has to decide

1     whether you have additional arguments you want to make which

2     you could do for the PI or not.  We're still talking about

3     turning stuff around next week.

4          MR. JOSHI:  Well, your Honor, I'm happy to move

5     forward with the TRO as a PI motion.  But we do need the

6     status quo ordered in the interim.

7          THE COURT:  Well, let me point something out:

8     Either you reach an agreement, in which case we do the PI

9     schedule.  If you don't reach an agreement, the Government

10    is going to file by noon; you'll file by 4:00 tomorrow; and

11    the hearing on the TRO will be at 3:30 on Friday.

12          So you either reach an agreement and have that

13    schedule with the hearing Friday or you don't reach an

14    agreement -- I mean, you do reach an agreement, and then you

15    can do a longer schedule in the context of a PI.  So it

16    depends on whether you can reach an agreement.  You're close

17    enough that I would hope you would be able to, but obviously

18    I'm not the one making those decisions.

19          So what I'm trying to do is the alternative.  If

20    you reach an agreement, what is the schedule for the PI?  So

21    the first question is:  Do you want to supplement what you

22    have for -- if we're doing a PI?  Do you want to add some

23    information around probably the legal issue more than

24    anything?  Or not?

25          MR. JOSHI:  We would be happy to rest on our TRO

1    motion for the legal issue at this point.

2          But once again, I think if that means that there's

3    a delay in the status quo, I think we'll go with the TRO and

4    the hearing on Friday.

5          THE COURT:  You're not listening to me.

6          MR. JOSHI:  I'd like to reach an agreement.

7          THE COURT:  You're not listening to me.  Let me

8    try this one more time.

9          You're going to have an opportunity, presumably,

10   this evening.  It sounds like Mr. Humphreys is making an

11   effort to try to get ahold of people that he can talk to to

12   see if they'll agree.

13         If you reach an agreement, we will then move to a

14   schedule for a PI.  Okay?  Because you'll have an agreement

15   that basically pauses things and preserves the status quo.

16         If you do not reach an agreement, then tomorrow at

17   noon the Government files their response; you will file a

18   reply at 4:00; and at 3:30 on Friday, we will have a hearing

19   and a ruling.

20         MR. JOSHI:  Understood, your Honor.

21         THE COURT:  So it depends on whether there's an

22   agreement as to which schedule.

23         So what I don't have is a schedule for the PI.  Do

24   you want to add additional material or not?

25         MR. JOSHI:  We don't have a need to add additional

 1    material.  So we can do a schedule where they file their

 2    opposition next week and we file our reply a few days later.

 3                THE COURT:  That's what you want.  That's okay.

 4                Mr. Humphreys, when would you file your opposition

 5    in the context of a PI?

 6                MR. HUMPHREYS:  If -- we're talking about in a PI

 7    context?

 8                THE COURT:  Yes.

 9                MR. HUMPHREYS:  Then the normal seven days under

10    the local rules would be fine with us.

11                THE COURT:  Okay.  So my law clerk will tell us

12    what that date is.

13                MR. HUMPHREYS:  A week from today.

14                THE LAW CLERK:  February 12th.

15                THE COURT:  So February 12th, the Government will

16    file their opposition.

17                What do you want to reply?

18                MR. JOSHI:  We would file it -- the 17th is a

19    holiday.  The 18th.

20                THE COURT:  All right.  Let me look at when we'd

21    set a hearing.  Hold on.

22                (Brief pause in the proceedings.)

23                THE COURT:  Okay.  Looking at the schedule, only

24    if we're doing a preliminary injunction, Defendants'

25    opposition will be February 12th; Plaintiffs' reply will be

```
 1    the 18th; and the hearing will be on February 24th at 2:00.

 2              I have a restitution/forfeiture long hearing on

 3    that Friday, so I can't do it then.  I have to do it the

 4    following week.  So I'm suggesting the 24th.

 5              Does that work for people?  Mr. Humphreys?

 6              MR. HUMPHREYS:  Yes.  That works for us, if we're

 7    in the situation where we have agreement.

 8              THE COURT:  Right.  An agreement and a PI.

 9              Plaintiffs' counsel, does this work for you?

10              MR. JOSHI:  Yes, your Honor.  Thanks.

11              THE COURT:  All right.  I'm going to leave it to

12    the two of you to figure out what conversations you want to

13    have.  I don't need to be involved.  If you reach an

14    agreement or you decide you're not going to, shoot us --

15    shoot chambers an email so we know what schedule you're

16    going to be working under.  Okay?

17              Hopefully, Mr. Humphreys, you'll be able to get

18    ahold of somebody.

19              MR. HUMPHREYS:  Thank you, your Honor.

20              THE COURT:  Anything else from Plaintiffs'

21    counsel?

22              MR. JOSHI:  No, your Honor.  Thank you.

23              THE COURT:  Defense counsel?

24              MR. HUMPHREYS:  No.  Thank you, your Honor.

25              THE COURT:  Hopefully, you'll be able to reach an
```

1   agreement.  I'll either see you on Friday or on the 24th.

2   Take care, everybody.  Goodnight.

3            MR. JOSHI:  Thank you, your Honor.

4            (Proceedings concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           **CERTIFICATE**

2

3                   I, LISA EDWARDS, RDR, CRR, do hereby

4       certify that the foregoing constitutes a true and accurate

5       transcript of my stenographic notes, and is a full, true,

6       and complete transcript of the proceedings produced to the

7       best of my ability.

8

9

10                  Dated this 6th day of February, 2025.

11

12              /s/ Lisa Edwards, RDR, CRR
                Official Court Reporter
13              United States District Court for the
                  District of Columbia
14              333 Constitution Avenue, Northwest
                Washington, D.C. 20001
15              (202) 354-3269

16

17

18

19

20

21

22

23

24

25