**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

ALLIANCE FOR RETIRED
AMERICANS, *et al.*,

                     *Plaintiffs*,

        v.

SCOTT BESSENT, *in his official capacity as Secretary of the Treasury*, *et al.*,

                     *Defendants*.

Case No. 1:25-cv-00313-CKK

---

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION**
**FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 1

I.    THE BUREAU OF THE FISCAL SERVICE ...................................................... 1

II.   THE UNITED STATES DOGE SERVICE ......................................................... 2

III.  REVIEW OF BFS PAYMENT SYSTEMS TO EFFECTUATE THE USDS EO............ 3

IV.   THIS LITIGATION............................................................................................. 7

STANDARD OF REVIEW .............................................................................................. 8

ARGUMENT .................................................................................................................... 9

I.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS. ........................... 9

      A.   Plaintiffs Lack Article III Standing. ......................................................... 9

      B.   Plaintiffs Cannot Prevail on their APA Claims......................................... 13

           1.   Plaintiffs Do Not Challenge Final Agency Action. ........................... 13

           2.   Plaintiffs Have an Adequate Alternative Remedy. ............................ 15

                a. *Privacy Act of 1974*..................................................................... 16

                b. *Internal Revenue Code*................................................................. 18

           3.   Plaintiffs Have Not Shown a Violation of the Privacy Act. .............. 20

           4.   Plaintiffs Have Not Shown a Violation of the Internal Revenue Code. ........... 22

           5.   Plaintiffs Have Not Shown Ultra Vires Agency Action. ................... 23

           6.   Plaintiffs Cannot Show That Defendants Acted Arbitrarily or Capriciously. ... 24

II.   PLAINTIFFS HAVE NOT SHOWN IRREPARABLE HARM. ...................................... 24

III.  THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH IN
      DEFENDANTS' FAVOR. .............................................................................. 25

CONCLUSION................................................................................................................ 25

i

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Agbanc Ltd. v. Berry*,
    678 F. Supp. 804 (D. Ariz. 1988) ............................................................................... 19

*Am. Library Ass'n v. FCC*,
    401 F.3d 489 (D.C. Cir. 2005) ................................................................................... 10

*Apter v. Dep't of Health & Human Servs.*,
    80 F.4th 579 (5th Cir. 2023) ..................................................................................... 23

*Barclift v. Keystone Cred. Servs., LLC*,
    585 F. Supp. 3d 748 (E.D. Pa. 2022), *aff'd*, 93 F.4th 136, 146 (3d Cir. 2024) ...................... 12

*Barton v. District of Columbia*,
    131 F. Supp. 2d 236 (D.D.C. 2001) .............................................................................. 9

*Bennett v. Spear*,
    520 U.S. 154 (1997) ................................................................................................ 14

*Block v. Community Nutrition Institute*,
    467 U.S. 340 (1984) ................................................................................................ 16

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988) ............................................................................................ 15-16

*Cell Assocs., Inc. v. Nat'l Insts. of Health*,
    579 F.2d 1155 (9th Cir. 1978) ................................................................................... 18

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ................................................................................... 25

*CityFed Fin. Corp. v. Office of Thrift Supervision*,
    58 F.3d 738 (D.C. Cir. 1995) ...................................................................................... 9

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ................................................................................................ 10

*Cobell v. Norton*,
    391 F. 3d 251 (D.C. Cir. 2004) .................................................................................... 9

*ConverDyn v. Moniz,*
  68 F. Supp. 3d 34 (D.D.C. 2014) ......................................................................... 25

*Council on American-Islamic Relations v. Gaubatzi,*
  667 F. Supp. 2d 67 (D.D.C. 2009) ....................................................................... 12

*El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Hum Servs.,*
  396 F.3d 1265 (D.C. Cir. 2005) ........................................................................... 16

*Farst v. AutoZone, Inc.,*
  700 F. Supp. 3d 222 (M.D. Pa. 2023) ............................................................ 11-12

*FDA v. Alliance for Hippocratic Medicine,*
  602 U.S. 367 (2024) ............................................................................................ 10

*Fed. Aviation Admin. v. Cooper,*
  566 U.S. 284 (2012) ...................................................................................... 16, 17

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.,*
  460 F.3d 13 (D.C. Cir. 2006) ......................................................................... 13-14

*FW/PBS, Inc. v. City of Dallas,*
  493 U.S. 215 (1990) ............................................................................................ 10

*Garcia v. Vilsack,*
  563 F.3d 519 (D.C. Cir. 2009) ............................................................................ 16

*Henkell v. United States,*
  No. 96-2228, 1998 WL 41565 (E.D. Cal. Jan. 9, 1998) ...................................... 19

*Hunstein v. Preferred Coll. & Mgmt. Servs., Inc.,*
  48 F.4th 1236 (11th Cir. 2022) ........................................................................... 11

*In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.,*
  45 F. Supp. 3d 14 (D.D.C. 2014) ........................................................................ 13

*Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.,*
  933 F. Supp. 2d 58 (D.D.C. 2013) ..................................................................... 8, 9

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ............................................................................................ 10

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
  567 U.S. 209 (2012) ............................................................................................ 20

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ........................................................................................... 24

*Nat'l Mining Ass'n v. Jackson*,
    768 F. Supp. 2d 34 (D.D.C. 2011) .................................................................... 25

*Nat'l Treasury Emps. Union v. United States*,
    101 F.3d 1423 (D.C. Cir. 1996) ........................................................................ 10

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................................................... 9

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ...................................................................................... 14, 15

*Parks v. IRS*,
    618 F.2d 677 (10th Cir. 1980) .......................................................................... 18

*Poss v. Kern*,
    No. 23-cv-2199 (DLF) 2024 WL 4286088 (D.D.C. Sept. 25, 2024) ................... 18

*Public Citizen v. U.S. Trade Representative*,
    5 F.3d 549 (D.C. Cir. 1993) .............................................................................. 15

*Sierra Club v. EPA*,
    292 F.3d 895 (D.C. Cir. 2002) .......................................................................... 10

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) .......................................................................................... 11

*Sussman v. U.S. Marshal Serv.*,
    494 F.3d 1106 (D.C. Cir. 2007) ........................................................................ 17

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) .............................................................................. 11, 12, 13

*Tripp v. Dep't of Defense*,
    193 F. Supp. 2d 229 (D.D.C. 2002) .................................................................. 18

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
    578 U.S. 590 (2016) .......................................................................................... 14

*Warth v. Seldin*,
    422 U.S. 490 (1975) .................................................................................... 10, 11

iv

*Westcott v. McHugh*,
   39 F. Supp. 3d 21 (D.D.C. 2014) ................................................................... 18

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ......................................................................................... 8, 24-25

**STATUTES**

5 U.S.C. § 552a ........................................................................................... *passim*

5 U.S.C. § 702 ................................................................................................... 19

5 U.S.C. § 704 ................................................................................................... 15

5 U.S.C. § 3109 ................................................................................................... 4

5 U.S.C. § 3161 ................................................................................................... 2

5 U.S.C. §§ 2103, 2105 ..................................................................................... 21

18 U.S.C. § 202 ................................................................................................. 21

26 U.S.C. § 6103 ....................................................................................... *passim*

26 U.S.C. § 7213(a)(1) ..................................................................................... 19

26 U.S.C. § 7431 ............................................................................................... 19

**ADMINISTRATIVE AND EXECUTIVE MATERIALS**

Temporary transitional Schedule C positions,
   5 C.F.R. § 213.3302 ........................................................................................ 5

*Treasury Order Establishing the Bureau of the Fiscal Service*,
   78 Fed. Reg. 31,629 (May 24, 2013) (Treasury Order 136-01) ................................. 1

*Privacy Act of 1974; System of Records*,
   85 Fed. Reg. 11,776 (Feb. 27, 2020) ............................................................. 21

Establishing and Implementing the President's "Department of Government Efficiency"
   Executive Order 14,158 (Jan. 20, 2025) ........................................................ 2, 3

**OTHER AUTHORITIES**

Fiscal Service Overview,
    *available at* https://www.fiscal.treasury.gov/about.html (last visited Feb. 12, 2025). ............. 23

GAO Report,
    "Financial Statement Audit: Bureau of the Fiscal Service's FY22 Schedules of the General
    Fund" (March 30, 2023), *available at* https://www.gao.gov/products/gao-23-104786 (last
    visited Feb. 11, 2025)................................................................................................................. 3

## INTRODUCTION

Plaintiffs bring this novel and unsupported challenge to the Executive Branch's power to carry out its functions in accordance with the President's priorities.  Plaintiffs' claims have no legal merit.  Plaintiffs lack standing because they have not pointed to any legally cognizable injury, much less irreparable harm that would support preliminary injunctive relief, and there is no basis for the Court to involve itself in the decisionmaking with respect to which Treasury Department employees are granted access to the Bureau of the Fiscal Service's systems and data.  The Court should also decline Plaintiffs' attempt to use the Administrative Procedure Act ("APA") to circumvent the remedies available under the Privacy Act and the Internal Revenue Code, which provide adequate remedies for any violation of those statutes for Plaintiffs' members.  Even if Plaintiffs could pass those threshold barriers—and they cannot—Plaintiffs have failed to show that Defendants are acting in violation of either the Privacy Act or the Internal Revenue Code, or that Defendants have acted arbitrarily or capriciously.

Defendants ask that the Court deny Plaintiffs' motion for a preliminary injunction and that the Court's February 6, 2025 Order be dissolved.

## BACKGROUND

### I.    THE BUREAU OF THE FISCAL SERVICE

The Bureau of the Fiscal Service ("BFS") is a component of the Department of the Treasury, established in October 2012 by then-Secretary of the Treasury Timothy Geithner, which consolidated two previously separate bureaus.  *Treasury Order Establishing the Bureau of the Fiscal Service*, 78 Fed. Reg. 31,629 (May 24, 2013) (Treasury Order 136-01).  The Secretary's order combined the former Bureau of the Public Debt and the Financial Management Service into

the BFS and established the role of BFS Commissioner to execute the functions for which the heads of those bureaus were previously responsible. *Id.*

Among other responsibilities, BFS is responsible for "manag[ing] the government's accounting, central payment systems, and public debt, and . . . serv[ing] as the central payment clearinghouse for most payments to and from federal agencies." Declaration of Thomas H. Krause, Jr. ("Krause Decl.") ¶ 5. BFS disburses the majority of the government's payments, more than $5 trillion per year. *Id.* BFS's payment systems include, among others, the Payment Automation Manager ("PAM") System, which is the federal government's largest system for receiving payment files and processing payments; the Secure Payment System ("SPS"), a system through which paying agencies securely create, certify, and submit payment files to Treasury; the Automated Standard Application for Payments ("ASAP"), a recipient-initiated electronic payment and information system; and the Central Accounting and Reporting System ("CARS"), which federal agencies use to account for their spending. Declaration of Joseph Gioeli III ("Gioeli Decl.") ¶¶ 6-11.

## II.    THE UNITED STATES DOGE SERVICE

On January 20, 2025, President Trump signed Executive Order 14,158, which directs changes to the previously established United States Digital Service designed to implement the President's agenda of "improv[ing] the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems." 90 Fed. Reg. 8441, § 4 ("USDS EO"). The USDS EO also redesignated the United States Digital Service as the Department of Governmental Efficiency Service, or U.S. DOGE Service. *Id.* § 3(a). Similarly, it established a "U.S. DOGE Service Temporary Organization" within the Executive Office of the President pursuant to 5 U.S.C. § 3161, which will terminate on July 4, 2026. USDS EO § 3(b). Agency

heads are required under the USDS EO to establish within their respective agencies a DOGE Team of at least four employees, which may include Special Government Employees.  *Id.* § 3(c).

The USDS EO directs USDS to collaborate with Executive agencies to modernize the technology and software infrastructure of the federal government to increase efficiency and productivity as well as ensure data integrity.  *Id.* § 4.  With respect to the Department of the Treasury, the need to modernize and ensure data integrity is uniquely critical:  the Government Accountability Office ("GAO") has identified "problems in accounting for transactions between federal agencies," resulting in potentially improper payments totaling approximately $2.7 trillion dollars.  *See* GAO Report, "Financial Statement Audit: Bureau of the Fiscal Service's FY22 Schedules of the General Fund" (March 30, 2023), *available at* https://www.gao.gov/products/gao-23-104786 (last visited Feb. 11, 2025).  Similarly, GAO has identified areas for improvement in BFS's systems related to identifying and tracing transactions to determine whether they were complete and properly recorded in the correct general ledger accounts and line items within the Schedules of the General Fund.  *Id.*  In particular, GAO has found inconsistent reporting, lack of traceability, and need for improved controls within CARS. *Id.*

To accomplish its objectives, the USDS EO directs USDS to work with relevant agency heads, and vice versa, to ensure USDS has access to "unclassified agency records, software systems, and IT systems" to the "extent consistent with law."  USDS EO § 4(b).  At all times, the USDS EO instructs, USDS must "adhere to rigorous data protection standards."  *Id.*

**III.    REVIEW OF BFS PAYMENT SYSTEMS TO EFFECTUATE THE USDS EO**

Thomas Krause is an employee of the Treasury Department and is the DOGE Team lead at the agency ("Treasury DOGE Team").  Krause Decl. ¶ 2.  His position at Treasury as Senior

Advisor for Technology and Modernization was created to effectuate the mission of DOGE by reducing and eliminating improper and fraudulent payments; waste, fraud, and abuse; and improving the accuracy of financial reporting. Krause Decl. ¶ 2. Currently, Mr. Krause is the only Treasury DOGE Team member. *Id.* ¶ 3. Although Mr. Krause coordinates with officials at USDS and provides them with regular updates on the team's progress, he is not an employee of USDS. Krause Decl. ¶ 4. Instead, he is an employee of Treasury. Declaration of Michael J. Wenzler ("Wenzler Decl.") ¶ 5. Mr. Krause was appointed as a Consultant to Treasury pursuant to 5 U.S.C. § 3109, which is a civil service appointment, on January 23, 2025, and designated by Treasury's Designated Agency Ethics Officer as a Special Government Employee (SGE) under 18 U.S.C. § 202. Wenzler Decl. ¶¶ 3-4. Treasury is in the process of hiring Mr. Krause in the same role under temporary Transitional Schedule C. *See* Wenzler Decl. ¶ 8. Mr. Krause's Schedule C appointment has not yet occurred, but will likely occur in the near future. Mr. Krause retains the ethics designation of Special Government Employee. *Id.*

Mr. Krause's role on the Treasury DOGE Team is to find ways to use technology to make the Treasury Department more effective, more efficient, and more responsive to the policy goals of the current Administration. Krause Decl. ¶ 4. As part of the President's DOGE efforts, Mr. Krause's mandate is to understand how BFS's end-to-end payment systems and financial reporting tools work, recommend ways to update and modernize those systems to better identify improper and fraudulent payments, and better allow federal agencies to quickly adapt to changing conditions. *Id.* ¶ 10.

Mr. Krause has never had any direct access to any BFS payment system. His only access to those systems was so-called "over the shoulder" access to review activity others performed in the system or data others accessed from the system. *Id.* ¶ 16. Although his access is permitted to

4

continue under this Court's February 6, 2025 Order, *see* Order, ECF No. 13, under the terms of a temporary restraining order entered in the U.S. District Court for the Southern District of New York, Mr. Krause is currently prohibited from having *any* access to BFS payment systems or certain payee data. Memorandum Opinion and Order, *State of New York v. U.S. Dep't of the Treasury*, 25-CV-01144 (JAV), ECF No. 28 (Feb. 11, 2025) (explaining the modified terms of the temporary restraining order entered on February 8, 2025); *see also* Krause Decl. ¶ 16.

A second Treasury DOGE Team member, Marko Elez, began working at the Treasury Department on January 21, 2025, but resigned from his role on February 6, 2025. Krause Decl. ¶ 3; Wenzler Decl. ¶ 9. Treasury appointed Mr. Elez as a Special Advisor for Information Technology and Modernization under Treasury's authority for temporary transitional Schedule C appointments under the Civil Service Regulations. Wenzler Decl. ¶ 9; *see also* 5 C.F.R. § 213.3302. In this role, Mr. Elez was a Treasury employee tasked with working closely with engineers at BFS on information technology matters in service of BFS's mission to promote financial integrity and operational efficiency of the federal government through accounting, financing, collection, payment, and other relevant BFS services. Krause Decl. ¶ 3. As part of precautions developed to mitigate risk associated with the Treasury DOGE Team's work, Mr. Elez's access to BFS systems was subject to close supervision and a number of security measures. Gioeli Decl. ¶ 11-13. Included in those measures was a limitation that Mr. Elez would receive only "read-only" access to the systems, which allows users to view and query information and data but does not allow for any changes to that information and data within the source system. *Id.* ¶¶ 13, 16.

BFS discovered on the morning of February 6, 2025, that the access provided to Mr. Elez on the prior day (February 5, 2025) to one payment system—SPS—was briefly and mistakenly

configured by career BFS employees to include "read/write" permissions instead of "read-only." *Id.* ¶ 20. According to review of BFS logs of Mr. Elez's activity, the only time Mr. Elez logged into the system with such privileges was on February 5, prior to this Court's Order. *Id*. A forensic investigation was immediately initiated, and that initial investigation confirmed that no unauthorized actions had taken place, and his access was promptly corrected to "read-only." To the best of Defendants' knowledge, Mr. Elez never knew that he briefly had "read/write" permissions for the SPS database, and Mr. Elez never took any action to exercise the "write privileges" to modify anything within the SPS database. *Id.* ¶ 20. Indeed, Mr. Elez never logged into the system during the time that he had read/write privileges, other than during a virtual walk-through with him that occurred on February 5. *Id.* ¶¶ 19-20.[1]

In addition to Mr. Elez's access to BFS payment systems, Mr. Elez was provided with copies of certain BFS information and source code with which to work in a secure environment, or "sandbox," on his BFS-provided device. Gioeli Decl. ¶¶ 11-12, 16. Mr. Elez never "wrote" code directly to (or otherwise directly altered) any BFS systems, nor does BFS have any reason to believe that Mr. Elez transmitted any BFS data or other information outside the federal government. *Id.* ¶¶ 16, 20-21; Krause Decl. ¶ 16. As described in the Krause and Robinson Declarations, the Treasury DOGE Team and BFS career employees were directed to undertake a process that would transmit certain payment information to the State Department, in connection with verifying that certain payments complied with President's January 20, 2025 Executive Order titled "Reevaluating and Realigning United States Foreign Aid." *See* Krause Decl. ¶¶ 17-20;

---

[1] The forensic analysis is ongoing to confirm the details of Mr. Elez access to and usage of BFS systems, including reviewing logs of his activity both on his laptop and within the systems. Gioeli Decl. ¶¶ 20-21. Defendants will promptly inform the Court if further facts develop relevant to the claims in this case or Defendants' compliance with the February 6 Order or to the Defendants' representations in this case.

Declaration of Vona S. Robinson ("Robinson Decl.") ¶¶ 11-12. Mr. Elez's duties involved helping

set up this process, including by assisting in automating the manual review of the payment files. [2]

On February 6, 2025, Mr. Elez submitted his resignation from his role at Treasury. *Id.*

¶ 22. On that same day, he turned in his government-issued laptops, access card, and other

government devices; his BFS systems access was terminated; and he has not conducted any work

related to the BFS payment systems since that date. *Id.*

## IV.    THIS LITIGATION

Plaintiffs filed suit on February 3, 2025. Compl., ECF No. 1. The Complaint includes

three causes of action. In Count One, Plaintiffs allege that Defendants acted contrary to law in

violation of the APA. Specifically, Plaintiffs allege that Defendants have "implemented a system"

for disclosing records containing Plaintiffs' members personal information in violation of Privacy

Act of 1974, and further by sharing Plaintiffs' members' tax returns and tax return information in

violation of Internal Revenue Code, 26 U.S.C. § 6103. Compl. ¶¶ 45-53. In Count Two, Plaintiffs

allege that Defendants violated the APA by "fail[ing] to engage in reasoned decisionmaking when

they implemented a system under which Elon Musk or other individuals associated with DOGE

could access [BFS's] records for purposes other than those authorized by the Privacy Act, [BFS's

systems of records notices ("SORNs")], and the Internal Revenue Code. *Id.* ¶ 56. Count Three

consists of Plaintiffs' claim that "permitting Elong Musk and/or other individuals associated with

DOGE" to access BFS records was in excess of Defendants' statutory authority. *Id.* ¶¶ 58-59.

---

[2] At the February 5, 2025 hearing, counsel for Defendants were unaware that Mr. Elez had ever been given more than "read-only" access, or that Mr. Elez may have taken part in helping disseminate information from BFS systems outside of Treasury as part of the new State Department review process. Defendants apologize to the Court that those facts were unclear to counsel at the time of the hearing.

Plaintiffs filed a motion for temporary restraining order on February 5, seeking to enjoin Defendants "from disclosing information about individuals to individuals affiliated with the so-called Department of Government Efficiency" and to require Defendants "to retrieve and safeguard any such information that has already been obtained by DOGE or individuals associated with it."  Pls.' Mem in Supp of Mot. for TRO ("TRO Mem."), ECF No. 8-1.

The Court held a hearing on Plaintiffs' motion on February 5, during which the Court raised scheduling for briefing to address Plaintiffs' claims in the context of a preliminary injunction rather than a temporary restraining order.  The Court gave Plaintiffs the opportunity to file a separate motion for preliminary injunction, but Plaintiffs opted to rest on their previously filed papers, Feb. 5 Hrg. Tr. at 45:4-6, and, accordingly, the Court converted their motion for a temporary restraining order into one for a preliminary injunction, *see* Order, ECF No. 13.  Following the hearing, the parties agreed to entry of an order requiring Defendants to refrain from providing access to any payment record or payment system of records maintained by or with BFS, with exceptions for Mr. Krause and Mr. Elez—provided that their access to payment records will be "read only"—and other to Treasury employees who are not Special Government Employees, and as permitted by 5 U.S.C. § 552a(b)(2)-(13) and the Internal Revenue Code.  The Court entered the parties proposed order, which remains in effect until such time as the Court rules on Plaintiffs' motion for preliminary injunction.  ECF No. 13.

## STANDARD OF REVIEW

"The standard for issuance of the extraordinary and drastic remedy of a temporary restraining order or a preliminary injunction is very high."  *Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*, 933 F. Supp. 2d 58, 75 (D.D.C. 2013) (citation omitted).  An interim injunction is "never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and

"should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion," *Cobell v. Norton*, 391 F. 3d 251, 258 (D.C. Cir. 2004).

A party moving for any preliminary injunction must demonstrate all of the following factors: "(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction.'" *Jack's Canoes*, 933 F. Supp. 2d at 75-76 (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)).   Where, as here, the government is opposing a motion for emergency injunctive relief, the third and fourth factors merge.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

Plaintiffs are not entitled to the relief they seek.  They are not likely to succeed on the merits because they lack standing to bring their claims.  The APA, too, poses a threshold obstacle to Plaintiffs' claims.  Because they have not identified final agency action, they have no cause of action.  Plaintiffs' APA claims would also fail even if the Court were to reach them.  And Plaintiffs have not demonstrated irreparable harm, or that the balance of the equities favors them.  Their motion should be denied.

## I.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS.

### A.    Plaintiffs Lack Article III Standing.

 "The first component of the likelihood of success on the merits prong usually examines whether the plaintiffs have standing." *Barton v. District of Columbia*, 131 F. Supp. 2d 236, 243 n.6 (D.D.C. 2001).   The doctrine of standing, an essential aspect of the Article III case-or-controversy requirement, demands that a plaintiff have "a personal stake in the outcome of the

controversy [so] as to warrant his invocation of federal-court jurisdiction[.]" *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (citation omitted). At its "irreducible constitutional minimum," the standing doctrine requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent, (2) a causal connection between the injury and defendants' challenged conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations omitted). Facts demonstrating each of these elements "must affirmatively appear in the record" and "cannot be inferred argumentatively from averments in the [plaintiff's] pleadings." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (citation omitted); *see also Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002).

An organization can assert standing either on its own behalf (organizational standing) or on behalf of its members (associational, sometimes called representational, standing). *See Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996)). Plaintiffs do not rely on alleged injury to the organizations themselves, but rather to the privacy interests of their members. TRO Mem. at 15; Compl ¶¶ 39-44; *see also* Feb. 5, 2025 Hrg. Tr. 18-19.

Under a theory of associational standing, Plaintiffs must, therefore, establish that at least one of their members would have "standing to sue in his or her own right." *Am. Library Ass'n v. FCC*, 401 F.3d 489, 492 (D.C. Cir. 2005). To do so, Plaintiffs must establish injury-in-fact as to those members, which requires that their injury must have already occurred or be likely to occur soon." *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 381 (2024). The injury must be "certainly impending," "allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

Here, Plaintiffs allege only one form of injury, that "Defendants have allowed third parties unlawful access to Plaintiffs' members' private information." TRO Mot. at 15. To be clear, however, there has been no "third party" access, as only authorized government officials accessed the information at issue. *See infra.* But even assuming—solely for purposes of the injury-in-fact analysis, *see, e.g.*, *Warth*, 422 U.S. at 502—that there had been such access, Plaintiffs still fail to establish standing.

Even unauthorized access alone would not give rise to an actual, concrete harm sufficient to establish standing. The Supreme Court's decision in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), leaves no doubt that a statutory violation is not, by itself, a cognizable Article III injury. *Id.* at 426-27. Rather, "[o]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that . . . defendant over that violation in federal court. *Id.* at 427 (emphasis in original). And the Supreme Court has instructed that "[i]n determining whether an intangible harm constitutes injury in fact . . . it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340-41 (2016); *see also TransUnion*, 594 U.S. at 424-25.

In order for Plaintiffs to establish some concrete harm on behalf of their members, they would need to show not just *access* to their members' information, but that the information had been disclosed in a way that causes them harm, such as a public disclosure. *See Hunstein v. Preferred Coll. & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1240, 1245-50 (11th Cir. 2022) (en banc) (no cognizable injury from disclosure of private information where plaintiff's information was sent from hospital to collection agency because disclosure was not public); *id.* at 1246 (citing cases); *Farst v. AutoZone, Inc.*, 700 F. Supp. 3d 222, 231-32 (M.D. Pa. 2023) (discussing the tort and

distinguishing *Bohnak*); Rest. 2d of Torts § 652D ("Publicity given to private life"); *see also TransUnion*, 594 U.S. at 434 n.6 ("Many American courts did not traditionally recognize intra-company disclosures as actionable publications for purposes of the tort of defamation.") (citations omitted).

It is clear that there has been no public disclosure here; instead, there has been (at most) an exchange internal to the federal government. *Barclift v. Keystone Cred. Servs., LLC*, 585 F. Supp. 3d 748, 758-59 (E.D. Pa. 2022) ("Even assuming that the employees of the mailing vendor read Barclift's personal information, sharing her personal information with 'a small group of persons is not publicity.'" (citation omitted)), *aff'd*, 93 F.4th 136, 146 (3d Cir. 2024) ("Like our sister circuits, we conclude that the harm from disclosures that remain functionally internal are not closely related to those stemming from public ones."). Plaintiffs do not allege—much less establish—that the employees with access to the BFS systems have disclosed any information in a way that causes tangible harm, such as publicly. There is thus no cognizable injury from the employees' access, and *Council on American-Islamic Relations v. Gaubatzi*, 667 F. Supp. 2d 67 (D.D.C. 2009), on which Plaintiffs rely, is easily distinguishable. *Id.* at 76 ("CAIR has provided evidence that Defendants have caused [their] material to be used and publicly disclosed.").

Plaintiffs also suggest harm in the form of an infringement of their members' "expectation" their information will remain private. TRO Mem. at 14. That concern is echoed in the declarations Plaintiffs submitted on February 11. *See, e.g.*, Declaration of Carol Rosenblatt ("Rosenblatt Decl."), ECF No. 16-2 ¶ 10 ("I have trusted the government to maintain the privacy of my information and to only use my information for lawful purposes."); Declaration of Jeanette L.

McElhaney, ECF No. 16-3 ¶ 10 (same); Declaration of Barbara Casey, ECF No. 16-4 ¶ 10 (same).[3]

This claim amounts to an allegation that Plaintiffs' members expected their information to be handled in a certain way, and it was not. Plaintiffs cite no authority for this standing theory of harm to expectations, or facts supporting any claim that those expectations were reasonable, as they have the burden to do. The absence of any on-point authority is perhaps unsurprising: were it enough for a plaintiff to establish standing simply by alleging that the holder of her personal information used it in a manner contrary to her subjective expectations, the limits the Supreme Court has carefully established to govern when disclosure of information constitutes injury-in-fact, including the requirement to identify a historical analogue, would be obliterated. *See generally TransUnion*, 594 U.S. 413.

Finally, Plaintiffs say that the allegedly "unauthorized" access to BFS systems harms Plaintiffs' members by "increasing the opportunity for further dissemination" of their personal information. TRO Mem. at 15. This supposition is too speculative on its own to support standing, and is contradicted by the declarations in the record regarding the extensive security mitigation measures Treasury has employed. *See* Gioeli Decl. ¶¶ 11-15; Krause Decl. ¶ 15.

## B.    Plaintiffs Cannot Prevail on their APA Claims.

### 1.    Plaintiffs Do Not Challenge Final Agency Action.

Plaintiffs' claims under the APA fail to satisfy several threshold prerequisites. Compl. ¶¶ 45-57. As an initial matter, the law is clear that the APA does not permit "judicial review over everything done by an administrative agency." *Fund for Animals, Inc. v. U.S. Bureau of Land*

---

[3] Plaintiffs' supplemental declarations also include statements that the individuals are "disturbed, anxious, and frustrated" that the government has violated their trust, in the view of the declarants. *See, e.g.*, Rosenblatt Decl. ¶ 10. Such feelings, even if they are objectively reasonable, are not sufficient to constitute a concrete harm. *See In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*, 45 F. Supp. 3d 14, 26 (D.D.C. 2014).

*Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006) (quotation omitted).  Rather, APA review is limited to "final agency action."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61-62 (2004) (quoting 5 U.S.C. § 704) ("*SUWA*").

Plaintiffs attempt to meet that requirement by asserting that Treasury implemented a "new policy" to "disregard[] [BFS's] privacy safeguards and authorize[] individuals associated with the so-called 'Department of Government Efficiency [ ] to access [BFS's] payment systems."  TRO Mem. at 1; *see also id.* at 14 (claiming a reversal of the "Department's longstanding policy fully protecting individuals' personal information").  Even assuming, *arguendo*, the existence of such a policy—which is untrue, *see* Gioeli Decl. ¶ 23—Plaintiffs have not established that any such policy constitutes final agency action.  That is because agency action is final when it (1) "mark[s] the consummation of the agency's decisionmaking process" and (2) is "one by which rights or obligations have been determined, or from which legal consequences will flow."  *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).

Here, final agency action is absent based on the second prong alone.  Decisions regarding whom among their workforce agencies grant systems access, based on their assessment of those employees' need for access for the performance of their duties—and the risk mitigation measures agencies put in place to ensure appropriate safeguarding of government systems and information—is a routine matter of internal government operation that has no "legal consequences" for Plaintiffs.  Nor does it determine any rights Plaintiffs have.  Every day, government agencies make decisions to grant data or systems access to their employees.  It is true that all of those decisions carry some inherent risk of misuse or abuse.  But Plaintiffs plead no facts to suggest any Treasury or BFS policy prohibits granting access to Treasury employees such as Mr. Krause or Mr. Elez on the

14

basis of their appointment status (e.g., Schedule C) nor their ethics designations (e.g., SGE), or on the conditions that such access was granted here, given the multiple risk mitigation measures BFS put in place.  *See* Gioeli Decl ¶¶12-14.  Nor do they plead that any policy concerning access by "political" appointees or SGEs previously existed and that such policy was changed.  Indeed, no such policies have been identified. *Id*. ¶ 23.  This is the type of day-to-day operation of governmental programs that does not fall into APA review.  *See SUWA*, 542 U.S. at 63-64.

Even if the Treasury DOGE Team's access to BFS systems was final vis-à-vis the agency, it creates no immediate legal effects for the Plaintiffs, and so is not final with respect to them and therefore does not meet the requirements of the second prong.  *See Public Citizen v. U.S. Trade Representative*, 5 F.3d 549, 551 (D.C. Cir. 1993) (describing the second prong as "whether the result of [the agency's decisionmaking] process will directly affect *the parties*." (emphasis added) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992)).   The mere fact that some negative consequence for Plaintiffs could eventually theoretically flow from the agency's internal operation decision, such as an improper disclosure of data, does not establish finality or "directly affect" Plaintiffs, particularly when no such downstream consequence for Plaintiffs has actually occurred.  By analogy, an agency's decision to give an employee a work computer is not itself final agency action, even if the employee might conceivably use the computer to effect final agency action (*e.g.*, in approving or denying benefits).

2.     <u>Plaintiffs Have an Adequate Alternative Remedy</u>.

Plaintiffs' APA claims fail for the additional, independent reason that the statute does not apply where there is "[an]other adequate remedy in any court."  5 U.S.C. § 704.  This statutory provision "makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action."  *Bowen v. Massachusetts*, 487 U.S.

879, 903 (1988).  An "adequate remedy," in turn, is available where a statutory review provision

allows for "de novo district-court review" of the agency action challenged, *El Rio Santa Cruz*

*Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Hum Servs.*, 396 F.3d 1265, 1270 (D.C.

Cir. 2005), even where the relief available under the statutory provision is not identical to APA

relief, *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009).  Stated differently, where an agency

action is subject to review in some manner under a statutory review scheme, then the general rule

is that action must be reviewed within the confines of that scheme, because the mode of review

established by the statutory review scheme is presumed exclusive.  This is true even where a

statutory review scheme provides only for review of issues by certain parties; other parties are

presumptively precluded from obtaining review of those issues under the APA.  *See Block v.*

*Community Nutrition Institute*, 467 U.S. 340, 349 (1984) ("[W]hen a statute provides a detailed

mechanism for judicial consideration of particular issues at the behest of particular persons,

judicial review of those issues at the behest of other persons may be found to be impliedly

precluded.").

Under these principles, Plaintiffs are not entitled to challenge purported violations of the

Privacy Act and the Internal Revenue Code under the APA, because each statute provides an

adequate alternative remedy for persons entitled to sue under those statutes.

### a.  Privacy Act of 1974

The Privacy Act establishes "a comprehensive and detailed set of requirements" for federal

agencies that maintain systems of records containing individuals' personal information. *Fed.*

*Aviation Admin. v. Cooper*, 566 U.S. 284, 287 (2012).  Section (g) of the Privacy Act provides for

a limited subset of civil remedies, and Plaintiffs' allegations do not fall within these carefully

demarcated limits.  Civil remedies are available—and thus the United States' sovereign immunity

has been waived—in four circumstances: (1) when the agency "makes a determination . . . not to amend an individual's record in accordance with his request," (an "Amendment Action"), 5 U.S.C. § 552a(g)(1)(A), (2) when the agency refuses to comply with an individual's request for access to her records, (an "Access Action"), *id.* § 552a(g)(1)(B), (3), when the agency fails to maintain an individual's records "with such accuracy, relevance, timeliness, and completeness" as is necessary for a government action and "consequently a determination is made which is adverse to the individual," (a "Benefits Action"), *id.* § 552a(g)(1)(C), or (4) where the government "fails to comply with any other provision of this section . . . in such a way as to have an adverse act on an individual," (an "Other Action") *id.* § 552a(g)(1)(D).  For Benefits Actions or Other Actions, a plaintiff may recover "actual damages sustained by the individual as a result of the refusal or failure," subject to a $1,000 statutory minimum, but only if the "agency acted in a manner which was intentional and willful" and if that plaintiff could prove "actual damages," which is "limited to proven pecuniary or economic harm."  *Cooper*, 566 U.S. at 291 299.

As to injunctive relief specifically, the Act allows for injunctive relief in only two narrow circumstances: (1) to order an agency to amend inaccurate, incomplete, irrelevant, or untimely records, 5 U.S.C. § 552a(g)(1)(A), (g)(2)(A); and (2) to order an agency to allow an individual access to his records, *id.* § 552a(g)(1)(B), (g)(3)(A).  Injunctive relief, as the D.C. Circuit has recognized, is not available for any other situation arising out of the Privacy Act.  *See Sussman v. U.S. Marshal Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) ("We have held that only monetary damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs . . . .") (citing *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988)); *see also Cell. Assocs., Inc. v. Nat'l Insts. of Health*, 579 F.2d 1155, 1161-62 (9th Cir. 1978).

Given the Privacy Act's comprehensive remedial scheme, courts in this District have repeatedly recognized that "a plaintiff cannot bring an APA claim to obtain relief for an alleged Privacy Act violation." *Westcott v. McHugh*, 39 F. Supp. 3d 21, 33 (D.D.C. 2014); *see also Tripp v. Dep't of Defense*, 193 F. Supp. 2d 229, 238 (D.D.C. 2002); *Poss v. Kern*, No. 23-cv-2199 (DLF) 2024 WL 4286088, at *6 (D.D.C. Sept. 25, 2024) (citing cases). That is consistent with the principle that "[w]here [a] 'statute provides certain types of equitable relief but not others, it is not proper to imply a broad right to injunctive relief.'" *Parks v. IRS*, 618 F.2d 677, 84 (10th Cir. 1980) (citing *Cell. Assocs.*, 579 F.2d at 1161-62).

This is especially true with the Privacy Act because Congress "link[ed] particular violations of the Act to particular remedies in a specific and detailed manner[,]" which "points to a conclusion that Congress did not intend to authorize the issuance of [other] injunctions." *Cell Assocs.*, 579 F.2d at 1159. Indeed, as the Ninth Circuit concluded, were injunctive relief available for violations of the Privacy Act generally, "the detailed remedial scheme adopted by Congress would make little sense. We think it unlikely that Congress would have gone to the trouble of authorizing equitable relief for two forms of agency misconduct and monetary relief for all other forms if it had intended to make injunctions available across the board." *Id.* at 1160. Plaintiffs' efforts to obtain an agency-wide injunction by channeling Privacy Act claims through the APA would be an end run around these common-sense principles and should be rejected.

### b. Internal Revenue Code

For similar reasons, it would be inappropriate to allow Plaintiffs to use the APA to create an end-run around the remedial scheme provided in the Internal Revenue Code for violations of 26 U.S.C. § 6103. Congress created a waiver of sovereign immunity for violations of § 6103 by authorizing only civil damages against the United States in 26 U.S.C. § 7431. Specifically, § 7431

18

authorizes a right of action against the United States if "any officer or employee of the United States knowingly, or by reason of negligence, discloses any return or return information . . . in violation of section 6103." 26 U.S.C. § 7431(a)(1).  Damages are authorized in the sum of "the greater of" (a) $1,000 for each unauthorized disclosure of a return or return information, or (b) the actual damages sustained by the plaintiff plus punitive damages for willful disclosures or disclosures that result from gross negligence.  *Id.* § 7431(c).  Civil damages under § 7431 is the sole remedy that Congress provided for a violation of § 6103, and it does not authorize injunctive relief.  *See generally id.*; *see also Henkell v. United States*, No. 96-2228, 1998 WL 41565, at *5 (E.D. Cal. Jan. 9, 1998) (explaining that § 7431 does not authorize injunctive relief).[4]

Given the civil damages available to individuals whose return information is disclosed in violation of § 6103—which is part of the complex statutory scheme Congress created in the Internal Revenue Code— there is another adequate remedy available, and Plaintiffs are not entitled to injunctive relief through the APA.  *Cf. Agbanc Ltd. v. Berry*, 678 F. Supp. 804, 807 (D. Ariz. 1988) (concluding that § 7431 provides an adequate remedy at law that precludes equity jurisdiction).

\*       \*       \*

Congress's creation of comprehensive remedial schemes in the Privacy Act and the Internal Revenue Code, as discussed above, forbids the relief Plaintiffs seek under the APA.  That runs into another problem under the APA—the APA's waiver of sovereign immunity, which does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."  5 U.S.C. § 702.  As the Supreme Court has stated, the purpose of this carve-out waiver

---

[4] In addition, however, Congress has imposed criminal penalties for willful violations of § 6103, which are punishable as a felony and by dismissal from Federal service.  26 U.S.C. § 7213(a)(1).

is to prevent plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). "When Congress has dealt in particularity with a claim and has intended a specified remedy—including its exceptions—to be exclusive, that is the end of the matter; the APA does not undo the judgment." *Id.* Just so here. Congress has set out the exclusive remedies for violations of the Privacy Act and in the Internal Revenue Code in the respective statutes. The APA does not provide a waiver of sovereign immunity to evade those considered judgments.

3.    <u>Plaintiffs Have Not Shown a Violation of the Privacy Act</u>.

In arguing that Defendants have acted contrary to law, Plaintiffs first identify, and primarily rely on, the Privacy Act as the alleged statutory violation. *See* TRO Mem. at 12-13. But Plaintiffs have not plausibly alleged that a violation of the Privacy Act has occurred. Plaintiffs recognize, as they must, that Privacy Act-covered records may be shared if an exception within the statute applies. *See* TRO Mem. at 12. And the Privacy Act specifically permits disclosure "to those officers and employees of the agency . . . who have a need for the record in the performance of their duties" 5 U.S.C. § 552a(b)(1), as well as for a "routine use" (5 U.S.C. § 552a(b)(3)). The Privacy Act-covered records at issue were made here were disclosed to Treasury "employees" in accordance with exception (b)(3) and to other federal agencies under routine uses exceptions specified in the applicable System of Records Notice.

The Treasury DOGE Team members—or other future SGEs or Schedule C personnel who may do the work that Plaintiffs seek to block access from—are "officers" or "employees" of the Treasury Department, who "have a need for the records in the performance of their duties." *See* Krause Decl. ¶ 2 (explaining need).

To the extent Plaintiffs may attempt in their reply brief to distinguish SGEs and Schedule C personnel from "officers and employees" within the meaning of the Privacy Act, that purported

distinction would be unconvincing.  The Privacy Act applies to "employees," without qualification.  5 U.S.C. § 552a(b)(1).  SGE is an ethics designation that applies to employees who meet certain eligibility criteria, specifically:

> officer[s] or employee[s] of the executive or legislative branch of the United States Government, of any independent agency of the United States or of the District of Columbia, who [are] retained, designated, appointed, or employed to perform, with or without compensation, for not to exceed one hundred and thirty days during any period of three hundred and sixty-five consecutive days, temporary duties either on a full-time or intermittent basis[.]

18 U.S.C. § 202(a).  Similarly, Schedule C personnel (commonly referred to as "political appointees") are individuals "appointed to the civil service" and are "employees" of the federal government.  *See* 5 U.S.C. §§ 2103, 2105.  Accordingly, the system and data access provided to the Treasury DOGE team falls squarely within the Privacy Act's general authorization for intra-agency information sharing in furtherance of employees' duties, *see* 5 U.S.C. § 552a(b)(1); no "routine use" exception is required.[5]

Furthermore, disclosure of payment records to other federal agencies that occurred as a result of the Treasury DOGE Team's work to facilitate identification of payments that may have been improper under the President's Executive Orders, *see* Krause Decl. ¶¶ 17-20, Robinson Decl. ¶¶ 8-10, were permissible under published routine uses under the System of Record Notice (SORN).  *See* 5 U.S.C § 552a(b)(3); *Privacy Act of 1974; System of Records*, 85 Fed. Reg. 11,776 (Feb. 27, 2020). Disclosure within the federal government that occurred in connection with the process to assist agencies in complying with the President's Executive Order on foreign aid, which

---

[5] Plaintiffs also contend that no "routine use" exception authorizes the disclosures by or to Mr. Krause and Mr. Elez because of the passage of time since the SORN was published.  See TRO Mem. at 13. However, such notices are forward-looking, explaining the circumstances under which records may be disclosed in the future pursuant to 5 U.S.C. § 552a(b)(3).  Because the disclosures fit within the existing SORN routine uses, they are authorized. It is circular, moreover, to claim that application of any of the various uses published in that notice would necessarily "circumvent" the Privacy Act.  *Id.*

was approved by Treasury leadership on January 26, 2025 and implemented between January 27, 2025 and February 10, 2025 (Krause Decl. ¶¶ 17-20; Robinson Decl. ¶¶ 8-10), was therefore permissible under the Routine Uses in the Payment Record SORN.  Routine Use 17 permits disclosure to a federal agency "for the purpose of identifying, preventing, or recouping improper payments to an applicant for, or recipient of, federal funds." 85 Fed. Reg. 11,780. Treasury transmitted payment records to the Department of State to facilitate the agency's identification of payments that were subject to the pause required by the Executive Order and, thus, may not have been proper for the payor agency to certify as well as payments that were entitled to a waiver and could properly be paid. *See* Krause Decl. ¶¶ 17-20. The process was implemented at the "pre-certification" or "pre-edit" phase, when other checks designed to identify potentially improper payments are performed, such as comparison of payments against the Do Not Pay working system. *See id*.  Like with Do Not Pay process, Treasury shared payment records identified through its review process to provide relevant agencies the opportunity to determine whether to ultimately certify a payment for processing.

4.    Plaintiffs Have Not Shown a Violation of the Internal Revenue Code.

Plaintiffs next turn—very briefly—to the set of statutory protections applicable to tax returns or return information in § 6103 of the Internal Revenue Code.  TRO Mem. at 13.  But Plaintiffs' argument fails because an exception to the general rule of § 6103(a) applies for "[d]isclosure to certain Federal officers and employees for purposes of tax administration."  26 U.S.C. § 6103(h).  Indeed, "officers and employees of the Department of the Treasury" may obtain returns and return information if their "official duties require such inspection or disclosure for tax administration purposes."  *Id.*  "Tax administration," in turn, is defined to include "the administration, management, conduct, direction, and supervision of the execution and application of the internal revenue laws."  *Id.* § 6103(b)(4)(A)(i).  The payment systems at issue in this case

disburse the vast majority of government payments, including tax refunds. *See* Fiscal Service Overview, *available at* https://www.fiscal.treasury.gov/about.html (last visited Feb. 12, 2025).

The Treasury DOGE Team satisfied these statutory conditions for access to returns and return information. They were, to start, employees of the Treasury Department. Krause Decl. ¶¶ 1-2. And their "official duties" included serving as Treasury DOGE Team members who were "spearheading advances in Treasury's technology infrastructure, financial management systems, and cybersecurity initiatives," "overseeing the modernization of Treasury's legacy systems," and "collaborating with Treasury's Chief Information Officer (CIO) to help strengthen Treasury's cybersecurity protocols to protect its critical financial systems and mitigate risks." *Id.* ¶ 2. Indeed, some of the Treasury DOGE Team's duties related to GAO concerns regarding improper payments generally, and one of the programs GAO identified with a high risk of improper payments is IRS's Earned Income Tax Credit refunds. *Id.* ¶ 8. Moreover, the returns and return information subject to the protections of § 6103 pass through (and are stored on) the very same systems that is the Treasury DOGE Team is responsible for improving. Just like all of the other Treasury employees, contractors, and others who work every day to maintain and improve the operation of these critical payment systems, they therefore had the requisite need to obtain § 6103 material in the exercise of their official duties.

5.    Plaintiffs Have Not Shown *Ultra Vires* Agency Action.

Plaintiffs also purport to bring a non-APA *ultra vires* claim that Treasury officials acted beyond their statutory authority. TRO Mem. at 12-13. Even assuming the common-law *ultra vires* doctrine still exists in suits against the federal government, *but see Apter v. Dep't of Health & Human Servs.*, 80 F.4th 579, 593 (5th Cir. 2023) ("[U]nder our precedent, Congress apparently 'did away with the ultra vires doctrine and other fictions surrounding sovereign immunity' when

it amended the APA in 1976.") (quoting *Geyen v. Marsh*, 885 F.2d 1303, 1307 (5th Cir. 1985)), Plaintiffs' non-APA arguments are identical to their APA "contrary to law" arguments. *See* TRO Mem. at 11-12. Those arguments fail for the same reasons discussed above.

      6.    <u>Plaintiffs Cannot Show That Defendants Acted Arbitrarily or Capriciously</u>.

Plaintiffs have also failed to show a likelihood of success on their claim that Defendants acted arbitrarily or capriciously. The gravamen of Plaintiffs' argument is that Treasury should not have permitted the Treasury DOGE Team to access BFS systems because of Defendants' "legal obligations under federal law." *See* TRO Mem. at 13-14. But that is just a restatement of Plaintiffs' contrary to law arguments. Because it was lawful for the Treasury DOGE Team to access BFS systems, for the reasons explained above, the premise of Plaintiffs' argument is faulty. Nor is there any basis for Plaintiffs' unsupported claim that Defendants "ignored the reliance and expectation interests" of individuals whose information is contained in BFS systems. TRO Mem. at 14. As described herein, Mr. Krause is, and Mr. Elez was, an employee of Treasury when they had access to those systems, and Plaintiffs cannot show how employee access is inconsistent with any reasonable expectation interests.

Finally, to the extent the Treasury Department was required to explain its (nonexistent) change in position, it has done so here. The Treasury DOGE Team was tasked by Treasury leadership with implementing technical improvements in Treasury systems. Krause Decl. ¶ 2. They had good reason, then, to have access to BFS payment systems, even if others might have managed the Treasury's systems differently. *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983).

## II.  PLAINTIFFS HAVE NOT SHOWN IRREPARABLE HARM.

Plaintiffs cannot obtain an injunction without establishing that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. This showing is

not optional: "[t]he failure to demonstrate irreparable harm is 'grounds for refusing to issue a preliminary injunction, even if the other three factors . . . merit such relief.'" *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). "In this Circuit, a litigant seeking a preliminary injunction must satisfy 'a high standard' for irreparable injury." *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 46 (D.D.C. 2014) (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297). For all the reasons Plaintiffs have failed to show cognizable injury for the purposes of Article III standing, they have necessarily failed to show any irreparable injury.

## III.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH IN DEFENDANTS' FAVOR.

As the Krause Declaration, and GAO reports to which it refers, detail, there are important reasons to improve and modernize BFS systems to avoid making improper or fraudulent payments on the order of billions of dollars. Krause Decl. ¶¶ 7-9. The Treasury DOGE Team's efforts, as led by Mr. Krause, are intended to assess and reform the technical systems so as to improve their ability to prevent this misspending of federal funds. There is plainly a public interest served by enabling them to do so. There is also a strong public interest in the President, duly elected, implementing through Executive Branch departments the policy objectives he was elected to implement.

Against this public interest, Plaintiffs offer only a rehash of their unconvincing arguments regarding irreparable harm and likelihood of success on the merits. TRO Mem. at 18-19. Plaintiffs have not even shown injury sufficient for standing, much less irreparable harm.

### CONCLUSION

For the foregoing reasons, Defendants ask that the Court deny Plaintiffs' motion for preliminary injunction, and that the Order entered on February 6, 2025 be dissolved.

Dated: February 12, 2025                    Respectfully submitted,

                                            BRETT A. SHUMATE
                                            Acting Assistant Attorney General
                                            Civil Division

                                            MARCIA BERMAN
                                            Assistant Director
                                            Federal Programs Branch

                                            */s/ Bradley P. Humphreys*
                                            BRADLEY P. HUMPHREYS
                                            Senior Trial Counsel
                                            ANNA DEFFEBACH
                                            Trial Attorney
                                            Federal Programs Branch
                                            Civil Division, Department of Justice
                                            1100 L Street, NW
                                            Washington, DC 20005
                                            Telephone: (202) 305-0878
                                            Bradley.Humphreys@usdoj.gov

                                            *Counsel for Defendants*