```
1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2                                 ---

3

   ALLIANCE FOR RETIRED          )
4  AMERICANS, et al.,            )
                                 )
5                                )  CIVIL NO. 25-313
              Plaintiffs,        )
6                                )
   v.                            )  February 24, 2025
7                                )
   SCOTT BESSENT, et al.,        )  2:03 p.m. - 5:01 p.m.
8                                )
                                 )
9             Defendants.        )
   _____)
10

11            TRANSCRIPT OF PRELIMINARY INJUNCTION

12      BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
                UNITED STATES DISTRICT JUDGE
13
                                 ---
14
   APPEARANCES:        PUBLIC CITIZEN LITIGATION GROUP
15                     BY:  Nandan M. Joshi
                            Allison Marcy Zieve
16                          Norman Eisen
                       1600 20th Street, NW
17                     Washington, DC 20009
                       (202) 588-1000
18                     Email: njoshi@citizen.org
                             azieve@citizen.org
19
                       For the Plaintiffs
20

21                               ---

22

23

24 COURT REPORTER:     CHANDRA R. KEAN, RMR
                       Official Court Reporter
25                     333 Constitution Avenue, NW
                       Washington, DC 20001
```

```
 1    APPEARANCES CONT'D:

 2
                        U.S. DEPARTMENT OF JUSTICE
 3                      BY:  Bradley Humphreys
                             Elizabeth Shapiro
 4                           Christopher Healy, Treasury
                        1100 L Street, NW
 5                      Washington, DC 20005
                        (202) 305-0878
 6                      Email: Bradley.humphreys@usdoj.gov

 7
                        For the Defendants
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | **PROCEEDINGS** |
| 13:23:01  2 | (Court called to order at 2:03 p.m.) |
| 14:03:21  3 | DEPUTY COURTROOM CLERK:  Civil case 25-313, |
| 14:03:25  4 | Alliance for Retired Americans et al., versus Scott |
| 14:03:29  5 | Bessent. |
| 14:03:29  6 | Counsel, would you please identify yourself for the |
| 14:03:31  7 | record, starting with the plaintiff. |
| 14:03:34  8 | THE COURT:  When you speak, you can take the |
| 14:03:35  9 | masks off, because otherwise we really can't get a |
| 14:03:41 10 | record, so that's not a problem.  And I would ask that |
| 14:03:43 11 | you come to the podium.  It just makes it easier. |
| 14:03:46 12 | We do have a public access line so those others can |
| 14:03:52 13 | hear what's going on.  So it's important that you speak |
| 14:03:56 14 | clearly into the microphone, not only for me to hear it |
| 14:04:01 15 | but for others as well. |
| 14:04:03 16 | All right. |
| 14:04:03 17 | MR. JOSHI:  Thank you, Your Honor.  Nandan |
| 14:04:05 18 | Joshi with Public Citizens Litigation Group for |
| 14:04:07 19 | plaintiffs. |
| 14:04:07 20 | With me at counsel table is Allison Zieve with |
| 14:04:11 21 | Public Citizens Litigation Group and Norm Eisen with |
| 14:04:16 22 | State Democracy Defender's Fund. |
| 14:04:16 23 | THE COURT:  All right.  Good afternoon. |
| 14:04:19 24 | MR. HUMPHREYS:  Good afternoon, Your Honor. |
| 14:04:20 25 | Bradley Humphreys for the Department of Justice on |

14:04:23  1    behalf of the defendants.  I also have with me Elizabeth

14:04:27  2    Shapiro of the Department of Justice and Christopher

14:04:33  3    Healy of the Treasury Department.

14:04:35  4         Thank you, Your Honor.

14:04:43  5         THE COURT:  All right.  So we're here on a

14:04:46  6    hearing on the preliminary injunction.  You should make

14:04:49  7    an assumption that I've read the briefs, the affidavit,

14:04:52  8    and the other materials that have been provided, as well

14:04:54  9    as the opinions that have been coming down.  Although

14:04:58  10   not all of the opinions I've -- some of them, if they've

14:05:01  11   been out of our circuit, I had less of a chance to

14:05:06  12   really study them carefully but -- other than the New

14:05:09  13   York one.

14:05:10  14        Obviously, the issues are complex and some may

14:05:14  15   even -- can be considered novel.

14:05:15  16        So I have a series of questions.  So I'm going to

14:05:19  17   have the plaintiffs get up, and you're going to be

14:05:20  18   answering questions.

14:05:22  19        If my question goes to something that somebody else

14:05:25  20   that's standing here -- one of your other attorneys is

14:05:28  21   better suited to answer, that's fine.  Just let them

14:05:31  22   come up.  Whoever it is that's versed in whatever I'm

14:05:34  23   asking you, I don't have any problem with your switching

14:05:37  24   around and having different people make arguments.  And

14:05:40  25   same thing, of course, for the defendants.

14:05:43　1　　　　So I have questions both -- for the plaintiffs,

14:05:44　2　then I'll have questions for the defendants.

14:05:47　3　　　　I'll let the plaintiffs come back, and if you want

14:05:50　4　to respond to something the defendants have raised, you

14:05:52　5　can do so since it is your burden.

14:05:57　6　　　　I will let you make -- once we've gone through that

14:06:00　7　process, make any additional arguments that do not

14:06:05　8　correspond with what we've already talked about through

14:06:07　9　my questions.  But if there's something additional you

14:06:10　10　want to bring to my attention, I don't have any problem

14:06:13　11　with that.

14:06:14　12　　　　And then at the end, we'll discuss sort of moving

14:06:16　13　forward and next steps in terms of what we should do.

14:06:26　14　　　　So I'm sure everybody is aware that Judge Vargas in

14:06:32　15　New York granted a preliminary injunction for the

14:06:34　16　Treasury Department, although the issues were slightly

14:06:37　17　different and some arguments were different, but

14:06:40　18　basically it's the same preliminary injunction that was

14:06:45　19　filed in this particular case.  Although I think the

14:06:48　20　relief is probably perhaps a little broader than

14:06:51　21　requested.

14:06:51　22　　　　So let me just ask at the outset before we go

14:06:55　23　through all of this:  Given Judge Vargas's ruling in the

14:06:58　24　Southern District of New York, why is an injunction from

14:07:02　25　this Court necessary to prevent irreparable harm?

14:07:10   1      So, Plaintiff, you're up.

14:07:11   2           MR. JOSHI:   Thank you, Your Honor.

14:07:12   3      Yes, the injunction in New York is -- would protect

14:07:18   4  us, but the -- I think the -- this case, as you note, is

14:07:25   5  on -- has some slightly different claims to it,

14:07:28   6  especially under the Privacy Act, that the action at

14:07:32   7  issue is in violation of the requirements of the Privacy

14:07:36   8  Act and the Internal Revenue Code.  The Court in New

14:07:39   9  York did not reach those because the state's interests

14:07:43  10  were different.

14:07:44  11      The -- I think that just simply as a matter of

14:07:47  12  course, the injunction may or may not last in New York.

14:07:51  13  I don't know yet if the government will appeal that

14:07:53  14  injunction.  In addition, the Court there provided an

14:07:56  15  opportunity for the government to come back with some

14:07:59  16  more information which may modify the injunction.

14:08:03  17      And rather than having us come back if something

14:08:07  18  changes in New York, I think -- or have a triggering

14:08:12  19  preliminary injunction here, it makes more sense for the

14:08:15  20  Court to address the issues presented in the motions.

14:08:20  21           THE COURT:  All right.  I expected that answer,

14:08:21  22  which is why I prepared my questions, but I thought you

14:08:24  23  should be asked at least at the outset.

14:08:26  24      So let me start with standing.  And let me just put

14:08:31  25  a little bit of background to it.

14:08:34  1   To secure a preliminary injunction, plaintiffs must

14:08:37  2  show a substantial likelihood of standing under the

14:08:40  3  heightened standard for evaluating a motion for summary

14:08:43  4  judgment, and you have to rely on affidavits or other

14:08:46  5  credible evidence to do so.

14:08:47  6   So there's three elements of what I assume you're

14:08:50  7  raising, which is association with standing.

14:08:54  8   Plaintiffs' members could use on their own -- could

14:08:58  9  sue -- I'm sorry -- on their own.  The interests

14:09:01  10  plaintiffs seek to protect are germane to the

14:09:03  11  organizational purposes.  Neither the claim asserted or

14:09:06  12  relief requested requires participation of individual

14:09:11  13  members.

14:09:12  14   And then there's three elements of regular

14:09:15  15  standing, which is concrete injury-in-fact, causation,

14:09:18  16  and redressability.

14:09:19  17   So am I correct that you're only advancing a theory

14:09:23  18  of associational standing, and you're bringing these

14:09:26  19  claims on behalf of your members, not under a theory of

14:09:30  20  organizational standing that the plaintiffs organization

14:09:33  21  are injured as well?

14:09:34  22   Is that correct?

14:09:36  23    MR. JOSHI:  That's correct, Your Honor.

14:09:37  24    THE COURT:  Okay.  So your briefing on standing

14:09:40  25  focuses exclusively on the first requirement of

14:09:44  1    associational standing that plaintiffs' members could
14:09:46  2    sue on their own.  But I obviously have to make findings
14:09:50  3    on all three elements.
14:09:52  4        The second one:  Why are the interests that
14:09:56  5    plaintiffs are seeking to protect germane to the
14:09:58  6    organizations' purposes?
14:10:00  7        Where in the record can I see that?
14:10:02  8        And the third:  Do individual members need to
14:10:05  9    participate in this lawsuit?  And if not, why not?
14:10:08  10        So if you can answer those two, you know, whatever
14:10:10  11    arguments you have.  And you can do these in summary
14:10:12  12    form.  You obviously have written --
14:10:14  13            MR. JOSHI:  Sure.  We have declarations from
14:10:16  14    the organizational leaders attached to our motion.  I
14:10:21  15    think that's the best place to find the discussion of
14:10:24  16    germaneness.
14:10:25  17        As to the need for individual plaintiffs to
14:10:29  18    participate -- individual members to participate, since
14:10:32  19    this is an APA case, this is not the typical type of
14:10:35  20    case where the members themselves have information that
14:10:41  21    would -- that require their presence in a court.
14:10:44  22            THE COURT:  Okay.  So in terms of the
14:10:46  23    injury-in-fact requirement as to -- relates to the
14:10:50  24    individual members and the first prong of associational
14:10:54  25    standing, can you succinctly state the injury-in-fact

14:10:58  1    here?

14:10:59  2         MR. JOSHI:  The injury-in-fact is the removal

14:11:01  3    of protections that are guaranteed by law to the

14:11:08  4    security of information -- personal, sensitive

14:11:11  5    information stored in the Bureau's systems.

14:11:14  6         We do not have the -- there's been no

14:11:17  7    administrative record filed in this case, and we do not

14:11:20  8    have the contours of the Secretary's changes to the

14:11:23  9    access procedures at the Bureau.  But we -- based on the

14:11:30  10   information we have been provided, in -- through the

14:11:34  11   declarations of the Bureau, it does appear that

14:11:37  12   significant changes have been made to the level of

14:11:41  13   access given to personal information in those systems.

14:11:48  14        And this is a -- this is a request for injunctive

14:11:54  15   relief, and so the harm here is, under TransUnion,

14:11:59  16   different than -- it's a different analysis than you

14:12:04  17   might have in a particular data breach case where a

14:12:07  18   plaintiff is seeking damages.

14:12:08  19        And I think Judge Vargas in New York explained that

14:12:11  20   pretty well in her decision, citing various courts that

14:12:16  21   have recognized that injunctive relief can prevent harm

14:12:22  22   caused by the loss of security is sufficient to show

14:12:28  23   harm for -- injury for purposes of injunctive relief.

14:12:33  24        THE COURT:  Okay.  So the defendants argue that

14:12:34  25   there's no standing under TransUnion, a case we all

14:12:39   1   know, without a public disclosure.  And your response

14:12:41   2   was that disclosure is not required by analogy to the

14:12:44   3   tort of intrusive -- intrusion upon seclusion.

14:12:49   4       Now, why isn't public disclosure of private facts a

14:12:53   5   better analog?  TransUnion mentions that tort as well.

14:12:57   6       And let me just run through the questions and then

14:12:59   7   you can decide how you want to formulate it.

14:13:02   8       Does TransUnion give me guidance about how I'm

14:13:05   9   supposed to decide which tort -- "intrusion upon

14:13:08  10   seclusion" or "public disclosure of private facts" --

14:13:11  11   provides the best or maybe the most relevant analog?

14:13:14  12       And intrusion on seclusion imposes liability on the

14:13:18  13   person who does the intruding not the steward of the

14:13:22  14   private information who allows the intrusion to happen?

14:13:26  15       Is that a problem in this case?

14:13:28  16       So if you could address them, and you can do them

14:13:30  17   in whatever order you want.

14:13:32  18           MR. JOSHI:  Sure.  The lack of standing in

14:13:39  19   TransUnion, that case focused on a damages claim.  And

14:13:43  20   the Court was very clear there that when you're seeking

14:13:47  21   damages based on an action that poses a risk of harm,

14:13:52  22   you have to show a little bit more to get -- bring --

14:13:56  23   get some type of monetary relief.

14:13:59  24       And they distinguish that from the injunctive

14:14:03  25   situation involving an injunction where the whole

14:14:05   1    purpose is to prevent a harm.

14:14:07   2         So, for example, if the government issued a

14:14:11   3    regulation saying no one could use passwords on their

14:14:14   4    system, that doesn't produce an immediate harm until

14:14:17   5    someone's information is stolen.  But I think under

14:14:21   6    TransUnion, and under other cases involving injunctive

14:14:25   7    relief, someone who wanted to use a password to protect

14:14:30   8    their privacy would be able to bring an APA claim.  And

14:14:33   9    we've suffered immediate injury from the loss of that

14:14:35   10   protection.

14:14:36   11        And it really doesn't matter whether that

14:14:37   12   information is on their personal laptop, in the cloud,

14:14:40   13   or on the government systems.  Their interest in

14:14:44   14   protecting personal, private information from being

14:14:52   15   unprotected is one -- I think as you alluded to, akin to

14:14:57   16   the interest in a protection -- intrusion on seclusion,

14:15:04   17   which is that there are certain pieces of information

14:15:06   18   that the law protects against being intruded upon by

14:15:14   19   third parties against the plaintiff's consent.

14:15:16   20        And here you have two statutes, the Privacy Act and

14:15:19   21   the Internal Revenue Code, that specifically provide

14:15:23   22   plaintiff -- individuals the right to consent before

14:15:28   23   their information is disclosed, absent falling into one

14:15:32   24   of the expressed statutory exclusions.

14:15:34   25        And so that's the situation we have here.

14:15:38    1          And I -- you know, the actual decision in

14:15:43    2    TransUnion, because that involved a damages claim, I

14:15:45    3    don't think is directly applicable.  But I think the

14:15:49    4    distinction the Court drew there between injunctive

14:15:52    5    relief and damages action in analyzing standing is

14:15:54    6    relevant.

14:15:55    7          THE COURT:  So your view is the intrusion on

14:15:57    8    seclusion as the better -- is the better argument from

14:16:00    9    your perspective?

14:16:02   10          MR. JOSHI:  It's the most analogous to the

14:16:04   11    common law -- traditional common law torts.

14:16:07   12          Now, I will say here, even if you have a

14:16:10   13    publication -- if you look to the other courts that

14:16:15   14    require publication, here you do have the threat of

14:16:17   15    publication outside the Treasury Department.  And

14:16:21   16    Congress, in both of the statutes that are at issue

14:16:26   17    here, did seek to protect information from being

14:16:28   18    shuttled throughout the Federal Government and is

14:16:31   19    meant -- the protections are meant to confine personal

14:16:38   20    information to the agency that holds the data for the

14:16:41   21    agency purposes.

14:16:42   22          And so here you have a risk -- you have a directive

14:16:44   23    from the President that says agencies should give the

14:16:50   24    U.S. DOGE Service prompt -- full and prompt access to

14:16:54   25    all unclassified information on their systems.  That's

14:16:57  1    in the DOGE Executive Order.  And that would -- if that

14:17:04  2    were implemented, if the courts were to lift their

14:17:08  3    order -- if this Court were to lift its order and the

14:17:11  4    New York Court were to lift its order and the Executive

14:17:14  5    Order were implemented, that would entail sharing of

14:17:17  6    personal information outside the Bureau to the Executive

14:17:19  7    Office of the President.

14:17:27  8         THE COURT:  Okay.  Do you want to add any

14:17:30  9    additional arguments to my third sort of question, which

14:17:33  10   was the intrusion on seclusion liability on the person

14:17:36  11   who does the intruding not the steward of the

14:17:38  12   information, as to whether there's, you know, a problem

14:17:41  13   in this particular case?

14:17:43  14        MR. JOSHI:  Well, here if you take the

14:17:45  15   government's theory, the steward and the person doing

14:17:47  16   the intruding are the Federal Government, right?

14:17:48  17        It's one part of the Federal Government holds the

14:17:51  18   information and another part of the Federal Government,

14:17:53  19   the Executive Office of the President, the U.S. DOGE

14:17:58  20   Service, wants access to it.

14:18:01  21        So it's -- beyond that, I think the -- I mean, the

14:18:06  22   common law analogs to Article III injury don't have to

14:18:10  23   be perfect.  They don't have to line up element by

14:18:15  24   element.  They simply -- you look to the common law to

14:18:18  25   determine whether the type of injury that the plaintiff

14:18:21  1   would suffer is the type that was protected at common

14:18:25  2   law.  And here, we are talking about a massive loss of

14:18:28  3   privacy just like in any -- any type of situation where

14:18:33  4   personal information is held in the trust of someone

14:18:36  5   else, whether it's your bank or your creditor company or

14:18:41  6   here, your government.

14:18:42  7        And so it's -- or if it's -- even if it's just held

14:18:46  8   in, you know, in your own home, if there's an invasion

14:18:50  9   of that privacy by itself is -- the type of injury that

14:18:54 10   was reflected in common law and that's protected by

14:18:58 11   federal law and gives rise to an Article III injury.

14:19:02 12            THE COURT:  Well, if we look at the other

14:19:04 13   elements in terms of -- you're looking at the

14:19:07 14   injury-in-fact, what's the fairly traceable connection

14:19:09 15   between the members' injuries and the defendants'

14:19:12 16   conduct, as you see it.

14:19:17 17        You've gone to some of it, but if there's anything

14:19:19 18   else you want to add.

14:19:21 19            MR. JOSHI:  Right.  The traceability is if -- I

14:19:23 20   mean, it's the change in policy that is effectuated at

14:19:27 21   Treasury to implement the President's DOGE Executive

14:19:33 22   Order that changed the security that was -- that

14:19:38 23   protected plaintiffs' members' information.  And we

14:19:42 24   already have, even in one week since the -- that change

14:19:47 25   was implemented, we have a potential data breach that

14:19:51  1    still hasn't been fully resolved with Mr. Elez's perhaps

14:19:55  2    sending emails out of the Treasury into presumably

14:20:00  3    somewhere else in the Federal Government.

14:20:02  4        And I don't think they have provided information

14:20:03  5    about where --

14:20:05  6            THE COURT:  I'm going to be asking -- that's in

14:20:07  7    Judge Vargas's opinion, and hopefully --

14:20:10  8            MR. JOSHI:  That's something that could not --

14:20:12  9    would not have happened before -- before this change

14:20:17  10   that took place at Treasury to accommodate the Executive

14:20:21  11   Order.

14:20:21  12           THE COURT:  So you view it as a new policy or

14:20:22  13   as a change in the policy?

14:20:24  14           MR. JOSHI:  Yes.  Certainly, the information we

14:20:27  15   have was that up until Secretary Bessent took office,

14:20:32  16   career staff did not adhere to their old security

14:20:37  17   policy, and that there was a change when he took office

14:20:40  18   on January -- I think 28th was the exact date; that he

14:20:47  19   removed the career head of the Bureau and allowed the

14:20:54  20   DOGE team at the Treasury to access what Mr. Gioeli

14:21:03  21   called "broader access than has ever been granted

14:21:06  22   before."

14:21:07  23       And so that is -- I think that is a change in

14:21:09  24   policy just as if they had, you know, changed their

14:21:13  25   regulation to change their -- a regulation to change the

14:21:17   1    security that they use to protect their systems.

14:21:19   2              THE COURT:  All right.  And why is it likely

14:21:21   3    that your requested relief will redress members'

14:21:24   4    injuries, which is the last one.

14:21:25   5         You've discussed it to some degree.  Anything you

14:21:28   6    want to add to that?

14:21:29   7              MR. JOSHI:  No, Your Honor.  We're looking to

14:21:31   8    maintain the status quo to the extent possible with

14:21:35   9    respect to the old policy until this Court can issue a

14:21:41   10   final judgment.  And so that's -- our plaintiffs'

14:21:45   11   members' information would be protected from DOGE under

14:21:47   12   the old policy that was in place.

14:21:50   13             THE COURT:  All right.  Let me move to some

14:21:52   14   questions about subject matter jurisdiction under APA

14:21:59   15   702.

14:21:59   16        So APA Section 702 waives sovereign immunity for

14:22:04   17   suit seeking relief other than money damages against an

14:22:07   18   agency or officer.  But it conditions that waiver,

14:22:10   19   quote, "Nothing herein confers authority to grant relief

14:22:14   20   if any other statute that grants consent to suit

14:22:17   21   expressly or impliedly forbids the relief which is

14:22:22   22   sought."

14:22:23   23        "Impliedly forbids" is part of the issue.

14:22:25   24        The Court lacks subject matter jurisdiction if

14:22:27   25   another statute forbids the injunctive relief plaintiffs

14:22:31  1    seek here.

14:22:32  2         So both the Privacy Act and Internal Revenue Code,

14:22:36  3    which are the ones you're relying on, provide damage

14:22:39  4    remedies for unlawful disclosures.  Neither provides

14:22:42  5    injunctive relief against improper disclosure.

14:22:47  6         Why shouldn't I read that as impliedly by

14:22:49  7    implication forbidding injunctive relief for unlawful

14:22:52  8    disclosures?

14:22:54  9         MR. JOSHI:  I think you need something more

14:22:55  10   than a damages remedy.  Congress can always supplement

14:22:58  11   the APA with additional remedies, but if you don't have

14:23:01  12   anything more than -- even for an implied restriction,

14:23:09  13   if you don't have anything more than the existence of a

14:23:11  14   damages remedy, then you're simply saying that

14:23:14  15   supplementing the APA's remedies with something else

14:23:18  16   automatically forecloses the APA remedy.

14:23:22  17        And I don't think that's -- the courts have applied

14:23:25  18   702 that strictly.  I'm pretty sure they haven't.  The

14:23:29  19   Supreme Court in *Doe v. Chao* seem to recognize that the

14:23:32  20   Privacy Act and the APA can exist side by side.  The

14:23:37  21   Privacy Act for damages remedies, but the APA for

14:23:40  22   injunctive relief for policymaking decisions that affect

14:23:45  23   individual privacy.

14:23:48  24        The Court's decision last year in *USDA v. Kirts*

14:23:53  25   also recognized that the Privacy Act was not an

14:23:55  1    exclusive remedy that forecloses other statutes that

14:23:59  2    might provide a remedy against the Federal Government

14:24:03  3    for violations.

14:24:05  4        That case involved two statutes involving damages

14:24:08  5    remedy.  But I think the situation is even starker here

14:24:13  6    where you have two statutes citing the APA and the

14:24:16  7    Privacy Act.  They really go after two different

14:24:20  8    things.

14:24:20  9        I think the -- if the Privacy Act and the Internal

14:24:24  10    Revenue Code had specific methods for injunctive relief,

14:24:29  11    its own separate track for seeking review of

14:24:32  12    policymaking decisions, then you'd have a stronger

14:24:35  13    argument that Congress meant individuals to go through

14:24:37  14    that route rather than the APA.  But as it stands, you

14:24:41  15    don't have that sort of disconnect between the remedies

14:24:49  16    under the Privacy Act and the IRC versus the APA type of

14:24:54  17    remedy for unreasonable or unlawful policymaking

14:24:59  18    decisions.

14:25:03  19        THE COURT:  But doesn't *Match-E-Be-Nash* say

14:25:05  20    that when Congress intends a remedy to be exclusive the

14:25:08  21    APA can't undo that judgment?

14:25:09  22        Isn't that what you're asking for here?

14:25:11  23        MR. JOSHI:  No, I think once again, there's no

14:25:15  24    exclusivity indicated in either of the other statutes.

14:25:17  25    They are simply remedial statutes for certain types of

14:25:21   1    economic harm.

14:25:22   2         The Privacy Act involves economic harm, I should

14:25:25   3    say, but the -- for certain types of violations, but

14:25:28   4    they are supplementary and really go after damages

14:25:33   5    caused by violation as opposed to -- what the APA is

14:25:38   6    about was to ensure that aggrieved persons can seek

14:25:42   7    redress for violations of agency actions that are

14:25:47   8    contrary to law or arbitrary.

14:25:50   9         THE COURT:  So does it matter that the Privacy

14:25:52  10    Act does provide for injunctive relief for other things,

14:25:55  11    like correcting records, forcing an agency to provide

14:25:58  12    access to records about the individual person but not

14:26:03  13    for the remedy that you're requesting?

14:26:08  14         MR. JOSHI:  No.  In fact, I think it would go

14:26:10  15    the other way.  If an individual tried to get APA relief

14:26:14  16    for things that the Privacy Act -- injunctive relief

14:26:20  17    that the Privacy Act called for, that might be a better

14:26:23  18    argument for preclusion, but not a damages remedy.

14:26:26  19         And the courts have done the same thing in the FOIA

14:26:29  20    context, where the courts have said the fact that

14:26:34  21    individuals seeking records should proceed under FOIA

14:26:36  22    rather than the APA because they provide the same type

14:26:39  23    of relief: access to records.

14:26:41  24         But that doesn't preclude someone from using the

14:26:44  25    APA to file a reverse FOIA action.  The fact that FOIA

| | | |
|---|---|---|
| 14:26:49 | 1 | exists doesn't mean a reverse FOIA action is somehow |
| 14:26:52 | 2 | precluded under the APA.  Courts hear those all the time |
| 14:26:58 | 3 | because those involve a different type of remedy and |
| 14:27:04 | 4 | action than the FOIA itself -- than is implicated by |
| 14:27:11 | 5 | FOIA itself. |
| 14:27:12 | 6 | THE COURT:  So what's your best precedent |
| 14:27:15 | 7 | supporting your argument that APA relief, the injunctive |
| 14:27:18 | 8 | relief which we're talking about, is available here and |
| 14:27:21 | 9 | not under APA Section 702, "impliedly" forbidden by the |
| 14:27:26 | 10 | Privacy Act or the Internal Revenue Code? |
| 14:27:29 | 11 | MR. JOSHI:  We cited *Bowen v. Massachusetts*.  I |
| 14:27:32 | 12 | think that's more of a 704 case, but it seems like that |
| 14:27:35 | 13 | would also apply to 702. |
| 14:27:39 | 14 | It seems odd that if you can sue in the Court of |
| 14:27:41 | 15 | Claims for damages, that precludes -- that somehow |
| 14:27:43 | 16 | doesn't waive the government's sovereign immunity for |
| 14:27:46 | 17 | the -- under the APA. |
| 14:27:55 | 18 | THE COURT:  All right.  Let me move to -- and |
| 14:27:56 | 19 | I'll get back to that particular case, but I'll take it |
| 14:27:59 | 20 | at a later point. |
| 14:28:01 | 21 | Adequate Alternative Remedies Under APA 704. |
| 14:28:05 | 22 | So the D.C. Circuit said in Garcia that an |
| 14:28:10 | 23 | alternative remedy can be, quote, "adequate" and bar an |
| 14:28:14 | 24 | APA suit even if it's not identical to the injunctive |
| 14:28:17 | 25 | relief that would be available under the APA. |

14:28:19   1          And what's your response to that in terms of

14:28:23   2   Garcia?

14:28:23   3          MR. JOSHI:  Well, I agree it doesn't have to be

14:28:25   4   identical, but it does have to be adequate.  So if

14:28:30   5   there's a -- once again, I go back to the FOIA example.

14:28:34   6   A FOIA suit for records might not be exactly the same as

14:28:38   7   an APA suit, but they involve the same type of remedy,

14:28:43   8   which is getting access to records.

14:28:46   9          You don't have that situation here.  The Privacy

14:28:51  10   Act and the Internal Revenue Code do not care about

14:28:54  11   agency policymaking.  They don't care if the agency's

14:28:57  12   decisions are arbitrary and capricious.  They are simply

14:29:00  13   not grounded in those types of harms.

14:29:03  14          The APA is the only remedy that's available for

14:29:07  15   this sort of policymaking decision that was made here,

14:29:10  16   which was to change the security that applies to

14:29:18  17   information held in the Bureau's systems.

14:29:21  18          And so it's -- there's no, I think, sense that

14:29:30  19   the -- that somehow a private suit under -- for damages

14:29:34  20   under either of the statutes can address the situation

14:29:39  21   we have here where we're trying to restore the

14:29:45  22   protections that were previously afforded to this

14:29:48  23   information.

14:29:50  24          THE COURT:  Both sides cite to *Cell Associates*.

14:29:55  25   Why does that decision help you more than the

14:30:00  1    defendants?

14:30:01  2         MR. JOSHI:  I know we addressed it in our

14:30:07  3    brief, Your Honor.  I'm sorry, I'm blanking on *Cell*

14:30:10  4    *Associates*.

14:30:10  5         THE COURT:  From *Cell Associates:*  Congress,

14:30:12  6    quote, "linked particular violations of the Act to

14:30:15  7    particular remedies in a specific and detailed manner,"

14:30:18  8    which "points to a conclusion that Congress did not

14:30:21  9    intend to authorize the issuance of other injunctions."

14:30:27  10        MR. JOSHI:  I believe that was -- yes, I

14:30:29  11   believe that case involved a claim under the Privacy

14:30:32  12   Act.  And so this -- if this were a claim under the

14:30:35  13   Privacy Act, we would be limited to Privacy Act remedies

14:30:37  14   and not other remedies the Court could fashion.

14:30:40  15        That has nothing to do with the question of whether

14:30:41  16   the -- a suit under the APA allows for APA remedies --

14:30:47  17   the Court to award APA remedies.

14:30:53  18        THE COURT:  Okay.  Can you point me to some of

14:30:55  19   the best cases supporting the proposition that damages

14:30:59  20   under the Privacy Act are an inadequate remedy for the

14:31:03  21   injury that you're asserting and also in the Internal

14:31:07  22   Revenue Code?

14:31:07  23        MR. JOSHI:  I don't have any -- haven't seen

14:31:09  24   any cases under the Internal Revenue Code.  Once I

14:31:13  25   mentioned *Doe v. Chao*, albeit that's dicta, but that's

| | | |
|---|---|---|
| 14:31:17 | 1 | at 540 -- |
| 14:31:18 | 2 | THE COURT:  That's in your brief, right? |
| 14:31:20 | 3 | MR. JOSHI:  That's in our brief, yes. |
| | 4 | THE COURT:  Right. |
| 14:31:23 | 5 | MR. JOSHI:  Note 1 talks about the coexistence |
| 14:31:25 | 6 | of the Privacy Act with the APA.  And of course, we do |
| 14:31:29 | 7 | have -- I'll mention again, those are -- the D.C. |
| 14:31:33 | 8 | Circuit's case, *Doe v. Stephens*, also cited our brief, |
| 14:31:39 | 9 | does engage in APA review of a Privacy Act-related |
| 14:31:45 | 10 | action. |
| 14:31:45 | 11 | It's a -- it was a combination of the Privacy Act |
| 14:31:48 | 12 | of, I believe, a veteran statute.  And once again, *Bowen* |
| 14:31:53 | 13 | *v. Massachusetts* is -- squarely addresses the issue of |
| 14:31:57 | 14 | damages versus APA relief. |
| 14:31:59 | 15 | THE COURT:  You raised *Bowen* so let me get to |
| 14:32:03 | 16 | that one. |
| 14:32:04 | 17 | Isn't that more about the inadequacy of review in |
| 14:32:07 | 18 | the Federal Court of Claims -- which isn't obviously an |
| 14:32:10 | 19 | Article III court and might not have subject matter |
| 14:32:12 | 20 | jurisdiction over the relevant claims in the first |
| 14:32:15 | 21 | place. |
| 14:32:15 | 22 | So how does that case extend here?  Where can you |
| 14:32:20 | 23 | bring a damages suit in District Court? |
| 14:32:22 | 24 | MR. JOSHI:  It does -- it does talk about that, |
| 14:32:25 | 25 | but it also talks about the fact that the damages are |

14:32:30  1    simply not the type -- a damages remedy is simply not

14:32:35  2    the type of remedy that is sufficient by itself to

14:32:40  3    displace injunctive relief under the APA.

14:32:43  4        So I don't think it's solely about the venue at

14:32:47  5    issue with respect to the ability to sue.  It's -- it

14:32:56  6    does have a discussion about the remedies -- the

14:33:00  7    distinction between the remedies.

14:33:01  8        THE COURT:  So that's where you would have me

14:33:03  9    focus in terms of looking at the case?

14:33:05  10        MR. JOSHI:  Yes.

14:33:07  11        THE COURT:  All right.  Let me move to final

14:33:10  12    agency action.

14:33:12  13        APA Section 704 limits judicial review to, quote,

14:33:18  14    "final agency action" only.  And the action is final

14:33:24  15    when it marks the consummation of an agency

14:33:27  16    decision-making process.  It's one by which rights or

14:33:30  17    obligations have been determined or from which legal

14:33:32  18    consequences will flow.

14:33:35  19        So to show final agency action you seem to focus on

14:33:38  20    the implementation of a, quote, "new policy," end

14:33:43  21    quote -- which is what you mentioned earlier -- about

14:33:45  22    who can access the BFS systems.  But as you discuss in

14:33:50  23    your brief, this access was part of a, quote, "payment

14:33:53  24    process engagement plan" that was approved by the

14:33:58  25    Treasury Secretary.

14:33:59  1      Isn't the better argument that the approval of the

14:34:02  2  engagement plan was a final agency action?

14:34:06  3      I'm trying to get at what your -- what the new

14:34:11  4  policy is.  I mean, isn't it basically putting in place

14:34:14  5  the engagement plan?

14:34:17  6      MR. JOSHI:  Well, once again, we don't have a

14:34:19  7  record, but based on what we've seen so far --

14:34:20  8      THE COURT:  Well, we don't know what it is.

14:34:22  9  I'll agree with you on that.

14:34:25  10      MR. JOSHI:  Yes.  There were what seems to be a

14:34:29  11  series of steps that were taken shortly after Secretary

14:34:32  12  Bessent was sworn in.  The first was changing the

14:34:35  13  policies that had prevented the DOGE team from accessing

14:34:39  14  the data.  It appears then -- or around the same time

14:34:44  15  there was some negotiation that occurred between the

14:34:47  16  DOGE team and agency staff about this engagement plan,

14:34:52  17  as well as so-called mitigation measures to protect

14:34:58  18  information that was at risk because of this new access

14:35:01  19  policy.

14:35:02  20      And my understanding is Secretary Bessent either

14:35:06  21  directly or through his Chief of Staff approved all of

14:35:10  22  these changes.  So I can't segregate out the first

14:35:15  23  change from the subsequent implementation of the new

14:35:21  24  policy that occurred within a matter of a few days.  But

14:35:25  25  I think all together they add up to final agency action

14:35:31  1    that's at issue -- the final agency action that's at

14:35:34  2    issue in this case.

14:35:35  3         It has been consummated, and I don't think -- as I

14:35:39  4    read the defendants' brief, they don't challenge the

14:35:41  5    fact that there was agency action.  They simply say it's

14:35:44  6    not final.

14:35:44  7         But it's been done.  It's been implemented.  And it

14:35:48  8    changes the legal protections that plaintiffs' members

14:35:56  9    have with respect to the -- their personal data that's

14:35:59  10   in the Bureau systems.

14:36:01  11        So I'm not sure what else would be needed to make

14:36:04  12   the action final at this point.

14:36:08  13        THE COURT:  Okay.  Well, the engagement plan,

14:36:10  14   as I understood it, seems to have provided for a new

14:36:13  15   protocol for tagging BFS payment systems with symbols

14:36:21  16   and codes to categorize particular payments, which it

14:36:24  17   would appear had not been done before.

14:36:27  18        MR. JOSHI:  No, I -- my understanding --

14:36:30  19        THE COURT:  Unprecedented access by one person

14:36:31  20   to multiple sensitive databases.

14:36:36  21        MR. JOSHI:  Yeah, my understanding is there

14:36:38  22   were two different things that were going on.

14:36:40  23        The first was the attempt early on by the DOGE team

14:36:44  24   to implement the President's freeze on foreign aid

14:36:48  25   assistance.  And they went in and either attempt --

14:36:51   1   started to make some changes or made some changes to the

14:36:57   2   way the Bureau processes those payments in order to

14:37:02   3   implement the foreign aid Executive Order -- the foreign

14:37:05   4   aid freeze in the Executive Order.

14:37:09   5       Separate from that, there's this engagement plan

14:37:13   6   which is supposedly -- is supposed to last between four

14:37:15   7   to six weeks, by which the DOGE team will learn how the

14:37:19   8   Bureau's systems operate for some -- various purposes.

14:37:33   9       It's not clear -- we know from the President's

14:37:34   10  Executive Order that DOGE -- the USDS DOGE framework

14:37:45   11  lasts until July 2026.  What we don't know for Treasury

14:37:50   12  is after this engagement plan is completed in four to

14:37:53   13  six weeks what's next on the horizon for them.

14:37:56   14      But I think the engagement plan is different from

14:37:59   15  the procedures they implemented -- to implement the

14:38:03   16  Executive Order -- the foreign aid freeze Executive

14:38:08   17  Order.

14:38:08   18          THE COURT:  So would you rely on both of them

14:38:09   19  in your argument about a final agency action?

14:38:12   20          MR. JOSHI:  We're focused more on just the

14:38:14   21  access, which I think is represented more by the

14:38:17   22  engagement plan than the freeze order.  At least as I

14:38:22   23  understand it, that involved payments to grantees,

14:38:30   24  perhaps abroad, and if that's the case, that would

14:38:35   25  implicate the privacy interest of plaintiffs' members.

14:38:40  1          THE COURT:  Okay.  So what in terms of -- I'm

14:38:42  2    looking for precedent for some of these.

14:38:44  3      What's your best precedent for the proposition that

14:38:47  4    an agency's decision about how to manage and share

14:38:50  5    information within the Federal Government is a final

14:38:54  6    agency action, something that's more specific than what

14:38:58  7    I have at this point?

14:38:59  8          MR. JOSHI:  I do have the D.C. Circuit's

14:39:02  9    decision, *Doe v. Stephens*, that involved the routine use

14:39:06  10   exception.  But it did involve submitting information to

14:39:10  11   a grand jury.

14:39:10  12     To be honest, Your Honor, I think this type of --

14:39:14  13   what's going on now is pretty unprecedented, so I don't

14:39:17  14   know if I have anything that's squarely on point --

14:39:21  15         THE COURT:  Okay.

14:39:24  16         MR. JOSHI:  -- for this type of radical change

14:39:26  17   in how agencies manage their computer systems.

14:39:31  18         THE COURT:  Okay.  As I said, some of these

14:39:33  19   things are novel, so part of it is to find out whether

14:39:37  20   you have -- what you would focus on as precedent or if

14:39:40  21   there is actually any.

14:39:43  22     So let me move in terms of the merits, the

14:39:45  23   violation of the Privacy Act.

14:39:49  24     Obviously, the Privacy Act broadly prohibits

14:39:52  25   agencies from disclosing records to any person or any

14:39:54  1    other agency, but the Act also provides exceptions that

14:39:59  2    allow disclosure.  And there are two exceptions that are

14:40:02  3    relevant.

14:40:05  4        First, the Act allows disclosures to, quote, "those

14:40:08  5    officers and employees of the agency which maintains the

14:40:12  6    record who have a need for the record in the performance

14:40:15  7    of their duties."

14:40:16  8        And the second one is the Act allows disclosures,

14:40:19  9    quote, "for a routine use" that's identified in a

14:40:23  10   Systems of Record, without citing to the statute.

14:40:26  11       So the disclosure to employees exception, reading

14:40:32  12   their papers, you appear to -- I won't use speculate --

14:40:37  13   but to propose that Mr. Krause might be an employee of

14:40:40  14   USDS, which is not part of Treasury -- although we have

14:40:45  15   some issues with the organizations -- in addition to his

14:40:48  16   role as a Treasury employee and leader of the Treasury

14:40:52  17   DOGE team.

14:40:53  18       So can you point to anything in the record that

14:40:56  19   substantiates that, if I've read it correctly?

14:41:00  20       MR. JOSHI:  Well, we have Mr. Krause's

14:41:03  21   declaration, which says he does meet with USDS and gets

14:41:08  22   direction from them.  We accept that the declaration

14:41:12  23   says that Mr. Krause and formerly Mr. Elez, and I

14:41:15  24   believe they have a new person now, have job titles with

14:41:22  25   -- from the Treasury Department.

14:41:25  1          But I think there's still some ambiguity as to

14:41:29  2     whether they operate with two masters.  They are part of

14:41:32  3     the DOGE team.  The DOGE team was a creation of the

14:41:35  4     President's Executive Order.  There is some relationship

14:41:38  5     between the DOGE team at the agencies and USDS and the

14:41:44  6     Executive Office of the President that is not exactly

14:41:46  7     clear.

14:41:50  8          So if there were a chance for discovery on an

14:41:54  9     administrative record, it would be useful to have that

14:41:55  10    information, but at this -- based on what we have --

14:42:01  11    based on what we have now, I think there's at least some

14:42:04  12    ambiguity as to whether the DOGE team wears two hats.

14:42:08  13         And if they are doing that, then even when they're

14:42:12  14    getting information as employees -- officers or

14:42:17  15    employees of the Treasury, they are also getting

14:42:19  16    information -- the same information wearing that other

14:42:22  17    hat at the same time.

14:42:24  18         So that's our concern there.  It could be a back

14:42:26  19    door around the -- there's supposed to be a limited

14:42:32  20    exception to the nonconsensual nondisclosure requirement

14:42:37  21    if they're in fact sort of wearing two hats.

14:42:41  22         I think it would be the same thing of giving an

14:42:44  23    employee the job title of sharing information with

14:42:48  24    DOGE -- with USDS.  I don't think an agency would just

14:42:52  25    give a job title to their employees and say, well,

14:42:55  1    therefore, we can get around the Privacy Act limitations

14:42:57  2    that way.

14:42:58  3         So that's -- that's our concern with Mr. Krause, as

14:43:03  4    well as the other members of the DOGE team.

14:43:05  5         THE COURT:  I'm going to be asking the

14:43:07  6    defendant some questions relating to that.

14:43:09  7         So let's assume Mr. Krause is an employee of USDS.

14:43:15  8    Would that be a problem if he's only an employee of USDS

14:43:19  9    in the Executive Office of the President?  Because as I

14:43:21  10   understand it, USDS is an Executive Office of the

14:43:24  11   President.  Or do you think that Mr. Krause holding a

14:43:28  12   role in USDS is problematic even if he's both an

14:43:33  13   employee of Treasury and of USDS?

14:43:37  14        I'm giving different possibilities here.  We'll

14:43:40  15   hear from defendant hopefully a little more

14:43:43  16   specifically, but to ask you.

14:43:44  17        MR. JOSHI:  I think it's problematic if, once

14:43:48  18   again, he has two masters, in which case you're not

14:43:52  19   sealing off the information in the Bureau's records from

14:43:58  20   being disclosed outside the Bureau without the consent

14:44:00  21   of the individual involved.

14:44:03  22        It would be the same situation on the technical

14:44:08  23   side if you somehow connected the Bureau's computers

14:44:11  24   with the White House's computers and said that's all one

14:44:16  25   computer system.  I don't think you can do that to get

14:44:19  1   around the Privacy Act.  The same way I don't think you

14:44:21  2   can have an employee that has two masters, if you will,

14:44:25  3   and say that we're only disclosing information --

14:44:31  4   private information to the employee wearing hat A and

14:44:36  5   not hat B, especially in a situation where we know

14:44:40  6   they're working together for a common objective of some

14:44:44  7   sort.

14:44:44  8           THE COURT:  Who is the "they"?

14:44:46  9           MR. JOSHI:  USDS and the Treasury DOGE team.

14:44:50  10          THE COURT:  So is this "two hat" problem really

14:44:55  11  in terms of the Treasury USDS or -- I mean, the one --

14:44:57  12  you know, the two hats he clearly is is he's a Treasury

14:45:00  13  employee, at least at this point, but he's also the CEO

14:45:04  14  of Cloud Software Group.  That's the "two hat" question.

14:45:08  15          MR. JOSHI:  We have concerns about that.  We

14:45:09  16  don't have information at this point about what he's

14:45:13  17  doing with respect to his private CEO work as it relates

14:45:18  18  to what he's doing at the Treasury.

14:45:20  19       We don't have enough of a basis to make an

14:45:22  20  allegation with respect to those two roles he has.  I

14:45:26  21  think it's a concern.  I just don't know yet if it's a

14:45:32  22  legal claim.

14:45:33  23          THE COURT:  You don't -- I agree, at least I

14:45:35  24  don't see any information that was provided that tells

14:45:38  25  us exactly what he is or is not doing as the CEO.  But

14:45:42  1    my understanding is he at the same time as -- his

14:45:49  2    employment at this point is the government employment --

14:45:52  3    well, you have to be careful about how you term these.

14:45:55  4         Anyway, that he is the CEO of Cloud Software Group

14:46:01  5    at the present time.

14:46:02  6         Now, whether he's doing anything, I'm not -- I'm

14:46:05  7    not positive about it, but that seems to be a two hat --

14:46:09  8    more of a "two hat" issue than the other one.

14:46:12  9         MR. JOSHI:  No, I agree, Your Honor.  And to my

14:46:14  10   knowledge, the government has not taken the position

14:46:16  11   that Mr. Krause or anyone else can transfer the

14:46:20  12   Treasury's data to cloud computing legally.

14:46:24  13        I think they are taking the position that it is

14:46:29  14   okay and lawful for Treasury to --

14:46:33  15        THE COURT:  To have him have both positions.

14:46:36  16   But I agree, I don't think they're saying he can

14:46:39  17   transfer it but --

14:46:39  18        MR. JOSHI:  Well, I think they are taking the

14:46:41  19   position they can transfer it within the Federal

14:46:43  20   Government freely.

14:46:43  21        THE COURT:  Right.

14:46:44  22        MR. JOSHI:  But I don't think they're taking

14:46:45  23   the position they can transfer to a private --

14:46:48  24        THE COURT:  Right.  And that, I understand.  I

14:46:49  25   wasn't suggesting that they were doing that.  I think

14:46:51   1   they're aware that he has the two positions.

14:46:54   2          MR. JOSHI:  Yeah.

14:46:54   3          THE COURT:  Not that the information

14:46:56   4   necessarily gets -- the information gets transferred but

14:47:01   5   it does provide him, at this point at least, with access

14:47:05   6   to the information.

14:47:08   7          Does the timeline of Mr. Krause's employment status

14:47:12   8   matter for purposes of the preliminary injunction?

14:47:16   9          There have been obviously some irregularities which

14:47:20  10   have now been corrected about his onboarding process --

14:47:23  11   without getting into all the dates, which I will at one

14:47:26  12   point -- and some confusion by the government about what

14:47:29  13   role he had at various times.

14:47:32  14          I ask that because at least at one point in

14:47:35  15   their -- in the time frame, the engagement plan was

14:47:39  16   produced before he actually, I think, became a Treasury

14:47:44  17   employee.

14:47:45  18          So I'm curious as to whether you think the

14:47:50  19   employment, you know -- the changes in his employment

14:47:54  20   status have created any issues as far as you're

14:48:01  21   concerned.

14:48:02  22          MR. JOSHI:  There's some murkiness in the sense

14:48:07  23   that he -- according to the declarations, he became an

14:48:13  24   employee on January 23rd.  I believe his paperwork

14:48:17  25   initially said February 9th.  And then there was a

14:48:20  1    declaration that says that was in error and was

14:48:22  2    corrected.

14:48:23  3         So he -- if true, if that's true, then he became --

14:48:27  4    he started working at the Treasury Department on

14:48:30  5    January 23rd, which was before Secretary Bessent

14:48:34  6    actually was sworn in.

14:48:38  7         It's not clear from the record who he was reporting

14:48:42  8    to during that period since there was no -- I don't

14:48:45  9    believe there was a Treasury Secretary or even an acting

14:48:50  10   named during that time, so I think there was some

14:48:52  11   confusion there.

14:48:57  12        We have taken it that -- based on the reporting and

14:49:00  13   based on the information in the record, that when

14:49:02  14   Secretary Bessent came in, that's when Mr. Krause and

14:49:07  15   the DOGE team were granted full access to the Bureau's

14:49:11  16   systems.  I don't think they had that before, based on

14:49:15  17   the policy that was in place and being enforced by the

14:49:19  18   prior career staff.

14:49:22  19             THE COURT:  I'm going to ask the defendants in

14:49:24  20   terms -- there's a whole bunch of different dates, which

14:49:26  21   I won't go through now, but the engagement plan was

14:49:30  22   agreed to on January 26th, so part of it is to figure

14:49:35  23   out what position he actually was in at the point that

14:49:39  24   they came to that specific agreement, which I don't know

14:49:43  25   the answer to, but I assume you don't either.  And I

14:49:49  1    need to ask the defendants.

14:49:50  2          MR. JOSHI:  Yeah, I think that's right.  I

14:49:53  3    guess, as I understand it, they -- Mr. Krause came in.

14:49:57  4    Mr. Elez was already there on January 21st.  They had

14:50:04  5    this plan in place that they want to implement.  They

14:50:06  6    were not able to, by the way, because of the policy

14:50:10  7    enforced by the career staff.

14:50:11  8          Then Secretary Bessent was sworn in, and then the

14:50:14  9    policy changed.  And they were able to start

14:50:17  10   implementing the plan until the -- this Court's order,

14:50:21  11   and the court order in New York, at least, limited their

14:50:25  12   ability to access the systems directly.

14:50:30  13         THE COURT:  Okay.  The defendants seem to say

14:50:38  14   that Mr. Krause has a "need to know" information in BFS

14:50:44  15   systems because of his role in the payment processing

14:50:47  16   and the engagement plan.

14:50:49  17         Do you dispute that?

14:50:50  18         MR. JOSHI:  We have job descriptions for

14:50:55  19   Mr. Krause that are provided in the declarations.

14:51:01  20   They -- our concern with them is that they seem very

14:51:04  21   capacious, which is -- the "need to know" provision of

14:51:17  22   the Privacy Act is supposed to be about actual need to

14:51:22  23   know.  And it seems to me they draw this line between a

14:51:26  24   very broad description over IT improvements, basically,

14:51:30  25   to say he needs access to everything at all times upon

14:51:34  1    request, as far as I can -- as far as I see.

14:51:37  2        I think that could -- it could be a circumvention

14:51:41  3    around the Privacy Act limitations if, once again, they

14:51:45  4    had said his job description was to sell private data --

14:51:49  5    sell data in the private market.

14:51:51  6        That's not a reason to get around the Privacy Act.

14:51:55  7    You can't use the job description to do whatever you

14:51:57  8    want.

14:51:58  9        And so -- and that's our concern with what's been

14:52:04  10    put into the record so far, is that there's no apparent

14:52:09  11    cabining of his ability to access private data with

14:52:14  12    respect to how broadly they have defined his role.

14:52:20  13        THE COURT:  Okay.  Because their argument is

14:52:21  14    that the need to know -- they tie it together with his

14:52:23  15    role in the -- which we've talked about, which obviously

14:52:27  16    needs some more elucidation -- but the payment process,

14:52:30  17    the engagement plan, basically.

14:52:32  18        So it's not clear to me whether your -- you

14:52:35  19    obviously have concern broader than that in terms of

14:52:38  20    whether he's -- what his role is in the engagement plan

14:52:42  21    and some other aspects to it.  But do you see some

14:52:46  22    connection between "need to know" and this agreement

14:52:49  23    that they have, the engagement plan?

14:52:51  24        MR. JOSHI:  We don't have the contents of the

14:52:53  25    engagement plan.

14:52:54  1        As far as I understand it, the engagement plan says

14:52:57  2   they want to make improvements to the systems to spot

14:53:02  3   waste and abuse.  And they are going to look at

14:53:07  4   everything and, therefore, they need access to

14:53:09  5   everything without any sort of -- at least not that's in

14:53:13  6   the record -- any sort of detail as to how that will be

14:53:16  7   structured.

14:53:20  8        It's basically a roving charge to find fraud and

14:53:25  9   therefore they have access to whatever they want.

14:53:27  10        Mr. Gioeli called it broader than access -- you

14:53:30  11   know, "a broader level of access than has ever been

14:53:35  12   given before," I believe.  And I don't think the record

14:53:39  13   that they've put in place -- first of all, the record

14:53:42  14   they put in has nothing by the official decision-makers,

14:53:47  15   like Secretary Bessent, in terms of what he was

14:53:50  16   considering when he was structuring this plan.  So I

14:53:57  17   think it's deficient in that regard.

14:54:00  18        But if we had a statement, if we had some sort of

14:54:03  19   reasoned decision-making, we would have perhaps an

14:54:04  20   analysis of why everything -- all the data in the Bureau

14:54:08  21   systems would be open to the DOGE team seemingly upon

14:54:13  22   request.

14:54:14  23        THE COURT:  Okay.  Let me move to the routine

14:54:18  24   use in Paragraph 17 of the payment record, the SORN, in

14:54:25  25   terms of why it wouldn't apply here.

14:54:27  1          And as I understand it, Paragraph 17 allows

14:54:30  2     disclosures to a, quote, "federal or state agency, its

14:54:34  3     employees, agents, or contractors for the purpose of

14:54:37  4     identifying, preventing, or recouping improper payments

14:54:41  5     to an applicant for, or recipient of, federal funds."

14:54:49  6          So why doesn't that apply?  Why wouldn't you think

14:54:52  7     of it applying?

14:54:53  8          And let me add the next question, which is -- you

14:54:56  9     don't address this, I believe, because the defendants

14:55:00  10     only invoked the routine use exception as disclosures

14:55:04  11     made to State and Interior at the point that they did

14:55:08  12     that, not disclosures to USDS or Treasury DOGE team

14:55:13  13     personnel, or other reasons.

14:55:19  14          So is there a reason for not discussing this?  Is

14:55:22  15     it because they haven't brought it up as --

14:55:25  16          MR. JOSHI:  They didn't defend on that basis.

14:55:28  17     And I think -- the way I read that exception, it's for

14:55:31  18     actual fraud investigations.  For example, it includes

14:55:34  19     state agencies.

14:55:34  20          I don't think the Bureau would say, We can open up

14:55:37  21     our systems to states wholesale because there might be

14:55:40  22     fraud in our systems and therefore the states might be

14:55:43  23     able to help find that.

14:55:45  24          I read that exception for -- to allow for sort of

14:55:48  25     bona fide individualized fraud investigations, not to --

14:55:52  1    not for systematic technical changes to the system to

14:55:59  2    detect fraud.

14:56:00  3         THE COURT:  But you didn't really address it,

14:56:03  4    unless I missed it somehow.

14:56:04  5         MR. JOSHI:  No, we did not address it in our

14:56:07  6    reply brief because --

14:56:08  7         THE COURT:  Do you want to address it now?

14:56:09  8         MR. JOSHI:  I think that exception doesn't

14:56:11  9    apply --

14:56:11  10         THE COURT:  Is it what you just said?

14:56:12  11         MR. JOSHI:  Yeah.

14:56:13  12         THE COURT:  Okay.

14:56:14  13         MR. JOSHI:  It's -- I read that exception to

14:56:16  14    apply for particularized investigations.

14:56:22  15         So for example, they had an instance where an

14:56:24  16    account -- let's say the DOJ was conducting a fraud

14:56:28  17    investigation for illegal payments.  They might use the

14:56:30  18    Bureau.  They might coordinate with state agencies

14:56:35  19    about, you know, looking at payment transfers to

14:56:38  20    bringing a criminal action against a particular group of

14:56:42  21    entities.

14:56:43  22         I think that's what that exception is.  That's how

14:56:45  23    I read that exception to apply.

14:56:46  24         THE COURT:  Okay.

14:56:47  25         MR. JOSHI:  Which is why it has such a broad

14:56:52   1      category of recipients of information, not -- it's not

14:56:58   2      the type of thing where -- I think Mr. Krause is focused

14:57:02   3      on, according to his declaration, in improving the fraud

14:57:08   4      detection capabilities of the Bureau's payment systems.

14:57:13   5           THE COURT:   Okay.   So let me move just to the

14:57:17   6      Internal Revenue Code in terms of violation of that.

14:57:20   7           The Internal Revenue Code requires that, quote,

14:57:23   8      "returns and return information shall be confidential.

14:57:26   9      No one shall disclose any return or return information."

14:57:31  10      It does provide a whole bunch of exceptions to that

14:57:35  11      general rule.   They focus on -- defendants focus on one

14:57:39  12      exception which, quote, "allows disclosure to certain

14:57:43  13      federal officers and employees for purposes of tax

14:57:45  14      administration."

14:57:46  15           So why doesn't the tax administration exception

14:57:48  16      apply to any disclosures to the Treasury DOGE team?

14:57:54  17           MR. JOSHI:   I don't think there's enough

14:57:57  18      information that they put in that they're engaged in tax

14:58:00  19      administration.   They're looking -- if you take them at

14:58:05  20      their word, they're looking for making -- looking to

14:58:08  21      make systemic changes to the computer systems at the

14:58:13  22      Bureau, to perhaps detect tax information.

14:58:19  23           There's no sense of why they would need to look at

14:58:26  24      specific individualized tax return information of

14:58:29  25      individuals to engage in that activity.

14:58:32  1          I would note, I think there was recent reporting

14:58:35  2    that with respect to the DOGE team at the IRS, they're

14:58:38  3    not going to look at individualized tax information.

14:58:41  4    That was the representation made recently that was

14:58:42  5    reported in the media.

14:58:44  6          So I think there's a disconnect between sort of the

14:58:46  7    broad charge that the DOGE team has and the specific

14:58:53  8    exception for tax administration purposes that the

14:58:57  9    Internal Revenue Code provides for.

14:59:00 10          THE COURT:  All right.  Let me get into -- I

14:59:02 11    just have one question about the -- in terms of, again,

14:59:08 12    the merits, the arbitrary and capricious.

14:59:12 13          APA requires agencies engaged in reasoned

14:59:16 14    decision-making.  And the Court could set aside agency

14:59:20 15    action if it was arbitrary and capricious.

14:59:24 16          So the defendant's declaration suggests that

14:59:26 17    they're aware of the security, the operational risks

14:59:29 18    associated with the access they've provided to the

14:59:32 19    Treasury DOGE team.  They appear to have taken several

14:59:36 20    measures in response to those risks, which was in the

14:59:39 21    materials.

14:59:40 22          In your view, what factors or alternatives did they

14:59:43 23    fail to consider?

14:59:45 24          What should they have done differently, if you want

14:59:48 25    to address that.

14:59:48  1          MR. JOSHI:  Well, the first thing they could

14:59:50  2     have done, which is not in the record, is make

14:59:52  3     absolutely crystal clear that they cannot share any

14:59:56  4     personal data that's stored in the Bureau systems

14:59:58  5     outside the Bureau, especially to the Executive Office

15:00:01  6     of the President, because that's what's required under

15:00:03  7     the Executive Order, the DOGE Executive Order.  They

15:00:07  8     could have said, you know what, the DOGE Executive Order

15:00:10  9     says we have to follow all laws.  We need to make

15:00:13  10    crystal clear all of the data in our systems remain in

15:00:16  11    our systems.

15:00:17  12        Mr. Krause, the other members of the DOGE team, can

15:00:19  13    do their analysis, assuming everything else is lawful,

15:00:23  14    but they have to do it in-house.  They can't be sharing

15:00:27  15    that information outside of the agency.

15:00:30  16        So that's not in the record right now.

15:00:35  17        Beyond that, there's no real explanation of -- by a

15:00:40  18    decision-maker, especially Mr. Bessent, about what he

15:00:44  19    considered in implementing this particular system.  We

15:00:48  20    know it's failed already in the one week it was --

15:00:54  21    Mr. Elez was working under it.  And we don't have -- we

15:01:00  22    don't have a consideration of alternatives.  We don't

15:01:01  23    have any discussion of how they view the Privacy Act and

15:01:05  24    the Internal Revenue Code as limiting their discretion.

15:01:10  25        The Treasury has a privacy policy in place that is

15:01:16  1    supposed to implement the Privacy Act, and I don't think

15:01:18  2    there's any discussion about how their new system

15:01:23  3    comports with what they have articulated in that privacy

15:01:27  4    policy.

15:01:27  5        And so it's -- all that's missing.  For such a

15:01:31  6    pretty significant and unprecedented change in how the

15:01:35  7    Bureau has done -- has operated throughout its history.

15:01:40  8    I -- what we have is some contours of the end result of

15:01:44  9    the decision but not really an explanation and a

15:01:47  10   reasoned analysis for the decision.

15:01:49  11        THE COURT:  Okay.  So irreparable harm, which

15:01:54  12   I'll be frank, I think is your weakest link in terms of

15:01:59  13   discussing it.

15:02:00  14        Do you see precedent, which I would say is stricter

15:02:03  15   in a higher standard than New York, reading the cases

15:02:08  16   from Judge Vargas about --

15:02:10  17        Anyway, the D.C. Circuit precedent sets a very

15:02:13  18   "high standard" for the showing of "irreparable harm"

15:02:17  19   that is necessary to support the preliminary

15:02:20  20   injunction.

15:02:20  21        The threatened injury must be, quote, "beyond

15:02:24  22   remediation" and "injunctive relief" -- this is again a

15:02:27  23   quote -- "will not be granted against something merely

15:02:31  24   feared is liable to occur at some indefinite time," nor

15:02:35  25   will such relief be granted against an injury that's

15:02:38    1    merely theoretical, which is not simple.

15:02:43    2         Applying the standards, certainly a number of the

15:02:48    3    judges in this district have declined to issue TROs and

15:02:53    4    preliminary injunctions against, for instance, the high

15:02:57    5    stakes project like the oil pipeline when plaintiffs

15:03:01    6    have been unable to show that they've threatened harm,

15:03:05    7    oil spills is likely.

15:03:06    8         So what's your best precedent from this circuit for

15:03:10    9    the proposition that an uncertain or unmeasurable risk

15:03:16   10    of future harm satisfied, quote, "the likelihood of

15:03:20   11    irreparable harm" requirement for a preliminary

15:03:23   12    injunction?

15:03:24   13         And let me go to the second part, and you can

15:03:26   14    answer both together.

15:03:27   15         How do you distinguish cases in which judges in

15:03:29   16    this district have declined to find a likelihood of

15:03:32   17    irreparable harm, say, for example, from the permitting

15:03:36   18    of major oil pipeline projects based on a risk of future

15:03:42   19    harm, despite the opinions recognized that an oil spill

15:03:45   20    would be an enormous harm if it occurred?

15:03:49   21         Anything you can say on this point would be most

15:03:52   22    helpful.

15:03:53   23         MR. JOSHI:  Well, I agree the precedents are

15:03:55   24    mostly pretty recent because I don't think agencies have

15:03:58   25    been in the habit on a policy-making level of not

15:04:02  1    guarding their data pretty vigilantly.

15:04:04  2         I will say in terms of imminence, I would once

15:04:09  3    again go back to the Executive Order which says -- I'll

15:04:11  4    just read it.  This is what it requires:

15:04:14  5         "Agency heads shall ensure that USDS -- and that's

15:04:21  6    in the Executive Office of the President" --

15:04:23  7              THE COURT:  Right.

15:04:23  8              MR. JOSHI:  -- "has full and prompt access to

15:04:25  9    unclassified agency records."

15:04:28  10        And so in terms of imminence, but for this Court's

15:04:32  11   order and the Court order in New York, if Treasury is

15:04:35  12   going to comply with this Executive Order, and we have

15:04:39  13   no indication that they're not, they're going to share

15:04:43  14   data as soon as the courts allow them to.

15:04:46  15        And I don't think there's any --

15:04:48  16             THE COURT:  Share data with whom in terms of --

15:04:51  17             MR. JOSHI:  USDS.

15:04:52  18             THE COURT:  Okay.

15:04:53  19             MR. JOSHI:  USDS.  Share it outside of the

15:04:56  20   four -- the walls of the Bureau -- or the Treasury

15:04:58  21   Department.

15:04:58  22        And if -- if this were a situation where it was

15:05:02  23   just a piece of paper going from one agency into

15:05:06  24   another, that's something that can be clawed back.  I

15:05:09  25   think that -- in situations like that, you might find no

15:05:13  1    irreparable harm because you can sort of fix the problem

15:05:15  2    if the Court later determines that the plaintiff should

15:05:18  3    prevail.

15:05:20  4         But here, we're talking about a trove of

15:05:26  5    information in a database that will be transferred

15:05:30  6    wholesale if the Executive Order is to be taken on its

15:05:33  7    word, which talks about interoperability of systems and

15:05:37  8    data synchronization.

15:05:39  9         So once you transfer that database, and I don't

15:05:43  10   think there's any dispute of this either in this case or

15:05:47  11   any other cases, that can't be fixed.  You can't go back

15:05:51  12   to the status quo ante if you allow any kind of

15:05:55  13   wholesale database transfer of millions of records

15:05:58  14   containing personal information.  It's going to be mixed

15:06:01  15   up with other records, presumably from other agencies,

15:06:04  16   if this order is carried out.  And I think it's

15:06:07  17   impossible to disaggregate that.

15:06:14  18         That's why the preliminary injunction is so

15:06:16  19   important in this case, is to make sure that the

15:06:20  20   integrity of the data stays in place until this Court

15:06:23  21   can determine in a final decision whether in fact what

15:06:27  22   they're doing is lawful and permissible.  And -- because

15:06:34  23   once it's gone, it's a fait accompli.

15:06:38  24         And I think one of the things that perhaps I

15:06:42  25   disagree with some of the other decisions that have come

15:06:45    1    down --

15:06:46    2              THE COURT:  Please.

15:06:47    3              MR. JOSHI:  -- is they accept -- well, there's

15:06:48    4    a factual distinction and a legal error, in my view.

15:06:51    5        The factual distinction is in some of the other

15:06:53    6    cases, I believe there are actual declarations providing

15:06:58    7    the Court some assurance that no data would be shared if

15:07:02    8    it weren't for the Court's order.

15:07:03    9        You don't have that here.  There was no -- there's

15:07:06    10   no promise of not sharing data.

15:07:09    11             THE COURT:  In terms of -- if you can be more

15:07:11    12   specific about your concern of what -- sharing it with

15:07:14    13   whom?  Because I mean, you can do it within Treasury or

15:07:17    14   others.

15:07:17    15       So you're talking about USDS presumably or

15:07:20    16   something else?

15:07:21    17             MR. JOSHI:  Well, the Executive Order mentions

15:07:25    18   USDS, but to be honest, the whole DOGE thing is sort of

15:07:27    19   squirrely, because there's this USDS and there's this

15:07:31    20   USDS Temporary Organization that sits under it.  Then

15:07:35    21   there's the DOGE teams at each agency.  And then we

15:07:39    22   don't know Elon Musk's status.

15:07:42    23       The President said he was running DOGE, but there

15:07:44    24   was a filing in another case that said he was not the

15:07:47    25   USDS administrator.

15:07:50   1        So even though the Executive Order talks about

15:07:53   2   USDS, I think if it leaves the Treasury, if the

15:07:59   3   information we're worried about --

15:07:59   4        THE COURT:  So as long as it -- once it leaves

15:08:01   5   Treasury to --

15:08:02   6        MR. JOSHI:  Yeah.

15:08:03   7        THE COURT:  Okay.

15:08:03   8        MR. JOSHI:  And obviously, the DOGE network is

15:08:06   9   throughout the Federal Government at this point.  So

15:08:08  10   it's unclear what's happening behind their scenes with

15:08:10  11   respect to the computer networks.  But, right, Your

15:08:14  12   Honor, once the information leaves, it's not coming

15:08:17  13   back.  And that's gone forever.

15:08:20  14        And so that -- I think -- the legal error I think

15:08:26  15   from some of the other decisions is they seem to treat

15:08:34  16   intra-agency transfers as not public transfers.

15:08:37  17        And the Privacy Act says something different.  The

15:08:39  18   Internal Revenue Code says something different.

15:08:42  19        When you transfer information from one agency to

15:08:44  20   another, that's the equivalent, legally, of transferring

15:08:48  21   information from the agency to a private party.  They

15:08:53  22   are both, you know, unlawful unless they fall into an

15:08:58  23   exception that's specified in the statute.

15:09:00  24        THE COURT:  But this -- it does say -- in terms

15:09:05  25   of -- the other opinions sort of view it as it's not a

15:09:09    1    problem because it's an intra-agency sort of -- is that

15:09:11    2    your argument?  That an intra-agency transfer -- or

15:09:17    3    you're viewing it as not falling into that bucket, that

15:09:20    4    it's -- because it's a USDS and it's an entity that

15:09:22    5    is -- well, one we don't know totally how it's

15:09:25    6    formulated.  But that that's really the problem?

15:09:28    7        Do I understand your argument or not?

15:09:30    8            MR. JOSHI:  Maybe that's a distinction.  I

15:09:33    9    don't think -- going back to the standing argument, I

15:09:36   10    don't think publication is necessarily required, but to

15:09:41   11    the extent there is publication in violation of the

15:09:43   12    statute, the Court should treat -- respect Congress's

15:09:48   13    judgment that intra-agency transfers are the equivalent

15:09:53   14    of transfers to any other third party.

15:09:56   15            THE COURT:  Okay.  All right.

15:09:57   16        I missed your argument there.  Okay.

15:10:00   17        All right.  Anything else?  Because I think of the

15:10:03   18    arguments that I've gone through, and I haven't made a

15:10:05   19    final decision -- I wanted to hear from all of you -- I

15:10:11   20    think is the weakest link, to be frank with you.

15:10:14   21        So if there's any other argument that you want to

15:10:15   22    make on this, please go ahead.  I mean, I've focused on

15:10:19   23    certain things, but anything else you want to add at

15:10:21   24    this point would be welcome.

15:10:23   25            MR. JOSHI:  I think I'm good right now.  I

15:10:26  1    might add some more on rebuttal.

15:10:28  2              THE COURT:  Okay.

15:10:28  3              MR. JOSHI:  Thank you.

15:10:29  4              THE COURT:  The other thing is the balance of

15:10:31  5    equities in public interest.

15:10:33  6         Can you just give a short summary what you view

15:10:37  7    that as?

15:10:38  8              MR. JOSHI:  Oh, sure.  Once again, I think it

15:10:39  9    goes back to the immense harm that would happen if this

15:10:43  10   data was compromised versus I think very little effect

15:10:48  11   on the government's ability to do what it wants to do.

15:10:52  12        For example, if the DOGE team at Treasury can

15:10:56  13   undertake the reforms using Treasury career staff, I

15:11:03  14   don't -- I don't think the showing has been made that

15:11:06  15   the individual -- the two or three individuals who end

15:11:10  16   up being on the DOGE team need to look through and

15:11:14  17   process individualized personal information in order to

15:11:19  18   see the structure of the Treasury systems -- if that's

15:11:23  19   what they're interested in -- and how they work, and be

15:11:31  20   able to propose reforms to the way Treasury processes

15:11:35  21   data.

15:11:39  22        There's -- they say they need access to the

15:11:41  23   individual information.  It's not clear why -- there's

15:11:45  24   been no showing as to why that is the case, and what

15:11:49  25   harm would happen if they walled off from the personal

15:11:59  1    information while this case is pending -- what harm

15:12:07  2    would happen.

15:12:07  3        So I think the -- if you get to the balance of the

15:12:09  4    equities, it's pretty lopsided in favor of protecting

15:12:13  5    the individual privacy interests.

15:12:17  6        THE COURT:  All right.  Anything else you want

15:12:18  7    to make a particular point of?  Or anything that's new?

15:12:22  8    This is sort of an evolving case in terms of different

15:12:25  9    affidavits and material coming out.

15:12:27  10       And I was unable to get a copy of a transcript from

15:12:35  11   the New York case so I don't know whether something came

15:12:37  12   out of -- anything else other than what Judge Vargas put

15:12:41  13   in her opinion that came out in the, you know, in the

15:12:44  14   hearing.  But if you know of anything else that I should

15:12:49  15   know, please bring it to my attention.

15:12:50  16       MR. JOSHI:  I don't know of anything new.  I do

15:12:52  17   want to emphasize one thing about data security and

15:12:59  18   irreparable harm, which is we know about the breach with

15:13:01  19   respect to Mr. Elez's access.  We know he had wide

15:13:07  20   access, and we also know he sent emails out that they

15:13:12  21   still haven't tracked down.

15:13:14  22       And I would just point out that this was a very

15:13:18  23   minor breach, if the declarations are accurate.  And

15:13:24  24   yet, a week later, ten days later, we still don't know

15:13:26  25   the full scope of, you know, the harm or the level of

15:13:30  1    breach.  And once again --

15:13:33  2            THE COURT:  Excuse me.  When you say the --

15:13:36  3    this is what came out of the preliminary injunction

15:13:38  4    hearing, is that correct?

15:13:39  5            MR. JOSHI:  Yes.

15:13:40  6            THE COURT:  In New York.  I just want to make

15:13:41  7    sure.

15:13:41  8            MR. JOSHI:  Well, they put the information --

15:13:43  9    they have some declarations in here as well --

15:13:44  10           THE COURT:  Right.  Okay.

15:13:45  11           MR. JOSHI:  -- about the breach, but the

15:13:47  12   forensic analysis that they're going -- they're

15:13:50  13   undertaking for that minor breach is still not

15:13:53  14   completed.

15:13:53  15      And so I just think it -- it emphasizes that if

15:13:57  16   there's a wholesale compromise of the information issue,

15:14:04  17   if it gets transferred out, it's not going to be

15:14:06  18   repaired.

15:14:10  19           THE COURT:  Okay.  All right.

15:14:11  20      I don't have anything else.  So let me hear from

15:14:16  21   the defendants.  If they can wait one second and let me

15:14:19  22   get my papers together here.

15:15:39  23           MR. HUMPHREYS:  Thank you, Your Honor.

15:15:40  24           THE COURT:  So I have some questions, and most

15:15:43  25   of them are focused to bring some clarity -- my initial

15:15:48  1    ones at least -- on the organizational structure of DOGE

15:15:51  2    and USDS, et cetera, since there's some -- it's rather

15:15:57  3    opaque, at least from taking a look at it.

15:16:01  4        So let me start with the Executive Trump's --

15:16:06  5    President Trump's Executive Order and go through it.

15:16:08  6        So President Trump's Executive Order regarding the

15:16:12  7    U.S. DOGE Service -- which I'm going to call USDS, it's

15:16:16  8    just easier -- did three things, as I understand it.

15:16:18  9        It renamed the U.S. Digital Service.  It required

15:16:23  10   that the administrator of the U.S. DOGE Service report

15:16:26  11   to the White House Chief of Staff, so it moved it into

15:16:28  12   the Chief Executive Office.  And it created the U.S.

15:16:35  13   DOGE Service Temporary Organization.

15:16:37  14       So let me ask you some questions about those

15:16:39  15   actions.

15:16:40  16       So on January 19th of this year, where was USDS

15:16:46  17   located within the federal bureaucracy?  Was it a

15:16:50  18   component -- and I'll go through my questions, then you

15:16:52  19   can answer.

15:16:53  20       Was it a component of OMB?

15:16:55  21       And at that time the administrator of the USDS was

15:16:59  22   a Schedule C government employee; is that correct?

15:17:02  23       And that administrator reported to or was

15:17:06  24   supervised by the deputy director of management at OMB,

15:17:10  25   if that's correct.

15:17:11   1          And then the deputy Director of OMB is an officer

15:17:15   2   nominated by the President and confirmed by the Senate,

15:17:18   3   if that's correct.

15:17:18   4          And then the deputy director is supervised by the

15:17:21   5   Director of OMB, if that's correct.  And the director is

15:17:24   6   a principal officer nominated by the President and

15:17:28   7   confirmed by the Senate, if that's correct.

15:17:30   8          So let me go through each one of these.

15:17:33   9          This is January 19th of this year.  Where was USDS

15:17:39  10   located within the federal bureaucracy?

15:17:41  11          Was it a component of OMB, as I understand it?

15:17:45  12               MR. HUMPHREYS:  Your Honor --

15:17:46  13               THE COURT:  In its early stages.

15:17:47  14               MR. HUMPHREYS:  I apologize.  I may have to

15:17:49  15   confer with my colleagues.  I don't think that these

15:17:52  16   issues are directly presented in the plaintiffs' motion

15:17:54  17   or, you know, the structure before the Executive Order.

15:17:56  18          So on these specific questions about sort of the

15:17:59  19   USDS --

15:18:00  20               THE COURT:  Well, they do make a difference

15:18:02  21   ultimately, and I can get to that, but it does make a

15:18:06  22   difference in terms of where they are organizationally

15:18:08  23   and who the individuals are involved with as to whether

15:18:12  24   or not they have -- should have access to some of this

15:18:15  25   material, which is certainly at issue here.

15:18:17  1          So I mean, it's a road to get there, and some of

15:18:21  2     this is obviously factual information that I would hope

15:18:26  3     the government would know.  If there's somebody else who

15:18:29  4     has more knowledge about this, I'd appreciate it.

15:18:32  5          MR. HUMPHREYS:  I can check on that, Your

15:18:33  6     Honor.  I will say, I think this case, as plaintiffs

15:18:36  7     have pleaded it, is very simple in that the individuals

15:18:40  8     who have ever had access before this Court's

15:18:44  9     injunction --

15:18:44  10          THE COURT:  You need to move the microphone

15:18:46  11     over a little.

15:18:46  12          MR. HUMPHREYS:  Yes, Your Honor.

15:18:48  13          And that the specific individuals who had access

15:18:49  14     before this Court's injunction have and are and always

15:18:53  15     have been -- except that Mr. Wunderly has replaced

15:18:58  16     Mr. Elez -- but Treasury Department employees.

15:19:00  17          THE COURT:  Okay.  Let me go through this --

15:19:03  18     let me go through it in my way, if you don't mind.

15:19:06  19          MR. HUMPHREYS:  Yes, of course, Your Honor.

15:19:07  20          THE COURT:  Because it's particular time

15:19:09  21     periods and different decisions that were made along the

15:19:12  22     way.  And it does make a difference in terms of the

15:19:14  23     Privacy Act and various other things as to what category

15:19:17  24     they were in and where the organizations were, which is

15:19:21  25     why I'm starting with some sort of basic information

15:19:25  1    that cumulatively will answer some questions that I

15:19:31  2    have.  Okay?

15:19:32  3              MR. HUMPHREYS:  Of course, Your Honor.

15:19:32  4              THE COURT:  So let me get back to, do you know

15:19:35  5    where it was located on January 19th?

15:19:38  6         Was it a component of OMB, which I believe it was,

15:19:41  7    but I want to make sure that I'm correct.

15:19:44  8              MR. HUMPHREYS:  I also believe that's correct,

15:19:46  9    Your Honor.

15:19:46  10             THE COURT:  You do not?

15:19:47  11             MR. HUMPHREYS:  I do believe that's correct.

15:19:49  12             THE COURT:  You do.  Okay.

15:19:50  13        So it was a component of OMB.  And the

15:19:53  14    administrator of USDS at that point was a Schedule C

15:19:58  15    government employee, is that correct, based on the fact

15:20:00  16    that it's in OMB?

15:20:03  17             MR. HUMPHREYS:  I don't know the answer to

15:20:04  18    that, Your Honor.

15:20:05  19             THE COURT:  Okay.  USDS.

15:20:09  20        So do you know any -- in terms of who it is that

15:20:13  21    was in charge of the -- while it was sitting in OMB?

15:20:18  22             MR. HUMPHREYS:  No, Your Honor.

15:20:19  23             THE COURT:  For instance, administrator

15:20:22  24    reported to, supervised by the deputy director, which

15:20:25  25    are -- and some of these people are nominated by the

58

15:20:27  1    President, confirmed by them.  So the deputy director is

15:20:33  2    supervised by the Director of OMB, and some of these

15:20:37  3    people are -- as I said, are nominated by the President,

15:20:41  4    confirmed by the Senate, which puts them in different

15:20:45  5    categories.

15:20:45  6        So do you know any of that information?

15:20:47  7            MR. HUMPHREYS:  That information is knowable.

15:20:49  8    I'm sure the government does know it.  I just don't have

15:20:52  9    it at my fingertips.

15:20:54  10            THE COURT:  Okay.  Anybody at the table know?

15:20:57  11        Really, what I'm getting at is I understand it was

15:21:00  12    a component of OMB at that point.  And then I take it

15:21:02  13    nobody knows what the structure was as to who -- since

15:21:05  14    at this point there doesn't appear to be an

15:21:09  15    administrator, but I'll get to that.

15:21:11  16        So when it was with OMB, I take it it did have an

15:21:14  17    administrator who was a Schedule C government employee,

15:21:18  18    so you would be a government employee at that -- you

15:21:20  19    don't know that?

15:21:22  20            MR. HUMPHREYS:  I don't have that information.

15:21:23  21    I don't know at this time, you know, just here at the

15:21:26  22    lectern, Your Honor, about the structure before the

15:21:28  23    President's EO, but certainly we can get you that

15:21:35  24    information to confirm.

15:21:36  25            THE COURT:  Okay.  Anybody else know at the

15:21:38  1    table?

15:21:44  2         And this would have been before it was relocated to

15:21:46  3    the Executive Office of the President.

15:21:49  4              MR. HUMPHREYS:  We do not have that

15:21:52  5    information, Your Honor.  It did have --

15:21:52  6              THE COURT:  Okay.  Let me move on, then.

15:21:55  7              MR. HUMPHREYS:  Sorry.

15:21:56  8              THE COURT:  That's okay.  I realize that you

15:21:58  9    may not have come prepared for this, but I hoped you'd

15:22:02  10   know.

15:22:02  11        So now USDS has been renamed and it has been

15:22:06  12   relocated out of OMB to the Executive Office of the

15:22:09  13   President.  And an administrator of USDS reports to the

15:22:14  14   White House Chief of Staff.

15:22:14  15        Is that correct, at this point?

15:22:19  16             MR. HUMPHREYS:  That is the terms of the

15:22:21  17   Executive Order, that the administrator will report to

15:22:23  18   the Chief of Staff.

15:22:23  19             THE COURT:  Okay.  Is the position of

15:22:25  20   administrator of USDS still a Schedule C employee

15:22:29  21   position?

15:22:29  22             MR. HUMPHREYS:  I don't know.  If it's --

15:22:31  23   technically goes within Schedule C, Your Honor.

15:22:34  24             THE COURT:  Okay.  So what is the U.S. DOGE

15:22:37  25   Service Temporary Organization?

15:22:39  1          How is it different from USDS, and why are there

15:22:42  2    two versions of it?

15:22:46  3          Does that still exist or was that simply stored?

15:22:49  4          What's the --

15:22:50  5          MR. HUMPHREYS:  As the Executive Order

15:22:51  6    explains, it was renamed from U.S. Digital Service to

15:22:54  7    U.S. DOGE Service.

15:22:57  8          The second part of the question --

15:22:58  9          THE COURT:  What happened with the DOGE Service

15:23:00  10   Temporary Organization?

15:23:03  11         MR. HUMPHREYS:  I think for our purposes and

15:23:06  12   effectively the relationship between USDS and agencies,

15:23:08  13   that USDS and the USDS Temporary Organization are one in

15:23:14  14   the same.

15:23:15  15         THE COURT:  Okay.  So it's just two different

15:23:17  16   names for the same organization?  Or is one under the

15:23:20  17   other or what?

15:23:22  18         MR. HUMPHREYS:  One within the other.  I

15:23:24  19   believe there may be some internal reasons why there's a

15:23:28  20   separate organization.  But as for the interface with

15:23:30  21   Treasury, for example, as relevant here, there's not a

15:23:32  22   distinction.

15:23:34  23         THE COURT:  Okay.  Well, we move on, then.

15:23:42  24         Now, in the complaint, in the motion and

15:23:45  25   affidavits, it's obvious that the plaintiffs and their

15:23:49  1    members seem particularly concerned with the disclosures

15:23:52  2    that have been made to Elon Musk.

15:23:55  3         So on February 17th, the Department of Justice

15:23:58  4    represented to Judge Chutkan in 25-CV-429 that Mr. Musk,

15:24:05  5    quote, "is not an employee of USDS or the USDS Temporary

15:24:10  6    Organization," unquote.  And that Mr. Musk is not the

15:24:14  7    USDS administrator.

15:24:15  8         Is that all correct?

15:24:17  9              MR. HUMPHREYS:  That is correct, Your Honor.

15:24:18  10             THE COURT:  Okay.  Let me go through -- cite to

15:24:27  11   some other representations that had been made in terms

15:24:29  12   of balancing this out and considering what was said to

15:24:33  13   Judge Chutkan and what else has come out.

15:24:35  14        So this was -- she made those statements on

15:24:39  15   February -- the Department of Justice made those

15:24:41  16   statements on February 17th.

15:24:42  17        So the White House Press Secretary at -- on

15:24:47  18   February 3rd, said, quote, "President Trump tasked

15:24:50  19   Mr. Musk with starting up DOGE, and he has already done

15:24:54  20   that," unquote.

15:24:55  21        Mr. Musk issued a statement on February 8th:

15:25:00  22   Quote, "To be clear, what the DOGE team and Treasury

15:25:03  23   have jointly agreed makes sense is the following."

15:25:07  24        And then he lists a series of policy changes the

15:25:11  25   Treasury DOGE team is purportedly implementing.

15:25:14  1          Now, in his February 12th declaration, Mr. Krause

15:25:18  2   said that, quote, "In January, USDS recommended to me

15:25:22  3   that Mr. -- is it Elez?

15:25:28  4          MR. HUMPHREYS:  Elez, I believe, Your Honor.

15:25:29  5          THE COURT:  Elez be selected for a role at

15:25:32  6   Treasury because of experience as, quote, "a highly

15:25:36  7   qualified software engineer who previously worked at

15:25:40  8   several of Elon Musk' companies, including SpaceX and

15:25:44  9   X."

15:25:44  10         The President in a February 19th speech -- so this

15:25:48  11  is two days after Judge Chutkan -- at the Future

15:25:52  12  Investment Initiative Forum said, quote, "I signed an

15:25:55  13  order creating the Department of Government Efficiency

15:25:58  14  and put a man named Elon Musk in charge," unquote.

15:26:03  15         Two days ago, the acting U.S. Attorney for the

15:26:06  16  District of Columbia issued a statement about -- that's

15:26:10  17  about that OPM email -- to federal employees that they

15:26:14  18  received, and it says, "DOGE and Elon are doing great

15:26:19  19  work," unquote.

15:26:20  20         So if I have to decide at some point whether

15:26:23  21  Mr. Musk has a role at USDS, what representation do I

15:26:30  22  rely on?  He's not the administrator.  He obviously has

15:26:36  23  a role in all of this in terms of it, so what is his

15:26:41  24  position?  I mean, the different positions would suggest

15:26:43  25  that he has a greater role, although none of them --

15:26:46  1    some of them are not exact, but certainly they associate

15:26:49  2    USDS with Mr. Musk, but he's not the administrator.  And

15:26:56  3    he's not, as I understand it, an employee of USDS, but

15:27:01  4    he does seem to be speaking on behalf of USDS -- or

15:27:04  5    everybody seems to say so.

15:27:05  6         So my point is, if I have to decide -- if it's

15:27:10  7    important to decide what his role is, what

15:27:14  8    representation do I rely on?  These are all different.

15:27:19  9    Some before what was said to Judge Chutkan, and some

15:27:23  10   afterwards.  But they all seem to indicate a greater

15:27:26  11   role than not being the administrator of USDS or an

15:27:34  12   employee of USDS.

15:27:35  13        So can you tell me what his role is, and what I can

15:27:39  14   rely on?

15:27:40  15        MR. HUMPHREYS:  And Your Honor, with just a

15:27:42  16   caveat --

15:27:43  17        THE COURT:  I don't mean to put you -- you

15:27:44  18   know, pin you to the wall.  And I realize that you can

15:27:47  19   only say what you've been told.  So understanding that,

15:27:50  20   you're the messenger.

15:27:51  21        MR. HUMPHREYS:  And with the caveat, Your

15:27:53  22   Honor, that I don't believe that issue is presently

15:27:56  23   presented in plaintiffs' briefs or pleadings.  But with

15:27:59  24   that caveat, I mean, my understanding is Mr. Musk is a

15:28:03  25   close adviser to the President.

15:28:05  1          However, for our purposes, the authority flows from

15:28:08  2      the President to USDS and then -- or excuse me -- well,

15:28:13  3      for our purposes the authority flows from the President

15:28:16  4      to the Secretary of the Treasury, who then oversees

15:28:19  5      through the Chief of Staff, Mr. Krause, who then would

15:28:24  6      manage --

15:28:24  7          THE COURT:  Right.  Okay.  But where is

15:28:26  8      Mr. Musk in all of this?  Since he seems to be giving,

15:28:30  9      you know -- being involved in the operation of USDS or

15:28:34  10     the ideas or what they're implementing.  So what is his

15:28:39  11     role?

15:28:39  12         Is he in the -- is he sort of a separate adviser?

15:28:42  13         Is he in the Chief Executive Office of the

15:28:45  14     President?  I mean, what is he?

15:28:48  15         MR. HUMPHREYS:  I don't have any further

15:28:49  16     information beyond a close adviser to the President,

15:28:51  17     which then, under the President's authority, goes to the

15:28:53  18     Secretary of Treasury and then down to the Treasury, the

15:28:58  19     DOGE team.

15:28:59  20         THE COURT:  But that -- I understand that.

15:28:59  21     That goes from the President to the Secretary of the

15:29:04  22     Treasury.  And then we can get into what else is doing

15:29:08  23     there.

15:29:08  24         But Mr. Musk at this point, you don't know what

15:29:11  25     role -- you can't tell me what role he has.

15:29:15  1          MR. HUMPHREYS:  My understanding is what I just

15:29:17  2     said.  As an adviser to the President, Your Honor.

15:29:18  3          THE COURT:  Okay.  And so as an adviser would

15:29:21  4     he be in some category that -- in terms of some, you

15:29:30  5     know, employment category as an adviser?

15:29:32  6          MR. HUMPHREYS:  I -- I'm not aware, Your Honor.

15:29:34  7          THE COURT:  Okay.

15:29:38  8       All right.  So is there an administrator of USDS at

15:29:44  9     the present time?

15:29:44  10          MR. HUMPHREYS:  I don't know the answer to that

15:29:46  11     either, Your Honor.

15:29:56  12          THE COURT:  So let me -- we're at a point where

15:29:58  13     we don't know whether there is an administrator.

15:30:01  14       Is that what you're saying to me?

15:30:03  15          MR. HUMPHREYS:  I'm saying I don't know, Your

15:30:05  16     Honor.

15:30:05  17          THE COURT:  Okay.  Everybody speak up over

15:30:07  18     there, if you know anything else at the table.

15:30:15  19       So if you don't know -- I mean, I have to say the

15:30:18  20     government represented to Judge Alston in the Eastern

15:30:21  21     District of Virginia that there is, quote, "Acting USDS

15:30:25  22     administrator" -- and this was at Page 2 of his

15:30:27  23     opposition to the motion for TRO.  And obviously the

15:30:32  24     Executive Order creating USDS says, "There shall be a

15:30:36  25     USDS administrator, and that the USDS Temporary

15:30:39  1    Organization shall be headed by the USDS

15:30:44  2    administrator."

15:30:44  3         So isn't there some problem if there's no

15:30:50  4    administrator as to how USDS functions, who supervises

15:30:55  5    them, how they come up with ideas?  I mean, if you've

15:30:58  6    got employees working with USDS that are working with

15:31:00  7    Treasury, who's telling them what to do if there's no

15:31:03  8    administrator?

15:31:05  9              MR. HUMPHREYS:  I can't opine on that.  I would

15:31:06  10   have to evaluate it in terms of the specific legal

15:31:10  11   claim.  I don't think plaintiffs have challenged --

15:31:12  12             THE COURT:  Well, it does make a difference

15:31:14  13   ultimately.  I'm getting there, but I need to know some

15:31:17  14   facts before I get there in terms of -- but, you know,

15:31:20  15   obviously, if USDS employees are involved in this

15:31:25  16   engagement plan or whatever, I would think that somebody

15:31:30  17   would be telling them what to do, supervising their work

15:31:32  18   or doing something.

15:31:34  19        And as I understand it, you don't know how that's

15:31:36  20   operating?

15:31:38  21             MR. HUMPHREYS:  Again, as I mentioned, Your

15:31:39  22   Honor, Mr. Krause reports to the Treasury -- reports to

15:31:44  23   the Treasury Chief of Staff, who reports to the Treasury

15:31:46  24   Secretary.  And USDS is not part of that chain of

15:31:49  25   command.

15:31:49  1          THE COURT:  Okay.  So it's not -- but that's

15:32:01  2   the whole point.  Mr. Krause doesn't seem to me -- he's

15:32:04  3   part of the USDS team or the DOGE team, but is he -- who

15:32:08  4   is telling him what the priorities or anything else is?

15:32:13  5          MR. HUMPHREYS:  Well, the Executive Order sets

15:32:14  6   out, you know, high-level priority for modernization.

15:32:20  7          THE COURT:  So he -- whatever the Executive

15:32:21  8   Order is, which is fairly broad, that -- he's to decide

15:32:24  9   how that is to be implemented?

15:32:26  10      I mean, is that the answer?

15:32:28  11          MR. HUMPHREYS:  I --

15:32:29  12          THE COURT:  As you know?

15:32:30  13          MR. HUMPHREYS:  As otherwise directed by the

15:32:32  14   Chief of Staff of Treasury and the Treasury

15:32:34  15   Department -- Treasury Secretary.

15:32:37  16          THE COURT:  But they're not -- they're not part

15:32:40  17   of USDS or the DOGE team, so are they -- what's the

15:32:45  18   relationship, then, between the Secretary and Mr. Krause

15:32:49  19   in terms of their relationship on this issue of, you

15:32:54  20   know, the implementation of the DOGE priorities?

15:32:58  21          MR. HUMPHREYS:  Again, as a formal matter, I

15:32:59  22   don't think there is a relationship, Your Honor.  The

15:33:02  23   relationship is through the Executive Order, and I can't

15:33:05  24   say that discussions, you know, don't happen between

15:33:09  25   USDS and Mr. Krause.  I believe they do.  But in terms

15:33:11  1    of authority and who has the decision-making -- again,

15:33:14  2    it's the chain of command that I discussed.

15:33:16  3         THE COURT:  Well, the Executive Order states

15:33:20  4    that agency heads, and that would be Secretary

15:33:22  5    Bessent -- I'm not sure I'm pronouncing that

15:33:24  6    correctly -- shall select the DOGE team members in

15:33:27  7    consultation with the USDS administrator.

15:33:30  8         So there's no administrator to consult with.  Who

15:33:37  9    did he consult with when he hired Mr. Krause?  This is

15:33:40  10   the Executive Order that says this.

15:33:44  11        And the Executive Order states, "the USDS

15:33:47  12   administrator shall commence a software modernization

15:33:51  13   initiative."

15:33:54  14        Has the initiative been commenced?  By whom?

15:33:58  15        If there's no administrator, who did it?

15:34:00  16        MR. HUMPHREYS:  Well, yes, Your Honor.  I mean,

15:34:01  17   as we described, the team is going about modernizing and

15:34:04  18   improving the legacy systems at BFS consistent with the

15:34:09  19   direction --

15:34:09  20        THE COURT:  Okay.  What team?

15:34:12  21        MR. HUMPHREYS:  When I say the Treasury DOGE

15:34:14  22   team, I'm referring to Mr. Krause, previously Mr. Elez,

15:34:18  23   but now Mr. Wunderly.  But of course, they have not been

15:34:21  24   conducting work beyond --

15:34:22  25        THE COURT:  Okay.  And who is, who is -- I

15:34:24  1    mean, Mr. Krause, it looks like, hasn't been -- there's
15:34:27  2    no administrator telling him anything.  So it's -- I'm
15:34:35  3    still having trouble grasping how they're going out as
15:34:38  4    the team if nobody is telling them what to do, other
15:34:41  5    than the Executive Order, if that's -- as you
15:34:44  6    understand, and I realize that you -- it doesn't sound
15:34:47  7    like you were prepared for these questions, which is
15:34:52  8    unfortunate, but I will get to the point in a moment is
15:34:55  9    why I'm asking these.  But as I understand it, there's
15:35:00  10   no administrator.
15:35:02  11       So what the Executive Order says the administrator
15:35:05  12   is suppose to be doing at USDS is not happening.  And at
15:35:08  13   this point, we don't know who is actually doing these
15:35:10  14   things that the administrator was supposed to do.
15:35:14  15       Would that be fair?
15:35:15  16       MR. HUMPHREYS:  I don't think that's fair, Your
15:35:17  17   Honor.
15:35:17  18       Again, the mission of the Executive Order was to
15:35:19  19   modernize the technology --
15:35:21  20       THE COURT:  Right.
15:35:21  21       MR. HUMPHREYS:  -- of the agency.
15:35:22  22       THE COURT:  But who decides what's
15:35:24  23   modernization or what to do with the modernization?
15:35:26  24       MR. HUMPHREYS:  Well, as we described in the
15:35:27  25   declaration, Mr. Krause was selected because he has a

15:35:31  1    wealth of experience --

15:35:33  2              THE COURT:  Selected by whom?

15:35:34  3              MR. HUMPHREYS:  Well, was appointed by the

15:35:36  4    Treasury Department in conjunction with USDS officials

15:35:38  5    there.

15:35:39  6              THE COURT:  Right.  And who at USDS, since

15:35:41  7    there's no administrator?

15:35:43  8              MR. HUMPHREYS:  I -- I don't know specifically

15:35:45  9    the person who consulted with Mr. -- with the Secretary

15:35:51  10   to appoint him.

15:35:52  11             THE COURT:  Let me get to my reason for asking

15:35:55  12   these, which I think you indicated you thought they were

15:35:59  13   sort of outside of what -- the complaint.  But I'll tell

15:36:01  14   you why I think it's important.

15:36:04  15        Based on the limited record I have before me, I

15:36:06  16   have some concerns about the constitutionality, frankly,

15:36:09  17   of USDS's structure and operations.

15:36:14  18        USDS seems to be taking actions, like entering into

15:36:16  19   the payment process engagement plan.  That plan appears

15:36:20  20   to bind a federal agency, the Treasury Department.

15:36:23  21        The Appointments Clause of the Constitution

15:36:26  22   requires that principal officers be nominated by the

15:36:30  23   President and confirmed by the Senate.  Employees and

15:36:33  24   inferior officers need to be supervised by principal

15:36:37  25   officers to comply with the Appointments Clause.

15:36:39   1        So I want to ask a few questions -- and I have

15:36:42   2    been -- about the status of the people acting in

15:36:46   3    official capacities at USDS.  It appears to me that the

15:36:50   4    people within USDS could be exercising authority as

15:36:54   5    officers of the United States, including by supervising

15:36:57   6    and directing Treasury employees, like Mr. Krause,

15:37:01   7    without complying with the Appointments Clause, so --

15:37:07   8    which I think is something that the Court can certainly

15:37:09   9    note may be a problem.  It may not.  But at least on

15:37:14  10    this record, we certainly don't have enough information

15:37:16  11    in terms of who is supervising and whether they're in a

15:37:19  12    position to make the --you know, make these

15:37:22  13    arrangements, et cetera.

15:37:25  14        At Paragraph 4 of the February 12th declaration,

15:37:29  15    Mr. Krause said that, quote, "He coordinates with

15:37:32  16    officials at USDS DOGE, provides them with regular

15:37:40  17    updates about the team's progress, and receives

15:37:44  18    high-level policy direction from those officials."

15:37:45  19        Now, officials are not just employees.  So

15:37:49  20    officials are people that -- principal officers,

15:37:57  21    officials.  They're in a different category than regular

15:38:00  22    employees.

15:38:01  23        So my question is:  Who are the officials who give

15:38:04  24    Mr. Krause direction?  Are any of them -- well, they're

15:38:09  25    not going to be the USDS administrator.

15:38:14  1          What are their titles?  Do they work only for USDS?

15:38:17  2          In *Lucia*, the Supreme Court held that "government

15:38:21  3  officials," which we're talking about, are officers,

15:38:23  4  rather than employees, subject to the Appointments

15:38:27  5  Clause when they exercise "significant authority" and

15:38:30  6  "significant discretion."  When USDS officials provide

15:38:34  7  "high-level policy direction" to a high-ranking employee

15:38:38  8  at Treasury, are they exercising significant authority

15:38:42  9  and discretion?

15:38:45  10          If yes, does that make them officers under the

15:38:51  11  Appointments Clause as interpreted by the Supreme Court?

15:38:52  12          Were they nominated by the President and confirmed

15:38:55  13  by the Senate?

15:38:56  14          Does the statute provide for their appointment by

15:38:58  15  some other means?

15:38:59  16          So that's why I'm asking these questions.  And

15:39:02  17  based on the fact that there's a lack of information

15:39:04  18  about all this, how this is all connected and

15:39:10  19  structured.

15:39:10  20          Do you understand my concern?

15:39:13  21          MR. HUMPHREYS:  I believe I understand your

15:39:14  22  concern, Your Honor, although not how it relates to the

15:39:17  23  Appointments Clause.

15:39:17  24          THE COURT:  Well, it does if USDS is not acting

15:39:19  25  constitutionally.

15:39:20  1            Wouldn't that be irreparable harm?

15:39:23  2            MR. HUMPHREYS:  No, Your Honor, for many

15:39:24  3   reasons we can discuss.  These particular plaintiffs

15:39:27  4   don't have standing.

15:39:28  5            THE COURT:  Well, if you are asking, wouldn't

15:39:30  6   it be ultra vires -- potentially ultra vires in terms of

15:39:37  7   the -- if they're taking direction or doing things where

15:39:40  8   they do not have this authority under the Appointments

15:39:43  9   Clause or something else?

15:39:46 10            MR. HUMPHREYS:  I'm just not prepared to opine

15:39:49 11   on issues the plaintiffs have not briefed and are not in

15:39:52 12   their complaint, Your Honor.  I mean, there is --

15:39:53 13            THE COURT:  Okay.  But I'm raising an issue for

15:39:55 14   you, and part of it is some knowledge, hopefully, that

15:39:58 15   you all will learn as to how these -- who's involved,

15:40:02 16   who's in charge, who's giving them direction, which I

15:40:09 17   think is key to making some decisions here about what

15:40:15 18   exactly their authority is to make these decisions,

15:40:18 19   engage in the plan, and do other things.

15:40:20 20       So at this point it would appear that you're not in

15:40:22 21   a position to answer them.

15:40:23 22       Would that be accurate?

15:40:24 23            MR. HUMPHREYS:  I'm not, Your Honor.  I know we

15:40:26 24   do have Appointments Clause litigation.  I'm happy to

15:40:29 25   consult, and we can update the Court.

15:40:36  1          THE COURT:  Okay.  So let me move on to some

15:40:39  2    other areas.

15:40:40  3          But I'll finish this whole thing so that you have

15:40:42  4    some idea of what I'm getting that.  I may need to have

15:40:48  5    additional information provided.

15:40:49  6          For instance, in *Free Enterprise Fund*, a Supreme

15:40:53  7    Court case in *Edmond* -- they're back -- one is 2010.

15:40:56  8    The other is 1997 -- the Supreme Court held that

15:40:59  9    inferior officers are officers whose work is supervised

15:41:03  10   by other officers nominated by the President, confirmed

15:41:06  11   by the Senate.

15:41:07  12         So, again, are the USDS officials, which have not

15:41:12  13   been identified, the ones who give direction to

15:41:16  14   Mr. Krause, supervised by an officer nominated by the

15:41:19  15   President and confirmed by the Senate?

15:41:22  16         I would point out that the White House Chief of

15:41:23  17   Staff is not such an officer.

15:41:30  18         So what I'm getting at, does it mean that USDS

15:41:32  19   officials that Mr. Krause identified -- well, he didn't

15:41:35  20   identify principal officers within the meaning of the

15:41:40  21   Appointments Clause interpreted by the Supreme Court --

15:41:43  22   who are they?  Do they give direction to Mr. Krause?

15:41:46  23   Were they nominated by the President and confirmed by

15:41:49  24   the Senate?

15:41:51  25         It does seem to me that if you have people that are

15:41:58  1    not authorized to carry out some of these functions that

15:42:00  2    they're carrying out, that that does raise an issue.

15:42:06  3         I would hope that by now we would know the

15:42:10  4    structure.  Who's the administrator?  Who's acting as

15:42:15  5    the administrator?  Who is providing some of this

15:42:17  6    information?  What authority do they have within

15:42:19  7    Treasury or within, frankly, USDS?

15:42:27  8         MR. HUMPHREYS:  Yes, Your Honor, we can report

15:42:28  9    back on that, except just to point out one more time,

15:42:32  10   that Mr. Krause is overseen by a Senate-confirmed

15:42:38  11   official, who is Secretary Bessent.  But we understand

15:42:39  12   the Court has additional questions, and we can report

15:42:43  13   back.

15:42:43  14        THE COURT:  Okay.  Let me move on to some other

15:42:45  15   issues.

15:42:46  16        In terms of standing, as to associational standing,

15:42:51  17   which is what they have focused on, your briefing

15:42:55  18   focuses exclusively on their point that plaintiffs'

15:43:02  19   members would have standing to sue on their own.

15:43:03  20        Are you disputing whether the interests plaintiffs

15:43:06  21   seek to protect are germane to their organizational

15:43:09  22   interest or are you disputing whether the individual

15:43:11  23   members have to participate in this suit?

15:43:14  24        It wasn't clear to me.

15:43:15  25        MR. HUMPHREYS:  On the second point, we would

15:43:16  1    not dispute that the interests are germane to the

15:43:20  2    organization.

15:43:21  3              THE COURT:  Okay.

15:43:21  4              MR. HUMPHREYS:  However, we do think, for

15:43:23  5    reasons that are also tied up with adequate alternative

15:43:26  6    remedies, the 702 issue, that this case really should be

15:43:29  7    brought as either an individual Privacy Act claim or

15:43:34  8    individual Internal Revenue Code claim if it ever came

15:43:37  9    to pass that there was actual harm for the purposes of

15:43:41  10   standing to bring this claim in the first place.  But we

15:43:45  11   don't think that that has occurred.

15:43:47  12        Certainly, plaintiffs have not provided any reason

15:43:50  13   whatsoever that -- to think that there -- specific

15:43:55  14   members' data has ever been viewed much less disclosed

15:43:58  15   to a third party.

15:43:59  16             THE COURT:  So you're disputing whether the

15:44:01  17   individual members have to participate in this suit, as

15:44:03  18   opposed to the association.

15:44:05  19             MR. HUMPHREYS:  Well, I do think -- so, Your

15:44:09  20   Honor, because in order -- you know, it goes sort of to

15:44:12  21   the -- whether there's a final agency action.

15:44:15  22        Plaintiffs contend -- although we would dispute --

15:44:20  23   that there was a change in policy that allowed access

15:44:26  24   for these individuals to occur.

15:44:27  25        As Mr. Gioeli explains in his declaration, there is

15:44:30  1    no such change in policy.  These are Treasury employees

15:44:32  2    and properly have authorized access.

15:44:34  3        So if there's any actual claim --

15:44:36  4              THE COURT:  Who are the Treasury employees that

15:44:39  5    you're talking about?

15:44:41  6              MR. HUMPHREYS:  Mr. Krause and now

15:44:44  7    Mr. Wunderly, Your Honor.

15:44:45  8              THE COURT:  Okay.

15:44:46  9              MR. HUMPHREYS:  And so if that is the change in

15:44:47  10   policy that they're challenging, that does not go to

15:44:50  11   show, nor would a record reveal, whether or not

15:44:53  12   individuals in any specific instance were harmed such

15:44:57  13   that they could maintain suit.  And I think that goes to

15:45:00  14   show, Your Honor, why this case is not an appropriate

15:45:02  15   vehicle for the Administrative Procedure Act.

15:45:05  16       If and when plaintiffs' members' actual data is

15:45:08  17   ever released and they suffer, you know, actual harm --

15:45:12  18   injury-in-fact for the purposes of Article III, there's

15:45:15  19   a remedy under the Privacy Act or under the Internal

15:45:18  20   Revenue Code for damages.

15:45:21  21             THE COURT:  So is that sort of your argument as

15:45:23  22   well about the injury-in-fact requirement?

15:45:29  23       Is that what you're getting at?

15:45:31  24             MR. HUMPHREYS:  Yeah, I think that they're

15:45:32  25   similar, but it goes to show why, again, this is not a

15:45:36  1     proper vehicle for an Administrative Procedure Act.

15:45:38  2          But I do think you're right, Your Honor.  The focus

15:45:39  3     of our briefing was on injury-in-fact, and that is a

15:45:42  4     very clear reason why plaintiffs don't have standing

15:45:45  5     here.

15:45:45  6          THE COURT:  So let me just clarify a couple of

15:45:46  7     other -- in terms of the elements, do you dispute that

15:45:47  8     the members' injury is fairly traceable to defendants'

15:45:50  9     alleged conduct?

15:45:54  10          MR. HUMPHREYS:  Well, given that there's no

15:45:55  11     injury, yes, absolutely, Your Honor.

15:45:57  12          THE COURT:  Okay.  And do you dispute that

15:46:00  13     their injury would be redressed by the requested

15:46:04  14     injunctive relief?

15:46:05  15          MR. HUMPHREYS:  Yes, Your Honor, given that

15:46:06  16     there's no injury.

15:46:10  17          THE COURT:  Okay.  In your opposition you argue

15:46:12  18     that, quote, "an exchange of protected records internal

15:46:14  19     to the federal government is insufficient to establish

15:46:18  20     standing and the plaintiffs' need to show a public

15:46:20  21     disclosure."  So let me just ask a couple questions.  I

15:46:24  22     know that that's your position.

15:46:27  23          So just as an example, Congress is part of the

15:46:31  24     federal government.  Would disclosing an individual's

15:46:35  25     tax returns to a Congressional committee cause an injury

15:46:38  1    sufficient to create standing, as an example?

15:46:44  2            MR. HUMPHREYS:  In the hypothetical, Your

15:46:45  3    Honor, it may be that there's a routine use that permits

15:46:48  4    the disclosure under the relevant SORN, and so there may

15:46:54  5    not even be a bare statutory violation in that instance.

15:46:58  6        So therefore not --

15:46:58  7            THE COURT:  So if there was a routine use that

15:47:03  8    could be given, so -- a record could be given to

15:47:06  9    Congress, a congressional committee?

15:47:09  10       Is that what you're saying?

15:47:10  11           MR. HUMPHREYS:  My understanding, Your Honor,

15:47:11  12   is, yes, that there are routine uses that allow for the

15:47:15  13   disclosure of information to Congress.

15:47:17  14           THE COURT:  That allow disclosures to Congress?

          15           MR. HUMPHREYS:  Or in some instances.

15:47:19  16           THE COURT:  Or just in general allow

15:47:21  17   disclosures in certain circumstances?

15:47:23  18           MR. HUMPHREYS:  Well, one would have to look at

15:47:24  19   the specifics of the Systems of Record Notice, but many

15:47:26  20   of them do, based on my understanding, allow disclosures

15:47:30  21   to Congress by agencies in certain circumstances.

15:47:34  22       So that may not violate the Privacy Act at all,

15:47:38  23   much less -- there are two separate issues, but there

15:47:42  24   may also be no -- probably likely -- well, it would

15:47:45  25   depend, but there wouldn't -- may not be injury-in-fact.

15:47:47  1              THE COURT:  Okay.  Let me try a different

15:47:49  2      hypothetical.

15:47:52  3          The White House political director is a member, of

15:47:54  4      course, of the Executive Office of the President in the

15:47:58  5      executive branch.  If the Secretary of the Treasury sent

15:48:03  6      that person the tax returns of a first term President's

15:48:06  7      opponent in a primary, would that cause an injury

15:48:09  8      sufficient to create standing?  Just as a hypothetical.

15:48:13  9              MR. HUMPHREYS:  Yes, Your Honor.  Assuming

15:48:14 10      there were no routine use that allowed for such, I think

15:48:19 11      that is probable, although I don't know if a routine use

15:48:22 12      would apply but, again, one would have to look at the

15:48:29 13      SORN, the Systems of Record Notice.

15:48:32 14              THE COURT:  All right.  Mr. Krause is the CEO

15:48:34 15      of a software company as well as the employee of the

15:48:38 16      executive branch.  If he accessed the sensitive

15:48:42 17      financial disclosures of a competing firm, would that

15:48:45 18      firm have standing?

15:48:47 19          These are all standing questions.

15:48:50 20              MR. HUMPHREYS:  In his role as a Treasury

15:48:54 21      Department employee --

15:48:54 22              THE COURT:  Yeah, he's an employee of Treasury.

15:48:56 23      He's also the CEO of this company, software company.

15:49:01 24          So if he accessed the sensitive financial

15:49:04 25      disclosure information -- he's a competing firm, okay,

15:49:08  1     so we're talking about access -- would that -- would the

15:49:11  2     firm have standing?

15:49:13  3              MR. HUMPHREYS:  I think that --

15:49:15  4              THE COURT:  The competing firm.

15:49:16  5              MR. HUMPHREYS:  That would be up to the "need

15:49:18  6     to know" issue, I believe, Your Honor.  I mean, if he

15:49:20  7     accessed that information properly as part of his

15:49:25  8     duties, no, I don't think there would even be a bare

15:49:28  9     statutory violation.  And of course, in TransUnion, the

15:49:31  10    Court says that for standing there has to be something

15:49:33  11    even more than a bare statutory violation, some concrete

15:49:37  12    harm.

15:49:38  13         So if he exercised, you know -- if he were to view

15:49:42  14    information on a competitor, it would depend for what

15:49:46  15    purpose I think he accessed it.  But it may qualify into

15:49:50  16    the intra-agency exception within the Privacy Act but,

15:49:57  17    again, the plaintiff in that case, the litigant, would

15:49:59  18    have to show some concrete injury in order to have a

15:50:04  19    viable claim.

15:50:05  20         As they said in TransUnion:  No concrete injury, no

15:50:09  21    standing.  So --

15:50:17  22              THE COURT:  So if -- would you agree that there

15:50:18  23    can be a case where there's an injury sufficient to

15:50:22  24    create standing in an information access case, like the

15:50:27  25    one -- the examples that I've been giving you, without a

15:50:31  1    public disclosure?

15:50:32  2            MR. HUMPHREYS:  No, Your Honor, I wouldn't

15:50:33  3    agree with that.  I think under that hypothetical, you

15:50:35  4    know, the information --

15:50:36  5            THE COURT:  Under a couple of hypotheticals

15:50:40  6    I've given you.

15:50:41  7            MR. HUMPHREYS:  Yes, Your Honor.  The one I'm

15:50:42  8    speaking of --

15:50:42  9            THE COURT:  I would point out that I think, you

15:50:43  10   know, at least one hypothetical, although it's not

15:50:46  11   perfect, would certainly be the *Mazars,* M-A-Z-A-R-S,

15:50:56  12   President Trump case relating to the committee.  But at

15:50:58  13   any rate, it's your view -- well, let me not say what

15:51:03  14   your view is.  You tell me as to whether there would be

15:51:05  15   an issue in terms of whether you could in a particular

15:51:08  16   case have standing, where it's an information access

15:51:14  17   case such as the one I just gave you, without public

15:51:18  18   disclosure.

15:51:19  19           MR. HUMPHREYS:  No, Your Honor.  I think public

15:51:20  20   disclosure is required for standing.  And I think in

15:51:22  21   that instance, the hypothetical where Mr. Krause saw the

15:51:26  22   information, I think the outside disclosure there would

15:51:28  23   be to, you know, his company --

15:51:31  24           THE COURT:  But isn't the disclosure -- you're

15:51:34  25   basically having, you know, somebody who is competing

15:51:36  1    with the information that he has.  Wouldn't the fact

15:51:41  2    that he just got the information give him an advantage?

15:51:45  3    He wouldn't have a -- you know, he would not be privy to

15:51:48  4    this information under other circumstances.

15:51:51  5        This is in my hypothetical.  I'm not saying

15:51:53  6    Mr. Krause would do this.  But in my hypothetical, in

15:51:56  7    terms of just the fact that he would have access to the

15:51:59  8    information that is a competing -- you know, competing

15:52:02  9    firm in terms of, you know, just getting the

15:52:09 10    information.

15:52:09 11            MR. HUMPHREYS:  No, Your Honor.  I think that

15:52:10 12    is still a public disclosure with respect to

15:52:13 13    Mr. Krause's company.  I mean, I think there has to be

15:52:17 14    something more than Mr. Krause knowing it in his mind.

15:52:19 15    He has to use it for some other reason to create, again,

15:52:23 16    hypothetically, a competitive advantage.

15:52:28 17        In all the cases plaintiffs cite, I believe, there

15:52:32 18    is some publication that requires -- in the data access

15:52:37 19    case that was essentially -- in TransUnion, in order for

15:52:43 20    there to be standing, there had to be disclosure of the

15:52:45 21    information to another party, which was through the

15:52:48 22    credit reporting.

15:52:49 23        I mean, in that case, the plaintiffs there had

15:52:51 24    actually been designated in the defendant's system as

15:52:55 25    either potentially a terrorist or a drug trafficker.

15:52:58  1    But the Court still said where the information hadn't

15:53:01  2    left the agency that there's no standing and therefore

15:53:05  3    dismissed the claim as to the people -- where there had

15:53:09  4    been no publication.

15:53:10  5         THE COURT:  TransUnion talks about, you know,

15:53:13  6    different competing common law harms.  And you had

15:53:21  7    focused on the public disclosure of private facts rather

15:53:26  8    than intrusion upon seclusion, which is what the

15:53:35  9    plaintiffs have focused on.  So tell me why that doesn't

15:53:37  10   work in terms of their theory, not the one you brought

15:53:39  11   up.

15:53:40  12        MR. HUMPHREYS:  Yes, Your Honor.  Plaintiffs do

15:53:42  13   point to intrusion upon seclusion.

15:53:45  14      TransUnion didn't mention that as a potential

15:53:47  15   analog that could create standing; however, I think if

15:53:49  16   you look at the cited case in that case --

15:53:52  17        THE COURT:  I'm sorry, what didn't they -- I

15:53:53  18   missed what they didn't specifically bring up.

15:53:55  19        MR. HUMPHREYS:  They did list intrusion upon

15:53:58  20   seclusion among the list of historic analogs that may

15:54:03  21   give rise to standing.

          22        THE COURT:  Okay.  I see.

15:54:04  23        MR. HUMPHREYS:  However, the case cited, the

15:54:07  24   Seventh Circuit case the Supreme Court cited in

15:54:10  25   TransUnion, shows that the facts are very different from

15:54:14  1    the circumstance here.

15:54:16  2        There, the Court addressed text messages that were

15:54:18  3    being received on the plaintiff's phone, and the Court

15:54:22  4    compared that to receiving unwanted phone calls at your

15:54:27  5    house.  And there, I think the comparison -- or the

15:54:32  6    analogy to an intrusion upon the home is much clearer

15:54:37  7    here, where the information before the Court is that

15:54:40  8    these are Treasury systems that have data and the

15:54:45  9    Treasury Department is giving access to its own

15:54:49  10   employees, access to that data.

15:54:51  11       And we just don't think that the analogy to

15:54:53  12   intrusion upon seclusion at all works, unlike a case

15:54:57  13   like Gadelhak that the Supreme Court cited in the

15:55:01  14   TransUnion situation.

15:55:03  15       THE COURT:  Okay.  So let me move to APA 702,

15:55:09  16   which as I indicated when I was talking to the

15:55:12  17   plaintiffs, that waives sovereign immunity for suits

15:55:15  18   seeking relief other than money damages against an

15:55:17  19   agency or officer.  But it conditions that waiver,

15:55:21  20   quote, "Nothing herein confers authority to grant relief

15:55:25  21   if any other statute that grants consent to suit

15:55:28  22   expressly or impliedly forbids the relief which is

15:55:33  23   sought."

15:55:33  24       And the Court lacks subject matter jurisdiction if

15:55:36  25   another statute forbids the injunctive relief plaintiffs

15:55:41   1    seek here.

15:55:41   2         You rely on *Match-E-Be-Nash*.

15:55:47   3         I'll give the court reporter what that cite is.

15:55:52   4         And there, the Supreme Court held that the Quiet

15:55:55   5    Title Act forbids the relief the plaintiffs sought under

15:55:58   6    the APA.  But the Quiet Title Act had an explicit

15:56:03   7    exception to its waiver of sovereign immunity.  Anything

15:56:07   8    similar to that in the Privacy Act or Internal Revenue

15:56:13   9    Code?

15:56:13   10        MR. HUMPHREYS:  No, Your Honor, not explicitly.

15:56:15   11   I think our point is that Congress has devised a very

15:56:18   12   specific scheme both with respect to the Privacy Act and

15:56:21   13   the Internal Revenue Code.  And as Your Honor pointed

15:56:23   14   out, has in the Privacy Act injunctive relief for

15:56:26   15   certain types of claims and monetary relief for others.

15:56:30   16   And we think that the, you know, the upshot of that

15:56:34   17   carefully crafted scheme with respect to both the

15:56:36   18   Privacy Act and the Internal Revenue Code, is that

15:56:40   19   prospective relief through the Administrative Procedure

15:56:42   20   Act should not be -- should not be permitted.

15:56:45   21        And, again, I think it helps to focus on what a

15:56:51   22   plaintiff might need to show in order to make out a

15:56:54   23   Privacy Act or Internal Revenue claim, which is that

15:56:58   24   their particular information was disclosed, not that

15:57:00   25   employees of the Treasury Department were given access

15:57:03  1    to a Treasury Department system.

15:57:08  2              THE COURT:  Okay.  Any other precedents holding

15:57:12  3    that the Privacy Act or Internal Revenue Code forbid

15:57:17  4    relief such that Section 702 doesn't waive sovereign

15:57:22  5    immunity?  Anything else?

15:57:23  6              MR. HUMPHREYS:  No, Your Honor.  Although I

15:57:24  7    think the 702 claim is what -- part and parcel to the

15:57:27  8    704 claim.

15:57:28  9              THE COURT:  Okay.

15:57:29 10              MR. HUMPHREYS:  If the Court created a

15:57:30 11    statutory scheme and impliedly meant to preclude review

15:57:33 12    for the APA, there's another alternative remedy.

15:57:37 13              THE COURT:  All right.

         14              MR. HUMPHREYS:  So we would also rely on the

         15    cases in that --

15:57:41 16              THE COURT:  Yeah.  The plaintiffs also bring up

15:57:43 17    *Agriculture v. Kirtz.*  So didn't the Supreme Court

15:57:47 18    indicate in that particular case that the Privacy Act is

15:57:50 19    not the kind of legislation that occupies the field of

15:57:54 20    privacy remedies and forbids relief under other

15:57:59 21    statutes, if you're familiar with the case?

15:58:03 22        It's K-I-R-T-Z, *Agriculture v. Kirtz.*  I'm sorry, I

15:58:11 23    didn't write down the page number.

15:58:20 24              MR. HUMPHREYS:  Yes, Your Honor, but I don't --

15:58:23 25    I don't have -- I acknowledge the Court said that.

15:58:26  1              Yeah, I don't have nothing else to add.

15:58:28  2              THE COURT:  Okay.  Let me move to final agency

15:58:30  3    action.  This is obviously 704, and -- judicial review

15:58:38  4    is limited to final agency action.  And that "agency

15:58:43  5    action is final when it marks the consummation of an

15:58:45  6    agency's decision-making process.  It's one by which

15:58:49  7    rights or obligations have been determined or for which

15:58:53  8    legal consequences flow."

15:58:54  9         Your supplemental memoranda stated that, quote,

15:58:58  10   "there's no waiver of sovereign immunity under the APA

15:59:01  11   because plaintiffs have not identified a final agency

15:59:03  12   action."  But the D.C. Circuit in *Trudeau* stated that

15:59:13  13   the APA's final agency action requirement is not

15:59:17  14   jurisdictional.

15:59:19  15        Should I interpret your argument as really going to

15:59:22  16   the merits and not jurisdiction?

15:59:24  17             MR. HUMPHREYS:  Yes, that's fair, Your Honor.

15:59:26  18             THE COURT:  Okay.  Just to make sure.

15:59:27  19        But you argue that there's no final agency action

15:59:30  20   because decisions about access to records are a routine

15:59:33  21   matter; part of Treasury's day-to day operations.

15:59:38  22        That's your argument, principal one; correct?

15:59:44  23             MR. HUMPHREYS:  Yes, Your Honor.

15:59:45  24             THE COURT:  Okay.  Well, the USDA issues

15:59:47  25   thousands of licenses per year.  Is the issuance of a

15:59:50  1    license by, say, USDA a final agency action even though

15:59:56  2    they do it every day?

15:59:57  3        So does the APA define final agency action by

16:00:02  4    reference to how routine or important the agency action

16:00:04  5    is?

16:00:06  6            MR. HUMPHREYS:  Yes, Your Honor.  There can be

16:00:07  7    actions that happen frequently that are also final

16:00:11  8    agency actions.  We don't believe that's the case here.

16:00:14  9            THE COURT:  Why not?

16:00:17  10           MR. HUMPHREYS:  Well, because, again, the

16:00:17  11   decision of whether or not to give a particular employee

16:00:20  12   within the Treasury Department access to some of -- data

16:00:26  13   which is housed within the agency is the sort of routine

16:00:30  14   or ministerial agency decision that should not be

16:00:34  15   subject to APA review.

16:00:36  16       And I would point the Court to the Supreme Court's

16:00:38  17   decision in *Norton v. Southern Utah Wilderness*

16:00:48  18   *Association* for the point that such ministerial actions

16:00:51  19   aren't subject to APA review.

16:00:55  20       In other words, because there is no policy that

16:00:56  21   requires the denial of access as to the Treasury DOGE

16:01:02  22   team, it's not reviewable under the APA.

16:01:05  23           THE COURT:  Wouldn't the, you know, payment

16:01:07  24   process engagement plan, the engagement plan, be a final

16:01:11  25   agency action?  It's an agreement that they reached in

16:01:13    1    terms of how things were to be done?

16:01:15    2         MR. HUMPHREYS:  I mean, there is a decision

16:01:16    3    there, Your Honor, to give employees access to BFS

16:01:20    4    systems, but I don't think that any legal consequences

16:01:24    5    flow from that decision with respect --

16:01:26    6         THE COURT:  Well, isn't it a different decision

16:01:28    7    from what -- it changes what has been the policy in the

16:01:31    8    past in terms of -- I mean, we don't have the engagement

16:01:35    9    plan so it's a little difficult to do it, but my

16:01:37   10    understanding is that there was a change in terms of

16:01:41   11    access that had not been provided in the past.  And that

16:01:44   12    was the purpose of part of the plan, if I understood

16:01:48   13    the -- as I understood it correctly.

16:01:51   14         MR. HUMPHREYS:  Well, the purpose of the plan

16:01:53   15    is to give the Treasury DOGE team access, but we dispute

16:01:55   16    that there's any change in policy.  And that's actually

16:01:58   17    in our declaration.

16:01:59   18         THE COURT:  Well, ordinarily somebody in that

16:02:02   19    position would not have -- as I understand it, would not

16:02:05   20    have had access to it.  So wouldn't that make it a

16:02:09   21    change?

16:02:10   22         MR. HUMPHREYS:  Again, I don't think that's the

16:02:12   23    sort of -- there's no legal consequences, which is the

16:02:15   24    analysis of what the final agency action that flow from

16:02:18   25    the decision to allow a particular employee access to

16:02:22    1    one system or two or three.  And I don't think that

16:02:26    2    changes the analysis just because a prior employee may

16:02:31    3    never have had the same access.

16:02:33    4        There are no legal consequences that flow.  The

16:02:36    5    Privacy Act and the Internal Revenue Code still apply.

16:02:40    6    And to the extent there is ever hypothetically a

16:02:43    7    violation of one of those statutes, that can be brought

16:02:45    8    through a separate claim individually as opposed to

16:02:50    9    through broad APA review.

16:02:53    10        THE COURT:  I'll leave that one alone.  If the

16:02:57    11    plaintiffs want to respond, I'll let them do that.

16:02:59    12        You also argue that the Treasury decisions here,

16:03:02    13    particular ones in, say, the engagement plan among other

16:03:06    14    things, have no effect on rights or obligations.  But

16:03:10    15    isn't this -- you know, if you look under the Privacy

16:03:15    16    Act of right against disclosure without consent, if

16:03:17    17    you're disclosing protected records to persons who might

16:03:20    18    not have lawful access, wouldn't that affect that right?

16:03:24    19        MR. HUMPHREYS:  No, Your Honor.  Because they

16:03:25    20    do have lawful access.  They are employees with a need

16:03:28    21    to know.  So therefore fall within, for the Privacy Act,

16:03:32    22    552(a)(B) --

16:03:34    23        THE COURT:  Well, we don't know that they're

16:03:36    24    all employees.  Part of the problem I think is in terms

16:03:38    25    of precisely what categories they are in.

16:03:40  1          MR. HUMPHREYS:  Well, I think we do, Your

16:03:42  2  Honor.  Mr. Krause and Mr. Wunderly are both employees,

16:03:45  3  so therefore they're covered by 552(a)(B)(1).

16:03:51  4       To the extent that information were to go outside

16:03:54  5  of the Treasury Department, it would only be able to do

16:03:56  6  so subject to a routine use, and therefore, one would

16:03:59  7  look at the relevant SORN.

16:04:05  8       There's no broad policy here of allowing sharing

16:04:08  9  outside of the department just to employees within the

16:04:11  10  Treasury DOGE team who have access, who have authorized

16:04:14  11  access, and therefore fall within the Privacy Act's

16:04:17  12  parameters.

16:04:25  13       So no, Your Honor, we would not say -- we would

16:04:26  14  strongly disagree that there's any unlawful access

16:04:30  15  because the employees themselves have a need to know and

16:04:33  16  fall within a 552(a)(B)(1).  And if information is going

16:04:39  17  outside of the Treasury Department, it would only do so

16:04:42  18  pursuant to a routine use, as in the case with the State

16:04:45  19  Department with Routine Use 17 of the SORN at issue for

16:04:49  20  that systems --

16:04:58  21          THE COURT:  Okay.  You also argued in the

16:04:59  22  supplemental memorandum, "there's no waiver of sovereign

16:05:01  23  immunity because adequate alternate remedies preclude

16:05:05  24  APA review."  And then you -- the D.C. Circuit held in

16:05:08  25  *Perry Capital,* "there is no textual or logical basis for

16:05:12  1    construing 704 to condition of waiver sovereign immunity

16:05:16  2    on the absence of an adequate remedy."

16:05:21  3         So wouldn't, again, this go to merits rather than

16:05:25  4    jurisdiction?

16:05:27  5              MR. HUMPHREYS:  I do think it goes to the

16:05:28  6    merits, Your Honor, but the merits question is -- there

16:05:30  7    must be a final agency action for plaintiffs to be able

16:05:33  8    to prevail on the merits of an APA claim.

16:05:35  9         Again, they could bring -- their members could

16:05:39  10   bring a Privacy Act claim or an Internal Revenue Act

16:05:42  11   claim if there is ever a disclosure of their information

16:05:46  12   that harms them.

16:05:47  13        But in order to give the sort of broad programmatic

16:05:51  14   review of the APA, they must show final agency action.

16:05:55  15   And given the Congressional remedies that have been

16:05:58  16   carefully created, we don't think that final -- excuse

16:06:00  17   me, that -- excuse me -- we do think that there is other

16:06:03  18   alternate remedies available here.

16:06:06  19             THE COURT:  Okay.  You argue that the Privacy

16:06:10  20   Act creates a "detailed remedial scheme," a specific one

16:06:13  21   regarding violations of its prohibitions against

16:06:16  22   disclosures.  But the damages remedy for disclosure is

16:06:20  23   in a catch-all provision for failure to, quote, "comply

16:06:23  24   with any other provision of this section."

16:06:26  25        So should that affect my thinking about how

16:06:29  1    detailed and comprehensive the remedial scheme is?  Why

16:06:34  2    shouldn't I be able to conclude that the scheme is

16:06:36  3    detailed as to actions for correction of records as

16:06:39  4    opposed to actions regarding disclosure?

16:06:43  5        Isn't most of the statute about that rather than

16:06:46  6    disclosure?

16:06:48  7            MR. HUMPHREYS:  I don't think how Congress --

16:06:51  8    where within the statute it organized remedies makes a

16:06:55  9    difference.  I mean, the reality is that plaintiffs may

16:06:59  10   bring a claim for monetary damages through the Privacy

16:07:02  11   Act, and plaintiffs often do.  Congress provided that

16:07:06  12   avenue for them.  I don't think the organizational

16:07:08  13   structure there matters, Your Honor.

16:07:12  14           THE COURT:  Okay.  Now, you cite a number of

16:07:14  15   cases from this district where courts held that a

16:07:18  16   plaintiff cannot use the APA to duplicate the injunctive

16:07:22  17   relief provided by the Privacy Act.

16:07:24  18       Can you point me to any precedent from the circuit

16:07:28  19   where a court has concluded that the damages remedy is

16:07:31  20   an adequate alternative for an APA injunction?

16:07:36  21           MR. HUMPHREYS:  Not specifically, Your Honor,

16:07:38  22   beyond the cases we cited.  I think the *Cell Associates*

16:07:41  23   case about the availability of injunctive remedy is

16:07:45  24   probably our best case.

16:07:47  25           THE COURT:  So do you think that when Congress

16:07:49  1      created the damages remedy in the Privacy Act it had in

16:07:52  2      mind a challenge to a policy of allegedly unlawful

16:07:57  3      disclosures?  As opposed to sort of one-off

16:08:00  4      retrospective challenges to unlawful disclosures of an

16:08:04  5      individual plaintiff's records?

16:08:06  6           So one is really more in the context of a policy as

16:08:09  7      opposed to individuals.

16:08:13  8                MR. HUMPHREYS:  I think that the same analysis

16:08:15  9      applies, Your Honor, and it kind of goes back to the

16:08:18  10     standing requirement, which is incorporated within the

16:08:21  11     Privacy Act as an adverse consequence.

16:08:23  12          I mean, I don't -- Congress required an adverse

16:08:26  13     consequence before one can bring a Privacy Act claim.

16:08:32  14     And that means that they thought there should be an

16:08:36  15     individualized showing of harm before money damages can

16:08:41  16     attach.  And I think in order to allow sort of

16:08:45  17     programmatic review through the APA would upend that

16:08:49  18     system and root out the adverse consequences portion of

16:08:57  19     the statute.

16:09:00  20               THE COURT:  Okay.  So in terms of the arbitrary

16:09:03  21     and capricious, if I disagree with your threshold

16:09:07  22     arguments and reach the merits, how should I assess

16:09:11  23     whether Secretary Bessent considered the relevant

16:09:13  24     factors and alternatives when deciding to give the

16:09:17  25     Treasury DOGE team access to the BFS records?

16:09:20  1          Should I order you to produce a complete

16:09:23  2    administrative record?

16:09:24  3          Should I allow plaintiffs to obtain limited

16:09:26  4    discovery from the Secretary?

16:09:30  5          I mean, how would I know whether -- you know, what

16:09:35  6    the Secretary considered in doing -- in making this

16:09:40  7    decision so -- to determine whether the decision was --

16:09:44  8    the reasonable decision-making was arbitrary and

16:09:46  9    capricious?

16:09:46  10         Where would it fit with the administrative record

16:09:49  11   and potential discovery which plaintiffs have asked for?

16:09:53  12              MR. HUMPHREYS:  Well, for the reasons stated in

16:09:54  13   our supplemental memorandum, Your Honor, we think the

16:09:56  14   Court can and should decide this motion on the

16:10:00  15   information already before the case -- excuse me, before

16:10:03  16   the Court.

16:10:04  17         And that is because, as the D.C. Circuit has

16:10:07  18   explained, the Court can evaluate jurisdictional

16:10:10  19   questions, like whether plaintiffs have suffered any

16:10:12  20   injury-in-fact without resorting to the administrative

16:10:17  21   record.

16:10:17  22         If the Court believes at this juncture that more

16:10:20  23   information is required, we do believe that an

16:10:22  24   administrative record is the appropriate way for the

16:10:26  25   Court to proceed.

16:10:27   1          Plaintiffs have opted to bring this claim as in --

16:10:31   2   their claims under the APA.  And as your Court

16:10:35   3   indicated, the general rule for APA review is the

16:10:38   4   administrative record.

16:10:39   5          We don't think that discovery would be appropriate.

16:10:42   6   Again, had plaintiffs chosen to plead this case through

16:10:45   7   the Privacy Act showing harm based on an individualized

16:10:50   8   disclosure, there may be discovery there.  But

16:10:53   9   plaintiffs have chosen the APA, and we think they should

16:10:57  10   be held to their choice.

16:10:58  11          THE COURT:  Okay.  Let me move to what Judge

16:11:01  12   Vargas did.  She concluded the plaintiffs in the case

16:11:04  13   before her were likely to succeed in showing that

16:11:07  14   Treasury's decision to give, quote, "the Treasury DOGE

16:11:10  15   team access to critical BFS payment systems with full

16:11:15  16   knowledge of the serious risks that access entailed was

16:11:19  17   arbitrary and capricious."

16:11:20  18          And she cited the inexplicable urgency and time

16:11:25  19   constraints under which this access was granted, which

16:11:28  20   she concluded, quote, "all but ensured that the launch

16:11:32  21   of the Treasury DOGE team was chaotic and haphazard,"

16:11:36  22   unquote.

16:11:37  23          Give me a reason why I should think differently.

16:11:41  24          MR. HUMPHREYS:  Well, we disagree, Your Honor.

16:11:44  25   As set forth in the EO, it is a priority of the

16:11:47  1    President to modernize agency systems, certainly

16:11:50  2    reasonable for the agency to act swiftly to implement

16:11:53  3    the President's priorities to combat waste, fraud, and

16:11:57  4    abuse and to modernize government systems.

16:12:00  5         Also I think the declaration, particularly the

16:12:04  6    Gioeli declaration, makes clear that the agency thought

16:12:06  7    this through.  There were risks identified and measures

16:12:08  8    put in place to combat that risk.

16:12:10  9         The fact that things moved quickly does not suggest

16:12:14  10   arbitrary and capriciousness, and we would disagree with

16:12:17  11   the characterization, Your Honor, that the rollout was

16:12:22  12   haphazard.

16:12:29  13        THE COURT:  Okay.  Let me -- and hopefully we

16:12:32  14   can move through this a little more -- I'm getting to

16:12:35  15   the end -- but a little more quickly.

16:12:38  16        In terms of Mr. Krause's employment status, he

16:12:42  17   started working -- he, Mr. Krause, started working at

16:12:45  18   Treasury on January 23rd.  He took the oath, was

16:12:50  19   onboarded, but his actual employment paperwork was not

16:12:54  20   processed until February 3rd.  And the paperwork

16:12:57  21   originally identified Mr. Krause's start date as

16:13:00  22   February 9th, which is more than two weeks after he

16:13:03  23   began working at the Treasury Department.

16:13:04  24        So on February 10th, the appointing official

16:13:08  25   executed a revised appointment documentation for

16:13:11  1    Mr. Krause, retroactively stating that his appointment

16:13:14  2    began on January 23rd.

16:13:17  3        On February 5th, the Secretary delegated to

16:13:20  4    Mr. Krause the duties of the Fiscal Assistant Secretary,

16:13:24  5    which is a leadership role with the responsibility for

16:13:26  6    BFS.  But between January 23rd and February 13th,

16:13:32  7    Mr. Krause was nominally a, quote, "consultant" for

16:13:37  8    Treasury.

16:13:38  9        A consultant cannot perform managerial or

16:13:42  10   supervisory work except as team leader or director of

16:13:45  11   the specific project for which he's been hired.  And a

16:13:48  12   consultant also cannot make final decisions on

16:13:52  13   substantive policies or otherwise function in the agency

16:13:55  14   chain of command.

16:13:58  15       Because of these restrictions, as I understand it,

16:14:01  16   the defendants represent that Mr. Krause did not, quote,

16:14:04  17   "assume the duties of the Fiscal Assistant Secretary

16:14:07  18   until he was appointed as a temporary transitional

16:14:11  19   Schedule C on February 13th."

16:14:14  20       Now, there are a couple other questions about, you

16:14:16  21   know, what his status was in the meantime.

16:14:19  22       The Payment Process Engagement Plan was entered

16:14:24  23   into in terms of the agreement on January 26th.  So did

16:14:29  24   he have the authority at that point to do so?  And if

16:14:36  25   not, who did?  Because in terms of February 26, which

16:14:42  1    would be between January 23rd and February 3rd, the date

16:14:51  2    they processed his appointment paperwork, so he seems to

16:14:56  3    have been a consultant from January 23rd to

16:15:00  4    February 13th, which would cover the period of the

16:15:03  5    January 26th.

16:15:04  6        So if he was a consultant, what was his authority?

16:15:08  7        Consultants don't have the authority to do

16:15:10  8    policymaking and a bunch of other things to have done

16:15:12  9    the engagement plan?  Or did somebody else have the

16:15:15  10   authority?

16:15:16  11            MR. HUMPHREYS:  No, correct, Your Honor.  He

16:15:17  12   was a consultant and working under the Secretary's Chief

16:15:24  13   of Staff, and therefore he exercised that authority, not

16:15:27  14   independent policymaking authority.

16:15:28  15            THE COURT:  So who -- but as I understand it,

16:15:32  16   he was involved in the -- unless I'm wrong, and correct

16:15:36  17   me -- I'll call it, for shorthand, the "engagement

16:15:40  18   plan," in terms of it being established and agreed to at

16:15:42  19   that point, he wouldn't have had authority as a

16:15:45  20   consultant.  So who basically did the agreement from the

16:15:50  21   perspective of presumably the DOGE team or whatever?

16:15:57  22            MR. HUMPHREYS:  I think the engagement plan

16:16:01  23   sets out the terms that Mr. Krause was going to be

16:16:05  24   performing.  It doesn't suggest that there's any

16:16:08  25   policymaking authority on his part, Your Honor.

16:16:10  1          THE COURT:  I thought that the engagement plan

16:16:12  2    had not only discussions of Mr. Krause but had

16:16:20  3    basically, you know -- you don't view them as the

16:16:22  4    changes, but the plaintiff does -- affecting access,

16:16:26  5    I'll put it that way -- in terms of who would be getting

16:16:29  6    access to the system.  I don't think it was the BFS

16:16:33  7    system.  It was another system.

16:16:35  8        But it went beyond just talking about Mr. Krause,

16:16:38  9    right?

16:16:39  10          MR. HUMPHREYS:  Well, yes, Your Honor.  And I

16:16:40  11    meant by "Mr. Krause," him and the Treasury DOGE team.

16:16:44  12    And, yes, it sets out the -- essentially the scope of

16:16:49  13    work that they will be performing, but, again, I don't

16:16:51  14    think that suggests that Mr. Krause had any policymaking

16:16:55  15    role at that time.

16:16:57  16        And the -- sorry.

16:16:59  17          THE COURT:  Go ahead.

16:17:01  18          MR. HUMPHREYS:  And of course, Your Honor, we

16:17:02  19    do disagree that there's any change in policy.  And

16:17:05  20    there's nothing -- plaintiffs had mentioned several

16:17:06  21    times about --

16:17:07  22          THE COURT:  Okay.

16:17:08  23          MR. HUMPHREYS:  Sure.

16:17:09  24          THE COURT:  So let's -- looking at the time

16:17:10  25    between January 23rd and February 9th, for Privacy Act

16:17:16   1    purposes, was he an officer, employee, or federal agency

16:17:19   2    during that time?

16:17:21   3               MR. HUMPHREYS:  Yes, Your Honor.  A consultant

16:17:22   4    is an employee for --

16:17:23   5               THE COURT:  As a consultant?

16:17:25   6               MR. HUMPHREYS:  Yes, Your Honor.

16:17:26   7               THE COURT:  And what confidentiality

16:17:28   8    obligations did Mr. Krause owe to the federal government

16:17:30   9    during those particular times?

16:17:34   10              MR. HUMPHREYS:  Those of any other employee, is

16:17:36   11   my understanding, Your Honor.  He was advised of his

16:17:39   12   need to keep information confidential.

16:17:41   13              THE COURT:  And what remedies would have been

16:17:43   14   available to enforce those obligations as a consultant?

16:17:51   15              MR. HUMPHREYS:  Well, he's a consultant on

16:17:53   16   behalf of the agency, Your Honor, so if he had --

16:17:55   17              THE COURT:  In terms of Treasury?

16:17:58   18              MR. HUMPHREYS:  What remedies --

16:18:00   19              THE COURT:  He was a consultant on "the

16:18:04   20   agency."

16:18:04   21       What did you mean by that?

16:18:05   22              MR. HUMPHREYS:  He's a consultant of the agency

16:18:07   23   and an employee --

16:18:09   24              THE COURT:  The agency being --

16:18:11   25              MR. HUMPHREYS:  The Treasury Department, Your

16:18:14   1    Honor.

16:18:14   2         THE COURT:  Okay.  That's what I'm trying to

16:18:15   3    get at.  Okay.

16:18:18   4      So he didn't assume the duties of Fiscal Assistant

16:18:24   5    Secretary until February 13th when he was appointed as a

16:18:27   6    temporary Schedule C employee rather than a consultant.

16:18:31   7      So how would you describe his duties before

16:18:34   8    February 13th?

16:18:34   9         MR. HUMPHREYS:  As a consultant providing

16:18:36  10    expertise on modernization and integration of systems,

16:18:43  11    which is the work that the Treasury DOGE did.

16:18:44  12         THE COURT:  Was he supervising or managing

16:18:48  13    anybody before February 13th that we know?

16:18:51  14         MR. HUMPHREYS:  He is the -- was the team

16:18:54  15    leader of the Treasury DOGE team, and so to some degree

16:18:57  16    at least, Mr. Elez, when he was at the Treasury

16:19:01  17    Department, worked under him.  But I don't -- in terms

16:19:08  18    of his direct supervisor, I don't believe so.

16:19:10  19         THE COURT:  Well, wouldn't he have been

16:19:12  20    supervising Mr. Elez?

16:19:15  21      I'm mispronouncing it, I'm sorry.

16:19:18  22         MR. HUMPHREYS:  No, Your Honor, I think you're

16:19:19  23    doing well.

16:19:22  24      In the sense that he is the team leader of the

16:19:25  25    Treasury Department -- excuse me, of the Treasury DOGE

16:19:26  1    team, I think he's providing direction to the team,

16:19:28  2    although I don't -- I don't know if he was his direct

16:19:32  3    supervisor.  I think the fact that he was a consultant

16:19:34  4    suggests not.  He was certainly the team leader

16:19:39  5    directing the team's work within the agency.  The agency

16:19:42  6    being Treasury.

16:19:46  7             THE COURT:  Okay.  Let me move back to

16:19:47  8    something I had talked to you earlier.

16:19:49  9         Let's assume hypothetically that the Treasury

16:19:53  10   Department disclosed records to Mr. Krause, and he was

16:19:54  11   acting in his capacity as the CEO of the software

16:20:01  12   company.  I take it you would agree that that would

16:20:04  13   violate the Privacy Act?  I mean, he has two hats.

16:20:08  14            MR. HUMPHREYS:  Yeah, if -- if the purpose of

16:20:10  15   providing him with the records was for his work in

16:20:14  16   his --

16:20:15  17            THE COURT:  Well, he's acting -- Mr. Krause

16:20:18  18   is -- my hypothetical has him acting in his capacity as

16:20:21  19   the CEO of a software company, and he is provided these

16:20:27  20   records not as for USDS.

16:20:32  21            MR. HUMPHREYS:  I think the Court should look

16:20:33  22   to the Privacy Act in 552(a)(B)(1), which talks about

16:20:38  23   whether or not there's a need for the record in the

16:20:41  24   performance of the duties.

16:20:43  25        So if there was no need for the records in the

16:20:46  1    performance of the duties, it would fall outside the

16:20:49  2    scope of that exception.

16:20:52  3            THE COURT:  But that doesn't fit my

16:20:54  4    hypothetical, does it?

16:20:59  5        I mean, I'm talking about him being the CEO of the

16:21:02  6    company, and he's in that capacity and he gets records.

16:21:05  7            MR. HUMPHREYS:  Right.  So in that -- I believe

16:21:07  8    in your hypothetical, Mr. Krause would be wearing his

16:21:09  9    hat as the --

16:21:10  10           THE COURT:  The CEO.

16:21:12  11           MR. HUMPHREYS:  The CEO.

16:21:13  12           THE COURT:  So would --

16:21:13  13           MR. HUMPHREYS:  And therefore --

16:21:14  14           THE COURT:  -- you would agree that it would

16:21:15  15    violate the Privacy Act?

16:21:17  16           MR. HUMPHREYS:  If he is not wearing his

16:21:18  17    Treasury Department hat?

16:21:19  18           THE COURT:  Right, right.

16:21:20  19           MR. HUMPHREYS:  Then, yes, I would agree with

16:21:22  20    that.

16:21:22  21           THE COURT:  Okay.  Because he's got two hats.

16:21:24  22    He's Treasury and then he's also the CEO of this other

16:21:30  23    company.

16:21:35  24        All right.  One last area.  Mr. Elez's

16:21:46  25    communications potentially outside the Treasury

1    Department.

16:21:50   2         Judge Vargas of the Southern District of New York

16:21:54   3    found based on representations during a PI hearing --

16:21:57   4    and of course I don't have the transcript, but she put

16:21:59   5    it in her opinion -- that was on February 14th -- that

16:22:03   6    Mr. Elez sent emails to USDS personnel outside the

16:22:07   7    Treasury Department.

16:22:10   8         That information is not in the record in this case;

16:22:13   9    however, it is consistent with the declaration of Joseph

16:22:17  10    Gioeli, which states that BFS officials, quote, "have

16:22:24  11    found no indication that Mr. Elez used his BFS's laptop

16:22:30  12    to share any BFS payment systems data outside the U.S.

16:22:38  13    Government."

16:22:38  14         "Mr. Elez had the ability to copy sensitive payment

16:22:41  15    data from BFS databases onto his BFS laptop."

16:22:48  16         Now, outside the U.S. Government, but would

16:22:53  17    there -- he didn't share it, but -- outside of the

16:22:57  18    Treasury Department, so who did he share it --

16:23:01  19    presumably, at some other government agency, but is

16:23:04  20    it --

16:23:05  21         MR. HUMPHREYS:  Well, we know, Your Honor, that

16:23:07  22    Mr. Elez shared information with the State Department as

16:23:10  23    part of the process to review payments in conjunction

16:23:15  24    with the President's Executive Order on foreign

16:23:19  25    assistance.  And there is a specific routine use for

16:23:21  1    that, number 17 of the applicable SORN.

16:23:25  2         THE COURT:  So that's the forensic analysis

16:23:27  3    that's been shown that it's the material from the State

16:23:31  4    Department?  That's not -- I wasn't at the hearing so

16:23:32  5    obviously I can't say, but that's not the impression

16:23:34  6    that I had that they were referring to that.

16:23:37  7         MR. HUMPHREYS:  I wasn't finished, Your Honor.

16:23:39  8    I wasn't at the hearing either and have been unable to

16:23:41  9    get a transcript, but I am aware of the quote that Judge

16:23:45  10   Vargas has in her opinion.

16:23:47  11        There is, for one, the State Department sharing of

16:23:51  12   information that we described in our declarations.  So

16:23:55  13   that would be one instance of --

16:23:56  14        THE COURT:  Is there anything else, though?  I

16:23:58  15   mean, the State Department we already know in terms of

16:24:00  16   their, you know, having looked at particular payments

16:24:03  17   that were being made, et cetera.  And then they may have

16:24:07  18   set up a different system where the State Department

16:24:09  19   looked at it before it got, you know, it got -- the

16:24:13  20   Treasury got involved and changed their procedures.  But

16:24:17  21   was there any other contact outside of the Treasury

16:24:27  22   Department other than the State Department, or do --

16:24:28  23        In other words, has the forensic analysis actually

16:24:30  24   been completed about all of it or not?

16:24:32  25        MR. HUMPHREYS:  The forensic analysis has not

16:24:34  1    been complete.  We are not aware of another sharing

16:24:39  2    currently.

16:24:40  3        I will note that -- I think it's important, Your

16:24:41  4    Honor, that the mere fact that information -- if we

16:24:44  5    later learn that information went to another federal

16:24:48  6    government agency, that does not necessarily mean that

16:24:50  7    anything improper happened.  Because just as with the

16:24:53  8    State Department sharing information, there may be a

16:24:56  9    routine use that would cover it, therefore, making it

16:25:02 10    completely lawful under the Privacy Act.

16:25:04 11        THE COURT:  But it does make a difference in

16:25:06 12    terms of who outside of the -- even if it's within the

16:25:08 13    government, who outside of the Treasury Department he

16:25:11 14    communicated with, you know, in terms of any

16:25:14 15    confidentiality requirements that bind the recipients of

16:25:17 16    them, in terms of, you know, any of the recipients, were

16:25:22 17    they employed by the Executive Office of the President.

16:25:25 18        Does the Privacy Act actually apply to them?  And

16:25:30 19    more pointedly, is the USDS an agency for purposes of

16:25:33 20    the Privacy Act?

16:25:34 21        So it does make a difference in terms of how the

16:25:44 22    information is shared with others outside of Treasury

16:25:51 23    but still within the government.

16:25:52 24        MR. HUMPHREYS:  Well, yes, Your Honor.  And if

16:25:54 25    it were discovered that there was a disclosure outside

16:25:58  1    of the Treasury Department and --

16:26:00  2             THE COURT:  Just with State, as far as you

16:26:02  3    know.

16:26:02  4             MR. HUMPHREYS:  No, the only one that I'm aware

16:26:04  5    of is the State Department, Your Honor.

16:26:05  6             THE COURT:  I'm sorry?

16:26:06  7             MR. HUMPHREYS:  The only one that I'm aware of,

16:26:08  8    information-sharing, is with the State Department.  But

16:26:11  9    I mean, my point is if there is -- if there were such a

16:26:13  10   disclosure, plaintiffs, if harmed, could bring a

16:26:17  11   challenge regarding that disclosure and seek monetary

16:26:22  12   damages.

16:26:22  13            THE COURT:  Okay.  So let me just ask.  You're

16:26:26  14   arguing that -- let's assume that they disclosed the

16:26:29  15   payment records to the State Department.  And they

16:26:32  16   didn't violate the Privacy Act because they were

16:26:36  17   complying with the routine use exception.  And you

16:26:39  18   invoke Routine Use 17 which allows disclosures for

16:26:42  19   purposes of identifying, preventing, and recouping, say,

16:26:46  20   improper payments.

16:26:47  21       I believe that's what you argued, am I correct?

16:26:49  22            MR. HUMPHREYS:  That's correct, Your Honor.

16:26:51  23            THE COURT:  Okay.  Why were those payments

16:26:52  24   improper within the meaning of the Routine Use 17?

16:26:57  25       Is it because they were improper because they were

16:27:00  1    inconsistent with the President's Executive Order

16:27:03  2    purporting to pause foreign aid payments that are not

16:27:07  3    aligned with the foreign policy?

16:27:09  4        Is there any other reason they were improper?

16:27:11  5        I mean, there's no allegation that they were

16:27:14  6    fraudulent or not duly authorized by Congress, correct?

16:27:19  7            MR. HUMPHREYS:  Well, I'm not saying they were

16:27:20  8    or weren't improper, Your Honor.  My understanding is

16:27:22  9    that all those payments were ultimately approved, only

16:27:25  10   that the sharing of information in order to determine,

16:27:26  11   in conjunction with the State Department, whether or not

16:27:29  12   they are proper is a permitted routine use in the

16:27:33  13   published SORN.

16:27:36  14           THE COURT:  But it's all based on it being

16:27:39  15   improper, right, in terms of not some other

16:27:43  16   fraudulent --  or whatever.  So let me test this with

16:27:51  17   another one of these hypotheticals.

16:27:54  18       The President can't just decide that something is

16:27:57  19   improper through an Executive Order and then remove the

16:28:00  20   Privacy Act protections.  Let's assume that the

16:28:04  21   President decides there's a policy that elected

16:28:07  22   officials shouldn't voluntarily take itemized tax

16:28:11  23   deductions and should take the standard deductions.

16:28:16  24       Would a tax refund to a politician's itemized

16:28:20  25   deductions be improper within the routine use?  And

16:28:24  1   would Mr. Krause be complying with Routine Use 17 if he

16:28:27  2   went through the Treasury database, identified tax

16:28:32  3   returns for members of Congress who took itemized

16:28:35  4   deductions and then reported them as improper payments,

16:28:40  5   using my hypothetical?

16:28:41  6        MR. HUMPHREYS:  If I understand it correctly,

16:28:43  7   Your Honor, for the purposes of the Privacy Act alone,

16:28:46  8   if there were a question about whether or not any

16:28:51  9   particular payment were proper, it would be permissible

16:28:57  10  to share the information from the Treasury Department

16:29:00  11  to, in this instance, the consulting agency to determine

16:29:05  12  whether or not those payments are proper or not.

16:29:08  13       And so I --

16:29:12  14       THE COURT:  But they would be improper based on

16:29:15  15  the Executive Order, as I understand it, not on

16:29:18  16  something else -- at least as I understood it from the

16:29:21  17  State Department.

16:29:23  18     So I gave you a -- you know, another hypothetical

16:29:27  19  why it's -- you know, in terms of its -- there's nothing

16:29:31  20  fraudulent or anything about these, particularly in

16:29:34  21  terms of -- but it's strictly that it's based on an

16:29:40  22  Executive Order that came down that's made it improper.

16:29:44  23       MR. HUMPHREYS:  I think it would depend, Your

16:29:46  24  Honor, on -- in the context of that hypothetical what

16:29:48  25  else Congress restrictions had established and whether

16:29:51  1    or not the Executive Order conflicted with them.  And I

16:29:55  2    don't think we have anything present as to the State

16:29:59  3    Department that would impose those same sort of

16:30:02  4    restrictions.  But, again, I think sharing information,

16:30:06  5    just to determine whether or not something is improper

16:30:09  6    or to ask the opinion of another agency, as permitted

16:30:14  7    explicitly by the SORN, falls within the scope of Number

16:30:23  8    17.

16:30:23  9              THE COURT:  Okay.  So my last question really

16:30:26  10   gets to the irreparable harm in terms of the sharing

16:30:43  11   outside of the federal government.  Obviously, we'd

16:30:47  12   agree with that, that that's irreparable harm.  The

16:30:51  13   question is whether outside of the Treasury Department

16:30:52  14   whether that's an issue.

16:30:54  15       Have there been steps taken to mitigate risks of

16:30:58  16   harm at this point or in the future in terms of making

16:31:02  17   sure that the mistakes that were made with Mr. Elez

16:31:05  18   have -- don't get repeated?

16:31:08  19              MR. HUMPHREYS:  I'm not sure I agree with the

16:31:09  20   premise to start, Your Honor.

16:31:10  21       I mean, the only mistake that I'm aware of, and I

16:31:14  22   believe our Treasury is aware of, with respect to

16:31:17  23   Mr. Elez is the short period of time in which he was

16:31:20  24   given write access in addition to read access.

16:31:29  25       Write, W-R-I-T-E.

16:31:29  1          THE COURT:  Well, I'm just saying though, a

16:31:30  2   mistake is a mistake.  And the point I'm getting at is:

16:31:33  3   Has that made it clear to Treasury that maybe they need

16:31:36  4   better procedures or training or whatever, as Judge

16:31:39  5   Vargas had indicated?

16:31:40  6          MR. HUMPHREYS:  Your Honor, well -- the agency

16:31:42  7   has --

16:31:43  8          THE COURT:  That -- she's going to require it.

16:31:45  9   She made some findings.  I take it you disagree with

16:31:47  10   them, but has the Treasury done anything to implement

16:31:51  11   it, even before she did her order?

16:31:54  12          MR. HUMPHREYS:  Well, with the read/write

16:31:59  13   error, the access that Mr. Elez very briefly had, the

16:32:03  14   agency became aware of it and corrected it before

16:32:06  15   Mr. Elez, we believe, ever knew about his write access

16:32:09  16   in order -- or ever logged into the system.

16:32:11  17      So, yes, that was a mistake, but the agency found

16:32:14  18   it out on its own accord and, yes, has corrected that,

16:32:17  19   and I'm sure will be very aware to make sure that, you

16:32:20  20   know, the proper access is granted going forward.

16:32:23  21          THE COURT:  So will there be any kind of

16:32:25  22   procedures, if you know, by the defendants who are

16:32:30  23   logging or monitoring the activities of the Treasury

16:32:34  24   DOGE team members when they interact with the BFS

16:32:37  25   systems?

16:32:38  1          MR. HUMPHREYS:  Yes, Your Honor, as

16:32:39  2   described --

16:32:39  3          THE COURT:  In terms of doing some -- to make

16:32:41  4   sure -- especially if it goes outside of the Treasury

16:32:46  5   Department?

16:32:48  6          MR. HUMPHREYS:  Excuse me, Your Honor.

16:32:48  7      Yes, Your Honor.  The Gioeli declaration explains

16:32:53  8   many steps that were taken to mitigate risks with

16:32:55  9   respect to members of the Treasury --

16:32:57  10         THE COURT:  So there will be -- what I'm asking

16:33:01  11  is, is there a system of monitoring and logging in so

16:33:03  12  that you can keep track of where information goes, if it

16:33:06  13  goes outside of Treasury?

16:33:07  14         MR. HUMPHREYS:  Yes, Your Honor.

16:33:08  15         THE COURT:  Okay.  All right.  It's gotten

16:33:11  16  late.  My questions took longer, but let me take -- I

16:33:16  17  take it back.  I have one last question, which I forgot,

16:33:21  18  and then we'll take a break.

16:33:23  19      And at this point if there's something additional

16:33:25  20  you want to raise for me, that's fine, you know, that I

16:33:28  21  should be focused on.  If not, we'll move to next

16:33:33  22  steps.

16:33:34  23      So let me -- let's make an assumption here that

16:33:36  24  there was a disclosure from Treasury to USDS.

16:33:43  25      Now, any harm from that disclosure might be mooted

16:33:47  1    if the Privacy Act prohibits further disclosures by USDS

16:33:51  2    employees.  But the Privacy Act applies only to

16:33:54  3    government agencies, and the agencies adopt the FOIA's

16:33:59  4    definition of what it means to be a government agency.

16:34:03  5        And is USDS an agency within the meaning of FOIA,

16:34:08  6    which means the Privacy Act applies?

16:34:13  7            MR. HUMPHREYS:  We've not briefed that issue in

16:34:14  8    this case.  I know some of my colleagues have and have

16:34:17  9    taken a position that it is not.

16:34:20  10           THE COURT:  So it's -- well, they've indicated

16:34:25  11   that it's a government agency, correct, USDS?  Or not?

16:34:31  12           MR. HUMPHREYS:  I don't know the answer to

16:34:33  13   that, Your Honor.

16:34:33  14           THE COURT:  I'm sorry?

16:34:34  15           MR. HUMPHREYS:  I don't know the answer to

16:34:35  16   that.  It's not been presented.

16:34:38  17           THE COURT:  Would you agree that if it was -- I

16:34:40  18   mean, if it was an agency, it has to follow the

16:34:42  19   definition of FOIA, which means you would be subject to

16:34:44  20   FOIA as well?

16:34:47  21       You don't know one way or the other?

16:34:51  22           MR. HUMPHREYS:  No, my understanding is it's a

16:34:52  23   complicated body of law out there.

16:34:53  24           THE COURT:  No, no, no, I'm just asking you

16:34:55  25   whether -- if USDS is an agency, using the FOIA

16:35:01  1    definition, then that's what I'm asking you:  Is USDS

16:35:05  2    a -- an agency, and what's required is that you use the

16:35:09  3    definition that happens to be in the FOIA statute, which

16:35:12  4    would seem to assume that you would then be subject to

16:35:15  5    FOIA.  But that's not -- I'm not getting into FOIA.  I'm

16:35:19  6    just asking you whether USDS is an agency.

16:35:20  7          MR. HUMPHREYS:  I don't -- that hasn't been

16:35:22  8    presented in this case, Your Honor.

16:35:24  9          THE COURT:  Okay.  Let me take a break at this

16:35:26  10   point and -- I'm assuming we've covered everything, but

16:35:31  11   if there's something you want to bring up, plaintiff,

16:35:33  12   I'll let you -- get me to focus on something that you

16:35:36  13   think based on the answers that would be -- you want to

16:35:41  14   bring up, and then we'll move forward to what we need to

16:35:44  15   do next steps, no matter what I do with the PI.

16:35:49  16       So let me -- so it should be a short conversation.

          17       (Pause)

16:36:18  18          THE COURT:  The court reporter has kindly said

16:36:20  19   ten minutes, so about a quarter to 5:00, and we should

16:36:24  20   be done by 5:00.  So let's take a quick break.

16:51:45  21       (Court in recess at 4:36 p.m.)

16:51:45  22       (After recess, 4:51 p.m.)

16:51:52  23          THE COURT:  Okay.  I do have one additional

16:51:54  24   question, defense counsel.

16:52:03  25       So the President's Executive Order establishing the

16:52:06  1    U.S. DOGE Service provides in Section 4(b), and I'm

16:52:12  2    going to read exactly what it says:

16:52:13  3        "Agency heads shall take all necessary steps in

16:52:19  4    coordination with the USDS administrator and to the

16:52:25  5    maximum extent consistent with law to ensure that USDS

16:52:29  6    has full and prompt access to all unclassified agency

16:52:33  7    records, software systems, and IT systems.  USDS shall

16:52:43  8    adhere to rigorous data protection standards."

16:52:43  9        Based on the Executive Order, which I've just read,

16:52:46  10   what is the defendant's position on the extent to which

16:52:49  11   it would be quote, "consistent with law," unquote, to

16:52:52  12   provide USDS with full and prompt access to BFS payment

16:52:58  13   systems as directed by the Executive Order?

16:53:01  14            MR. HUMPHREYS:  Our position, Your Honor, is

16:53:03  15   that the "consistent with law" phrase there incorporates

16:53:06  16   or refers to also the Privacy Act and the Internal

16:53:10  17   Revenue Code.

16:53:11  18       So sharing information from Treasury to USDS would

16:53:15  19   only be permissible as authorized by those specific

16:53:20  20   statutes, including whatever restrictions --

16:53:23  21            THE COURT:  So in the absence of an injunction

16:53:25  22   from this Court or the Southern District of New York,

16:53:31  23   you would give access to USDS officials based on the

16:53:37  24   Executive Order.

16:53:37  25       Do I understand that correctly?

16:53:40  1          MR. HUMPHREYS:  No, Your Honor.  I did not mean

16:53:41  2     to say that at all.  Only to the extent that the Privacy

16:53:44  3     Act or the Internal Revenue Code allowed so -- because

16:53:50  4     plaintiffs are claiming here an APA violation based on a

16:53:52  5     violation of the Privacy Act or the Internal Revenue

         6     Code.

16:53:55  7          What I'm saying is that the defendants, the

16:53:57  8     Treasury Department, would not share information with

16:54:00  9     USDS unless it were authorized by the Privacy Act or the

16:54:05 10     Internal Revenue Code.

16:54:06 11          So, for example, with the Privacy Act, there would

16:54:10 12     need to be a routine use published in the Systems of

16:54:13 13     Record Notice and applied and allowed for under the

16:54:18 14     Privacy Act the sharing of that information.

16:54:19 15          THE COURT:  So from your perspective, the

16:54:22 16     Executive Order would not authorize them to go forward

16:54:29 17     and provide USDS with access; is that what you're

16:54:34 18     saying?

16:54:34 19          MR. HUMPHREYS:  Not in all circumstances.

16:54:35 20     There would have to be a reason consistent with the

16:54:37 21     Privacy Act that allowed for the sharing of that

16:54:39 22     information, which is what the "consistent with law"

16:54:42 23     means there.

16:54:43 24          If it would violate the Privacy Act, then the

16:54:45 25     defendants would not share that information, or the

16:54:47  1    Internal Revenue Code --

16:54:59  2            THE COURT:  Okay.  I'm obviously going to take

16:55:01  3    this under advisement.  At this point I'm inclined to

16:55:03  4    conclude that plaintiffs do have standing.  So we'll be

16:55:07  5    moving forward and the Court will be taking it under

16:55:09  6    advisement.

16:55:11  7        D.C. Circuit case law requires that I have the

16:55:14  8    administrative record to rule on the merits, and many of

16:55:18  9    the arguments from the defendants today appear to boil

16:55:22  10   down to an argument on the merits.  So I'm inclined at

16:55:25  11   this point to conclude that the plaintiffs do have

16:55:29  12   standing and that I do need the administrative record.

16:55:32  13       So when can you produce it?  What kind of a

16:55:37  14   timeline do you have?

16:55:40  15       Hopefully somebody has thought about it?

16:55:47  16           MR. HUMPHREYS:  May I confer for just a moment

16:56:07  17   with my colleagues?

16:56:08  18           THE COURT:  Sure.

16:56:09  19       (Counsel conferring)

16:56:14  20           MR. HUMPHREYS:  Thank you, Your Honor.

16:56:16  21       We'd ask for two weeks.  If there's any way we can

16:56:20  22   file it sooner than that, we certainly will.

16:56:23  23           THE COURT:  Sure.  Can you give me a date?

16:56:25  24       Let me just look.

16:56:30  25       So March 10th?  That's two weeks.

16:56:32  1          MR. HUMPHREYS:  Yes, Your Honor.

16:56:34  2          THE COURT:  Okay.  Has anybody thought about

16:56:36  3    what's going to happen next or what you're proposing

16:56:39  4    next?  Motions or whatever else, if anybody's got ideas?

16:56:46  5      I mean, this is the time to say something.

16:56:49  6          MR. HUMPHREYS:  Since I'm here --

        7          THE COURT:  Plaintiffs or defendants?

16:56:49  8          MR. HUMPHREYS:  -- we would propose a motion to

16:56:52  9    dismiss, Your Honor.

16:56:56  10         THE COURT:  Okay.  Anything from the plaintiff?

16:56:58  11   I'm trying to set a schedule while everybody is here

16:57:01  12   instead of trying to do it at a later point.

16:57:03  13         MR. JOSHI:  Yes.  If they are proceeding with a

16:57:05  14   motion to dismiss, we would proceed with a cross-motion

16:57:07  15   for summary judgment, but the record would be helpful in

16:57:12  16   that process.

16:57:13  17         THE COURT:  I'm sorry, I missed the last part.

16:57:16  18         MR. JOSHI:  The record, having the

16:57:18  19   administrative record --

16:57:21  20         THE COURT:  The administrative record, okay.

        21         MR. JOSHI:  -- and seeing what that consists --

16:57:22  22         THE COURT:  I don't know whether today you're

16:57:24  23   in a position to give me a schedule or you need to

16:57:26  24   confer among yourselves and with opposing counsel and

16:57:30  25   propose one for the motion to dismiss or the

16:57:32   1       cross-motion.

16:57:36   2           I'm sorry, I was talking while you all were

16:57:39   3       conferring.  Let me let you confer.

           4           (Counsel conferring)

16:57:42   5           THE COURT:  Okay.  So what I was going to do is

16:57:45   6       suggest a schedule for the motion to dismiss, and if

16:57:47   7       they file them, cross-motion.

16:57:49   8           In terms of a schedule, we can either set it now or

16:57:53   9       if you need to confer and talk to each other and propose

16:57:57  10       a schedule, I can, you know, wait, and you can give it

16:58:02  11       to me tomorrow.

16:58:02  12           I don't know whether you all have thought about it

16:58:04  13       already and -- or you can have a quick discussion or --

16:58:09  14           I'll give you a few minutes to talk, if you want.

16:58:19  15           (Counsel conferring)

16:58:48  16           THE COURT:  One question, obviously, is whether

16:58:52  17       I should resolve the PI before briefing on the motion to

16:58:55  18       dismiss or -- resolve it or hold it in abeyance.

16:59:01  19           I don't know what people's positions are.

16:59:05  20           MR. HUMPHREYS:  May I make a point on that,

16:59:07  21       Your Honor?

16:59:07  22           THE COURT:  Sure.

16:59:07  23           MR. HUMPHREYS:  So the government respectfully

16:59:11  24       asks that the Court would decide the PI motion before

16:59:12  25       briefing on the motion to dismiss.

16:59:13    1          Our agreement to an order in this case to maintain

16:59:16    2     the status quo is premised on an understanding that that

16:59:19    3     agreed-upon order would last for only a very short

16:59:22    4     period of time.  And defendants believe --

16:59:26    5          THE COURT:  Well, I understand that the PI

16:59:31    6     would end when the -- I mean, the agreement would end

16:59:36    7     once the Court issued whatever I did on the PI,

16:59:41    8     depending on what you're doing with the motion to

16:59:43    9     dismiss.

16:59:44    10         What's your schedule for that?

16:59:47    11         MR. HUMPHREYS:  We are going to confer on that,

16:59:49    12    Your Honor.

16:59:49    13         MR. JOSHI:  Yes.

16:59:50    14         THE COURT:  Do you have a date?

16:59:51    15         Tell me what the dates are.

16:59:53    16         MR. HUMPHREYS:  We were hoping to confer off

16:59:57    17    line and touch base with our clients --

17:00:01    18         THE COURT:  I'm sorry?

            19         MR. HUMPHREYS:  We were hoping to confer also

17:00:00    20    with our clients and then file something.

17:00:01    21         THE COURT:  And then come back?  Okay.

17:00:03    22         Plaintiffs, in terms of holding off or not holding

17:00:05    23    off?

17:00:06    24         MR. JOSHI:  We would just -- we would ask the

17:00:11    25    Court to determine the PI.  We have this consent order

17:00:15  1    in place but it's reached by agreement.

17:00:18  2        We would point out on the irreparable harm the

17:00:21  3    Treasury officials' brief that talks about how things --

17:00:29  4    how it worked at the Treasury and the harms that would

17:00:31  5    result in changes, but we would -- I think the decision

17:00:34  6    on the PI would help --

17:00:38  7            THE COURT:  So at this point I should go ahead

17:00:39  8    and make the decision on the PI separate from whatever

17:00:42  9    you come up with for the motion to dismiss, if I

17:00:45  10   understand you correctly?

17:00:46  11           MR. JOSHI:  That's our preference.

17:00:48  12           THE COURT:  Okay.  So you both have the same

17:00:50  13   view, it sounds like?

17:00:53  14           MR. HUMPHREYS:  Yes, Your Honor.  We agree.

17:00:54  15           THE COURT:  Okay.  All right.

17:01:00  16       Then obviously, confer with your clients.  If you

17:01:01  17   can get back -- why don't you file a proposed schedule?

17:01:06  18   We don't need to discuss it again.  And I'll issue an

17:01:09  19   order in terms of, you know, how the motions are to be

17:01:14  20   filed and whatever, you know, conditions, et cetera, are

17:01:18  21   done.

17:01:19  22       Okay.  So March 10th is the administrative record,

17:01:24  23   and then the Court will go forward with making a

17:01:27  24   decision on the PI and the motion to dismiss, you know,

17:01:31  25   you'll give me a briefing.  Motion to dismiss and

17:01:35   1      cross-motion for summary judgment.

17:01:38   2           Okay.  Anything else at this point?

17:01:40   3           Plaintiffs?

17:01:40   4                MR. JOSHI:  No, Your Honor.

17:01:41   5                THE COURT:  Defendants?

17:01:43   6                MR. HUMPHREYS:  No, Your Honor.

17:01:46   7                THE COURT:  All right.  The parties are

17:01:47   8      excused.  Take care.

17:01:48   9           (Court adjourned 5:01 p.m.)

17:01:54   10

          11                              - - - - -

          12

          13

          14

          15                      CERTIFICATE

          16

          17      I, Chandra Kean, RMR, certify that the foregoing is

          18      a correct transcription from the record of proceedings

          19      in the above-titled matter.

          20

          21      _____          February 25, 2025
                   Chandra Kean, RMR                      DATE

          22

          23

          24

          25

## 1

**1** [1] - 23:5
**10th** [3] - 98:24, 119:25, 123:22
**12th** [2] - 62:1, 71:14
**13th** [6] - 99:6, 99:19, 100:4, 103:5, 103:8, 103:13
**14th** [1] - 106:5
**17** [8] - 38:24, 39:1, 92:19, 107:1, 109:18, 109:24, 111:1, 112:8
**17th** [2] - 61:3, 61:16
**1997** [1] - 74:8
**19th** [4] - 54:16, 55:9, 57:5, 62:10

## 2

**2** [1] - 65:22
**2010** [1] - 74:7
**2025** [1] - 124:21
**2026** [1] - 27:11
**21st** [1] - 36:4
**23rd** [8] - 34:24, 35:5, 98:18, 99:2, 99:6, 100:1, 100:3, 101:25
**25** [1] - 124:21
**25-313** [1] - 3:3
**25-CV-429** [1] - 61:4
**26** [1] - 99:25
**26th** [3] - 35:22, 99:23, 100:5
**28th** [1] - 15:18
**2:03** [1] - 3:2

## 3

**3rd** [3] - 61:18, 98:20, 100:1

## 4

**4** [1] - 71:14
**4(b** [1] - 117:1
**4:36** [1] - 116:21
**4:51** [1] - 116:22

## 5

**540** [1] - 23:1
**552(a)(B** [1] - 91:22
**552(a)(B)(1** [1] - 104:22
**552(a)(B)(1)** [2] - 92:3, 92:16
**5:00** [2] - 116:19, 116:20
**5:01** [1] - 124:9
**5th** [1] - 99:3

## 7

**702** [9] - 16:15, 16:16, 17:18, 20:9, 20:13, 76:6, 85:15, 87:4, 87:7
**704** [6] - 20:12, 20:21, 24:13, 87:8, 88:3, 93:1

## 8

**8th** [1] - 61:21

## 9

**9th** [3] - 34:25, 98:22, 101:25

## A

**abeyance** [1] - 121:18
**ability** [5] - 24:5, 36:12, 37:11, 51:11, 106:14
**able** [8] - 11:8, 36:6, 36:9, 39:23, 51:20, 92:5, 93:7, 94:2
**above-titled** [1] - 124:19
**abroad** [1] - 27:24
**absence** [2] - 93:2, 117:21
**absent** [1] - 11:23
**absolutely** [2] - 43:3, 78:11
**abuse** [2] - 38:3, 98:4
**accept** [2] - 29:22, 48:3
**access** [71] - 3:12, 9:9, 9:13, 12:24, 13:20, 15:20, 15:21, 19:12, 19:23, 21:8, 24:22, 24:23, 25:18, 26:19, 27:21, 34:5, 35:15, 36:12, 36:25, 37:11, 38:4, 38:9, 38:10, 38:11, 42:18, 46:8, 51:22, 52:19, 52:20, 55:24, 56:8, 56:13, 76:23, 77:2, 81:1, 81:24, 82:16, 83:7, 83:18, 85:9, 85:10, 86:25, 88:20, 89:12, 89:21, 90:3, 90:11, 90:15, 90:20, 90:25, 92:10, 92:11, 92:14, 95:25, 97:15, 97:16, 97:19, 101:4, 101:6, 112:24, 113:13, 113:15, 113:20,

117:6, 117:12, 117:23, 118:17
**accessed** [4] - 80:16, 80:24, 81:7, 81:15
**accessing** [1] - 25:13
**accommodate** [1] - 15:10
**accompli** [1] - 47:23
**accord** [1] - 113:18
**according** [2] - 34:23, 41:3
**account** [1] - 40:16
**accurate** [2] - 52:23, 73:22
**acknowledge** [1] - 87:25
**act** [1] - 98:2
**Act** [87] - 6:6, 6:8, 11:20, 17:2, 17:20, 17:21, 17:25, 18:7, 18:9, 18:16, 19:2, 19:10, 19:16, 19:17, 20:10, 21:10, 22:6, 22:12, 22:13, 22:20, 23:6, 23:9, 23:11, 28:23, 28:24, 29:1, 29:4, 29:8, 31:1, 32:1, 36:22, 37:3, 37:6, 43:23, 44:1, 49:17, 56:23, 76:7, 77:15, 77:19, 78:1, 79:22, 81:16, 86:5, 86:6, 86:8, 86:12, 86:14, 86:18, 86:20, 86:23, 87:3, 87:18, 91:5, 91:16, 91:21, 93:10, 93:20, 94:11, 94:17, 95:1, 95:15, 95:13, 97:7, 101:25, 104:13, 104:22, 105:15, 108:10, 108:18, 108:20, 109:16, 110:20, 111:7, 115:1, 115:2, 115:6, 117:16, 118:3, 118:5, 118:9, 118:11, 118:14, 118:21, 118:24
**Act's** [1] - 92:11
**Act-related** [1] - 23:9
**acting** [8] - 35:9, 62:15, 71:2, 72:24, 75:4, 104:11, 104:17, 104:18
**Acting** [1] - 65:21
**action** [34] - 6:6, 10:21, 12:5, 19:25, 20:1, 20:4, 23:10, 24:12, 24:14, 24:19, 25:2, 25:25, 26:1,

26:5, 26:12, 27:19, 28:6, 40:20, 42:15, 76:21, 88:3, 88:4, 88:5, 88:12, 88:13, 88:19, 89:1, 89:3, 89:4, 89:25, 90:24, 93:7, 93:14
**actions** [8] - 19:7, 54:15, 70:18, 89:7, 89:8, 89:18, 94:3, 94:4
**activities** [1] - 113:23
**activity** [1] - 41:25
**actual** [9] - 12:1, 36:22, 39:18, 48:6, 76:9, 77:3, 77:16, 77:17, 98:19
**add** [8] - 13:8, 14:18, 16:6, 25:25, 39:8, 50:23, 51:1, 88:1
**addition** [6] - 6:14, 29:15, 112:24
**additional** [8] - 5:7, 5:9, 13:9, 17:11, 74:5, 75:12, 114:19, 116:23
**address** [8] - 6:20, 10:16, 21:20, 39:9, 40:3, 40:5, 40:7, 42:25
**addressed** [2] - 22:2, 85:2
**addresses** [1] - 23:13
**adequate** [7] - 20:21, 20:23, 21:4, 76:5, 92:23, 93:2, 94:20
**adhere** [2] - 15:16, 117:8
**adjourned** [1] - 124:9
**administration** [4] - 41:14, 41:15, 41:19, 42:8
**administrative** [12] - 9:7, 30:9, 96:2, 96:10, 96:20, 96:24, 97:4, 119:8, 119:12, 120:19, 120:20, 123:22
**Administrative** [3] - 77:15, 78:1, 86:19
**administrator** [35] - 48:25, 54:10, 54:21, 54:23, 57:14, 57:23, 58:15, 58:17, 59:13, 59:17, 59:20, 61:7, 62:22, 63:2, 63:11, 65:8, 65:13, 65:22, 65:25, 66:2, 66:4, 66:8, 68:7, 68:8, 68:12, 68:15, 69:2,

69:10, 69:11, 69:14, 70:7, 71:25, 75:4, 75:5, 117:4
**adopt** [1] - 115:3
**advancing** [1] - 7:17
**advantage** [2] - 83:2, 83:16
**adverse** [3] - 95:11, 95:12, 95:18
**advised** [1] - 102:11
**advisement** [2] - 119:3, 119:6
**adviser** [6] - 63:25, 64:12, 64:16, 65:2, 65:3, 65:5
**affect** [3] - 17:22, 91:18, 93:25
**affecting** [1] - 101:4
**affidavit** [1] - 4:7
**affidavits** [3] - 7:4, 52:9, 60:25
**afforded** [1] - 21:22
**afternoon** [2] - 3:23, 3:24
**afterwards** [1] - 63:10
**agencies** [13] - 12:23, 28:17, 28:25, 30:5, 39:19, 40:18, 42:13, 45:24, 47:15, 60:12, 79:21, 115:3
**agency** [84] - 12:20, 12:21, 16:18, 19:7, 19:11, 21:11, 24:12, 24:14, 24:15, 24:19, 25:2, 25:16, 25:25, 26:1, 26:5, 27:19, 28:6, 29:1, 29:5, 30:24, 39:2, 42:14, 43:15, 46:5, 46:9, 46:23, 48:21, 49:16, 49:19, 49:21, 50:1, 50:2, 50:13, 68:4, 69:21, 70:20, 76:21, 81:16, 84:2, 85:19, 88:2, 88:4, 88:11, 88:13, 88:19, 89:1, 89:3, 89:4, 89:8, 89:13, 89:14, 89:25, 90:24, 93:7, 93:14, 98:1, 98:2, 98:6, 99:13, 102:1, 102:16, 102:20, 102:22, 102:24, 104:5, 106:19, 108:6, 108:19, 111:11, 112:6, 113:6, 113:14, 113:17, 115:4, 115:5, 115:11, 115:18, 115:25,

116:2, 116:6, 117:3, 117:6
**agency's** [3] - 21:11, 28:4, 88:6
**agents** [1] - 99:3
**aggrieved** [1] - 19:6
**ago** [1] - 62:15
**agree** [15] - 21:3, 25:9, 32:23, 33:9, 33:16, 45:23, 81:22, 82:3, 104:12, 105:14, 105:19, 112:12, 112:19, 115:17, 123:14
**agreed** [4] - 35:22, 61:23, 100:18, 122:3
**agreed-upon** [1] - 122:3
**agreement** [8] - 35:24, 37:22, 89:25, 99:23, 100:20, 122:1, 122:6, 123:1
**Agriculture** [2] - 87:17, 87:22
**ahead** [3] - 50:22, 101:17, 123:7
**aid** [5] - 26:24, 27:3, 27:4, 27:16, 110:2
**akin** [1] - 11:15
**al** [1] - 3:4
**albeit** [1] - 22:25
**aligned** [1] - 110:3
**allegation** [2] - 32:20, 110:5
**alleged** [1] - 78:9
**allegedly** [1] - 95:2
**Alliance** [1] - 3:4
**Allison** [1] - 3:9
**allow** [11] - 29:2, 39:24, 46:14, 47:12, 79:12, 79:14, 79:16, 79:20, 90:25, 95:16, 96:3
**allowed** [6] - 15:19, 76:23, 80:10, 118:3, 118:13, 118:21
**allowing** [1] - 92:8
**allows** [7] - 10:14, 22:16, 29:4, 29:8, 39:1, 41:12, 109:18
**alluded** [1] - 11:15
**alone** [2] - 91:10, 111:7
**Alston** [1] - 65:20
**alternate** [2] - 92:23, 93:18
**Alternative** [1] - 20:21
**alternative** [4] - 20:23, 76:5, 87:12, 94:20
**alternatives** [3] -

42:22, 43:22, 95:24
**ambiguity** [2] - 30:1, 30:12
**Americans** [1] - 3:4
**analog** [3] - 10:5, 10:11, 84:15
**analogous** [1] - 12:10
**analogs** [2] - 13:22, 84:20
**analogy** [3] - 10:2, 85:6, 85:11
**analysis** [11] - 9:16, 38:20, 43:13, 44:10, 53:12, 90:24, 91:2, 95:8, 107:2, 107:23, 107:25
**analyzing** [1] - 12:5
**answer** [13] - 4:21, 6:21, 8:10, 35:25, 45:14, 54:19, 57:1, 57:17, 65:10, 67:10, 73:21, 115:12, 115:15
**answering** [1] - 4:18
**answers** [1] - 116:13
**ante** [1] - 47:12
**anyway** [2] - 33:4, 44:17
**APA** [53] - 8:19, 11:8, 16:14, 16:16, 17:11, 17:16, 17:20, 17:21, 18:6, 18:14, 18:16, 18:21, 19:5, 19:15, 19:22, 19:25, 20:2, 20:7, 20:9, 20:17, 20:21, 20:24, 20:25, 21:7, 21:14, 22:16, 22:17, 23:6, 23:9, 23:14, 24:3, 24:13, 42:13, 85:15, 86:6, 87:12, 88:10, 89:3, 89:15, 89:19, 89:22, 91:9, 92:24, 93:8, 93:14, 94:16, 94:20, 95:17, 97:2, 97:3, 97:9, 118:4
**APA's** [2] - 17:15, 88:13
**apologize** [1] - 55:14
**apparent** [1] - 37:10
**appeal** [1] - 6:13
**appear** [7] - 9:11, 26:17, 29:12, 42:19, 58:14, 73:20, 119:9
**applicable** [2] - 12:3, 107:1
**applicant** [1] - 39:5
**applied** [2] - 17:17, 118:13
**applies** [4] - 21:16,

95:9, 115:2, 115:6
**apply** [10] - 20:13, 38:25, 39:6, 40:9, 40:14, 40:23, 41:16, 80:12, 91:5, 108:18
**applying** [2] - 39:7, 45:2
**appoint** [1] - 70:10
**appointed** [3] - 70:3, 99:18, 103:5
**appointing** [1] - 98:24
**appointment** [4] - 72:14, 98:25, 99:1, 100:2
**Appointments** [9] - 70:21, 70:25, 71:7, 72:4, 72:11, 72:23, 73:8, 73:24, 74:21
**appreciate** [1] - 56:4
**appropriate** [3] - 77:14, 96:24, 97:5
**approval** [1] - 25:1
**approved** [3] - 24:24, 25:21, 110:9
**arbitrary** [8] - 19:8, 21:12, 42:12, 42:15, 95:20, 96:8, 97:17, 98:10
**area** [1] - 105:24
**areas** [1] - 74:2
**argue** [5] - 9:24, 78:17, 88:19, 91:12, 93:19
**argued** [2] - 92:21, 109:21
**arguing** [1] - 109:14
**argument** [16] - 12:8, 18:13, 19:18, 20:7, 25:1, 27:19, 37:13, 50:2, 50:7, 50:9, 50:16, 50:21, 77:21, 88:15, 88:22, 119:10
**arguments** [8] - 4:24, 5:7, 5:17, 8:11, 13:9, 50:18, 95:22, 119:9
**arrangements** [1] - 71:13
**Article** [4] - 13:22, 14:11, 23:19, 77:18
**articulated** [1] - 44:3
**aside** [1] - 42:14
**aspects** [1] - 37:21
**asserted** [1] - 7:11
**asserting** [1] - 22:21
**assess** [1] - 95:22
**assistance** [2] - 26:25, 106:25
**Assistant** [1] - 99:4, 99:17, 103:4
**associate** [1] - 63:1

**associated** [1] - 42:18
**Associates** [4] - 21:24, 22:4, 22:5, 94:22
**Association** [1] - 89:18
**association** [2] - 7:7, 76:18
**associational** [4] - 7:18, 8:1, 8:24, 75:16
**assume** [9] - 7:6, 31:7, 35:25, 99:17, 103:4, 104:9, 109:14, 110:20, 116:4
**assuming** [3] - 43:13, 80:9, 116:10
**assumption** [2] - 4:7, 114:23
**assurance** [1] - 48:7
**attach** [1] - 95:16
**attached** [1] - 8:14
**attempt** [2] - 26:23, 26:25
**attention** [2] - 5:10, 52:15
**Attorney** [1] - 62:15
**attorneys** [1] - 4:20
**authority** [20] - 16:19, 64:1, 64:3, 64:17, 68:1, 71:4, 72:5, 72:8, 73:8, 73:18, 75:6, 85:20, 99:24, 100:6, 100:7, 100:10, 100:13, 100:14, 100:19, 100:25
**authorize** [2] - 22:9, 118:16
**authorized** [6] - 75:1, 77:2, 92:10, 110:6, 117:19, 118:9
**automatically** [1] - 17:16
**availability** [1] - 94:23
**available** [5] - 20:8, 20:25, 21:14, 93:18, 102:14
**avenue** [1] - 94:12
**award** [1] - 22:17
**aware** [12] - 5:14, 34:1, 42:17, 65:6, 107:9, 108:1, 109:4, 109:7, 112:21, 112:22, 113:14, 113:19

**B**

**background** [1] - 6:25

**balance** [2] - 51:4, 52:3
**balancing** [1] - 61:12
**bank** [1] - 14:5
**bar** [1] - 20:23
**bare** [3] - 79:5, 81:8, 81:11
**base** [1] - 122:17
**based** [22] - 9:9, 10:21, 25:7, 30:10, 30:11, 35:12, 35:13, 35:16, 45:18, 57:15, 70:15, 72:17, 79:20, 97:7, 106:3, 110:14, 111:14, 111:21, 116:13, 117:9, 117:23, 118:4
**basic** [1] - 56:25
**basis** [3] - 32:19, 39:16, 92:25
**became** [4] - 34:16, 34:23, 35:3, 113:14
**began** [2] - 98:23, 99:2
**behalf** [4] - 4:1, 7:19, 63:4, 102:16
**behind** [1] - 49:10
**believes** [1] - 96:22
**Bessent** [12] - 3:5, 15:15, 25:12, 25:20, 35:5, 35:14, 36:8, 38:15, 43:18, 68:5, 75:11, 95:23
**best** [7] - 8:15, 10:11, 20:6, 62:19, 28:3, 45:8, 94:24
**better** [7] - 4:21, 10:5, 12:8, 19:17, 25:1, 113:4
**between** [16] - 12:4, 14:15, 18:15, 24:7, 25:15, 27:6, 30:5, 36:23, 37:22, 42:6, 60:12, 67:18, 67:24, 99:6, 100:1, 101:25
**beyond** [7] - 13:21, 43:17, 44:21, 64:16, 68:24, 94:22, 101:8
**BFS** [15] - 24:22, 26:15, 36:14, 68:18, 90:3, 95:25, 97:15, 99:6, 101:6, 106:10, 106:12, 106:15, 113:24, 117:12
**BFS's** [1] - 106:11
**bind** [2] - 70:20, 108:15
**bit** [2] - 6:25, 10:22
**blanking** [1] - 22:3
**body** [1] - 115:23

**boil** [1] - 119:9
**bona** [1] - 39:25
**Bowen** [3] - 20:11, 23:12, 23:15
**Bradley** [1] - 3:25
**branch** [2] - 80:5, 80:16
**breach** [7] - 9:17, 14:25, 52:18, 52:23, 53:1, 53:11, 53:13
**break** [3] - 114:18, 116:9, 116:20
**brief** [8] - 22:3, 23:2, 23:3, 23:8, 24:23, 26:4, 40:6, 123:3
**briefed** [2] - 73:11, 115:7
**briefing** [6] - 7:24, 75:17, 78:3, 121:17, 121:25, 123:25
**briefly** [1] - 113:13
**briefs** [2] - 4:7, 63:23
**bring** [17] - 5:10, 10:22, 11:8, 23:23, 52:15, 53:25, 76:10, 84:18, 87:16, 93:9, 93:10, 94:10, 95:13, 97:1, 109:10, 116:11, 116:14
**bringing** [2] - 7:18, 40:20
**broad** [7] - 36:24, 40:25, 42:7, 67:8, 91:9, 92:8, 93:13
**broader** [5] - 5:20, 15:21, 37:19, 38:10, 38:11
**broadly** [2] - 28:24, 37:12
**brought** [4] - 39:15, 76:7, 84:10, 91:7
**bucket** [1] - 50:3
**bunch** [3] - 35:20, 41:10, 100:8
**burden** [1] - 5:5
**Bureau** [15] - 9:9, 9:11, 13:6, 15:19, 26:10, 27:2, 31:20, 38:20, 39:20, 40:18, 41:22, 43:4, 43:5, 44:7, 46:20
**Bureau's** [7] - 9:5, 21:17, 27:8, 31:19, 31:23, 35:15, 41:4
**bureaucracy** [2] - 54:17, 55:10

**C**

**cabining** [1] - 37:11

63:21, 63:24
**Cell** [4] - 21:24, 22:3, 22:5, 94:22
**CEO** [12] - 32:13, 32:17, 32:25, 33:4, 80:14, 80:23, 104:11, 104:19, 105:5, 105:10, 105:11, 105:22
**certain** [8] - 11:17, 18:25, 19:3, 41:12, 50:23, 79:17, 79:21, 86:15
**certainly** [12] - 15:14, 45:2, 55:25, 58:23, 63:1, 71:8, 71:10, 76:12, 82:11, 98:1, 104:4, 119:22
**CERTIFICATE** [1] - 124:15
**certify** [1] - 124:17
**cetera** [4] - 54:2, 71:13, 107:17, 123:20
**chain** [3] - 66:24, 68:2, 99:14
**challenge** [3] - 26:4, 95:2, 109:11
**challenged** [1] - 66:11
**challenges** [1] - 95:4
**challenging** [1] - 77:10
**chance** [2] - 4:11, 30:8
**Chandra** [2] - 124:17, 124:21
**change** [19] - 14:20, 14:24, 15:9, 15:13, 15:17, 15:23, 15:25, 21:16, 25:23, 28:16, 44:6, 76:23, 77:1, 77:9, 90:10, 90:16, 90:21, 101:19
**changed** [4] - 14:22, 15:24, 36:9, 107:20
**changes** [6] - 6:18, 9:8, 9:12, 25:22, 26:8, 27:1, 34:19, 40:1, 41:21, 61:24, 90:7, 91:2, 101:4, 123:5
**changing** [1] - 25:12
**Chao** [2] - 17:19, 22:25
**chaotic** [1] - 97:21
**characterization** [1] - 98:11
**charge** [5] - 38:8, 42:7, 57:21, 62:14, 73:16
**check** [1] - 56:5

**Chief** [11] - 25:21, 54:11, 54:12, 59:14, 59:18, 64:5, 64:13, 66:23, 67:14, 74:16, 100:12
**choice** [1] - 97:10
**chosen** [2] - 97:6, 97:9
**Christopher** [1] - 4:2
**Chutkan** [4] - 61:4, 61:13, 62:11, 63:9
**Circuit** [7] - 20:22, 44:17, 84:24, 88:12, 92:24, 96:17, 119:7
**circuit** [3] - 4:11, 45:8, 94:18
**Circuit's** [2] - 23:8, 28:8
**circumstance** [1] - 85:1
**circumstances** [4] - 79:17, 79:21, 83:4, 118:19
**circumvention** [1] - 37:2
**cite** [5] - 21:24, 61:10, 83:17, 86:3, 94:14
**cited** [8] - 20:11, 23:8, 84:16, 84:23, 84:24, 85:13, 94:22, 97:18
**citing** [3] - 9:20, 18:6, 29:10
**Citizens** [2] - 3:18, 3:21
**civil** [1] - 3:3
**claim** [24] - 7:11, 10:19, 11:8, 12:2, 22:11, 22:12, 32:22, 66:11, 76:7, 76:8, 76:10, 77:3, 81:19, 84:3, 86:23, 87:7, 87:8, 91:8, 93:8, 93:10, 93:11, 94:10, 95:13, 97:1
**claiming** [1] - 118:4
**Claims** [2] - 20:15, 23:18
**claims** [5] - 6:5, 7:19, 23:20, 86:15, 97:2
**clarify** [1] - 78:6
**clarity** [1] - 53:25
**Clause** [9] - 70:21, 70:25, 71:7, 72:5, 72:11, 72:23, 73:9, 73:24, 74:21
**clawed** [1] - 46:24
**clear** [13] - 10:20, 27:9, 30:7, 35:7, 37:18, 43:3, 43:10, 51:23, 61:22, 75:24,

78:4, 98:6, 113:3
**clearer** [1] - 85:6
**clearly** [2] - 3:14, 95:21
**CLERK** [1] - 3:3
**clients** [3] - 122:17, 122:20, 123:16
**close** [2] - 63:25, 64:16
**Cloud** [2] - 32:14, 33:4
**cloud** [2] - 11:12, 33:12
**Code** [25] - 6:8, 11:21, 17:2, 18:10, 20:10, 21:10, 22:22, 22:24, 41:6, 41:7, 42:9, 43:24, 49:18, 76:8, 77:20, 86:9, 86:13, 86:18, 87:3, 91:5, 117:17, 118:3, 118:6, 118:10, 119:1
**codes** [1] - 26:16
**coexistence** [1] - 23:5
**colleagues** [3] - 55:15, 115:8, 119:17
**Columbia** [1] - 62:16
**combat** [2] - 98:3, 98:8
**combination** [1] - 23:11
**coming** [3] - 4:9, 49:12, 52:9
**command** [2] - 66:25, 68:2, 99:14
**commence** [1] - 68:12
**commenced** [1] - 68:14
**committee** [3] - 78:25, 79:9, 82:12
**common** [8] - 12:11, 13:22, 13:24, 14:1, 14:10, 32:6, 84:6
**communicated** [1] - 108:14
**communications** [1] - 105:25
**companies** [1] - 62:8
**company** [10] - 14:5, 80:15, 80:23, 82:23, 83:13, 104:12, 104:19, 105:6, 105:23
**compared** [1] - 85:4
**comparison** [1] - 85:5
**competing** [7] - 80:17, 80:25, 81:4, 82:25, 83:8, 84:6
**competitive** [1] - 83:16
**competitor** [1] - 81:14

**complaint** [3] - 60:24, 70:13, 73:12
**complete** [2] - 96:1, 108:1
**completed** [3] - 27:12, 53:14, 107:24
**completely** [1] - 108:10
**complex** [1] - 4:14
**complicated** [1] - 115:23
**comply** [3] - 46:12, 70:25, 93:23
**complying** [3] - 71:7, 109:17, 111:1
**component** [6] - 54:18, 54:20, 55:11, 57:6, 57:13, 58:12
**comports** [1] - 44:3
**comprehensive** [1] - 94:1
**compromise** [1] - 53:16
**compromised** [1] - 51:10
**computer** [4] - 28:17, 31:25, 41:21, 49:11
**computers** [2] - 31:23, 31:24
**computing** [1] - 33:12
**concern** [9] - 30:18, 31:3, 32:21, 36:20, 37:9, 37:19, 48:12, 72:20, 72:22
**concerned** [2] - 34:21, 61:1
**concerns** [2] - 32:15, 70:16
**conclude** [3] - 94:2, 119:4, 119:11
**concluded** [3] - 94:19, 97:12, 97:20
**conclusion** [1] - 22:8
**concrete** [4] - 7:15, 81:11, 81:18, 81:20
**condition** [1] - 93:1
**conditions** [3] - 16:18, 85:19, 123:20
**conduct** [2] - 14:16, 78:9
**conducting** [2] - 40:16, 68:24
**confer** [9] - 55:15, 119:16, 120:24, 121:3, 121:9, 122:11, 122:16, 122:19, 123:16
**conferring** [4] - 119:19, 121:3, 121:4, 121:15

**confers** [2] - 16:19, 85:20
**confidential** [2] - 41:8, 102:12
**confidentiality** [2] - 102:7, 108:15
**confine** [1] - 12:19
**confirm** [1] - 58:24
**confirmed** [10] - 55:2, 55:7, 58:1, 58:4, 70:23, 72:12, 74:10, 74:15, 74:23, 75:10
**conflicted** [1] - 112:1
**confusion** [2] - 34:12, 35:11
**Congress** [19] - 12:16, 17:10, 18:13, 18:20, 22:5, 22:8, 78:23, 79:9, 79:13, 79:14, 79:21, 86:11, 94:7, 94:11, 94:25, 95:12, 110:6, 111:3, 111:25
**Congress's** [1] - 50:12
**Congressional** [2] - 78:25, 93:15
**congressional** [1] - 79:9
**conjunction** [3] - 70:4, 106:23, 110:11
**connected** [2] - 31:23, 72:18
**connection** [2] - 14:14, 37:22
**consent** [7] - 11:19, 11:22, 16:20, 31:20, 85:21, 91:16, 122:25
**consequence** [2] - 95:11, 95:13
**consequences** [6] - 24:18, 88:8, 90:4, 90:23, 91:4, 95:18
**consider** [1] - 42:23
**consideration** [1] - 43:22
**considered** [4] - 4:15, 43:19, 95:23, 96:6
**considering** [2] - 38:16, 61:12
**consistent** [7] - 68:18, 106:9, 117:5, 117:11, 117:15, 118:20, 118:22
**consists** [1] - 120:21
**Constitution** [1] - 70:21
**constitutionality** [1] - 70:16
**constitutionally** [1] - 72:25
**constraints** [1] - 97:19

**construing** [1] - 93:1
**consult** [3] - 68:8, 68:9, 73:25
**consultant** [16] - 99:7, 99:9, 99:12, 100:3, 100:6, 100:12, 100:20, 102:3, 102:5, 102:14, 102:15, 102:19, 102:22, 103:6, 103:9, 104:3
**consultants** [1] - 100:7
**consultation** [1] - 68:7
**consulted** [1] - 70:9
**consulting** [1] - 111:11
**consummated** [1] - 26:3
**consummation** [2] - 24:15, 88:5
**contact** [1] - 107:21
**containing** [1] - 47:14
**contend** [1] - 76:22
**contents** [1] - 37:24
**context** [3] - 19:20, 95:6, 111:24
**contours** [2] - 9:8, 44:8
**contractors** [1] - 39:3
**contrary** [1] - 19:8
**conversation** [1] - 116:16
**coordinate** [1] - 40:18
**coordinates** [1] - 71:15
**coordination** [1] - 117:4
**copy** [2] - 52:10, 106:14
**correct** [24] - 7:17, 7:22, 7:23, 53:4, 54:22, 54:25, 55:3, 55:5, 55:7, 57:7, 57:8, 57:11, 57:15, 59:15, 61:8, 61:9, 88:22, 100:11, 100:16, 109:21, 109:22, 110:6, 115:11, 124:18
**corrected** [4] - 34:10, 35:2, 113:14, 113:18
**correcting** [1] - 19:11
**correction** [1] - 94:3
**correctly** [6] - 29:19, 68:6, 90:13, 111:6, 117:25, 123:10
**correspond** [1] - 5:8
**counsel** [6] - 3:6, 3:20, 116:24,

119:19, 120:24, 121:15
**Counsel** [1] - 121:4
**couple** [4] - 78:6, 78:21, 82:5, 99:20
**course** [10] - 4:25, 6:12, 23:6, 56:19, 57:3, 68:23, 80:4, 81:9, 101:18, 106:4
**court** [7] - 8:21, 23:19, 36:11, 86:3, 94:19, 116:18, 116:21
**Court** [58] - 3:2, 5:25, 6:8, 6:14, 6:20, 10:20, 12:4, 13:3, 13:4, 16:9, 16:24, 17:19, 20:14, 22:14, 22:17, 23:18, 23:23, 42:14, 46:11, 47:2, 47:20, 48:7, 50:12, 71:8, 72:2, 72:11, 73:25, 74:7, 74:8, 74:21, 75:12, 81:10, 84:1, 84:24, 85:2, 85:3, 85:7, 85:13, 85:24, 86:4, 87:10, 87:17, 87:25, 89:16, 96:14, 96:16, 96:18, 96:22, 96:25, 97:2, 104:21, 117:22, 119:5, 121:24, 122:7, 122:25, 123:23, 124:9
**COURT** [227] - 3:8, 3:23, 4:5, 6:21, 7:24, 8:22, 9:24, 12:7, 13:8, 14:12, 15:6, 15:12, 16:2, 16:13, 18:19, 19:9, 20:6, 20:18, 21:24, 22:5, 22:18, 23:2, 23:4, 23:15, 24:8, 24:11, 25:8, 26:13, 26:19, 27:18, 28:1, 28:15, 28:18, 31:5, 32:8, 32:10, 32:23, 33:15, 33:21, 33:24, 34:3, 35:19, 36:13, 37:13, 38:23, 40:3, 40:7, 40:10, 40:12, 40:24, 41:5, 42:10, 44:11, 46:7, 46:16, 46:18, 48:2, 48:11, 49:4, 49:7, 49:24, 50:15, 51:2, 51:4, 52:6, 53:2, 53:6, 53:10, 53:19, 53:24, 54:13, 55:20, 56:10, 56:17, 56:20, 57:4, 57:10, 57:12, 57:19, 57:23,

58:10, 58:25, 59:6, 59:8, 59:19, 59:24, 60:9, 60:15, 60:23, 61:10, 62:5, 63:17, 64:7, 64:20, 65:3, 65:7, 65:12, 65:17, 66:12, 67:1, 67:7, 67:12, 67:16, 68:3, 68:20, 68:25, 69:20, 69:22, 70:2, 70:6, 70:11, 72:24, 73:5, 73:13, 74:1, 75:14, 76:3, 76:16, 77:4, 77:8, 77:21, 78:6, 78:12, 78:17, 79:7, 79:14, 79:16, 80:1, 80:14, 80:22, 81:4, 81:22, 82:5, 82:9, 82:24, 84:5, 84:17, 84:22, 85:15, 87:2, 87:9, 87:13, 87:16, 88:2, 88:18, 88:24, 89:9, 89:23, 90:6, 90:18, 91:10, 91:23, 92:21, 93:19, 94:14, 94:25, 95:20, 97:11, 98:13, 100:15, 101:1, 101:17, 101:22, 101:24, 102:5, 102:7, 102:13, 102:17, 102:19, 102:24, 103:2, 103:12, 103:19, 104:7, 104:17, 105:3, 105:10, 105:12, 105:14, 105:18, 105:21, 107:2, 107:14, 108:11, 109:2, 109:6, 109:13, 109:23, 110:14, 111:14, 112:9, 113:1, 113:8, 113:21, 114:3, 114:10, 114:15, 115:10, 115:14, 115:17, 115:24, 116:9, 116:18, 116:23, 117:21, 118:15, 119:2, 119:18, 119:23, 120:2, 120:7, 120:10, 120:17, 120:20, 120:22, 121:5, 121:16, 121:22, 122:5, 122:14, 122:18, 122:21, 123:7, 123:12, 123:15, 124:5, 124:7
**Court's** [7] - 17:24,

36:10, 46:10, 48:8,
56:8, 56:14, 89:16
**COURTROOM** [1] -
3:3
**courts** [9] - 9:20,
12:13, 13:2, 17:17,
19:19, 19:20, 20:2,
46:14, 94:15
**cover** [2] - 100:4,
108:9
**covered** [2] - 92:3,
116:10
**crafted** [1] - 86:17
**create** [5] - 79:1, 80:8,
81:24, 83:15, 84:15
**created** [5] - 34:20,
54:12, 87:10, 93:16,
95:1
**creates** [1] - 93:20
**creating** [2] - 62:13,
65:24
**creation** [1] - 30:3
**credible** [1] - 7:5
**credit** [1] - 83:22
**creditor** [1] - 14:5
**criminal** [1] - 40:20
**critical** [1] - 97:15
**cross** [4] - 120:14,
121:1, 121:7, 124:1
**cross-motion** [4] -
120:14, 121:1,
121:7, 124:1
**crystal** [2] - 43:3,
43:10
**cumulatively** [1] -
57:1
**curious** [1] - 34:18


# D

**D.C** [8] - 20:22, 23:7,
28:8, 44:17, 88:12,
92:24, 96:17, 119:7
**damage** [1] - 17:3
**damages** [27] - 9:18,
10:19, 10:21, 12:2,
12:5, 16:17, 17:10,
17:14, 17:21, 18:4,
19:4, 19:18, 20:15,
21:19, 22:19, 23:14,
23:23, 23:25, 24:1,
77:20, 85:18, 93:22,
94:10, 94:19, 95:1,
95:15, 109:12
**data** [31] - 9:17, 12:20,
14:25, 25:14, 26:9,
33:12, 37:4, 37:5,
37:11, 38:20, 43:4,
43:10, 46:1, 46:14,
46:16, 47:8, 47:20,

48:7, 48:10, 51:10,
51:21, 52:17, 76:14,
77:16, 83:18, 85:8,
85:10, 89:12,
106:12, 106:15,
117:8
**database** [4] - 47:5,
47:9, 47:13, 111:2
**databases** [2] - 26:20,
106:15
**DATE** [1] - 124:21
**date** [5] - 15:18, 98:21,
100:1, 119:23,
122:14
**dates** [3] - 34:11,
35:20, 122:15
**day-to** [1] - 88:21
**days** [4] - 25:24,
52:24, 62:11, 62:15
**decide** [9] - 10:7, 10:9,
62:20, 63:6, 63:7,
67:8, 96:14, 110:18,
121:24
**decides** [2] - 69:22,
110:21
**deciding** [1] - 95:24
**decision** [32] - 9:20,
12:1, 17:24, 21:15,
21:25, 24:16, 28:4,
28:9, 38:14, 38:19,
42:14, 43:18, 44:9,
44:10, 47:21, 50:19,
68:1, 88:6, 89:11,
89:14, 89:17, 90:2,
90:5, 90:6, 90:25,
96:7, 96:8, 97:14,
123:5, 123:8, 123:24
**decision-maker** [1] -
43:18
**decision-makers** [1] -
38:14
**decision-making** [6] -
24:16, 38:19, 42:14,
68:1, 88:6, 96:8
**decisions** [2] - 17:22,
18:12, 18:18, 21:12,
47:25, 49:15, 56:21,
73:17, 73:18, 88:20,
91:12, 99:12
**declaration** [14] -
29:21, 29:22, 35:1,
41:3, 42:16, 62:1,
69:25, 71:14, 76:25,
90:17, 98:5, 98:6,
106:9, 114:7
**declarations** [8] -
8:13, 9:11, 34:23,
36:19, 48:6, 52:23,
53:9, 107:12
**declined** [2] - 45:3,

45:16
**deductions** [4] -
110:23, 110:25,
111:4
**defend** [1] - 39:16
**defendant** [2] - 31:6,
31:15
**defendant's** [3] -
42:16, 83:24, 117:10
**defendants** [20] - 4:1,
4:25, 5:2, 5:4, 9:24,
22:1, 35:19, 36:1,
36:13, 39:9, 41:11,
53:21, 99:16,
113:22, 118:7,
118:25, 119:9,
120:7, 122:4, 124:5
**defendants'** [3] -
14:15, 26:4, 78:8
**Defender's** [1] - 3:22
**defense** [1] - 116:24
**deficient** [1] - 38:17
**define** [1] - 89:3
**defined** [1] - 37:12
**definition** [4] - 115:4,
115:19, 116:1, 116:3
**degree** [2] - 16:5,
103:15
**delegated** [1] - 99:3
**Democracy** [1] - 3:22
**denial** [1] - 89:21
**Department** [52] -
3:25, 4:2, 4:3, 5:16,
12:15, 29:25, 35:4,
46:21, 56:16, 61:3,
61:15, 62:13, 67:15,
70:4, 70:20, 80:21,
85:9, 86:25, 87:1,
89:12, 92:5, 92:17,
92:19, 98:23,
102:25, 103:17,
103:25, 104:10,
105:17, 106:1,
106:7, 106:18,
106:22, 107:4,
107:11, 107:15,
107:18, 107:22,
108:8, 108:13,
109:1, 109:5, 109:8,
109:15, 110:11,
111:10, 111:17,
112:3, 112:13,
114:5, 118:8
**department** [1] - 92:9
**deputy** [5] - 54:24,
55:1, 55:4, 57:24,
58:1
**DEPUTY** [1] - 3:3
**describe** [1] - 103:7
**described** [4] - 68:17,

69:24, 107:12, 114:2
**description** [3] -
36:24, 37:4, 37:7
**descriptions** [1] -
36:18
**designated** [1] - 83:24
**despite** [1] - 45:19
**detail** [1] - 38:6
**detailed** [4] - 22:7,
93:20, 94:1, 94:3
**detect** [2] - 40:2,
41:22
**detection** [1] - 41:4
**determine** [7] - 13:25,
47:21, 96:7, 110:10,
111:11, 112:5,
122:25
**determined** [2] -
24:17, 88:7
**determines** [1] - 47:2
**devised** [1] - 86:11
**dicta** [1] - 22:25
**difference** [7] - 55:20,
55:22, 56:22, 66:12,
94:9, 108:11, 108:21
**different** [28] - 4:24,
5:17, 6:5, 6:10, 9:16,
18:7, 20:3, 26:22,
27:14, 31:14, 35:20,
49:17, 49:18, 52:8,
56:21, 58:4, 60:1,
60:15, 62:24, 63:8,
71:21, 80:1, 84:6,
84:25, 90:6, 107:18
**differently** [2] - 42:24,
97:23
**difficult** [1] - 90:9
**Digital** [2] - 54:9, 60:6
**direct** [2] - 103:18,
104:2
**directed** [2] - 67:13,
117:13
**directing** [2] - 71:6,
104:5
**direction** [10] - 29:22,
68:19, 71:18, 71:24,
72:7, 73:7, 73:16,
74:13, 74:22, 104:1
**directive** [1] - 12:22
**directly** [4] - 12:3,
25:21, 36:12, 55:16
**director** [7] - 54:24,
55:4, 55:5, 57:24,
58:1, 80:3, 99:10
**Director** [3] - 55:1,
55:5, 58:2
**disaggregate** [1] -
47:17
**disagree** [7] - 47:25,
92:14, 95:21, 97:24,

98:10, 101:19, 113:9
**disclose** [1] - 41:9
**disclosed** [6] - 11:23,
31:20, 76:14, 86:24,
104:10, 109:14
**disclosing** [4] - 28:25,
32:3, 78:24, 91:17
**disclosure** [31] - 10:1,
10:2, 10:4, 10:10,
17:5, 29:2, 29:11,
41:12, 78:21, 79:4,
79:13, 80:25, 82:1,
82:18, 82:20, 82:22,
82:24, 83:12, 83:20,
84:7, 91:16, 93:11,
93:22, 94:4, 94:6,
97:8, 108:25,
109:10, 109:11,
114:24, 114:25
**disclosures** [18] -
17:4, 17:8, 29:4,
29:8, 39:2, 39:10,
39:12, 41:16, 61:1,
79:14, 79:17, 79:20,
80:17, 93:22, 95:3,
95:4, 109:18, 115:1
**disconnect** [2] -
18:15, 42:6
**discovered** [1] -
108:25
**discovery** [5] - 30:8,
96:4, 96:11, 97:5,
97:8
**discretion** [3] - 43:24,
72:6, 72:9
**discuss** [4] - 5:12,
24:22, 73:3, 123:18
**discussed** [2] - 16:5,
68:2
**discussing** [2] -
39:14, 44:13
**discussion** [5] - 8:15,
24:6, 43:23, 44:2,
121:13
**discussions** [2] -
67:24, 101:2
**dismiss** [10] - 120:9,
120:14, 120:25,
121:6, 121:18,
121:25, 122:9,
123:9, 123:24,
123:25
**dismissed** [1] - 84:3
**displace** [1] - 24:3
**dispute** [7] - 36:17,
47:10, 76:1, 76:22,
78:7, 78:12, 90:15
**disputing** [3] - 75:20,
75:22, 76:16
**distinction** [6] - 12:4,

24:7, 48:4, 48:5,
50:8, 60:22
**distinguish** [2] -
10:24, 45:15
**District** [6] - 5:24,
23:23, 62:16, 65:21,
106:2, 117:22
**district** [3] - 45:3,
45:16, 94:15
**documentation** [1] -
98:25
**Doe** [4] - 17:19, 22:25,
23:8, 28:9
**DOGE** [67] - 12:24,
13:1, 13:19, 14:21,
15:20, 16:11, 25:13,
25:16, 26:23, 27:7,
27:10, 29:17, 30:3,
30:5, 30:12, 30:24,
31:4, 32:9, 35:15,
38:21, 39:12, 41:16,
42:2, 42:7, 42:19,
43:7, 43:8, 43:12,
48:18, 48:21, 48:23,
49:8, 51:12, 51:16,
54:1, 54:7, 54:10,
54:13, 59:24, 60:7,
60:9, 61:19, 61:22,
61:25, 62:18, 64:19,
67:3, 67:17, 67:20,
68:6, 68:21, 71:16,
89:21, 90:15, 92:10,
95:25, 97:14, 97:21,
100:21, 101:11,
103:11, 103:15,
103:25, 113:24,
117:1
**DOJ** [1] - 40:16
**done** [12] - 19:19,
26:7, 26:17, 42:24,
43:2, 44:7, 61:19,
90:1, 100:8, 113:10,
116:20, 123:21
**door** [1] - 30:19
**down** [7] - 4:9, 48:1,
52:21, 64:18, 87:23,
111:22, 119:10
**draw** [1] - 36:23
**drew** [1] - 12:4
**drug** [1] - 83:25
**duly** [1] - 110:6
**duplicate** [1] - 94:16
**during** [5] - 35:8,
35:10, 102:2, 102:9,
106:3
**duties** [8] - 29:7, 81:8,
99:4, 99:17, 103:4,
103:7, 104:24, 105:1

**E**

**early** [2] - 26:23, 55:13
**easier** [2] - 3:11, 54:8
**Eastern** [1] - 65:20
**economic** [2] - 19:1,
19:2
**Edmond** [1] - 74:7
**effect** [2] - 51:10,
91:14
**effectively** [1] - 60:12
**effectuated** [1] - 14:20
**Efficiency** [1] - 62:13
**Eisen** [1] - 3:21
**either** [11] - 18:24,
21:20, 25:20, 26:25,
35:25, 47:10, 65:11,
76:7, 83:25, 107:8,
121:8
**elected** [1] - 110:21
**element** [2] - 13:23,
13:24
**elements** [5] - 7:6,
7:14, 8:3, 14:13,
78:7
**Elez** [18] - 29:23, 36:4,
43:21, 56:16, 62:3,
62:4, 62:5, 68:22,
103:16, 103:20,
106:6, 106:11,
106:14, 106:22,
112:17, 112:23,
113:13, 113:15
**Elez's** [3] - 15:1,
52:19, 105:24
**Elizabeth** [1] - 4:1
**Elon** [5] - 48:22, 61:2,
62:8, 62:14, 62:18
**elucidation** [1] - 37:16
**email** [1] - 62:17
**emails** [3] - 15:2,
52:20, 106:6
**emphasize** [1] - 52:17
**emphasizes** [1] -
53:15
**employed** [1] - 108:17
**employee** [31] - 29:13,
29:16, 30:23, 31:7,
31:8, 31:13, 32:2,
32:4, 32:13, 34:17,
34:24, 54:22, 57:15,
58:17, 58:18, 59:20,
61:5, 63:3, 63:12,
72:7, 80:15, 80:21,
80:22, 89:11, 90:25,
91:2, 102:1, 102:4,
102:10, 102:23,
103:6
**employees** [27] - 29:5,
29:11, 30:14, 30:15,

30:25, 39:3, 41:13,
56:16, 62:17, 66:6,
66:15, 70:23, 71:6,
71:19, 71:22, 72:4,
77:1, 77:4, 85:10,
86:25, 90:3, 91:20,
91:24, 92:2, 92:9,
92:15, 115:2
**employment** [8] -
33:2, 34:7, 34:19,
65:5, 98:16, 98:19
**end** [7] - 5:12, 24:20,
44:8, 51:15, 98:15,
122:6
**enforce** [1] - 102:14
**enforced** [2] - 35:17,
36:7
**engage** [2] - 23:9,
41:25, 73:19
**engaged** [2] - 41:18,
42:13
**engagement** [27] -
24:24, 25:2, 25:5,
25:16, 26:13, 27:5,
27:12, 27:14, 27:22,
34:15, 35:21, 36:16,
37:17, 37:20, 37:23,
37:25, 38:1, 66:16,
70:19, 89:24, 90:8,
91:13, 100:9,
100:17, 100:22,
101:1
**Engagement** [1] -
99:22
**engineer** [1] - 62:7
**enormous** [1] - 45:20
**ensure** [3] - 19:6,
46:5, 117:5
**ensured** [1] - 97:20
**entail** [1] - 13:5
**entailed** [1] - 97:16
**entered** [1] - 99:22
**entering** [1] - 70:18
**Enterprise** [1] - 74:6
**entities** [1] - 40:21
**entity** [1] - 50:4
**EO** [2] - 58:23, 97:25
**equities** [2] - 51:5,
52:4
**equivalent** [2] - 49:20,
50:13
**error** [4] - 35:1, 48:4,
49:14, 113:13
**especially** [5] - 6:6,
32:5, 43:5, 43:18,
114:4
**essentially** [2] - 83:19,
101:12
**establish** [1] - 78:19
**established** [2] -

100:18, 111:25
**establishing** [1] -
116:25
**et** [5] - 3:4, 54:22,
71:13, 107:17,
123:20
**evaluate** [2] - 66:10,
96:18
**evaluating** [1] - 7:3
**evidence** [1] - 7:5
**evolving** [1] - 52:8
**exact** [2] - 15:18, 63:1
**exactly** [5] - 21:6,
30:6, 32:25, 73:18,
117:2
**example** [10] - 11:2,
21:5, 39:18, 40:15,
45:17, 51:12, 60:21,
78:23, 79:1, 118:11
**examples** [1] - 81:25
**except** [5] - 56:15,
75:9, 99:10
**exception** [18] - 28:10,
29:11, 30:20, 39:10,
39:17, 39:24, 40:8,
40:13, 40:22, 40:23,
41:12, 41:15, 42:8,
49:23, 81:16, 86:7,
105:2, 109:17
**exceptions** [3] - 29:1,
29:2, 41:10
**exchange** [1] - 78:18
**exclusions** [1] - 11:24
**exclusive** [2] - 18:1,
18:20
**exclusively** [2] - 7:25,
75:18
**exclusivity** [1] - 18:24
**Excuse** [1] - 114:6
**excuse** [6] - 53:2,
64:2, 93:16, 93:17,
96:15, 103:25
**excused** [1] - 124:8
**executed** [1] - 98:25
**executive** [2] - 80:5,
80:16
**Executive** [58] - 13:1,
13:4, 13:6, 13:19,
14:21, 15:10, 27:3,
27:4, 27:10, 27:16,
30:4, 30:6, 31:9,
31:10, 43:5, 43:7,
43:8, 46:3, 46:6,
46:12, 47:6, 48:17,
49:1, 54:4, 54:5,
54:6, 54:12, 55:17,
59:3, 59:12, 59:17,
60:5, 64:13, 65:24,
67:5, 67:7, 67:23,
68:3, 68:10, 68:11,

69:5, 69:11, 69:18,
80:4, 106:24,
108:17, 110:1,
110:19, 111:15,
111:22, 112:1,
116:25, 117:9,
117:13, 117:24,
118:16
**exercise** [1] - 72:5
**exercised** [2] - 81:13,
100:13
**exercising** [2] - 71:4,
72:8
**exist** [2] - 17:20, 60:3
**existence** [1] - 17:13
**exists** [1] - 20:1
**expected** [1] - 6:21
**experience** [2] - 62:6,
70:1
**expertise** [1] - 103:10
**explained** [2] - 9:19,
96:18
**explains** [3] - 60:6,
76:25, 114:7
**explanation** [2] -
43:17, 44:9
**explicit** [1] - 86:6
**explicitly** [2] - 86:10,
112:7
**expressed** [1] - 11:24
**expressly** [2] - 16:21,
85:22
**extend** [1] - 23:22
**extent** [7] - 16:8,
50:11, 91:6, 92:4,
117:5, 117:10, 118:2

**F**

**fact** [24] - 7:15, 8:23,
8:25, 9:2, 14:14,
19:14, 19:20, 19:25,
23:25, 26:5, 30:21,
47:21, 57:15, 72:17,
77:18, 77:22, 78:3,
79:25, 83:1, 83:7,
96:20, 98:9, 104:3,
108:4
**factors** [2] - 42:22,
95:24
**facts** [5] - 10:4, 10:10,
66:14, 84:7, 84:25
**factual** [3] - 48:4,
48:5, 56:2
**fail** [1] - 42:23
**failed** [1] - 43:20
**failure** [1] - 93:23
**fair** [3] - 69:15, 69:16,
88:17
**fairly** [3] - 14:14, 67:8,

78:8
**fait** [1] - 47:23
**fall** [5] - 49:22, 91:21, 92:11, 92:16, 105:1
**falling** [2] - 11:23, 50:3
**falls** [1] - 112:7
**familiar** [1] - 87:21
**far** [7] - 25:7, 34:20, 37:1, 37:10, 38:1, 109:2
**fashion** [1] - 22:14
**favor** [1] - 52:4
**feared** [1] - 44:24
**February** [24] - 34:25, 61:3, 61:15, 61:16, 61:18, 61:21, 62:1, 62:10, 71:14, 98:20, 98:22, 98:24, 99:3, 99:6, 99:19, 99:25, 100:1, 100:4, 101:25, 103:5, 103:8, 103:13, 106:5, 124:21
**Federal** [10] - 12:18, 13:16, 13:17, 13:18, 15:3, 18:2, 23:18, 28:5, 33:19, 49:9
**federal** [14] - 14:11, 39:2, 39:5, 41:13, 54:17, 55:10, 62:17, 70:20, 78:19, 78:24, 102:1, 102:8, 108:5, 112:11
**few** [3] - 25:24, 71:1, 121:14
**fide** [1] - 39:25
**field** [1] - 87:19
**figure** [1] - 35:22
**file** [5] - 19:25, 119:22, 121:7, 122:20, 123:17
**filed** [3] - 5:19, 9:7, 123:20
**filing** [1] - 48:24
**final** [30] - 16:10, 24:11, 24:14, 24:19, 25:2, 25:25, 26:1, 26:6, 26:12, 27:19, 28:5, 47:21, 50:19, 76:21, 88:2, 88:4, 88:5, 88:11, 88:13, 88:19, 89:1, 89:3, 89:7, 89:24, 90:24, 93:7, 93:14, 93:16, 99:12
**financial** [2] - 80:17, 80:24
**findings** [2] - 8:2, 113:9

**fine** [2] - 4:21, 114:20
**fingertips** [1] - 58:9
**finish** [1] - 74:3
**finished** [1] - 107:7
**firm** [6] - 80:17, 80:18, 80:25, 81:2, 81:4, 83:9
**first** [11] - 7:25, 8:24, 23:20, 25:12, 25:22, 26:23, 29:4, 38:13, 43:1, 76:10, 80:6
**Fiscal** [3] - 99:4, 99:17, 103:8
**fit** [2] - 96:10, 105:3
**fix** [1] - 47:1
**fixed** [1] - 47:11
**flow** [5] - 24:18, 88:8, 90:5, 90:24, 91:4
**flows** [2] - 64:1, 64:3
**focus** [8] - 24:9, 24:19, 28:20, 41:11, 78:2, 86:21, 116:12
**focused** [9] - 17:19, 17:20, 41:2, 50:22, 53:25, 75:17, 84:7, 84:9, 114:21
**focuses** [2] - 7:25, 75:18
**FOIA** [16] - 19:19, 19:21, 19:25, 20:1, 20:4, 20:5, 21:5, 21:6, 115:5, 115:19, 115:20, 115:25, 116:3, 116:5
**FOIA's** [1] - 115:3
**follow** [2] - 43:9, 115:18
**following** [1] - 61:23
**forbid** [1] - 87:3
**forbidden** [1] - 20:9
**forbidding** [1] - 17:7
**forbids** [7] - 16:21, 16:23, 16:25, 85:22, 85:25, 86:5, 87:20
**forcing** [1] - 19:11
**forecloses** [2] - 17:16, 18:1
**foregoing** [1] - 124:17
**foreign** [7] - 26:24, 27:3, 27:16, 106:24, 110:2, 110:3
**forensic** [4] - 53:12, 107:2, 107:23, 107:25
**forever** [1] - 49:13
**forgot** [1] - 114:17
**form** [1] - 8:12
**formal** [1] - 67:21
**formerly** [1] - 29:23
**formulate** [1] - 10:7

**formulated** [1] - 50:6
**forth** [1] - 97:25
**Forum** [1] - 62:12
**forward** [6] - 5:13, 113:20, 116:14, 118:16, 119:5, 123:23
**four** [3] - 27:6, 27:12, 46:20
**frame** [1] - 34:15
**framework** [1] - 27:10
**frank** [2] - 44:12, 50:20
**frankly** [2] - 70:16, 75:7
**fraud** [8] - 38:8, 39:18, 39:22, 39:25, 40:2, 40:16, 41:3, 98:3
**fraudulent** [3] - 110:6, 110:16, 111:20
**Free** [1] - 74:6
**freely** [1] - 33:20
**freeze** [4] - 26:24, 27:4, 27:16, 27:22
**frequently** [1] - 89:7
**full** [7] - 12:24, 35:15, 46:8, 52:25, 97:15, 117:6, 117:12
**fully** [1] - 15:1
**function** [1] - 99:13
**functions** [2] - 66:4, 75:1
**Fund** [2] - 3:22, 74:6
**funds** [1] - 39:5
**Future** [1] - 62:11
**future** [3] - 45:10, 45:18, 112:16

## G

**Gadelhak** [1] - 85:13
**Garcia** [2] - 20:22, 21:2
**general** [3] - 41:11, 79:16, 97:3
**germane** [4] - 7:10, 8:5, 75:21, 76:1
**germaneness** [1] - 8:16
**Gioeli** [5] - 15:20, 38:10, 76:25, 98:6, 106:10, 114:7
**given** [11] - 5:23, 9:13, 38:12, 78:10, 78:15, 79:8, 82:6, 86:25, 93:15, 112:24
**Government** [12] - 12:18, 13:16, 13:17, 13:18, 15:3, 18:2, 28:5, 33:20, 49:9,

62:13, 106:13, 106:16
**government** [29] - 6:13, 6:15, 11:2, 11:13, 14:6, 33:2, 33:10, 34:12, 54:22, 56:3, 57:15, 58:8, 58:17, 58:18, 65:20, 72:2, 78:19, 78:24, 98:4, 102:8, 106:19, 108:6, 108:13, 108:23, 112:11, 115:3, 115:4, 115:11, 121:23
**government's** [3] - 13:15, 20:16, 51:11
**grand** [1] - 28:11
**grant** [2] - 16:19, 85:20
**granted** [7] - 5:15, 15:21, 35:15, 44:23, 44:25, 97:19, 113:20
**grantees** [1] - 27:23
**grants** [2] - 16:20, 85:21
**grasping** [1] - 69:3
**great** [1] - 62:18
**greater** [2] - 62:25, 63:10
**grounded** [1] - 21:13
**group** [1] - 40:20
**Group** [4] - 3:18, 3:21, 32:14, 33:4
**guaranteed** [1] - 9:3
**guarding** [1] - 46:1
**guess** [1] - 36:3
**guidance** [1] - 10:8

## H

**habit** [1] - 45:25
**haphazard** [2] - 97:21, 98:12
**happy** [1] - 73:24
**harm** [34] - 5:25, 9:15, 9:21, 9:23, 10:21, 11:1, 11:4, 19:1, 19:2, 44:11, 44:18, 45:6, 45:10, 45:11, 45:17, 45:19, 45:20, 47:1, 51:9, 51:25, 52:1, 52:18, 52:25, 73:1, 76:9, 77:17, 81:12, 95:15, 97:7, 112:10, 112:12, 112:16, 114:25, 123:2
**harmed** [2] - 77:12, 109:10
**harms** [4] - 21:13,

84:6, 93:12, 123:4
**hat** [9] - 30:17, 32:4, 32:5, 32:10, 32:14, 33:7, 33:8, 105:9, 105:17
**hats** [5] - 30:12, 30:21, 32:12, 104:13, 105:21
**head** [1] - 15:19
**headed** [1] - 66:1
**heads** [3] - 46:5, 68:4, 117:3
**Healy** [1] - 4:3
**hear** [6] - 3:13, 3:14, 20:2, 31:15, 50:19, 53:20
**hearing** [6] - 4:6, 52:14, 53:4, 106:3, 107:4, 107:8
**heightened** [1] - 7:3
**held** [9] - 14:4, 14:7, 21:17, 72:2, 74:8, 86:4, 92:24, 94:15, 97:10
**help** [3] - 21:25, 39:23, 123:6
**helpful** [2] - 45:22, 120:15
**helps** [1] - 86:21
**herein** [2] - 16:19, 85:20
**high** [6] - 44:18, 45:4, 67:6, 71:18, 72:7
**high-level** [3] - 67:6, 71:18, 72:7
**high-ranking** [1] - 72:7
**higher** [1] - 44:15
**highly** [1] - 62:6
**hired** [2] - 68:9, 99:11
**historic** [1] - 84:20
**history** [1] - 44:7
**hold** [1] - 121:18
**holding** [4] - 31:11, 87:2, 122:22
**holds** [2] - 12:20, 13:17
**home** [2] - 14:8, 85:6
**honest** [2] - 28:12, 48:18
**Honor** [109] - 3:17, 3:24, 4:4, 6:2, 7:23, 16:7, 22:3, 28:12, 33:9, 49:12, 53:23, 55:12, 56:6, 56:12, 56:19, 57:3, 57:9, 57:18, 57:22, 58:22, 59:5, 59:23, 61:9, 62:4, 63:15, 63:22, 65:2, 65:6, 65:11,

65:16, 66:22, 67:22,
68:16, 69:17, 72:22,
73:2, 73:12, 73:23,
75:8, 76:20, 77:7,
77:14, 78:2, 78:11,
78:15, 79:3, 79:11,
80:9, 81:6, 82:2,
82:7, 82:19, 83:11,
84:12, 86:10, 86:13,
87:6, 87:24, 88:17,
88:23, 89:6, 90:3,
91:19, 92:2, 92:13,
93:6, 94:13, 94:21,
95:9, 96:13, 97:24,
98:11, 100:11,
100:25, 101:10,
101:18, 102:3,
102:6, 102:11,
102:16, 103:1,
103:22, 106:21,
107:7, 108:4,
108:24, 109:5,
109:22, 110:8,
111:7, 111:24,
112:20, 113:6,
114:1, 114:6, 114:7,
114:14, 115:13,
116:8, 117:14,
118:1, 119:20,
120:1, 120:9,
121:21, 122:12,
123:14, 124:4, 124:6
**hope** [2] - 56:2, 75:3
**hoped** [1] - 59:9
**hopefully** [5] - 15:7,
31:15, 73:14, 98:13,
119:15
**hoping** [2] - 122:16,
122:19
**horizon** [1] - 27:13
**house** [2] - 43:14,
85:5
**House** [5] - 54:11,
59:14, 61:17, 74:16,
80:3
**House's** [1] - 31:24
**housed** [1] - 89:13
**HUMPHREYS** [149] -
3:24, 53:23, 55:12,
55:14, 56:5, 56:12,
56:19, 57:3, 57:8,
57:11, 57:17, 57:22,
58:7, 58:20, 59:4,
59:7, 59:16, 59:22,
60:5, 60:11, 60:18,
61:9, 62:4, 63:15,
63:21, 64:15, 65:1,
65:6, 65:10, 65:15,
66:9, 66:21, 67:5,
67:11, 67:13, 67:21,

68:16, 68:21, 69:16,
69:21, 69:24, 70:3,
70:8, 72:21, 73:2,
73:10, 73:23, 75:8,
75:25, 76:4, 76:19,
77:6, 77:9, 77:24,
78:10, 78:15, 79:2,
79:11, 79:15, 79:18,
80:9, 80:20, 81:3,
81:5, 82:2, 82:7,
82:19, 83:11, 84:12,
84:19, 84:23, 86:10,
87:6, 87:10, 87:14,
87:24, 88:17, 88:23,
89:6, 89:10, 90:2,
90:14, 90:22, 91:19,
92:1, 93:5, 94:7,
94:21, 95:8, 96:12,
97:24, 100:11,
100:22, 101:10,
101:18, 101:23,
102:3, 102:6,
102:10, 102:15,
102:18, 102:22,
102:25, 103:9,
103:14, 103:22,
104:14, 104:21,
105:7, 105:11,
105:13, 105:16,
105:19, 106:21,
107:7, 107:25,
108:24, 109:4,
109:7, 109:22,
110:7, 111:6,
111:23, 112:19,
113:6, 113:12,
114:1, 114:6,
114:14, 115:7,
115:12, 115:15,
115:22, 116:7,
117:14, 118:1,
118:19, 119:16,
119:20, 120:1,
120:6, 120:8,
121:20, 121:23,
122:11, 122:16,
122:19, 123:14,
124:6
**Humphreys** [1] - 3:25
**hypothetical** [14] -
79:2, 80:2, 80:8,
82:3, 82:10, 82:21,
83:5, 83:6, 104:18,
105:4, 105:8, 111:5,
111:18, 111:24
**hypothetically** [3] -
83:16, 91:6, 104:9
**hypotheticals** [2] -
82:5, 110:17

**I**

**idea** [1] - 74:4
**ideas** [3] - 64:10, 66:5,
120:4
**identical** [2] - 20:24,
21:4
**identified** [7] - 29:9,
74:13, 74:19, 88:11,
98:7, 98:21, 111:2
**identify** [2] - 3:6,
74:20
**identifying** [2] - 39:4,
109:19
**III** [4] - 13:22, 14:11,
23:19, 77:18
**illegal** [1] - 40:17
**immediate** [2] - 11:4,
11:9
**immense** [1] - 51:9
**imminence** [1] - 46:2,
46:10
**immunity** [8] - 16:16,
20:16, 85:17, 86:7,
87:5, 88:10, 92:23,
93:1
**implement** [8] - 14:21,
26:24, 27:3, 27:15,
36:5, 44:1, 98:2,
113:10
**implementation** [3] -
24:20, 25:23, 67:20
**implemented** [6] -
13:2, 13:5, 14:25,
26:7, 27:15, 67:9
**implementing** [4] -
36:10, 43:19, 61:25,
64:10
**implicate** [1] - 27:25
**implicated** [1] - 20:4
**implication** [1] - 17:7
**implied** [1] - 17:12
**impliedly** [5] - 16:21,
17:6, 20:9, 85:22,
87:11
**Impliedly** [1] - 16:23
**important** [6] - 3:13,
47:19, 63:7, 70:14,
89:4, 108:3
**impose** [1] - 112:3
**imposes** [1] - 10:12
**impossible** [1] - 47:17
**impression** [1] - 107:5
**improper** [15] - 17:5,
39:4, 108:7, 109:20,
109:24, 109:25,
110:4, 110:8,
110:15, 110:19,
110:25, 111:4,
111:14, 111:22,

112:5
**improvements** [2] -
36:24, 38:2
**improving** [2] - 41:3,
68:18
**in-house** [1] - 43:14
**inadequacy** [1] -
23:17
**inadequate** [1] - 22:20
**inclined** [2] - 119:3,
119:10
**includes** [1] - 39:18
**including** [2] - 62:8,
71:5, 117:20
**inconsistent** [1] -
110:1
**incorporated** [1] -
95:10
**incorporates** [1] -
117:15
**indefinite** [1] - 44:24
**independent** [1] -
100:14
**indicate** [2] - 63:10,
87:18
**indicated** [6] - 18:24,
70:12, 85:16, 97:3,
113:5, 115:10
**indication** [2] - 46:13,
106:11
**individual** [17] - 7:12,
8:8, 8:17, 8:18, 8:24,
17:23, 19:12, 19:15,
31:21, 51:15, 51:23,
52:5, 75:22, 76:7,
76:8, 76:17, 95:5
**individual's** [1] -
78:24
**individualized** [6] -
39:25, 41:24, 42:3,
51:17, 95:15, 97:7
**individually** [1] - 91:8
**individuals** [11] -
11:22, 18:13, 19:21,
41:25, 51:15, 55:23,
56:7, 56:13, 76:24,
77:12, 95:7
**inexplicable** [1] -
97:18
**inferior** [2] - 70:24,
74:9
**information** [114] -
6:16, 8:20, 9:4, 9:5,
9:10, 9:13, 10:14,
11:5, 11:12, 11:14,
11:17, 11:23, 12:17,
12:20, 12:25, 13:6,
13:12, 13:18, 14:4,
14:23, 15:4, 15:14,
16:11, 21:17, 21:23,

25:18, 28:5, 28:10,
30:10, 30:14, 30:16,
30:23, 31:19, 32:3,
32:4, 32:16, 32:24,
34:3, 34:4, 34:6,
35:13, 36:14, 41:1,
41:8, 41:9, 41:18,
41:22, 41:24, 42:3,
43:15, 47:5, 47:14,
49:3, 49:12, 49:19,
49:21, 51:17, 51:23,
52:1, 53:8, 53:16,
56:2, 56:25, 58:6,
58:7, 58:20, 58:24,
59:5, 64:16, 71:10,
72:17, 74:5, 75:6,
79:13, 80:25, 81:7,
81:14, 81:24, 82:4,
82:16, 82:22, 83:1,
83:2, 83:4, 83:8,
83:10, 83:21, 84:1,
85:7, 86:24, 92:4,
92:16, 93:11, 96:15,
96:23, 102:12,
106:8, 106:22,
107:12, 108:4,
108:5, 108:8,
108:22, 109:8,
110:10, 111:10,
112:4, 114:12,
117:18, 118:8,
118:14, 118:22,
118:25
**information-sharing**
[1] - 109:8
**initial** [1] - 53:25
**initiative** [2] - 68:13,
68:14
**Initiative** [1] - 62:12
**injunction** [20] - 4:16,
5:15, 5:18, 5:24, 6:3,
6:12, 6:14, 6:16,
6:19, 7:1, 10:25,
34:8, 44:20, 45:12,
47:18, 53:3, 56:9,
56:14, 94:20, 117:21
**injunctions** [2] - 22:9,
45:4
**injunctive** [22] - 9:14,
9:21, 9:23, 10:24,
11:6, 12:4, 16:25,
17:5, 17:7, 17:22,
18:10, 19:10, 19:16,
20:7, 20:24, 24:3,
44:22, 78:14, 85:25,
86:14, 94:16, 94:23
**injured** [1] - 7:21
**injuries** [2] - 14:15,
16:4
**injury** [28] - 7:15, 8:23,

8:25, 9:2, 9:23, 11:9, 13:22, 13:25, 14:9, 14:11, 14:14, 22:21, 44:21, 44:25, 77:18, 77:22, 78:3, 78:8, 78:11, 78:13, 78:16, 78:25, 79:25, 80:7, 81:18, 81:20, 81:23, 96:20
**injury-in-fact** [10] - 7:15, 8:23, 8:25, 9:2, 14:14, 77:18, 77:22, 78:3, 79:25, 96:20
**instance** [9] - 40:15, 45:4, 57:23, 74:6, 77:12, 79:5, 82:21, 107:13, 111:11
**instances** [1] - 79:15
**instead** [1] - 120:12
**insufficient** [1] - 78:19
**integration** [1] - 103:10
**integrity** [1] - 47:20
**intend** [1] - 22:9
**intends** [1] - 18:20
**interact** [1] - 113:24
**interest** [5] - 11:13, 11:16, 27:25, 51:5, 75:22
**interested** [1] - 51:19
**interests** [6] - 6:9, 7:9, 8:4, 52:5, 75:20, 76:1
**interface** [1] - 60:20
**Interior** [1] - 39:11
**Internal** [27] - 6:8, 11:21, 17:2, 18:9, 20:10, 21:10, 22:21, 22:24, 41:6, 41:7, 42:9, 43:24, 49:18, 76:8, 77:19, 86:8, 86:13, 86:18, 86:23, 87:3, 91:5, 93:10, 117:16, 118:3, 118:5, 118:10, 119:1
**internal** [2] - 60:19, 78:18
**interoperability** [1] - 47:7
**interpret** [1] - 88:15
**interpreted** [2] - 72:11, 74:21
**intra** [5] - 49:16, 50:1, 50:2, 50:13, 81:16
**intra-agency** [5] - 49:16, 50:1, 50:2, 50:13, 81:16
**intruded** [1] - 11:18
**intruding** [3] - 10:13, 13:11, 13:16

**intrusion** [12] - 10:3, 10:9, 10:12, 10:14, 11:16, 12:7, 13:10, 84:8, 84:13, 84:19, 85:6, 85:12
**intrusive** [1] - 10:3
**invasion** [1] - 14:8
**investigation** [1] - 40:17
**investigations** [3] - 39:18, 39:25, 40:14
**Investment** [1] - 62:12
**invoke** [1] - 109:18
**invoked** [1] - 39:10
**involve** [3] - 20:3, 21:7, 28:10
**involved** [12] - 12:2, 18:4, 22:11, 27:23, 28:9, 31:21, 55:23, 64:9, 66:15, 73:15, 100:16, 107:20
**involves** [1] - 19:2
**involving** [3] - 10:25, 11:6, 18:4
**IRC** [1] - 18:16
**irregularities** [1] - 34:9
**irreparable** [13] - 5:25, 44:11, 44:18, 45:11, 45:17, 47:1, 52:18, 73:1, 112:10, 112:12, 123:2
**IRS** [1] - 42:2
**issuance** [2] - 22:9, 88:25
**issue** [23] - 6:7, 12:16, 16:9, 16:23, 23:13, 24:5, 26:1, 26:2, 33:8, 45:3, 53:16, 55:25, 63:22, 67:19, 73:13, 75:2, 76:6, 81:6, 82:15, 92:19, 112:14, 115:7, 123:18
**issued** [4] - 11:2, 61:21, 62:16, 122:7
**issues** [10] - 4:14, 5:16, 6:20, 29:15, 34:20, 55:16, 73:11, 75:15, 79:23, 88:24
**IT** [2] - 36:24, 117:7
**itemized** [3] - 110:22, 110:24, 111:3
**itself** [4] - 14:9, 20:4, 20:5, 24:2

**J**

**January** [17] - 15:18, 34:24, 35:5, 35:22,

36:4, 54:16, 55:9, 57:5, 62:2, 98:18, 99:2, 99:6, 99:23, 100:1, 100:3, 100:5, 101:25
**job** [6] - 29:24, 30:23, 30:25, 36:18, 37:4, 37:7
**jointly** [1] - 61:23
**Joseph** [1] - 106:9
**JOSHI** [74] - 3:17, 6:2, 7:23, 8:13, 9:2, 10:18, 12:10, 13:14, 14:19, 15:8, 15:14, 16:7, 17:9, 18:23, 19:14, 20:11, 21:3, 22:2, 22:10, 22:23, 23:3, 23:5, 23:24, 24:10, 25:6, 25:10, 26:18, 26:21, 27:20, 28:8, 28:16, 29:20, 31:17, 32:9, 32:15, 33:9, 33:18, 33:22, 34:2, 34:22, 36:2, 36:18, 37:24, 39:16, 40:5, 40:8, 40:11, 40:13, 40:25, 41:17, 43:1, 45:23, 46:8, 46:17, 46:19, 48:3, 48:17, 49:6, 49:8, 50:8, 50:25, 51:3, 51:8, 52:16, 53:5, 53:8, 53:11, 120:13, 120:18, 120:21, 122:13, 122:24, 123:11, 124:4
**Joshi** [1] - 3:18
**Judge** [15] - 5:14, 5:23, 9:19, 15:7, 44:16, 52:12, 61:4, 61:13, 62:11, 63:9, 65:20, 97:11, 106:2, 107:9, 113:4
**judges** [2] - 45:3, 45:15
**judgment** [6] - 7:4, 16:10, 18:21, 50:13, 120:15, 124:1
**judicial** [2] - 24:13, 88:3
**July** [1] - 27:11
**juncture** [1] - 96:2
**jurisdiction** [6] - 16:14, 16:24, 23:20, 85:24, 88:16, 93:4
**jurisdictional** [2] - 88:14, 96:18
**jury** [1] - 28:11
**Justice** [4] - 3:25, 4:2, 61:3, 61:15

**K**

**Kean** [2] - 124:17, 124:21
**keep** [2] - 102:12, 114:12
**key** [1] - 73:17
**kind** [5] - 47:12, 87:19, 95:9, 113:21, 119:13
**kindly** [1] - 116:18
**Kirts** [1] - 17:24
**Kirtz** [2] - 87:17, 87:22
**KIRTZ** [1] - 87:22
**knowable** [1] - 58:7
**knowing** [1] - 83:14
**knowledge** [4] - 33:10, 56:4, 73:14, 97:16
**knows** [1] - 58:13
**Krause** [50] - 29:13, 29:23, 31:3, 31:7, 31:11, 33:11, 35:14, 36:3, 36:14, 36:19, 41:2, 43:12, 62:1, 64:5, 66:22, 67:2, 67:18, 67:25, 68:9, 68:22, 69:1, 69:25, 71:6, 71:15, 71:24, 74:14, 74:19, 74:22, 75:10, 77:6, 80:14, 82:21, 83:6, 83:14, 92:2, 98:17, 99:1, 99:4, 99:7, 99:16, 100:23, 101:2, 101:8, 101:11, 101:14, 102:8, 104:10, 104:17, 105:8, 111:1
**Krause's** [5] - 29:20, 34:7, 83:13, 98:16, 98:21

**L**

**lack** [2] - 10:18, 72:17
**lacks** [2] - 16:24, 85:24
**laptop** [3] - 11:12, 106:11, 106:15
**last** [9] - 6:12, 16:4, 17:24, 27:6, 105:24, 112:9, 114:17, 120:17, 122:3
**lasts** [1] - 27:11
**late** [1] - 114:16
**launch** [1] - 97:20
**law** [17] - 9:3, 11:18, 12:11, 13:22, 13:24, 14:2, 14:10, 14:11, 19:8, 84:6, 115:23, 117:5, 117:11,

117:15, 118:22, 119:7
**lawful** [6] - 33:14, 43:13, 47:22, 91:18, 91:20, 108:10
**laws** [1] - 43:9
**lawsuit** [1] - 8:9
**leader** [5] - 29:16, 99:10, 103:15, 103:24, 104:4
**leaders** [1] - 8:14
**leadership** [1] - 99:5
**learn** [3] - 27:7, 73:15, 108:5
**least** [15] - 6:23, 27:22, 30:11, 32:13, 32:23, 34:5, 34:14, 36:11, 38:5, 54:1, 54:3, 71:9, 82:10, 103:16, 111:16
**leave** [1] - 91:10
**leaves** [3] - 49:2, 49:4, 49:12
**lectern** [1] - 58:22
**left** [1] - 84:2
**legacy** [1] - 68:18
**legal** [10] - 24:17, 26:8, 32:22, 48:4, 49:14, 66:10, 88:8, 90:4, 90:23, 91:4
**legally** [2] - 33:12, 49:20
**legislation** [1] - 87:19
**less** [3] - 4:11, 76:14, 79:23
**level** [7] - 9:12, 38:11, 45:25, 52:25, 67:6, 71:18, 72:7
**liability** [2] - 10:12, 13:10
**liable** [1] - 44:24
**license** [1] - 89:1
**licenses** [1] - 88:25
**lift** [3] - 13:2, 13:3, 13:4
**likelihood** [3] - 7:2, 45:10, 45:16
**likely** [4] - 16:2, 45:7, 79:24, 97:13
**limitations** [2] - 31:1, 37:3
**limited** [6] - 22:13, 30:19, 36:11, 70:15, 88:4, 96:3
**limiting** [1] - 43:24
**limits** [1] - 24:13
**line** [4] - 3:12, 13:23, 36:23, 122:17
**link** [2] - 44:12, 50:20
**linked** [1] - 22:6

**list** [2] - 84:19, 84:20
**lists** [1] - 61:24
**litigant** [1] - 81:17
**Litigation** [2] - 3:18, 3:21
**litigation** [1] - 73:24
**located** [3] - 54:17, 55:10, 57:5
**logged** [1] - 113:16
**logging** [2] - 113:23, 114:11
**logical** [1] - 92:25
**look** [15] - 12:13, 13:24, 14:12, 38:3, 41:23, 42:3, 51:16, 54:3, 79:18, 80:12, 84:16, 91:15, 92:7, 104:21, 119:24
**looked** [2] - 107:16, 107:19
**looking** [9] - 14:13, 16:7, 24:9, 28:2, 40:19, 41:19, 41:20, 101:24
**looks** [1] - 69:1
**lopsided** [1] - 52:4
**loss** [3] - 9:22, 11:9, 14:2
**Lucia** [1] - 72:2

**M**

**maintain** [3] - 16:8, 77:13, 122:1
**maintains** [1] - 29:5
**major** [1] - 45:18
**maker** [1] - 43:18
**makers** [1] - 73:4
**man** [1] - 62:14
**manage** [3] - 28:4, 28:17, 64:6
**management** [1] - 54:24
**managerial** [1] - 99:9
**managing** [1] - 103:12
**manner** [1] - 22:7
**March** [2] - 119:25, 123:22
**market** [1] - 37:5
**marks** [2] - 24:15, 88:5
**masks** [1] - 3:9
**Massachusetts** [2] - 20:11, 23:13
**massive** [1] - 14:2
**masters** [3] - 30:2, 31:18, 32:2
**Match** [2] - 18:19, 86:2
**Match-E-Be-Nash** [2] - 18:19, 86:2
**material** [3] - 52:9,

55:25, 107:3
**materials** [2] - 4:8, 42:21
**matter** [13] - 6:11, 11:11, 16:14, 16:24, 19:9, 23:19, 25:24, 34:8, 67:21, 85:24, 88:21, 116:15, 124:19
**matters** [1] - 94:13
**maximum** [1] - 117:5
**Mazars** [1] - 82:11
**MAZARS** [1] - 82:11
**mean** [39] - 13:21, 14:20, 20:1, 25:4, 32:11, 48:13, 50:22, 56:1, 62:24, 63:17, 63:24, 64:14, 65:19, 66:5, 67:10, 68:16, 69:1, 73:12, 74:18, 81:6, 83:13, 83:23, 90:2, 90:8, 94:9, 95:12, 96:5, 102:21, 104:13, 105:5, 107:15, 108:6, 109:9, 110:5, 112:21, 115:18, 118:1, 120:5, 122:6
**meaning** [3] - 74:20, 109:24, 115:5
**means** [6] - 72:15, 95:14, 115:4, 115:6, 115:19, 118:23
**meant** [5] - 12:19, 18:13, 87:11, 101:11
**meantime** [1] - 99:21
**measures** [3] - 25:17, 42:20, 98:7
**media** [1] - 42:5
**meet** [1] - 29:21
**member** [1] - 80:3
**members** [21] - 7:8, 7:13, 7:19, 8:1, 8:8, 8:18, 8:20, 8:24, 26:8, 27:25, 31:4, 43:12, 61:1, 68:6, 75:19, 75:23, 76:17, 93:9, 111:3, 113:24, 114:9
**members'** [7] - 14:15, 14:23, 16:3, 16:11, 76:14, 77:16, 78:8
**memoranda** [1] - 88:9
**memorandum** [2] - 92:22, 96:13
**mention** [2] - 23:7, 84:14
**mentioned** [4] - 22:25, 24:21, 66:21, 101:20
**mentions** [2] - 10:5,

48:17
**mere** [1] - 108:4
**merely** [2] - 44:23, 45:1
**merits** [10] - 28:22, 42:12, 88:16, 93:3, 93:6, 93:8, 95:22, 119:8, 119:10
**messages** [1] - 85:2
**messenger** [1] - 63:20
**methods** [1] - 18:10
**microphone** [2] - 3:14, 56:10
**might** [15] - 9:17, 18:2, 19:17, 21:6, 23:19, 29:13, 39:21, 39:22, 40:17, 40:18, 46:25, 51:1, 86:22, 91:17, 114:25
**millions** [1] - 47:13
**mind** [3] - 56:18, 83:14, 95:2
**ministerial** [2] - 89:14, 89:18
**minor** [2] - 52:23, 53:13
**minutes** [2] - 116:19, 121:14
**mispronouncing** [1] - 103:21
**missed** [4] - 40:4, 50:16, 84:18, 120:17
**missing** [1] - 44:5
**mission** [1] - 69:18
**mistake** [4] - 112:21, 113:2, 113:17
**mistakes** [1] - 112:17
**mitigate** [2] - 112:15, 114:8
**mitigation** [1] - 25:17
**mixed** [1] - 47:14
**modernization** [5] - 67:6, 68:12, 69:23, 103:10
**modernize** [3] - 69:19, 98:1, 98:4
**modernizing** [1] - 68:17
**modify** [1] - 6:16
**moment** [2] - 69:8, 119:16
**monetary** [4] - 10:23, 86:15, 94:10, 109:11
**money** [3] - 16:17, 85:18, 95:15
**monitoring** [2] - 113:23, 114:11
**mooted** [2] - 114:25
**most** [5] - 10:11, 12:10, 45:21, 53:24,

94:5
**mostly** [1] - 45:24
**motion** [21] - 7:3, 8:14, 55:16, 60:24, 65:23, 96:14, 120:8, 120:14, 120:25, 121:1, 121:6, 121:7, 121:17, 121:24, 121:25, 122:8, 123:9, 123:24, 123:25, 124:1
**motions** [3] - 6:20, 120:4, 123:19
**move** [18] - 16:13, 20:18, 24:11, 28:22, 38:23, 41:5, 56:10, 59:6, 60:23, 74:1, 75:14, 85:15, 88:2, 97:11, 98:14, 104:7, 114:21, 116:14
**moved** [2] - 54:11, 98:9
**moving** [2] - 5:12, 119:5
**MR** [223] - 3:17, 3:24, 6:2, 7:23, 8:13, 9:2, 10:18, 12:10, 13:14, 14:19, 15:8, 15:14, 16:7, 17:9, 18:23, 19:14, 20:11, 21:3, 22:2, 22:10, 22:23, 23:3, 23:5, 23:24, 24:10, 25:6, 25:10, 26:18, 26:21, 27:20, 28:8, 28:16, 29:20, 31:17, 32:9, 32:15, 33:9, 33:18, 33:22, 34:2, 34:22, 36:2, 36:18, 37:24, 39:16, 40:5, 40:8, 40:11, 40:13, 40:25, 41:17, 43:1, 45:23, 46:8, 46:17, 46:19, 48:3, 48:17, 49:6, 49:8, 50:8, 50:25, 51:3, 51:8, 52:16, 53:5, 53:8, 53:11, 53:23, 55:12, 55:14, 56:5, 56:12, 56:19, 57:3, 57:8, 57:11, 57:17, 57:22, 58:7, 58:20, 59:4, 59:7, 59:16, 59:22, 60:5, 60:11, 60:18, 61:9, 62:4, 63:15, 63:21, 64:15, 65:1, 65:6, 65:10, 65:15, 66:9, 66:21, 67:5, 67:11, 67:13, 67:21, 68:16, 68:21, 69:16, 69:21, 69:24,

70:3, 70:8, 72:21, 73:2, 73:10, 73:23, 75:8, 75:25, 76:4, 76:19, 77:6, 77:9, 77:24, 78:10, 78:15, 79:2, 79:11, 79:15, 79:18, 80:9, 80:20, 81:3, 81:5, 82:2, 82:7, 82:19, 83:11, 84:12, 84:19, 84:23, 86:10, 87:6, 87:10, 87:14, 87:24, 88:17, 88:23, 89:6, 89:10, 90:2, 90:14, 90:22, 91:19, 92:1, 93:5, 94:7, 94:21, 95:8, 96:12, 97:24, 100:11, 100:22, 101:10, 101:18, 101:23, 102:3, 102:6, 102:10, 102:15, 102:18, 102:22, 102:25, 103:9, 103:14, 103:22, 104:14, 104:21, 105:7, 105:11, 105:13, 105:16, 105:19, 106:21, 107:7, 107:25, 108:24, 109:4, 109:7, 109:22, 110:7, 111:6, 111:23, 112:19, 113:6, 113:12, 114:1, 114:6, 114:14, 115:7, 115:12, 115:15, 115:22, 116:7, 117:14, 118:1, 118:19, 119:16, 119:20, 120:1, 120:6, 120:8, 120:13, 120:18, 120:21, 121:20, 121:23, 122:11, 122:13, 122:16, 122:19, 122:24, 123:11, 123:14, 124:4, 124:6
**multiple** [1] - 26:20
**murkiness** [1] - 34:22
**Musk** [2] - 61:2, 62:14
**musk** [9] - 61:4, 61:6, 61:19, 61:21, 62:21, 63:2, 63:24, 64:8, 64:24
**Musk'** [1] - 62:8
**Musk's** [1] - 48:22
**must** [4] - 7:1, 44:21, 93:7, 93:14

**N**

**named** [2] - 35:10, 62:14
**names** [1] - 60:16
**Nandan** [1] - 3:17
**Nash** [2] - 18:19, 86:2
**necessarily** [3] - 34:4, 50:10, 108:6
**necessary** [3] - 5:25, 44:19, 117:3
**need** [34] - 8:8, 8:17, 17:9, 29:6, 36:1, 36:14, 36:21, 36:22, 37:14, 37:22, 38:4, 41:23, 43:9, 51:16, 51:22, 56:10, 66:13, 70:24, 74:4, 78:20, 81:5, 86:22, 91:20, 92:15, 102:12, 104:23, 104:25, 113:3, 116:14, 118:12, 119:12, 120:23, 121:9, 123:18
**needed** [1] - 26:11
**needs** [2] - 36:25, 37:16
**negotiation** [1] - 25:15
**network** [1] - 49:8
**networks** [1] - 49:11
**never** [1] - 91:3
**new** [10] - 15:12, 24:20, 25:3, 25:18, 25:23, 26:14, 29:24, 44:2, 52:7, 52:16
**New** [16] - 4:12, 5:15, 5:24, 6:3, 6:8, 6:12, 6:18, 9:19, 13:4, 36:11, 44:15, 46:11, 52:11, 53:6, 106:2, 117:22
**next** [7] - 5:13, 27:13, 39:8, 114:21, 116:15, 120:3, 120:4
**nobody** [2] - 58:13, 69:4
**nominally** [1] - 99:7
**nominated** [9] - 55:2, 55:6, 57:25, 58:3, 70:22, 72:12, 74:10, 74:14, 74:23
**nonconsensual** [1] - 30:20
**nondisclosure** [1] - 30:20
**none** [1] - 62:25
**Norm** [1] - 3:21
**Norton** [1] - 89:17
**note** [5] - 6:4, 23:5,

42:1, 71:9, 108:3
**Nothing** [2] - 16:19, 85:20
**nothing** [5] - 22:15, 38:14, 88:1, 101:20, 111:19
**Notice** [3] - 79:19, 80:13, 118:13
**novel** [2] - 4:15, 28:19
**number** [4] - 45:2, 87:23, 94:14, 107:1
**Number** [1] - 112:7

**O**

**oath** [1] - 98:18
**objective** [1] - 32:6
**obligations** [5] - 24:17, 88:7, 91:14, 102:8, 102:14
**obtain** [1] - 96:3
**obvious** [1] - 60:25
**obviously** [19] - 4:14, 8:2, 8:12, 23:18, 28:24, 34:9, 37:15, 37:19, 49:8, 56:2, 62:22, 65:23, 66:15, 88:3, 107:5, 112:11, 119:2, 121:16, 123:16
**occupies** [1] - 87:19
**occur** [2] - 44:24, 76:24
**occurred** [4] - 25:15, 25:24, 45:20, 76:11
**odd** [1] - 20:14
**Office** [13] - 13:7, 13:19, 30:6, 31:9, 31:10, 43:5, 46:6, 54:12, 59:13, 62:14, 64:13, 80:4, 108:17
**office** [2] - 15:15, 15:17
**officer** [7] - 16:18, 55:1, 55:6, 74:14, 74:17, 85:19, 102:1
**officers** [14] - 29:5, 30:14, 41:13, 70:22, 70:24, 70:25, 71:5, 71:20, 72:3, 72:10, 74:9, 74:10, 74:20
**official** [4] - 38:14, 71:3, 75:11, 98:24
**officials** [14] - 70:4, 71:16, 71:18, 71:19, 71:20, 71:21, 71:23, 72:3, 72:6, 74:12, 74:19, 106:10, 110:22, 117:23
**officials'** [1] - 123:3

**often** [1] - 94:11
**oil** [4] - 45:5, 45:7, 45:18, 45:19
**old** [3] - 15:16, 16:9, 16:12
**OMB** [13] - 54:20, 54:24, 55:1, 55:5, 55:11, 57:6, 57:13, 57:16, 57:21, 58:2, 58:12, 58:16, 59:12
**onboarded** [1] - 98:19
**onboarding** [1] - 34:10
**once** [16] - 5:6, 18:23, 21:5, 22:24, 23:12, 25:6, 31:17, 37:3, 46:2, 47:9, 47:23, 49:4, 49:12, 51:8, 53:1, 122:7
**one** [62] - 4:13, 4:20, 8:4, 11:3, 11:15, 11:23, 13:17, 14:24, 16:4, 23:16, 24:16, 26:19, 29:8, 31:24, 32:11, 33:8, 34:11, 34:14, 41:9, 41:11, 42:11, 43:20, 46:23, 47:24, 49:19, 50:5, 52:17, 53:21, 55:8, 60:13, 60:16, 60:18, 74:7, 75:9, 79:18, 80:12, 81:25, 82:7, 82:10, 82:17, 84:10, 88:6, 88:22, 91:1, 91:7, 91:10, 92:6, 93:20, 95:3, 95:6, 95:13, 105:24, 107:11, 107:13, 109:4, 109:7, 110:17, 114:17, 115:21, 116:23, 120:25, 121:16
**one-off** [1] - 95:3
**ones** [4] - 17:3, 54:1, 74:13, 91:13
**opaque** [1] - 54:3
**open** [2] - 38:21, 39:20
**operate** [2] - 27:8, 30:2
**operated** [1] - 44:7
**operating** [1] - 66:20
**operation** [1] - 64:9
**operational** [1] - 42:17
**operations** [2] - 70:17, 88:21
**opine** [2] - 66:9, 73:10
**opinion** [5] - 15:7, 52:13, 106:5, 107:10, 112:6

**opinions** [4] - 4:9, 4:10, 45:19, 49:25
**OPM** [1] - 62:17
**opponent** [1] - 80:7
**opportunity** [1] - 6:15
**opposed** [6] - 19:5, 76:18, 91:8, 94:4, 95:3, 95:7
**opposing** [1] - 120:24
**opposition** [2] - 65:23, 78:17
**opted** [1] - 97:1
**order** [29] - 3:2, 10:17, 13:3, 13:4, 27:2, 27:22, 36:10, 36:11, 46:11, 47:16, 48:8, 51:17, 62:13, 76:20, 81:18, 83:19, 86:22, 93:13, 95:16, 96:1, 110:10, 113:11, 113:16, 122:1, 122:3, 122:25, 123:19
**Order** [44] - 13:1, 13:5, 14:22, 15:11, 27:3, 27:4, 27:10, 27:16, 27:17, 30:4, 43:7, 43:8, 46:3, 46:12, 47:6, 48:17, 49:1, 54:5, 54:6, 55:17, 59:17, 60:5, 65:24, 67:5, 67:8, 67:23, 68:3, 68:10, 68:11, 69:5, 69:11, 69:18, 106:24, 110:1, 110:19, 111:15, 111:22, 112:1, 116:25, 117:9, 117:13, 117:24, 118:16
**ordinarily** [1] - 90:18
**organization** [4] - 7:20, 60:16, 60:20, 76:2
**Organization** [7] - 48:20, 54:13, 59:25, 60:10, 60:13, 61:6, 66:1
**organizational** [6] - 7:11, 7:20, 8:14, 54:1, 75:21, 94:12
**organizationally** [1] - 55:22
**organizations** [2] - 29:15, 56:24
**organizations'** [1] - 8:6
**organized** [1] - 94:8
**originally** [1] - 98:21
**otherwise** [3] - 3:9,

67:13, 99:13
**outset** [2] - 5:22, 6:23
**outside** [26] - 12:15, 13:6, 31:20, 43:5, 43:15, 46:19, 70:13, 82:22, 92:4, 92:9, 92:17, 105:1, 105:25, 106:6, 106:12, 106:16, 106:17, 107:21, 108:12, 108:13, 108:22, 108:25, 112:11, 112:13, 114:4, 114:13
**overseen** [1] - 75:10
**oversees** [1] - 64:4
**owe** [1] - 102:8
**own** [8] - 7:8, 7:9, 8:2, 14:8, 18:11, 75:19, 85:9, 113:18

**P**

**p.m** [4] - 3:2, 116:21, 116:22, 124:9
**page** [1] - 87:23
**Page** [1] - 65:22
**paper** [1] - 46:23
**papers** [2] - 29:12, 53:22
**paperwork** [4] - 34:24, 98:19, 98:20, 100:2
**Paragraph** [3] - 38:24, 39:1, 71:14
**parameters** [1] - 92:12
**parcel** [1] - 87:7
**part** [23] - 13:17, 13:18, 16:23, 24:23, 28:19, 29:14, 30:2, 35:22, 45:13, 60:8, 66:24, 67:3, 67:16, 73:14, 78:23, 81:7, 87:7, 88:21, 90:12, 91:24, 100:25, 106:23, 120:17
**participate** [5] - 8:9, 8:18, 75:23, 76:17
**participation** [1] - 7:12
**particular** [21] - 5:19, 9:17, 13:13, 20:19, 22:6, 22:7, 26:16, 40:20, 43:19, 52:7, 56:20, 73:3, 82:15, 86:24, 87:18, 89:11, 90:25, 91:13, 102:9, 107:16, 111:9
**particularized** [1] - 40:14
**particularly** [3] - 61:1,

98:5, 111:20
**parties** [2] - 11:19, 124:7
**party** [4] - 49:21, 50:14, 76:15, 83:21
**pass** [1] - 76:9
**password** [1] - 11:7
**passwords** [1] - 11:3
**past** [2] - 90:8, 90:11
**pause** [1] - 110:2
**Pause** [1] - 116:17
**payment** [15] - 24:23, 26:15, 36:15, 37:16, 38:24, 40:19, 41:4, 70:19, 89:23, 97:15, 106:12, 106:14, 109:15, 111:9, 117:12
**Payment** [1] - 99:22
**payments** [13] - 26:16, 27:2, 27:23, 39:4, 40:17, 106:23, 107:16, 109:20, 109:23, 110:2, 110:9, 111:4, 111:12
**pending** [1] - 52:1
**people** [8] - 4:24, 57:25, 58:3, 71:2, 71:4, 71:20, 74:25, 84:3
**people's** [1] - 121:19
**per** [1] - 88:25
**perfect** [2] - 13:23, 82:11
**perform** [1] - 99:9
**performance** [3] - 29:6, 104:24, 105:1
**performing** [1] - 100:24, 101:13
**perhaps** [6] - 5:20, 15:1, 27:24, 38:19, 41:22, 47:24
**period** [4] - 35:8, 100:4, 112:23, 122:4
**periods** [1] - 56:21
**permissible** [3] - 47:22, 111:9, 117:19
**permits** [1] - 79:3
**permitted** [3] - 86:20, 110:12, 112:6
**permitting** [1] - 45:17
**Perry** [1] - 92:25
**person** [9] - 10:13, 13:10, 13:15, 19:12, 26:19, 28:25, 29:24, 70:9, 80:6
**personal** [12] - 9:4, 9:13, 11:12, 11:14, 12:19, 13:6, 14:4, 26:9, 43:4, 47:14,

51:17, 51:25
**personnel** [2] - 39:13, 106:6
**persons** [2] - 19:6, 91:17
**perspective** [3] - 12:9, 100:21, 118:15
**phone** [2] - 85:3, 85:4
**phrase** [1] - 117:15
**PI** [10] - 106:3, 116:15, 121:17, 121:24, 122:5, 122:7, 122:25, 123:6, 123:8, 123:24
**piece** [1] - 46:23
**pieces** [1] - 11:17
**pin** [1] - 63:18
**pipeline** [2] - 45:5, 45:18
**place** [13] - 8:15, 15:10, 16:12, 23:21, 25:4, 35:17, 36:5, 38:13, 43:25, 47:20, 76:10, 98:8, 123:1
**Plaintiff** [1] - 6:1
**plaintiff** [11] - 3:7, 9:18, 11:22, 13:25, 47:2, 81:17, 86:22, 94:16, 101:4, 116:11, 120:10
**plaintiff's** [3] - 11:19, 85:3, 95:5
**plaintiffs** [47] - 3:19, 4:17, 5:1, 5:3, 7:1, 7:10, 7:20, 8:5, 8:17, 16:25, 45:5, 56:6, 60:25, 66:11, 73:3, 73:11, 75:20, 76:12, 76:22, 78:4, 83:17, 83:23, 84:9, 84:12, 85:17, 85:25, 86:5, 87:16, 88:11, 91:11, 93:7, 94:9, 94:11, 96:3, 96:11, 96:19, 97:1, 97:6, 97:9, 97:12, 101:20, 109:10, 118:4, 119:4, 119:11, 122:22, 124:3
**Plaintiffs** [1] - 120:7
**plaintiffs'** [11] - 7:8, 8:1, 14:23, 16:10, 26:8, 27:25, 55:16, 63:23, 75:18, 77:16, 78:20
**plan** [34] - 24:24, 25:2, 25:5, 25:16, 26:13, 27:5, 27:12, 27:14, 27:22, 34:15, 35:21, 36:5, 36:10, 36:16,

37:17, 37:20, 37:23, 37:25, 38:1, 38:16, 66:16, 70:19, 73:19, 89:24, 90:9, 90:12, 90:14, 91:13, 100:9, 100:18, 100:22, 101:1
**Plan** [1] - 99:22
**plead** [1] - 97:6
**pleaded** [1] - 56:7
**pleadings** [1] - 63:23
**podium** [1] - 3:11
**point** [55] - 20:20, 22:18, 26:12, 28:7, 28:14, 29:18, 32:13, 32:16, 33:2, 34:5, 34:12, 34:14, 35:23, 39:11, 45:21, 49:9, 50:24, 52:7, 52:22, 57:14, 58:12, 58:14, 59:15, 62:20, 63:6, 64:24, 65:12, 67:2, 69:8, 69:13, 73:20, 74:16, 75:9, 75:18, 75:25, 82:9, 84:13, 86:11, 89:16, 89:18, 94:18, 99:24, 100:19, 109:9, 112:16, 113:2, 114:19, 116:10, 119:3, 119:11, 120:12, 121:20, 123:2, 123:7, 124:2
**pointed** [1] - 86:13
**pointedly** [1] - 108:19
**points** [1] - 22:8
**policies** [2] - 25:13, 99:13
**policy** [32] - 14:20, 15:12, 15:13, 15:17, 15:24, 16:9, 16:12, 24:20, 25:4, 25:19, 25:24, 35:17, 36:6, 36:9, 43:25, 44:4, 45:25, 61:24, 71:18, 72:7, 76:23, 77:1, 77:10, 89:20, 90:7, 90:16, 92:8, 95:2, 95:6, 101:19, 110:3, 110:21
**policy-making** [1] - 45:25
**policymaking** [9] - 17:22, 18:12, 18:17, 21:11, 21:15, 100:8, 100:14, 100:25, 101:14
**political** [1] - 80:3
**politician's** [1] - 110:24

portion [1] - 95:18
**poses** [1] - 10:21
**position** [16] - 33:10, 33:13, 33:19, 33:23, 35:23, 59:19, 59:21, 62:24, 71:12, 73:21, 78:22, 90:19, 115:9, 117:10, 117:14, 120:23
**positions** [4] - 33:15, 34:1, 62:24, 121:19
**positive** [1] - 33:7
**possibilities** [1] - 31:14
**possible** [1] - 16:8
**potential** [4] - 14:25, 84:14, 96:11
**potentially** [3] - 73:6, 83:25, 105:25
**precedent** [8] - 20:6, 28:2, 28:3, 28:20, 44:14, 44:17, 45:8, 94:18
**precedents** [2] - 45:23, 87:2
**precisely** [1] - 91:25
**preclude** [3] - 19:24, 87:11, 92:23
**precluded** [1] - 20:2
**precludes** [1] - 20:15
**preclusion** [1] - 19:18
**preference** [1] - 123:11
**preliminary** [11] - 4:6, 5:15, 5:18, 6:19, 7:1, 34:8, 44:19, 45:4, 45:11, 47:18, 53:3
**premise** [1] - 112:20
**premised** [1] - 122:2
**prepared** [4] - 6:22, 59:9, 69:7, 73:10
**presence** [1] - 8:21
**present** [3] - 33:5, 65:9, 112:2
**presented** [5] - 6:20, 55:16, 63:23, 115:16, 116:8
**presently** [1] - 63:22
**President** [37] - 12:23, 13:7, 13:19, 30:6, 31:9, 31:11, 43:6, 46:6, 48:23, 54:5, 54:6, 55:2, 55:6, 58:1, 58:3, 59:3, 59:13, 61:18, 62:10, 63:25, 64:2, 64:3, 64:14, 64:16, 64:21, 65:2, 70:23, 72:12, 74:10, 74:15, 74:23, 80:4, 82:12, 98:1,

108:17, 110:18, 110:21
**President's** [11] - 14:21, 26:24, 27:9, 30:4, 58:23, 64:17, 80:6, 98:3, 106:24, 110:1, 116:25
**Press** [1] - 61:17
**presumably** [5] - 15:2, 47:15, 48:15, 100:21, 106:19
**pretty** [7] - 9:20, 17:18, 28:13, 44:6, 45:24, 46:1, 52:4
**prevail** [2] - 47:3, 93:8
**prevent** [3] - 5:25, 9:21, 11:1
**prevented** [1] - 25:13
**preventing** [2] - 39:4, 109:19
**previously** [3] - 21:22, 62:7, 68:22
**primary** [1] - 80:7
**principal** [6] - 55:6, 70:22, 70:24, 71:20, 74:20, 88:22
**priorities** [3] - 67:4, 67:20, 98:3
**priority** [2] - 67:6, 97:25
**privacy** [9] - 11:8, 14:3, 14:9, 17:23, 27:25, 43:25, 44:3, 52:5, 87:20
**Privacy** [78] - 6:6, 6:7, 11:20, 17:2, 17:20, 17:21, 17:25, 18:7, 18:9, 18:16, 19:2, 19:9, 19:16, 19:17, 20:10, 21:9, 22:11, 22:13, 22:20, 23:6, 23:9, 23:11, 28:23, 28:24, 31:1, 32:1, 36:22, 37:3, 37:6, 43:23, 44:1, 49:17, 56:23, 76:7, 77:19, 79:22, 81:16, 86:8, 86:12, 86:14, 86:18, 86:23, 87:3, 87:18, 91:5, 91:15, 91:21, 92:11, 93:10, 93:19, 94:10, 94:17, 95:1, 95:11, 95:13, 97:7, 101:25, 104:13, 104:22, 105:15, 108:10, 108:18, 108:20, 109:16, 110:20, 111:7, 115:1, 115:2, 115:6, 117:16, 118:2,

118:5, 118:9,
118:11, 118:14,
118:21, 118:24
**private** [13] - 10:4,
10:10, 10:14, 11:14,
21:19, 32:4, 32:17,
33:23, 37:4, 37:5,
37:11, 49:21, 84:7
**privy** [1] - 83:3
**probable** [1] - 80:11
**problem** [13] - 3:10,
4:23, 5:10, 10:15,
13:12, 31:8, 32:10,
47:1, 50:1, 50:6,
66:3, 71:9, 91:24
**problematic** [2] -
31:12, 31:17
**Procedure** [3] - 77:15,
78:1, 86:19
**procedures** [5] - 9:9,
27:15, 107:20,
113:4, 113:22
**proceed** [3] - 19:21,
96:25, 120:14
**proceeding** [1] -
120:13
**PROCEEDINGS** [1] -
3:1
**proceedings** [1] -
124:18
**process** [11] - 5:7,
24:16, 24:24, 34:10,
37:16, 51:17, 70:19,
88:6, 89:24, 106:23,
120:16
**Process** [1] - 99:22
**processed** [2] - 98:20,
100:2
**processes** [2] - 27:2,
51:20
**processing** [1] - 36:15
**produce** [3] - 11:4,
96:1, 119:13
**produced** [1] - 34:16
**programmatic** [2] -
93:13, 95:17
**progress** [1] - 71:17
**prohibitions** [1] -
93:21
**prohibits** [2] - 28:24,
115:1
**project** [2] - 45:5,
99:11
**projects** [1] - 45:18
**promise** [1] - 48:10
**prompt** [5] - 12:24,
46:8, 117:6, 117:12
**prong** [1] - 8:24
**pronouncing** [1] -
68:5

**proper** [5] - 78:1,
110:12, 111:9,
111:12, 113:20
**properly** [2] - 77:2,
81:7
**propose** [5] - 29:13,
51:20, 120:8,
120:25, 121:9
**proposed** [1] - 123:17
**proposing** [1] - 120:3
**proposition** [1] -
22:19, 28:3, 45:9
**prospective** [1] -
86:19
**protect** [8] - 6:3, 7:10,
8:5, 11:7, 12:17,
16:1, 25:17, 75:21
**protected** [6] - 14:1,
14:10, 14:23, 16:11,
78:18, 91:17
**protecting** [2] - 11:14,
52:4
**protection** [3] - 11:10,
11:16, 117:8
**protections** [5] - 9:3,
12:19, 21:22, 26:8,
110:20
**protects** [1] - 11:18
**protocol** [1] - 26:15
**provide** [12] - 11:21,
17:3, 18:2, 19:10,
19:11, 19:22, 34:5,
41:10, 72:6, 72:14,
117:12, 118:17
**provided** [14] - 4:8,
6:14, 9:10, 15:4,
26:14, 32:24, 36:19,
42:18, 74:5, 76:12,
90:11, 94:11, 94:17,
104:19
**provides** [6] - 10:11,
17:4, 29:1, 42:9,
71:16, 117:1
**providing** [5] - 48:6,
75:5, 103:9, 104:1,
104:15
**provision** [3] - 36:21,
93:23, 93:24
**public** [12] - 3:12,
10:1, 10:4, 10:10,
49:16, 51:5, 78:20,
82:1, 82:17, 82:19,
83:12, 84:7
**Public** [2] - 3:18, 3:21
**publication** [7] -
12:13, 12:14, 12:15,
50:10, 50:11, 83:18,
84:4
**published** [2] -
110:13, 118:12

**purportedly** [1] -
61:25
**purporting** [1] - 110:2
**purpose** [6] - 11:1,
39:3, 81:15, 90:12,
90:14, 104:14
**purposes** [17] - 7:11,
8:6, 9:23, 12:21,
27:8, 34:8, 41:13,
42:8, 60:11, 64:1,
64:3, 76:9, 77:18,
102:1, 108:19,
109:19, 111:7
**pursuant** [1] - 92:18
**put** [12] - 6:24, 37:10,
38:13, 38:14, 41:18,
52:12, 53:8, 62:14,
63:17, 98:8, 101:5,
106:4
**puts** [1] - 58:4
**putting** [1] - 25:4

**Q**

**qualified** [1] - 62:7
**qualify** [1] - 81:15
**quarter** [1] - 116:19
**questions** [14] - 4:16,
4:18, 5:1, 5:2, 5:9,
6:22, 10:6, 16:14,
31:6, 53:24, 54:14,
54:18, 55:18, 57:1,
69:7, 71:1, 72:16,
75:12, 78:21, 80:19,
96:19, 99:20, 114:16
**quick** [2] - 116:20,
121:13
**quickly** [2] - 98:9,
98:15
**Quiet** [2] - 86:4, 86:6
**quo** [2] - 16:8, 47:12,
122:2
**quote** [34] - 16:19,
20:23, 22:6, 24:13,
24:20, 24:21, 24:23,
29:4, 29:9, 39:2,
41:7, 41:12, 44:21,
44:23, 45:10, 61:5,
61:18, 61:22, 62:2,
62:6, 62:12, 65:21,
71:15, 78:18, 85:20,
88:9, 93:23, 97:14,
97:20, 99:7, 99:16,
106:10, 107:9,
117:11

**R**

**radical** [1] - 28:16
**raise** [2] - 75:2, 114:20
**raised** [2] - 5:4, 23:15

**raising** [2] - 7:7, 73:13
**ranking** [1] - 72:7
**rate** [1] - 82:13
**rather** [9] - 6:17,
18:14, 19:22, 54:2,
72:4, 84:7, 93:3,
94:5, 103:6
**reach** [2] - 6:9, 95:22
**reached** [2] - 89:25,
123:1
**read** [12] - 4:7, 17:6,
26:4, 29:19, 39:17,
39:24, 40:13, 40:23,
46:4, 112:24, 117:2,
117:9
**read/write** [1] - 113:12
**reading** [2] - 29:11,
44:15
**real** [1] - 43:17
**reality** [1] - 94:9
**realize** [2] - 59:8,
63:18, 69:6
**really** [14] - 3:9, 4:12,
11:11, 18:7, 19:4,
32:10, 40:3, 44:9,
50:6, 58:11, 76:6,
88:15, 95:6, 112:9
**reason** [9] - 37:6,
39:14, 70:11, 76:12,
78:4, 83:15, 97:23,
110:4, 118:20
**reasonable** [2] - 96:8,
98:2
**reasoned** [3] - 38:19,
42:13, 44:10
**reasons** [5] - 39:13,
60:19, 73:3, 76:5,
96:12
**rebuttal** [1] - 51:1
**received** [2] - 62:18,
85:3
**receives** [1] - 71:17
**receiving** [1] - 85:4
**recent** [2] - 42:1,
45:24
**recently** [1] - 42:4
**recess** [2] - 116:21,
116:22
**recipient** [1] - 39:5
**recipients** [3] - 41:1,
108:15, 108:16
**recognize** [1] - 17:19
**recognized** [3] - 9:21,
17:25, 45:19
**recommended** [1] -
62:2
**Record** [4] - 29:10,
79:19, 80:13, 118:13
**record** [37] - 3:7, 3:10,
8:7, 9:7, 25:7, 29:6,

**29**:18, 30:9, 35:7,
35:13, 37:10, 38:6,
38:12, 38:13, 38:24,
43:2, 43:16, 70:15,
71:10, 77:11, 79:8,
96:2, 96:10, 96:21,
96:24, 97:4, 104:23,
106:8, 119:8,
119:12, 120:15,
120:18, 120:19,
120:20, 123:22,
124:18
**records** [24] - 19:11,
19:12, 19:21, 19:23,
21:6, 21:8, 28:25,
31:19, 46:9, 47:13,
47:15, 78:18, 88:20,
91:17, 94:3, 95:5,
95:25, 104:10,
104:15, 104:20,
104:25, 105:6,
109:15, 117:7
**recouping** [2] - 39:4,
109:19
**redress** [2] - 16:3,
19:7
**redressability** [1] -
7:16
**redressed** [1] - 78:13
**reference** [1] - 89:4
**referring** [2] - 68:22,
107:6
**refers** [1] - 117:16
**reflected** [1] - 14:10
**reforms** [2] - 51:13,
51:20
**refund** [1] - 110:24
**regard** [1] - 38:17
**regarding** [4] - 54:6,
93:21, 94:4, 109:11
**regular** [3] - 7:14,
71:16, 71:21
**regulation** [3] - 11:3,
15:25
**related** [1] - 23:9
**relates** [3] - 8:23,
32:17, 72:22
**relating** [2] - 31:6,
82:12
**relationship** [6] - 30:4,
60:12, 67:18, 67:19,
67:22, 67:23
**released** [1] - 77:17
**relevant** [8] - 10:11,
12:6, 23:20, 29:3,
60:21, 79:4, 92:7,
95:23
**relief** [40] - 5:20, 7:12,
9:15, 9:21, 9:23,
10:23, 11:7, 12:5,

16:3, 16:17, 16:19, 16:21, 16:25, 17:5, 17:7, 17:22, 18:10, 19:10, 19:15, 19:16, 19:23, 20:7, 20:8, 20:25, 23:14, 24:3, 44:22, 44:25, 78:14, 85:18, 85:20, 85:22, 85:25, 86:5, 86:14, 86:15, 86:19, 87:4, 87:20, 94:17

**relocated** [2] - 59:2, 59:12

**rely** [7] - 7:4, 27:18, 62:22, 63:8, 63:14, 86:2, 87:14

**relying** [1] - 17:3

**remain** [1] - 43:10

**remedial** [3] - 18:25, 93:20, 94:1

**remediation** [1] - 44:22

**Remedies** [1] - 20:21

**remedies** [20] - 17:4, 17:11, 17:15, 17:21, 18:15, 22:7, 22:13, 22:14, 22:16, 22:17, 24:6, 24:7, 76:6, 87:20, 92:23, 93:15, 93:18, 94:8, 102:13, 102:18

**remedy** [24] - 17:10, 17:14, 17:16, 18:1, 18:2, 18:5, 18:17, 18:20, 19:13, 19:18, 20:3, 20:23, 21:7, 21:14, 22:20, 24:1, 24:2, 77:19, 87:12, 93:2, 93:22, 94:19, 94:23, 95:1

**removal** [1] - 9:2

**remove** [1] - 110:19

**removed** [1] - 15:19

**renamed** [3] - 54:9, 59:11, 60:6

**repaired** [1] - 53:18

**repeated** [1] - 112:18

**replaced** [1] - 56:15

**reply** [1] - 40:6

**report** [4] - 54:10, 59:17, 75:8, 75:12

**reported** [4] - 42:5, 54:23, 57:24, 111:4

**reporter** [2] - 86:3, 116:18

**reporting** [4] - 35:7, 35:12, 42:1, 83:22

**reports** [3] - 59:13, 66:22, 66:23

**represent** [1] - 99:16

**representation** [3] - 42:4, 62:21, 63:8

**representations** [2] - 61:11, 106:3

**represented** [3] - 27:21, 61:4, 65:20

**request** [3] - 9:14, 37:1, 38:22

**requested** [4] - 5:21, 7:12, 16:3, 78:13

**requesting** [1] - 19:13

**require** [3] - 8:21, 12:14, 113:8

**required** [8] - 10:2, 43:6, 50:10, 54:9, 82:20, 95:12, 96:23, 116:2

**requirement** [7] - 7:25, 8:23, 30:20, 45:11, 77:22, 88:13, 95:10

**requirements** [2] - 6:7, 108:15

**requires** [8] - 7:12, 41:7, 42:13, 46:4, 70:22, 83:18, 89:21, 119:7

**resolve** [2] - 121:17, 121:18

**resolved** [1] - 15:1

**resorting** [1] - 96:20

**respect** [16] - 16:9, 24:5, 26:9, 32:17, 32:20, 37:12, 42:2, 49:11, 50:12, 52:19, 83:12, 86:12, 86:17, 90:5, 112:22, 114:9

**respectfully** [1] - 121:23

**respond** [2] - 5:4, 91:11

**response** [3] - 10:1, 21:1, 42:20

**responsibility** [1] - 99:5

**restore** [1] - 21:21

**restriction** [1] - 17:12

**restrictions** [4] - 99:15, 111:25, 112:4, 117:20

**result** [2] - 44:8, 123:5

**Retired** [1] - 3:4

**retroactively** [1] - 99:1

**retrospective** [1] - 95:4

**return** [4] - 41:8, 41:9, 41:24

**returns** [4] - 41:8, 78:25, 80:6, 111:3

**reveal** [1] - 77:11

**Revenue** [27] - 6:8, 11:21, 17:2, 18:10, 20:10, 21:10, 22:22, 22:24, 41:6, 41:7, 42:9, 43:24, 49:18, 76:8, 77:20, 86:8, 86:13, 86:18, 86:23, 87:3, 91:5, 93:10, 117:17, 118:3, 118:5, 118:10, 119:1

**reverse** [1] - 19:25, 20:1

**review** [14] - 18:11, 23:9, 23:17, 24:13, 87:11, 88:3, 89:15, 89:19, 91:9, 92:24, 93:14, 95:17, 97:3, 106:23

**reviewable** [1] - 89:22

**revised** [1] - 98:25

**rights** [3] - 24:16, 88:7, 91:14

**rigorous** [1] - 117:8

**rise** [2] - 14:11, 84:21

**risk** [6] - 10:21, 12:22, 25:18, 45:9, 45:18, 98:8

**risks** [6] - 42:17, 42:20, 97:16, 98:7, 112:15, 114:8

**RMR** [1] - 124:17, 124:21

**road** [1] - 56:1

**role** [20] - 29:16, 31:12, 34:13, 36:15, 37:12, 37:15, 37:20, 62:5, 62:21, 62:23, 62:25, 63:7, 63:11, 63:13, 64:11, 64:25, 80:20, 99:5, 101:15

**roles** [1] - 32:20

**rollout** [1] - 98:11

**root** [1] - 95:18

**route** [1] - 18:14

**routing** [20] - 28:9, 29:9, 38:23, 39:10, 79:3, 79:7, 79:12, 80:10, 80:11, 88:20, 89:4, 89:13, 92:6, 92:18, 106:25, 108:9, 109:17, 110:12, 110:25, 118:12

**Routine** [4] - 92:19, 109:18, 109:24, 111:1

**roving** [1] - 38:8

**rule** [3] - 41:11, 97:3, 119:8

**ruling** [1] - 5:23

**run** [1] - 10:6

**running** [1] - 48:23

# S

**satisfied** [1] - 45:10

**saw** [1] - 82:21

**scenes** [1] - 49:10

**schedule** [7] - 120:11, 120:23, 121:6, 121:8, 121:10, 122:10, 123:17

**Schedule** [7] - 54:22, 57:14, 58:17, 59:20, 59:23, 99:19, 103:6

**scheme** [6] - 86:12, 86:17, 87:11, 93:20, 94:1, 94:2

**scope** [4] - 52:25, 101:12, 105:2, 112:7

**Scott** [1] - 3:4

**sealing** [1] - 31:19

**seclusion** [10] - 10:3, 10:10, 10:12, 11:16, 12:8, 13:10, 84:8, 84:13, 84:20, 85:12

**second** [6] - 8:4, 29:8, 45:13, 53:21, 60:8, 75:25

**Secretary** [27] - 15:15, 24:25, 25:11, 25:20, 35:5, 35:9, 35:14, 36:8, 38:15, 61:17, 64:4, 64:18, 64:21, 66:24, 67:15, 67:18, 68:4, 70:9, 75:11, 80:5, 95:23, 96:4, 96:6, 99:3, 99:4, 99:17, 103:5

**Secretary's** [2] - 9:8, 100:12

**section** [1] - 93:24

**Section** [5] - 16:16, 20:9, 24:13, 87:4, 117:1

**secure** [1] - 7:1

**security** [8] - 9:4, 9:22, 14:22, 15:16, 16:1, 21:16, 42:17, 52:17

**see** [8] - 8:7, 14:16, 32:24, 37:1, 37:21, 44:14, 51:18, 84:22

**seeing** [1] - 120:21

**seek** [7] - 7:10, 12:17, 17:1, 19:6, 75:21, 86:1, 109:11

**seeking** [7] - 8:5, 9:18, 10:20, 16:17, 18:11, 19:21, 85:18

**seem** [11] - 17:19, 24:19, 36:13, 36:20, 49:15, 61:1, 63:4, 63:10, 67:2, 74:25, 116:4

**seemingly** [1] - 38:21

**segregate** [1] - 25:22

**select** [1] - 68:6

**selected** [2] - 62:5, 69:25, 70:2

**sell** [2] - 37:4, 37:5

**Senate** [9] - 55:2, 55:7, 58:4, 70:23, 72:13, 74:11, 74:15, 74:24, 75:10

**Senate-confirmed** [1] - 75:10

**sending** [1] - 15:2

**sense** [6] - 6:19, 21:18, 34:22, 41:23, 61:23, 103:24

**sensitive** [5] - 9:4, 26:20, 80:16, 80:24, 106:14

**sent** [3] - 52:20, 80:5, 106:6

**separate** [6] - 18:11, 60:20, 64:12, 79:23, 91:8, 123:8

**Separate** [1] - 27:5

**series** [3] - 4:16, 25:11, 61:24

**serious** [1] - 97:16

**Service** [11] - 12:24, 13:20, 54:7, 54:9, 54:10, 54:13, 59:25, 60:6, 60:7, 60:9, 117:1

**set** [5] - 42:14, 97:25, 107:18, 120:11, 121:8

**sets** [4] - 44:17, 67:5, 100:23, 101:12

**Seventh** [1] - 84:24

**several** [3] - 42:19, 62:8, 101:20

**shall** [9] - 41:8, 41:9, 46:5, 65:24, 66:1, 68:6, 68:12, 117:3, 117:7

**Shapiro** [1] - 4:2

**share** [11] - 28:4, 43:3, 46:13, 46:16, 46:19, 106:12, 106:17, 106:18, 111:10, 118:8, 118:25

**shared** [3] - 48:7, 106:22, 108:22

**sharing** [16] - 13:5, 30:23, 43:14, 48:10,

48:12, 92:8, 107:11, 108:1, 108:8, 109:8, 110:10, 112:4, 112:10, 117:18, 118:14, 118:21

**short** [4] - 51:6, 112:23, 116:16, 122:3

**shorthand** [1] - 100:17

**shortly** [1] - 25:11

**show** [12] - 7:2, 9:22, 10:22, 24:19, 45:6, 77:11, 77:14, 77:25, 78:20, 81:18, 86:22, 93:14

**showing** [6] - 44:18, 51:14, 51:24, 95:15, 97:7, 97:13

**shown** [1] - 107:3

**shows** [1] - 84:25

**shuttled** [1] - 12:18

**side** [3] - 17:20, 31:23

**sides** [1] - 21:24

**signed** [1] - 62:12

**significant** [5] - 9:12, 44:6, 72:5, 72:6, 72:8

**similar** [1] - 77:25, 86:8

**simple** [2] - 45:1, 56:7

**simply** [9] - 6:11, 13:24, 17:14, 18:25, 21:12, 24:1, 26:5, 60:3

**sits** [1] - 48:20

**sitting** [1] - 57:21

**situation** [10] - 10:25, 11:25, 14:3, 18:5, 21:9, 21:20, 31:22, 32:5, 46:22, 85:14

**situations** [1] - 46:25

**six** [2] - 27:7, 27:13

**slightly** [2] - 5:16, 6:5

**so-called** [1] - 25:17

**Software** [2] - 32:14, 33:4

**software** [7] - 62:7, 68:12, 80:15, 80:23, 104:11, 104:19, 117:7

**solely** [1] - 24:4

**someone** [3] - 11:7, 14:4, 19:24

**somewhere** [1] - 15:3

**soon** [1] - 46:14

**sooner** [1] - 119:22

**SORN** [3] - 38:24, 79:4, 80:13, 92:7, 92:19, 107:1,

110:13, 112:7

**sorry** [12] - 7:9, 22:3, 59:7, 84:17, 87:22, 101:16, 103:21, 109:6, 115:14, 120:17, 121:2, 122:18

**sort** [28] - 5:12, 13:9, 18:15, 21:15, 30:21, 32:7, 38:5, 38:6, 38:18, 39:24, 42:6, 47:1, 48:18, 49:25, 50:1, 52:8, 55:18, 56:25, 64:12, 70:13, 76:20, 77:21, 89:13, 90:23, 93:13, 95:3, 95:16, 112:3

**sought** [3] - 16:22, 85:23, 86:5

**sound** [1] - 69:6

**sounds** [1] - 123:13

**Southern** [4] - 5:24, 89:17, 106:2, 117:22

**sovereign** [8] - 16:16, 20:16, 85:17, 86:7, 87:4, 88:10, 92:22, 93:1

**SpaceX** [1] - 62:8

**speaking** [2] - 63:4, 82:8

**specific** [17] - 18:10, 22:7, 28:6, 35:24, 41:24, 42:7, 48:12, 55:18, 56:13, 66:10, 76:13, 77:12, 86:12, 93:20, 99:11, 106:25, 117:19

**specifically** [5] - 11:21, 31:16, 70:8, 84:18, 94:21

**specifics** [1] - 79:19

**specified** [1] - 49:23

**speculate** [1] - 29:12

**speech** [1] - 62:10

**spill** [1] - 45:19

**spills** [1] - 45:7

**spot** [1] - 38:2

**squarely** [2] - 23:13, 28:14

**squirrely** [1] - 48:19

**staff** [5] - 15:16, 25:16, 35:18, 36:7, 51:13

**Staff** [9] - 25:21, 54:11, 59:14, 59:18, 64:5, 66:23, 67:14, 74:17, 100:13

**stages** [1] - 55:13

**stakes** [1] - 45:5

**standard** [4] - 7:3,

44:15, 44:18, 110:23

**standards** [2] - 45:2, 117:8

**standing** [38] - 4:20, 6:24, 7:2, 7:7, 7:15, 7:18, 7:20, 7:24, 8:1, 8:25, 9:25, 10:18, 12:5, 50:9, 73:4, 75:16, 75:19, 76:10, 78:4, 78:20, 79:1, 80:8, 80:18, 80:19, 81:2, 81:10, 81:21, 81:24, 82:16, 82:20, 83:20, 84:2, 84:15, 84:21, 95:10, 119:4, 119:12

**stands** [1] - 18:14

**starker** [1] - 18:5

**start** [5] - 6:24, 36:9, 54:4, 98:21, 112:20

**started** [4] - 27:1, 35:4, 98:17

**starting** [3] - 3:7, 56:25, 61:19

**state** [4] - 8:25, 39:2, 39:19, 40:18

**State** [17] - 3:22, 39:11, 92:18, 106:22, 107:3, 107:11, 107:15, 107:18, 107:22, 108:8, 109:2, 109:5, 109:8, 109:15, 110:11, 111:17, 112:2

**state's** [1] - 6:9

**statement** [3] - 38:18, 61:21, 62:16

**statements** [2] - 61:14, 61:16

**States** [1] - 71:5

**states** [5] - 39:21, 39:22, 68:3, 68:11, 106:10

**stating** [1] - 99:1

**status** [9] - 16:8, 34:7, 34:20, 47:12, 48:22, 71:2, 98:16, 99:21, 122:2

**statute** [13] - 16:20, 16:25, 23:12, 29:10, 49:23, 50:12, 72:14, 85:21, 85:25, 94:5, 94:8, 95:19, 116:3

**statutes** [11] - 11:20, 12:16, 18:1, 18:4, 18:6, 18:24, 18:25, 21:20, 87:21, 91:7, 117:20

**statutory** [5] - 11:24,

79:5, 81:9, 81:11, 87:11

**stays** [1] - 47:20

**Stephens** [2] - 23:8, 28:9

**steps** [7] - 5:13, 25:11, 112:15, 114:8, 114:22, 116:15, 117:3

**steward** [3] - 10:13, 13:11, 13:15

**still** [12] - 15:1, 30:1, 52:21, 52:24, 53:13, 59:20, 60:3, 69:3, 83:12, 84:1, 91:5, 108:23

**stolen** [1] - 11:5

**stored** [3] - 9:5, 43:4, 60:3

**stricter** [1] - 44:14

**strictly** [2] - 17:18, 111:21

**stronger** [1] - 18:12

**strongly** [1] - 92:14

**structure** [8] - 51:18, 54:1, 55:17, 58:13, 58:22, 70:17, 75:4, 94:13

**structured** [2] - 38:7, 72:19

**structuring** [1] - 38:16

**study** [1] - 4:12

**subject** [10] - 16:14, 16:24, 23:19, 72:4, 85:24, 89:15, 89:19, 92:6, 115:19, 116:4

**submitting** [1] - 28:10

**subsequent** [1] - 25:23

**substantial** [1] - 7:2

**substantiates** [1] - 29:19

**substantive** [1] - 99:13

**succeed** [1] - 97:13

**succinctly** [1] - 8:25

**sue** [5] - 7:9, 8:2, 20:14, 24:5, 75:19

**suffer** [2] - 14:1, 77:17

**suffered** [2] - 11:9, 96:19

**sufficient** [5] - 9:22, 24:2, 79:1, 80:8, 81:23

**suggest** [4] - 62:24, 98:9, 100:24, 121:6

**suggesting** [1] - 33:25

**suggests** [2] - 42:16, 101:14, 104:4

**suit** [12] - 16:17,

16:20, 20:24, 21:6, 21:7, 21:19, 22:16, 23:23, 75:23, 76:17, 77:13, 85:21

**suited** [1] - 4:21

**suits** [1] - 85:17

**summary** [5] - 7:3, 8:11, 51:6, 120:15, 124:1

**supervised** [7] - 54:24, 55:4, 57:24, 58:2, 70:24, 74:9, 74:14

**supervises** [1] - 66:4

**supervising** [5] - 66:17, 71:5, 71:11, 103:12, 103:20

**supervisor** [2] - 103:18, 104:3

**supervisory** [1] - 99:10

**supplement** [1] - 17:10

**supplemental** [3] - 88:9, 92:22, 96:13

**supplementary** [1] - 19:4

**supplementing** [1] - 17:15

**support** [1] - 44:19

**supporting** [2] - 20:7, 22:19

**suppose** [1] - 69:12

**supposed** [6] - 10:9, 27:6, 30:19, 36:22, 44:1, 69:14

**supposedly** [1] - 27:6

**Supreme** [11] - 17:19, 72:2, 72:11, 74:6, 74:8, 74:21, 84:24, 85:13, 86:4, 87:17, 89:16

**swiftly** [1] - 98:2

**switching** [1] - 4:23

**sworn** [3] - 25:12, 35:6, 36:8

**symbols** [1] - 26:15

**synchronization** [1] - 47:8

**system** [15] - 11:4, 31:25, 40:1, 43:19, 44:2, 83:24, 87:1, 91:1, 95:18, 101:6, 101:7, 107:18, 113:16, 114:11

**systematic** [1] - 40:1

**systemic** [1] - 41:21

**systems** [38] - 9:5, 9:13, 11:13, 12:25, 16:1, 21:17, 24:22,

26:10, 26:15, 27:8,
28:17, 35:16, 36:12,
36:15, 38:2, 38:21,
39:21, 39:22, 41:4,
41:21, 43:4, 43:10,
43:11, 47:7, 51:18,
68:18, 85:8, 90:4,
92:20, 97:15, 98:1,
98:4, 103:10,
106:12, 113:25,
117:7, 117:13
**Systems** [4] - 29:10,
79:19, 80:13, 118:12

**T**

**table** [4] - 3:20, 58:10,
59:1, 65:18
**tagging** [1] - 26:15
**talks** [7] - 23:5, 23:25,
47:7, 49:1, 84:5,
104:22, 123:3
**tasked** [1] - 61:18
**tax** [12] - 41:13, 41:15,
41:18, 41:22, 41:24,
42:3, 42:8, 78:25,
80:6, 110:22,
110:24, 111:2
**team** [49] - 15:20,
25:13, 25:16, 26:23,
27:7, 29:17, 30:3,
30:5, 30:12, 31:4,
32:9, 35:15, 38:21,
39:12, 41:16, 42:2,
42:7, 42:19, 43:12,
51:12, 51:16, 61:22,
61:25, 64:19, 67:3,
67:17, 68:6, 68:17,
68:20, 68:22, 69:4,
89:22, 90:15, 92:10,
95:25, 97:15, 97:21,
99:10, 100:21,
101:11, 103:14,
103:15, 103:24,
104:1, 104:4, 113:24
**team's** [2] - 71:17,
104:5
**teams** [1] - 48:21
**technical** [2] - 31:22,
40:1
**technically** [1] - 59:23
**technology** [1] - 69:19
**temporary** [2] - 99:18,
103:6
**Temporary** [7] - 48:20,
54:13, 59:25, 60:10,
60:13, 61:5, 65:25
**ten** [2] - 52:24, 116:19
**term** [2] - 33:3, 80:6
**terms** [67] - 5:13, 8:22,
14:13, 21:1, 24:9,

28:1, 28:22, 32:11,
35:20, 37:19, 38:15,
38:25, 41:6, 42:11,
44:12, 46:2, 46:10,
46:16, 48:11, 49:24,
52:8, 55:22, 56:22,
57:20, 59:16, 61:11,
62:23, 65:4, 66:10,
66:14, 67:19, 67:25,
71:11, 73:6, 75:16,
78:7, 82:15, 83:7,
83:9, 84:10, 90:1,
90:8, 90:10, 91:24,
95:20, 98:16, 99:23,
99:25, 100:18,
100:23, 101:5,
102:17, 103:17,
107:15, 108:12,
108:14, 108:16,
108:21, 110:15,
111:19, 111:21,
112:10, 112:16,
114:3, 121:8,
122:22, 123:19
**terrorist** [1] - 83:25
**test** [1] - 110:16
**text** [1] - 85:2
**textual** [1] - 92:25
**THE** [227] - 3:8, 3:23,
4:5, 6:21, 7:24, 8:22,
9:24, 12:7, 13:8,
14:12, 15:6, 15:12,
16:2, 16:13, 18:19,
19:9, 20:6, 20:18,
21:24, 22:5, 22:18,
23:2, 23:4, 23:15,
24:8, 24:11, 25:8,
26:13, 26:19, 27:18,
28:1, 28:15, 28:18,
31:5, 32:8, 32:10,
32:23, 33:15, 33:21,
33:24, 34:3, 35:19,
38:7, 37:13, 38:23,
40:3, 40:7, 40:10,
40:12, 40:24, 41:5,
42:10, 44:11, 46:7,
46:16, 46:18, 48:2,
48:11, 49:4, 49:7,
49:24, 50:15, 51:2,
51:4, 52:6, 53:2,
53:6, 53:10, 53:19,
53:24, 55:13, 55:20,
56:10, 56:17, 56:20,
57:4, 57:10, 57:12,
57:19, 57:23, 58:10,
58:25, 59:6, 59:8,
59:19, 59:24, 60:9,
60:15, 60:23, 61:10,
62:5, 63:17, 64:7,
64:20, 65:3, 65:7,

65:12, 65:17, 66:12,
67:1, 67:7, 67:12,
67:16, 68:3, 68:20,
68:25, 69:20, 69:22,
70:2, 70:6, 70:11,
72:24, 73:5, 73:13,
74:1, 75:14, 76:3,
76:16, 77:4, 77:8,
77:21, 78:6, 78:12,
78:17, 79:7, 79:14,
79:16, 80:1, 80:14,
80:22, 81:4, 81:22,
82:5, 82:9, 82:24,
84:5, 84:17, 84:22,
85:15, 87:2, 87:9,
87:13, 87:16, 88:2,
88:18, 88:24, 89:9,
89:23, 90:6, 90:18,
91:10, 91:23, 92:21,
93:19, 94:14, 94:25,
95:20, 97:11, 98:13,
100:15, 101:1,
101:17, 101:22,
101:24, 102:5,
102:7, 102:13,
102:17, 102:19,
102:24, 103:2,
103:12, 103:19,
104:7, 104:17,
105:3, 105:10,
105:12, 105:14,
105:18, 105:21,
107:2, 107:14,
108:11, 109:2,
109:6, 109:13,
109:23, 110:14,
111:14, 112:9,
113:1, 113:8,
113:21, 114:3,
114:10, 114:15,
115:10, 115:14,
115:17, 115:24,
116:9, 116:18,
116:23, 117:21,
118:15, 119:2,
119:18, 119:23,
120:2, 120:7,
120:10, 120:17,
120:20, 120:22,
121:5, 121:16,
121:22, 122:5,
122:14, 122:18,
122:21, 123:7,
123:12, 123:15,
124:5, 124:7
**themselves** [2] - 8:20,
92:15
**theoretical** [1] - 45:1
**theory** [4] - 7:17, 7:19,
13:15, 84:10
**therefore** [13] - 31:1,

38:4, 38:9, 39:22,
79:6, 84:2, 91:21,
92:3, 92:6, 92:11,
100:13, 105:13,
108:9
**they've** [5] - 4:10,
38:13, 42:18, 45:6,
115:10
**thinking** [1] - 93:25
**third** [5] - 8:8, 11:19,
13:9, 50:14, 76:15
**thousands** [1] - 88:25
**threat** [1] - 12:14
**threatened** [2] - 44:21,
45:6
**three** [6] - 7:6, 7:14,
8:3, 51:15, 54:8,
91:1
**threshold** [1] - 95:21
**throughout** [3] -
12:18, 44:7, 49:9
**tie** [1] - 37:14
**tied** [1] - 76:5
**timeline** [2] - 34:7,
119:14
**Title** [2] - 86:5, 86:6
**title** [2] - 30:23, 30:25
**titled** [1] - 124:19
**titles** [2] - 29:24, 72:1
**today** [2] - 119:9,
120:22
**together** [5] - 25:25,
32:6, 37:14, 45:14,
53:22
**tomorrow** [1] - 121:11
**took** [6] - 15:10,
15:15, 15:17, 98:18,
111:3, 114:16
**tort** [3] - 10:3, 10:5,
10:9
**torts** [1] - 12:11
**totally** [1] - 50:5
**touch** [1] - 122:17
**traceability** [1] - 14:19
**traceable** [2] - 14:14,
78:8
**track** [2] - 18:11,
114:12
**tracked** [1] - 52:21
**traditional** [1] - 12:11
**trafficker** [1] - 83:25
**training** [1] - 113:4
**transcript** [3] - 52:10,
106:4, 107:9
**transcription** [1] -
124:18
**transfer** [8] - 33:11,
33:17, 33:19, 33:23,
47:9, 47:13, 49:19,
50:2

**transferred** [3] - 34:4,
47:5, 53:17
**transferring** [1] -
49:20
**transfers** [5] - 40:19,
49:16, 50:13, 50:14
**transitional** [1] - 99:18
**TransUnion** [14] -
9:15, 9:25, 10:5,
10:8, 10:19, 11:6,
12:2, 81:9, 81:20,
83:19, 84:5, 84:14,
84:25, 85:14
**Treasury** [115] - 4:3,
5:16, 12:15, 14:21,
15:2, 15:10, 15:20,
24:25, 27:11, 29:14,
29:16, 29:25, 30:15,
31:13, 32:9, 32:11,
32:12, 32:18, 33:14,
34:16, 35:4, 35:9,
39:12, 41:16, 42:19,
43:25, 46:11, 46:20,
48:13, 49:2, 49:5,
51:12, 51:13, 51:18,
51:20, 56:16, 60:21,
61:22, 61:25, 62:6,
64:4, 64:18, 64:22,
66:7, 66:22, 66:23,
67:14, 67:15, 68:21,
70:4, 70:20, 71:6,
72:8, 75:7, 77:1,
77:4, 80:5, 80:20,
80:22, 85:8, 85:9,
86:25, 87:1, 89:12,
89:21, 90:15, 91:12,
92:5, 92:10, 92:17,
95:25, 97:14, 97:21,
98:18, 98:23, 99:8,
101:11, 102:17,
102:25, 103:11,
103:15, 103:16,
103:25, 104:6,
104:9, 105:17,
105:22, 105:25,
106:7, 106:18,
107:20, 107:21,
108:13, 108:22,
109:1, 111:2,
111:10, 112:13,
112:22, 113:3,
113:10, 113:23,
114:4, 114:9,
114:13, 114:24,
117:18, 118:8,
123:3, 123:4
**Treasury's** [3] - 33:12,
88:21, 97:14
**treat** [2] - 49:15, 50:12
**tried** [1] - 19:15

**triggering** [1] - 6:18
**TRO** [1] - 65:23
**TROs** [1] - 45:3
**trouble** [1] - 69:3
**trove** [1] - 47:4
**Trudeau** [1] - 88:12
**true** [2] - 35:3
**Trump** [2] - 61:18, 82:12
**Trump's** [3] - 54:4, 54:5, 54:6
**trust** [1] - 14:4
**try** [1] - 80:1
**trying** [5] - 21:21, 25:3, 103:2, 120:11, 120:12
**two** [31] - 8:10, 11:20, 18:4, 18:6, 18:7, 26:22, 29:2, 30:2, 30:12, 30:21, 31:18, 32:2, 32:10, 32:12, 32:14, 32:20, 33:7, 33:8, 34:1, 51:15, 60:2, 60:15, 62:11, 62:15, 79:23, 91:1, 98:22, 104:13, 105:21, 119:21, 119:25
**type** [15] - 8:19, 10:23, 13:25, 14:1, 14:3, 14:9, 18:16, 19:22, 20:3, 21:7, 24:1, 24:2, 28:12, 28:16, 41:2
**types** [4] - 18:25, 19:3, 21:13, 86:15
**typical** [1] - 8:19

### U

**U.S** [13] - 12:24, 13:19, 54:7, 54:9, 54:10, 54:12, 59:24, 60:6, 60:7, 62:15, 106:12, 106:16, 117:1
**ultimately** [3] - 55:21, 66:13, 110:9
**ultra** [2] - 73:6
**unable** [3] - 45:6, 52:10, 107:8
**uncertain** [1] - 45:9
**unclassified** [3] - 12:25, 46:9, 117:6
**unclear** [1] - 49:10
**under** [49] - 6:6, 7:2, 7:19, 9:15, 9:25, 11:5, 11:6, 16:11, 16:14, 18:16, 19:21, 20:2, 20:9, 20:17, 20:25, 21:19, 21:20,

22:11, 22:12, 22:16, 22:20, 22:24, 24:3, 43:6, 43:21, 48:20, 60:16, 64:17, 72:10, 73:8, 77:19, 79:4, 82:3, 82:5, 83:4, 86:5, 87:20, 88:10, 89:22, 91:15, 97:2, 97:19, 100:12, 103:17, 108:10, 118:13, 119:3, 119:5
**Under** [1] - 20:21
**understood** [4] - 26:14, 90:12, 90:13, 111:16
**undertake** [1] - 51:13
**undertaking** [1] - 53:13
**undo** [1] - 18:21
**unfortunate** [1] - 69:8
**United** [1] - 71:5
**unlawful** [7] - 17:4, 17:7, 18:17, 49:22, 92:14, 95:2, 95:4
**unless** [4] - 40:4, 49:22, 100:16, 118:9
**unlike** [1] - 85:12
**unmeasurable** [1] - 45:9
**unprecedented** [3] - 26:19, 28:13, 44:6
**unprotected** [1] - 11:15
**unquote** [6] - 61:6, 61:20, 62:14, 62:19, 97:22, 117:11
**unreasonable** [1] - 18:17
**unwanted** [1] - 85:4
**up** [22] - 4:17, 4:22, 6:1, 13:23, 15:15, 25:25, 39:15, 39:20, 47:15, 51:16, 61:19, 65:17, 66:5, 76:5, 81:5, 84:11, 84:18, 87:16, 107:18, 116:11, 116:14, 123:9
**update** [1] - 73:25
**updates** [1] - 71:17
**upend** [1] - 95:17
**upshot** [1] - 86:16
**urgency** [1] - 97:18
**USDA** [3] - 17:24, 88:24, 89:1
**USDS** [97] - 27:10, 29:14, 29:21, 30:5, 30:24, 31:7, 31:8, 31:10, 31:12, 31:13, 32:9, 32:11, 39:12,

46:5, 46:17, 46:19, 48:15, 48:18, 48:19, 48:20, 48:25, 49:2, 50:4, 54:2, 54:7, 54:16, 54:21, 55:9, 55:19, 57:14, 57:19, 59:11, 59:13, 59:20, 60:1, 60:12, 60:13, 61:5, 61:7, 62:2, 62:21, 63:2, 63:3, 63:4, 63:11, 63:12, 64:2, 64:9, 65:8, 65:21, 65:24, 65:25, 66:1, 66:4, 66:6, 66:15, 66:24, 67:3, 67:17, 67:25, 68:7, 68:11, 69:12, 70:4, 70:6, 70:18, 71:3, 71:4, 71:16, 71:25, 72:1, 72:6, 72:24, 74:12, 74:18, 75:7, 104:20, 106:6, 108:19, 114:24, 115:1, 115:5, 115:11, 115:25, 116:1, 116:6, 117:4, 117:5, 117:7, 117:12, 117:18, 117:23, 118:9, 118:17
**USDS's** [1] - 70:17
**useful** [1] - 30:9
**uses** [1] - 79:12
**Utah** [1] - 89:17

### V

**Vargas** [8] - 5:14, 9:19, 44:16, 52:12, 97:12, 106:2, 107:10, 113:5
**Vargas's** [2] - 5:23, 15:7
**various** [4] - 9:20, 27:8, 34:13, 56:23
**vehicle** [2] - 77:15, 78:1
**venue** [1] - 24:4
**versed** [1] - 42:2
**versions** [1] - 60:2
**versus** [4] - 3:4, 18:16, 23:14, 51:10
**veteran** [1] - 23:12
**viable** [1] - 81:19
**view** [12] - 12:7, 15:12, 42:22, 43:23, 48:4, 49:25, 51:6, 81:13, 82:13, 82:14, 101:3, 123:13
**viewed** [1] - 76:14
**viewing** [1] - 50:3

**vigilantly** [1] - 46:1
**violate** [5] - 79:22, 104:13, 105:15, 109:16, 118:24
**violation** [11] - 6:7, 19:5, 28:23, 41:6, 50:11, 79:5, 81:9, 81:11, 91:7, 118:4, 118:5
**violations** [5] - 18:3, 19:3, 19:7, 22:6, 93:21
**vires** [1] - 73:6
**Virginia** [1] - 65:21
**voluntarily** [1] - 110:22

### W

**W-R-I-T-E** [1] - 112:25
**wait** [2] - 53:21, 121:10
**waive** [2] - 20:16, 87:4
**waiver** [6] - 16:18, 85:19, 86:7, 88:10, 92:22, 93:1
**waives** [2] - 16:16, 85:17
**wall** [1] - 63:18
**walled** [1] - 51:25
**walls** [1] - 46:20
**wants** [2] - 13:20, 51:11
**waste** [2] - 38:3, 98:3
**weakest** [2] - 44:12, 50:20
**wealth** [1] - 70:1
**wearing** [5] - 30:16, 30:21, 32:4, 105:8, 105:16
**wears** [1] - 30:12
**week** [3] - 14:24, 43:20, 52:24
**weeks** [5] - 27:7, 27:13, 98:22, 119:21, 119:25
**welcome** [1] - 50:24
**whatsoever** [1] - 76:13
**White** [6] - 31:24, 54:11, 59:14, 61:17, 74:16, 80:3
**whole** [6] - 10:25, 35:20, 41:10, 48:18, 67:2, 74:3
**wholesale** [4] - 39:21, 47:6, 47:13, 53:16
**wide** [1] - 52:19
**Wilderness** [1] - 89:17
**word** [2] - 41:20, 47:7

**words** [2] - 89:20, 107:23
**works** [1] - 85:12
**worried** [1] - 49:3
**write** [4] - 87:23, 112:24, 112:25, 113:15
**written** [1] - 8:12
**Wunderly** [4] - 56:15, 68:23, 77:7, 92:2

### Y

**year** [4] - 17:24, 54:16, 55:9, 88:25
**York** [16] - 4:13, 5:15, 5:24, 6:3, 6:9, 6:12, 6:18, 9:19, 13:4, 36:11, 44:15, 46:11, 52:11, 53:6, 106:2, 117:22
**yourself** [1] - 3:6
**yourselves** [1] - 120:24

### Z

**Zieve** [1] - 3:20