# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Alliance for Retired Americans, et al., <br><br> Plaintiffs, <br><br> v. <br><br> Scott Bessent, in his official capacity as Secretary of the Treasury, et al., <br><br> Defendants. | Civil Action No. 25-313 (CKK) |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY

Norman L. Eisen
(DC Bar No. 435051)
State Democracy Defenders Fund
600 Pennsylvania Avenue SE
#15180
Washington, DC 20003

Nandan M. Joshi
(DC Bar No. 456750)
Nicolas Sansone
(DC Bar No. 1686810)
Allison M. Zieve
(DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

March 17, 2025

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... ii

INTRODUCTION ......................................................................................... 1

BACKGROUND ........................................................................................... 3

ARGUMENT ................................................................................................ 9

    I.    This Court has broad discretion to allow discovery. ...................................... 9

    II.    Discovery is necessary to ensure effective judicial review. ......................... 10

CONCLUSION ............................................................................................ 18

# TABLE OF AUTHORITIES

**CASES**

*AFL-CIO v. Department of Labor,*
No. 25-339 (JDB) (Feb. 27, 2025) ........................................................ 10, 11, 13

*Air Transportation Ass'n of America, Inc. v. National Mediation Board,*
663 F.3d 476 (D.C. Cir. 2011) ...................................................................... 10, 15

*American Federation of Teachers v. Bessent,*
No. CV DLB-25-0430, 2025 WL 582063 (D. Md. Feb. 24, 2025) ..................... 11

*Brotherhood of Locomotive Engineers & Trainmen v. Federal Railroad Administration,*
972 F.3d 83 (D.C. Cir. 2020) ............................................................................ 11

*Camp v. Pitts,*
411 U.S. 138 (1973) .......................................................................................... 12

*Chamber of Commerce v. Reich,*
74 F.3d 1322 (D.C. Cir. 1996) .......................................................................... 11

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
401 U.S. 402 (1971) ................................................................................... 11, 15

*Community for Creative Non-Violence v. Lujan,*
908 F.2d 992 (D.C. Cir. 1990) .......................................................................... 10

*Department of Commerce v. New York,*
588 U.S. 752 (2019) .......................................................................................... 14

*Esch v. Yeutter,*
876 F.2d 976 (D.C. Cir. 1989) .......................................................................... 12

*Gomez v. Trump,*
485 F. Supp. 3d 145 (D.D.C. 2020) .................................................................... 1

*Hispanic* Affairs *Project v. Acosta,*
901 F.3d 378 (D.C. Cir. 2018) ....................................................................... 9, 12

*Marshall County Health Care Authority v. Shalala,*
988 F.2d 1221 (D.C. Cir. 1993) ........................................................................ 11

*National Law Center on Homelessness & Poverty v. U.S. Department of Veterans Affairs,*
842 F. Supp. 2d 127 (D.D.C. 2012) .................................................................. 11

ii

*Strike 3 Holdings, LLC v. Doe*,
   964 F.3d 1203 (D.C. Cir. 2020) ............................................................ 9

*Venetian Casino Resort, LLC v. EEOC*,
   530 F.3d 925 (D.C. Cir. 2008) ....................................................... 9, 12

**FEDERAL REGISTER**

Executive Order 14158,
   90 Fed. Reg. 8441 (Jan. 29, 2025)............................................. 1, 3, 4

**OTHER**

Jake Bleiberg et al., *US Treasury Brings In Two Members From Musk's
   DOGE Team*, Bloomberg, Feb. 4, 2025 ............................................ 6

Andrew Duehren et al., *Treasury Official Quits After Resisting Musk's
   Requests on Payments*, N.Y. Times, Jan. 31, 2025 ......................... 6

Vittoria Elliot et al., *A 25-Year-Old With Elon Musk Ties Has Direct
   Access to the Federal Payment System*, Wired, Feb. 4, 2025 ......... 17

Federal Rule of Civil Procedure 26 ........................................................ 9

Local Civil Rule 16.3(b)(1) .................................................................... 9

Treasury Department Letter to Members of Congress Regarding Payment
   Systems, Feb. 4, 2025, https://home.treasury.gov/news/press-
   releases/sb0009 ........................................................................... 7

**INTRODUCTION**

In an executive order establishing the "Department of Government Efficiency" (DOGE), President Trump directed each agency head to create a "DOGE Team," ensure that DOGE Team Leads coordinate with the U.S. DOGE Service (USDS) that sits in the Executive Office of the President, and "ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems." Exec. Order 14158, 90 Fed. Reg. 8441 (Jan. 29, 2025). The executive order is not self-effectuating. Instead, agency heads must take steps to implement it and, in doing so, must make policy decisions as to *how* to implement it. Those decisions are subject to judicial review and can be set aside by a court if the agency exceeds its statutory authority, acts contrary to law, or takes action that is arbitrary and capricious. *Gomez v. Trump*, 485 F. Supp. 3d 145, 177 (D.D.C. 2020).

Plaintiffs filed this action because Defendants reportedly implemented the DOGE executive order at the Bureau of the Fiscal Service (Bureau) by providing "DOGE" access to the Bureau's systems that contain sensitive personal and financial information about almost every individual who engages in a financial transaction with a federal agency. In doing so, Plaintiffs allege, Defendants acted in violation of the Privacy Act and the Internal Revenue Code, and arbitrarily and capriciously. In response to this lawsuit and others, Defendants have furnished additional information about DOGE's activities at the Bureau. In this case, Defendants have submitted four declarations in opposing Plaintiffs' motion for a preliminary injunction, ECF 24-1 to 24-4; their compilation of the administrative record, ECF 44-

1

1; and a supplemental administrative record and an additional declaration, ECF 48-1 & 48-2.

This Court directed Plaintiffs to file a motion for expedited discovery if additional information is needed "to inform their cross-motion for summary judgment," ECF 47, at 5, which is due on April 4, 2025. Plaintiffs now move for expedited discovery. The administrative record and additional information that Defendants have compiled contain gaps, reveal inconsistencies, and present issues that would hamper this Court's ability to engage in meaningful judicial review unless further information can be obtained through discovery.

The discovery that Plaintiffs propose is carefully targeted, would impose minimal burden on Defendants, and would not require modification of the summary-judgment briefing schedule. Plaintiffs' proposed interrogatories request that Defendants describe their implementation of specific directives in the DOGE Executive Order relating to information sharing and provide additional information about the Treasury DOGE Team's need for access to personal information in the Bureau's systems. The interrogatories also seek additional information about Marko Elez's activities in light of Defendants' recent disclosure that Mr. Elez shared personal information with the U.S. General Services Administration (GSA) without following proper procedures. Plaintiffs' document requests seek security policies that should have been included in the administrative record, as well as documents relating to Mr. Elez's email to GSA. Plaintiffs also propose three requests for admission that

Defendants should be able to answer with minimal burden. Plaintiffs do not seek to depose Defendants' officials or employees at this time.

Plaintiffs' proposed discovery is particularly important in light of Defendants' contention that no reviewable final agency action has occurred. In similar circumstances, courts have permitted limited factual discovery to ensure that they have a more complete record on which to base their decisions and to assist them in assessing the veracity and reliability of the parties' representations and evidence. This Court should similarly exercise its discretion to permit Plaintiffs to serve discovery here and should direct Defendants to respond by March 25, 2025.

## BACKGROUND

**1.** Executive Order 14158 did not create DOGE as a single entity with a fixed structure or leadership. Under the executive order, the United States Digital Service was "publicly renamed" the "United States DOGE Service (USDS)" and "established" in the Executive Office of the President. Exec. Order 14158, § 3(a), 90 Fed. Reg. at 8441. A "USDS Administrator," who reports to White House Chief of Staff Susan Wiles, was also "established" in the Executive Office of the President. *Id.* § 3(b). "[W]ithin USDS," the executive order establishes "the U.S. DOGE Service Temporary Organization" pursuant to 5 U.S.C. § 3161, which is to be led by the USDS Administrator and "dedicated to advancing the President's 18-month DOGE agenda." *Id.*

The executive order directs agency heads to establish "a DOGE Team of at least four employees" at each agency. *Id.* § 3(c). Agency heads must consult with the USDS Administrator when selecting DOGE Team members and must "ensure that DOGE

Team Leads coordinate their work with USDS and advise their respective Agency Heads on implementing the President's DOGE Agenda." *Id.*

The executive order does not define the "DOGE Agenda," except to note that it is to be achieved "by modernizing Federal technology and software to maximize governmental efficiency and productivity." *Id.* § 1. To that end, the executive order directs the USDS Administrator to "commence a Software Modernization Initiative to improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems" and directs the USDS Administrator to "work with Agency Heads to promote inter-operability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization." *Id.* § 4(a). Agency heads, in turn, must "take all necessary steps, in coordination with the USDS Administrator and to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems." *Id.* § 4(b). The DOGE executive order "displaces all prior executive orders and regulations, insofar as they are subject to direct presidential amendment, that might serve as a barrier to providing USDS access to agency records and systems as described above." *Id.* § 4(c).

**2.** DOGE moved rapidly to establish a team at the Department of the Treasury. Until recently, the Treasury DOGE Team consisted of two individuals: Team Lead Thomas Krause and Special Advisor Marko Elez. As Mr. Krause has indicated, "an important aspect of the President's DOGE efforts has been to quickly place [him] into the Treasury Department." ECF 24-1, at 7. He has been at the Treasury Department

4

since January 23, 2025. ECF 44-1, at 21; *see* ECF 24-3, at 3. Marko Elez started two days earlier, on January 21, 2025. ECF 44-1, at 10.

On January 24, 2025, the Bureau developed an "engagement plan" to support "the USDS/DOGE team during their 4–6-week engagement to understand payment processes and opportunities." ECF 44-1, at 63. The engagement plan sought to "engage in a way that is secure and minimizes the likelihood of disruptions" and avoids "catastrophic consequences" to U.S. financial interests and "the delivery of lifeline payments to millions of constituents." *Id*. With respect to data handling, the engagement plan provided that the Bureau would "provide USDS/DOGE safeguarding and handling instructions" and "USDS/DOGE confirmed Fiscal Service data will not leave the workstation during this engagement and will only be reviewed by cleared and authorized Treasury personnel." *Id*. USDS/DOGE also had to attest "at the end of the engagement" that Bureau "information has been properly destroyed and that "no known or suspicious unauthorized access" had occurred. *Id*. at 65. In a document dated January 27, 2025, the Bureau made clear that, under its "Security Rules of Behavior, "[u]sers must not browse or search Fiscal Service data except in the performance of authorized duties" and must not "reveal any data processed or stored by Fiscal Service except as required by job responsibilities and within established procedures." *Id*. at 38; *see also* ECF 46, at 2 (referring to the Rules of Behavior).

Scott Bessent was sworn in as Secretary of the Treasury on January 28, 2025. On that day, Marko Elez was "provided with the Bureau laptop and with copies of the

source code for [the Payment Automation Manager (PAM), the Secure Payment System (SPS), and the Automated Standard Application for Payments (ASAP)] in a separate, secure coding environment known as a 'secure code repository' or 'sandbox.'" ECF 24-2, at 6; *see also id*. at 3–4 (describing various Bureau systems used for payments). Between January 28 and January 30, Mr. Elez and Mr. Krause were in Kansas City to do a "deep dive" into the Bureau's systems. ECF 44, at 62; *see also* Jake Bleiberg et al., *US Treasury Brings In Two Members From Musk's DOGE Team*, Bloomberg, Feb. 4, 2025.

Between January 29 and January 31, an unknown individual or several individuals submitted requests concerning Mr. Elez's access to the Bureau's systems. At 6:02 pm on January 29, 2025, the individual asked for a "Change to #PAMDADM to a read/write access." ECF 48-1, at 13. At 9:12 am on January 30, the instruction was changed to "Please disregard – go with read only at this time." *Id*. At 6:07 pm on January 31, two instructions were given: "again disregard, read/write" and "sorry, read/write is needed." *Id*. On January 31, Secretary Bessent reportedly placed the then-head of the Bureau on administrative leave after disputes arose about the Treasury DOGE Team's access to Bureau systems. *See* Andrew Duehren et al., *Treasury Official Quits After Resisting Musk's Requests on Payments*, N.Y. Times, Jan. 31, 2025.

On February 1, a request was made by an unknown individual "to remove WRITE access for PAM PROFILE #PAMDADM." ECF 48-1, at 16. Also on that date,

Mr. Elez's account was added to the "dbrdwr" group and remained in that group until February 5, 2025, when his account was updated to read-only. *Id.* at 18.[1]

**3.** Plaintiffs filed this lawsuit on February 3. On February 4, the Treasury Department issued a letter to members of Congress regarding DOGE access to the Bureau's payment systems.[2] The letter does not mention Mr. Elez. It states: "Currently, Treasury staff members working with Tom Krause, a Treasury employee, will have read-only access to the coded data of the Fiscal Service's payment systems in order to continue this operational efficiency assessment."

In his declaration in this case, Joseph Gioeli, the Bureau's Deputy Commissioner for Transformation and Modernization, stated that Mr. Elez was granted read-only access to the Bureau's systems between February 3 and February 5. ECF 24-2, at 7–8. Mr. Gioeli did not address the earlier instruction to provide Mr. Elez with write access. On February 3, Mr. Elez accessed the PAM database and file system, during which he "copied two USAID files directly from the PAM database to his [Bureau] laptop." ECF 24-2, at 7. Mr. Elez also accessed the PAM file system on February 4 and 5; the PAM database on February 5; and the SPS database on February 5. *Id.* at 8. On February 6, the day on which Mr. Elez resigned from his position at the Treasury Department, the Bureau "discovered that Mr. Elez's database access to SPS on February 5 had mistakenly been configured, by a career [Bureau] employee, to have read/write permissions instead of read-only." *Id.* at 8–9.

---

[1] As discussed below, Plaintiffs' proposed discovery would inquire about the access granted to Mr. Elez by being added to the "dbrdwr" group.

[2] https://home.treasury.gov/news/press-releases/sb0009.

In addition, although Mr. Gioeli stated in his declaration that Mr. Elez did not have access to the Bureau's Central Accounting and Reporting System (CARS), *id.* at 8, he has stated in a declaration filed in another case that "Mr. Elez did receive the ability to access the CARS Application leveraging a read-only auditor role" and that "further analysis is underway to ascertain whether he ever accessed this system." Decl. of Joseph Gioeli, III, *New York v. U.S. Dep't of the Treasury*, No. 1:25-cv-1144-JAV (S.D.N.Y. Mar. 5, 2025), ECF 98-2, at 5.

On March 14, 2025, David Ambrose, the Bureau's Chief Security Officer/Chief Privacy Officer/Acting Chief Information Security Officer, submitted a declaration advising this Court of the results of the Bureau's forensic analysis of Mr. Elez's laptop. *See* ECF 48-2. According to Mr. Ambrose, Mr. Elez "sent an email with a spreadsheet containing [personally identifiable information (PII)] to two United States General Services Administration officials." *Id.* at 4. Mr. Ambrose did not state how many individuals' PII was disclosed in the spreadsheet. Mr. Ambrose refers to the "names" in the spreadsheet, but his declaration states that the spreadsheet shared more than just names: it "detailed a name (a person or an entity), a transaction type, and an amount of money," but not "social security numbers or birthdates." *Id.* at 4–5. Mr. Ambrose does not provide information about the date the email was sent, the identities of the recipients, the nature of the information disseminated, the Bureau system from which Mr. Elez obtained the information, or whether Mr. Elez acted on his own initiative or at the direction of another individual.

## ARGUMENT

### I.    This Court has broad discretion to allow discovery.

"Unless otherwise limited by court order, …[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case," including "the parties' relative access to relevant information," "the importance of the discovery in resolving the issues," and "whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). As a general rule, a "party may not seek discovery from any source before the parties have conferred" under Federal Rule of Civil Procedure 26(f). *Id.* 26(d)(1). Under this Court's local rules, the requirement to hold a Rule 26(f) conference does not apply to "an action for review on an administrative record." Local Civ. R. 16.3(b)(1). But district courts retain "broad discretion over the structure, timing, and scope of discovery." *Strike 3 Holdings, LLC v. Doe*, 964 F.3d 1203, 1208 (D.C. Cir. 2020); *see also* Fed. R. Civ. P. 26(d)(1) (permitting discovery prior to Rule 26(f) conference when authorized "by court order"). Thus, even in the context of claims under the Administrative Procedure Act (APA), where the court's review is typically based on the administrative record rather than a record generated through discovery, a "district court is free to exercise its discretion to permit further discovery 'to ascertain the contours of the precise policy'" under review. *Hispanic Affairs Project v. Acosta*, 901 F.3d 378, 388 (D.C. Cir. 2018) (quoting *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 928 (D.C. Cir. 2008)).

In the APA context, a party may obtain "limited discovery" if it "makes a significant showing … that it will find material in the agency's possession indicative

of bad faith or an incomplete record." *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 487–88 (D.C. Cir. 2011) (internal quotation marks omitted). A court may order discovery if "the record is so bare as to frustrate effective judicial review." *Cmty. for Creative Non-Violence v. Lujan*, 908 F.2d 992, 998 (D.C. Cir. 1990).

## II.  Discovery is necessary to ensure effective judicial review.

**A.** This case concerns Defendants' actions implementing the DOGE Executive Order. Unlike agency actions that implement statutes or executive orders through rulemaking, *see*, *e.g.*, *Chamber of Com. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996), Defendants here have not provided the public—or this Court—with any document that memorializes or explains the decisions they made as to how to comply with the DOGE executive order's directives about access to and sharing of sensitive personal information in agency databases.

In another case involving DOGE access to personal information stored on agency systems, Judge Bates recently permitted expedited discovery in advance of a motion for a preliminary injunction. *AFL-CIO v. Dep't of Labor*, No. 25-339 (JDB) (Feb. 27, 2025), ECF 48. Although applying the reasonableness standard that courts in this district use when considering discovery in support of a preliminary-injunction motion, he recognized that the "agency action challenged here is unlike the actions normally challenged in APA cases, such as a promulgated regulation or a grant or denial of an application," because "plaintiffs challenge the agency defendants' 'policies' to 'grant [USDS] employees access to information systems,' which plaintiffs say amount to a new polic[y] of permitting unlawful disclosures of protected information." *Id.* at 5. A "key question" in that circumstance is "'whether the alleged

disclosure policy in fact exists,'" and "the parties' arguments and the record in [that] case [had] 'not clarif[ied] matters' regarding the alleged policies' scope." *Id.* (quoting *Venetian Casino Resort*, 409 F.3d at 360). He thus concluded that discovery "is appropriate, for it is not so much 'fact-finding' as it is 'filling in gaps …. to determine what the agency actually did.'" *Id.* at 6; *see Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1227 (D.C. Cir. 1993); *Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Dep't of Veterans Aff's*, 842 F. Supp. 2d 127, 130–31 (D.D.C. 2012) (noting that, in an APA case "where no administrative record was ever filed … plaintiffs would likely be entitled to some discovery to enable meaningful judicial review").

As in *AFL-CIO*, Defendants have indicated that they will assert that they have not taken final agency action. ECF 46, at 4. But "the decisions to grant DOGE affiliates access to agency record systems [are] final agency actions." *Am. Fed'n of Teachers v. Bessent*, No. CV DLB-25-0430, 2025 WL 582063, at *8 (D. Md. Feb. 24, 2025); *see also Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020) (recognizing that agency action may be "final and judicially reviewable" even if it is not "committed to writing"). And where there are no "formal findings," a district court may "require some explanation in order to determine if the Secretary acted within the scope of his authority and if the Secretary's action was justifiable under the applicable standard." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *see Camp v. Pitts*, 411 U.S. 138, 143 (1973) (holding that the remedy for a "failure to explain administrative action as to frustrate effective

11

judicial review" is "to obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary"); *cf. Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (recognizing that "extra-record evidence" may be considered "when agency action is not adequately explained in the record before the court").

Here, the administrative record filed by Defendants is inadequate to permit the Court to undertake effective judicial review—or even to assess Defendants' argument that judicial review is unavailable due to the absence of final agency action. *See Hispanic Affairs Project*, 901 F.3d at 388 (holding that a district court has discretion to "permit further discovery 'to ascertain the contours of the precise policy at issue'" quoting *Venetian Casino Resort*, 530 F.3d at 928). Although the record provides some information about actions taken at the agency, it does not provide this Court with an authoritative agency pronouncement or explanation about how the agency will implement the directives in the DOGE executive order, in particular, the directives concerning coordination, inter-operability of networks, data synchronization, and USDS access to data. The only portions of the record that reflect substantive actions by agency officials are a spreadsheet purporting to adopt mitigation or additional controls on Mr. Elez's access to Bureau systems, ECF 44-1, at 68, and Treasury chief of staff Daniel Katz's approval of a process to intercept USAID payments, ECF 44-1, at 69.

The declarations that Defendants submitted in opposing Plaintiffs' preliminary-injunction motion do not fill the gap. *See*, *e.g.*, Krause Decl., ECF 24-1;

Gioeli Decl., ECF 24-2. As an initial matter, to the extent that Defendants intend to rely on these or other extra-record declarations during summary-judgment briefing, "[i]t would be strange to permit defendants to submit evidence that addresses critical factual issues … without permitting plaintiffs to explore those factual issues through very limited discovery." *AFL-CIO*, No. 25-339, ECF 48, at 9. In any event, the declarations do not obviate the need to obtain information from Defendants through discovery. None of the declarations are from an agency official with decisionmaking authority about implementing the DOGE executive order. And only Mr. Krause describes Defendants' implementation of the DOGE executive order. He asserts that his role was "created to help effectuate the mission" of the executive order; that he "is responsible, among other duties, for reducing and eliminating improper and fraudulent payments; waste, fraud, and abuse; and improving the accuracy of financial reporting"; and that he "coordinate[s] with officials at USDS/DOGE, provide[s] them with regular updates on the team's progress, and receive[s] high-level policy direction from them." ECF 24-1, at 2–4. But the DOGE executive order does not mention payment systems, and nothing in Mr. Krause's declaration explains how decisionmakers at the Treasury Department have implemented key information-access and -sharing elements of the DOGE executive order.

Mr. Krause further asserts that understanding the Bureau's payment systems requires him to have "the ability to review sensitive payment data." *Id*. at 9. He also separately asserts a duty to carry out the President's executive orders regarding payments. *Id*. at 10. But he fails to explain how the access to sensitive payment

13

data—what Mr. Gioeli described as "broader in scope than what has occurred in the past," ECF 24-2, at 5—is required for him or others on the Treasury DOGE Team to carry out these responsibilities. As the record currently stands, this Court lacks a sufficient basis for assessing Plaintiffs' claims that Defendants have implemented the DOGE executive order in a manner that is inconsistent with their obligations under the Privacy Act, the Internal Revenue Code, and the APA.

B. "[I]n order to permit meaningful judicial review, an agency must 'disclose the basis' of its action." *Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019); *see also id.* at 785 ("Reasoned decisionmaking under the Administrative Procedure Act calls for an explanation for agency action."). Because the administrative record compiled by Defendants does not do so, Plaintiffs propose to serve Defendants with a small number of targeted interrogatories. Interrogatories 2 and 3 ask Defendants to describe how they are implementing the directives in the DOGE executive order relating to coordination, inter-operability, data collection and synchronization, and USDS access to records, software systems, and IT systems, and to describe any undisclosed plans or projects for the Treasury DOGE Team that entail access to or sharing of personal information in the Bureau's systems. Interrogatories 4 and 5 ask for an explanation of the need for the Treasury DOGE Team to access personal information to carry out the responsibilities that Mr. Krause identified in his declaration. Interrogatory 6 seeks confirmation about whether Treasury DOGE Team members hold positions outside of the agency or, instead, are employees of only the

agency.[3] These interrogatories will impose minimal burdens on Defendants, but Defendants' responses will shed critical light on how they have implemented the DOGE executive order—information necessary for this Court to evaluate adequately the issues presented by Plaintiffs' claims.

Plaintiffs also seek discovery into other matters necessary to ensure a complete record for judicial review, as well as to address the possibility of "bad faith or improper behavior." *Air Transp. Ass'n of Am.*, 663 F.3d at 488 (quoting *Overton Park*, 401 U.S. at 420). Many of these discovery requests arise out of Defendants' filing of the supplemental administrative record (ECF 48-1) and the declaration of Thomas Ambrose (ECF 48-2), which Plaintiffs have not had a prior opportunity to address.

First, Defendants had previously submitted a declaration by Mr. Gioeli that asserted that, as a risk mitigation strategy, Mr. Elez would receive "read only" access to the Bureau's systems. Mr. Gioeli also averred that Mr. Elez was "mistakenly" provided "read/write" access to the SPS system "on February 5." ECF 24-2, at 5. In the supplemental administrative record, however, the incident tickets indicate that an unknown individual or several individuals had requested that Mr. Elez receive read/write access to the PAM system beginning on January 29, had changed the access request to read-only on January 30, and then back to read/write on January 31. ECF 48-1, at 13; *see also id.* at 16 ("Requested by [redacted] to remove WRITE access for PAM PROFILE #PAMDADM" on February 1). The incident tickets also

---

[3] Interrogatory 1 asks Defendants to identify the persons that provided information or assisted with the other interrogatories.

indicate that Mr. Elez may have been given read/write access ("dbrdwr group") to a Unix or Linux system on February 1 which remained in place until February 5, when his access was changed to read-only ("dbrdonly"). If this interpretation of the incident report is correct, it calls into question Defendants' assertions about their mitigation measures specifically and the nature of access that was given to Mr. Elez in general. Interrogatory 8, Document Request 9, and Requests for Admission 1 and 2 seek additional information about this matter.

Second, Mr. Ambrose's declaration reveals that Mr. Elez "sent an email with a spreadsheet containing PII to" two officials at the GSA. ECF 48-2, at 4. Mr. Ambrose does not provide information about the date the email was sent, the identities of the recipients, the nature of the information disseminated, or the Bureau system from which Mr. Elez obtained the PII. This is critical information for assessing the nature of Mr. Elez's access to personal information in the Bureau's databases. Moreover, although Mr. Ambrose asserts that Mr. Elez violated Bureau policy by not "obtain[ing] prior approval of the transmission via a 'Form 7005,' describing what will be sent and what safeguards the sender will implement to protect the information," *id*. at 5, he does not indicate whether Mr. Elez acted alone in disseminating information to GSA or, instead, received authority from another individual to do so. Interrogatories 9 and 10, Document Requests 1, 2, and 3, and Request for Admission 3 seek further information about Mr. Elez's actions and whether other similar disseminations of PII have occurred.

In addition, in light of the foregoing, Interrogatory 7 requests information about the nature of the access to Bureau systems provided to the Treasury DOGE Team (*i.e.*, Mr. Krause and Mr. Elez) during the Kansas City visit that occurred between January 28 and January 30. *See* ECF 44-1, at 62; *see also* Vittoria Elliot et al., *A 25-Year-Old With Elon Musk Ties Has Direct Access to the Federal Payment System*, Wired, Feb. 4, 2025 (reporting that Mr. Elez had "many administrator-level privileges" during visit to Kansas City). Such information is particularly important because Mr. Gioeli attended the Kansas City "deep dive," ECF 44-1, at 62, but his declaration does not address that site visit.

Finally, in response to Plaintiffs' objection that Defendants had failed to include "safeguarding and handling instructions of Fiscal Service data for the duration of this engagement" in the record, Defendants identified the Bureau's January 27 "Rules of Behavior" and Mr. Gioeli's declaration as the responsive documents. ECF 46, at 2. The Rules of Behavior incorporate documents that are not in the administrative record: (1) Base Line Security Requirements, (2) Treasury Information Technology Security Program, (3) Treasury Security Manual, and (4) Fiscal Service Policies. ECF 44-1, at 37. In addition, Mr. Ambrose's declaration refers to an "Email and Instant-Messaging Policy." ECF 48-2, at 3. Document Requests 4 through 8 seek copies of these documents, which, like the Rules of Behavior that Defendants produced, would assist the Court's analysis of Defendants' actions to implement the DOGE Executive Order.

**C.** The Court should require Defendants to respond to Plaintiffs' discovery requests by March 25, 2025. This deadline is sufficiently in advance of the April 4 deadline for Plaintiffs' motion for summary judgment to ensure that the responses can be fully considered. Defendants should also not have difficulty complying with that deadline. Only a small number of interrogatories call for a narrative response from Defendants. Most of the discovery requests seek data that may be presented in chart or table form or request documents that Defendants would easily be able to collect. A March 25 deadline therefore would not impose an unreasonable burden on Defendants.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for expedited discovery, permit Plaintiffs to serve their proposed discovery requests on Defendants, and require Defendants to respond to the discovery requests by March 25, 2025.

March 17, 2025                           Respectfully submitted,

                                         /s/ Nandan M. Joshi
                                         Nandan M. Joshi (DC Bar No. 456750)
                                         Nicolas Sansone (DC Bar No. 1686810)
                                         Allison M. Zieve (DC Bar No. 424786)
                                         Public Citizen Litigation Group
                                         1600 20th Street NW
                                         Washington, DC 20009
                                         (202) 588-1000

                                         Norman L. Eisen (DC Bar No. 435051)
                                         State Democracy Defenders Fund
                                         600 Pennsylvania Avenue SE
                                         #15180
                                         Washington, DC 20003