# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ALLIANCE FOR RETIRED
AMERICANS, *et al.*,

                *Plaintiffs*,

     v.

SCOTT BESSENT, *in his official capacity as Secretary of the Treasury*, *et al.*,

                *Defendants*.

Case No. 1:25-cv-00313-CKK

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

    I.    The Bureau of the Fiscal Service ....................................................................... 2

    II.   The United States DOGE Service ...................................................................... 3

    III.  Review of BFS Payment Systems ...................................................................... 4

    IV.  This Litigation ................................................................................................... 7

STANDARD OF REVIEW ................................................................................................ 9

ARGUMENT ................................................................................................................... 11

    I.    Plaintiffs Lack Article III Standing ................................................................. 11

    II.   Plaintiffs' Claim Should Be Dismissed for Failure to State a Claim or, Alternatively,
          Summary Judgment Should Be Entered in Defendants' Favor. . ..................................... 19

        A.   Plaintiffs Fail to Establish Reviewable Final Agency Action. ................................... 19

        B.   Plaintiffs Cannot Assert Alleged Violations of the Privacy Act and the Internal
             Revenue Code on Behalf of Their Members Through the APA ............................. 22

        C.   Plaintiffs Cannot Prevail on Their Privacy Act Claim.. ............................................. 25

        D.   Plaintiffs Cannot Prevail on Their Internal Revenue Code Claim.. ......................... 28

        E.   Granting of Data Access to Treasury Employees Was Not
             Arbitrary and Capricious. ......................................................................................... 29

        F.   Plaintiffs Cannot Prevail on Their Excess of Statutory Authority Claim.. ............... 30

CONCLUSION ................................................................................................................ 31

## INTRODUCTION

Plaintiffs' complaint seeks to interfere with the day-to-day operations of the U.S. Department of the Treasury by preventing it granting access to data systems maintained by the agency to specific Treasury employees because of Plaintiffs' disagreement with the policy objective those employees are tasked with implementing. Because the complaint fails to set out claims that can be properly adjudicated in this Court and fails to show those claims are legally viable even if the Court had jurisdiction, the Court should dismiss the complaint in full under Federal Rule of Civil Procedure 12(b). In the alternative, Defendants move for summary judgment under Rule 56.

At the outset, Plaintiffs fail to properly allege standing because harms arising from the mere provision of access to government employees are not the kind of injury that Article III of the Constitution contemplates being addressed in litigation, as the majority of a Fourth Circuit panel recently concluded in another challenge DOGE Teams' access to agency data systems. *See Am. Fed'n of Tchrs. v. Bessent*, No. 25-1282, 2025 WL 1023638 (4th Cir. Apr. 7, 2025) ("*AFT*"). Plaintiffs allege no tangible harm, nor could they, and their vague assertions of intangible harm arising from the mere provision of access have no common-law analogue that would satisfy the Supreme Court's injury-in-fact test for standing.

Turning to the merits, Plaintiffs fail to allege proper claims under the Administrative Procedure Act ("APA"). The complaint fails to allege the necessary "final agency action" for purposes of initiating APA review, for the provision of access is neither the sort of action the APA contemplates challenging, nor does it generate, on its own, the sort of consequences characteristic of a final agency action. Plaintiffs also cannot use the APA as a way to assert claims that would not be legally viable under the Privacy Act or the Internal Revenue Code—statutes that provide

1

precisely defined remedial schemes that do not encompass the sort of broad, programmatic injunctive relief on behalf of organizations that Plaintiffs seek. Even if Plaintiffs had properly pled some type of claim, Defendants have fully complied with the Privacy Act, the Internal Revenue Code, and the APA. Finally, Plaintiffs cannot salvage the fundamental flaws in those claims by bringing a freestanding ultra vires claim, as they do not fit into the narrow review window that theory leaves available to litigants.

Based on the foregoing, the Defendants respectfully request that the Court grant the instant motion and dismiss Plaintiffs' complaint under either Rule 12(b)(1) for lack of jurisdiction, or Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Alternatively, Defendants ask that the Court enter judgment in Defendants' favor under Rule 56.

## BACKGROUND

### I. The Bureau of the Fiscal Service

The Bureau of the Fiscal Service ("BFS") is a component of the Department of the Treasury, established in October 2012 by then-Secretary of the Treasury Timothy Geithner, which consolidated two previously separate bureaus. *Treasury Order Establishing the Bureau of the Fiscal Service*, 78 Fed. Reg. 31,629 (May 24, 2013) (Treasury Order 136-01). The Secretary's order combined the former Bureau of the Public Debt and the Financial Management Service into the BFS and established the role of BFS Commissioner to execute the functions for which the heads of those bureaus were previously responsible. *Id.*

Among other responsibilities, BFS is responsible for "manag[ing] the government's accounting, central payment systems, and public debt, and . . . serv[ing] as the central payment clearinghouse for most payments to and from federal agencies." Declaration of Thomas H. Krause,

Jr. ("Krause Decl.") ¶ 5, ECF No. 24-1.[1] BFS disburses the majority of the government's payments, more than $5 trillion per year. *Id*. BFS's payment systems include, among others, the Payment Automation Manager ("PAM") System, which is the federal government's largest system for receiving payment files and processing payments; the Secure Payment System ("SPS"), a system through which paying agencies securely create, certify, and submit payment files to Treasury; the Automated Standard Application for Payments ("ASAP"), a recipient-initiated electronic payment and information system; and the Central Accounting and Reporting System ("CARS"), which federal agencies use to account for their spending. Declaration of Joseph Gioeli III ("Gioeli Decl.") ¶¶ 6–11, ECF No. 24-2.

## II.    The United States DOGE Service

On January 20, 2025, President Trump signed Executive Order 14,158, which redesignated the previously established United States Digital Service as the U.S. DOGE Service ("USDS") and charged it with implementing the President's agenda of "improv[ing] the quality and efficiency of government wide software, network infrastructure, and information technology (IT) systems." 90 Fed. Reg. 8441, §§ 3(a), 4 ("the EO"). The EO also established a "U.S. DOGE Service Temporary Organization" pursuant to 5 U.S.C. § 3161, which will terminate on July 4, 2026. *Id.* § 3(b). Both

---

[1] The Court's review of the merits is limited to the administrative record created by the agency. *Am. Bioscience, Inc. v. Thompson*, 243 F.3d 579, 582 (D.C. Cir. 2001). But Courts in this Circuit and elsewhere routinely permit an agency to submit affidavits as background material or for further explanation of the evidence included in the record. *Clifford v. Pena*, 77 F.3d 1414, 1418 (D.C. Cir. 1996) (permitting introduction of agency declaration, in addition to the administrative record, as "background information"); *see also Alvarado Cmty. Hosp. v. Shalala*, 155 F.3d 1115, 1124 (9th Cir. 1998) ("A district court may go outside the administrative record for the purposes of background information . . . ."). An agency may explain the administrative record before the reviewing court, particularly where "the absence of formal administrative findings makes such investigation necessary in order to determine the reason for the agency's choice." *Nat'l Audobon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971)).

USDS and the Temporary Organization sit within the Executive Office of the President and are headed by the USDS Administrator, who reports to the White House Chief of Staff. *Id.*

Agency heads across the Executive Branch are required under the EO to establish within their respective agencies a DOGE Team of at least four employees, which may include Special Government Employees. *Id.* § 3(c). Agency heads are instructed to select the DOGE Team members in consultation with USDS and to ensure that "DOGE Team Leads coordinate their work with USDS and advise their respective Agency Heads on implementing the President's DOGE Agenda." *Id.*

The EO also directs USDS to collaborate with Executive agencies to modernize the technology and software infrastructure of the federal government to increase efficiency and productivity and ensure data integrity. EO § 4. To accomplish these objectives, the EO directs USDS to work with relevant agency heads, and vice versa, to ensure that USDS has access to "unclassified agency records, software systems, and IT systems" to the "extent consistent with law." *Id.* § 4(b). At all times, the EO instructs, USDS must "adhere to rigorous data protection standards." *Id.*

## III.    Review of BFS Payment Systems

As of the date of Plaintiffs' complaint, only two Treasury DOGE Team members were granted access to BFS payment systems, Mr. Thomas Krause and Mr. Marko Elez. *See* Krause Decl. ¶ 3; Gioeli Decl. ¶ 4; Declaration of Michael J. Wenzler ¶¶ 3–5, ECF No. 24-3 ("Wenzler Decl."); Declaration of Vona Robinson, ¶ 6, ECF No. 24-4.[2] Mr. Krause is an employee of the

---

[2] Since Plaintiffs filed their complaint on February 3, 2025, Treasury has added four additional members to the Treasury DOGE Team, in addition to the replacement of Mr. Elez, discussed below. *See* Defs.' Objections & Responses to Plaintiffs' Interrogatories at 6 (Ex. A). Because standing must be established as of the time of the complaint, and because any conceivable

Treasury Department and is the Treasury DOGE Team lead. AR-001–3, 007–21; Krause Decl. ¶ 2. His position at Treasury as Senior Advisor for Technology and Modernization was created to effectuate the mission of DOGE by reducing and eliminating improper and fraudulent payments, addressing the problems of waste, fraud, and abuse, and improving the accuracy of financial reporting. Krause Decl. ¶ 2; AR-0015, 21. Although Mr. Krause sometimes coordinates with officials at USDS, he is not an employee of USDS. Krause Decl. ¶ 4. Instead, he is an employee of Treasury with an ethics designation of Special Government Employee. *See* Wenzler Decl. ¶¶ 3–4; AR-0014–21. As of February 13, 2025, Mr. Krause has been delegated the duties of the Fiscal Assistant Secretary, in a Temporary Transition Schedule C position. AR-0001–2; Wenzler Decl. ¶ 7.

Mr. Krause's role at Treasury is to find ways to use technology to make the Treasury Department more effective, more efficient, and more responsive to the policy goals of the current Administration. AR-0021; Krause Decl. ¶ 2. As part of the President's DOGE efforts, Mr. Krause's mandate is to understand how BFS's end-to-end payment systems and financial reporting tools work, recommend ways to update and modernize those systems to better identify improper and fraudulent payments, and better allow federal agencies to quickly adapt to changing conditions. Krause Decl. ¶ 11. *See* AR-0021; *see also* Ex. A at 10. Mr. Krause has never had any direct access to any BFS payment system. His only access to those systems is so-called "over the shoulder" access to review activity others performed in the system or data others accessed from the system. Krause Decl. ¶ 16. Mr. Krause's access is limited by the terms of the preliminary injunction in

"agency action" Plaintiffs challenge is limited to the decision to grant access as of February 3, Defendants do not address those additional DOGE Team members here. *See Keene Corp. v. United States*, 508 U.S. 200, 207 (1993) (explaining that jurisdiction "depends upon the state of things at the time of the action brought"); Compl. ¶¶ 48–51 (challenging Defendants' alleged "implement[ation of] a system for disclosing records").

place from the U.S. District Court for the Southern District of New York ("SDNY"), as modified by that court. *See* Mem. Op. & Order, ECF No. 76, *State of New York, et al. v. Treasury, et al*, Civil Action No. 25-1144 (S.D.N.Y. Feb. 21, 2025); Order, ECF No. 108, 76, *State of New York, et al. v. Treasury, et al*, Civil Action No. 25-1144 (S.D.N.Y. Feb. 21, 2025).[3]

Mr. Elez began working at the Treasury Department on January 21, 2025, *see* AR-0004, but resigned from his role on February 6, 2025. Krause Decl. ¶ 3. Treasury had hired Mr. Elez as a Special Advisor for Information Technology and Modernization. *Id*.; AR-0022–23. In this role, Mr. Elez was a Treasury employee tasked with working closely with engineers at BFS on information technology matters in service of BFS's mission to promote financial integrity and operational efficiency of the federal government through accounting, financing, collection, payment, and other relevant BFS services. Krause Decl. ¶ 3; Wenzler Decl. ¶ 9; AR-0022–23. On February 6, 2025, Mr. Elez submitted his resignation from this role. Krause Decl. ¶ 23; Wenzler Decl. ¶ 11. Treasury has since filled the position previously held by Mr. Elez with another Treasury employee, Mr. Ryan Wunderly. However, given the restrictions of the preliminary injunction entered in SDNY, currently no member of the Treasury DOGE Team is permitted access to any Treasury payment record, payment system, or other data system maintained by Treasury containing the personally identifiable information (PII) and/or confidential financial information of the plaintiff States in that case. *See* Mem. Op. & Order, ECF No. 76, *State of New York, et al. v. Treasury, et al*, Civil Action No. 25-1144 (S.D.N.Y. Feb. 21, 2025).

---

[3]In the evening on the day of this filing, April 11, 2025, the SDNY court granted in part the defendants' motion to partially dissolve the injunction in that case. *See* Opinion and Order, ECF No. 139, *State of New York, et al. v. Treasury, et al*, Civil Action No. 25-1144 (S.D.N.Y. Apr. 11, 2025). Defendants are currently reviewing that order and its effect with respect to DOGE Team members' access.

## IV.    **This Litigation**

Plaintiffs are the Alliance for Retired America, the American Federation of Government Employees, AFL-CIO; and the Service Employees International Union, AFL-CIO. *See* Compl. ¶¶ 10–12. They filed suit on February 3, 2025, alleging that Defendants failed to protect their members' personal information by "granting individuals associated with DOGE access to the extensive records [BFS] maintains on every individual with whom it engages in financial transactions." *Id.* ¶ 43.

The complaint has three causes of action. In Count One, Plaintiffs allege that Defendants acted contrary to law in violation of the APA. Specifically, Plaintiffs allege that Defendants have "implemented a system" for disclosing records containing Plaintiffs' members personal information in violation of the Privacy Act of 1974, and further by sharing Plaintiffs' members' tax returns and tax return information in violation of Internal Revenue Code, 26 U.S.C. § 6103. Compl. ¶¶ 45–53. In Count Two, Plaintiffs allege that Defendants violated the APA by "fail[ing] to engage in reasoned decisionmaking when they implemented a system under which Elon Musk or other individuals associated with DOGE could access [BFS's] records for purposes other than those authorized by the Privacy Act, [BFS's systems of records notices ('SORNs')], and the Internal Revenue Code." *Id.* ¶ 56. Count Three consists of Plaintiffs' claim that "permitting Elon Musk and/or other individuals associated with DOGE" to access BFS records was in excess of Defendants' statutory authority. *Id.* ¶¶ 58–59.

Plaintiffs filed a motion for temporary restraining order on February 5, seeking to enjoin Defendants "from disclosing information about individuals to individuals affiliated with the so-called Department of Government Efficiency" and to require Defendants "to retrieve and

safeguard any such information that has already been obtained by DOGE or individuals associated with it." Pls.' Mem in Support of Mot. for TRO ("TRO Mem."), ECF No. 8-1.

The Court held a hearing on Plaintiffs' motion on February 5, during which the Court raised scheduling for briefing to address Plaintiffs' claims in the context of a preliminary injunction rather than a temporary restraining order. Plaintiffs opted to rest on their previously filed papers, and, accordingly, the Court converted their motion for a temporary restraining order into one for a preliminary injunction. *See* Order, ECF No. 13. After the hearing, the parties agreed to entry of an order requiring Defendants to refrain from providing access to any payment record or payment system of records maintained by or with BFS, with exceptions for Mr. Krause and Mr. Elez—provided that their access to payment records will be "read only"—and for other Treasury employees who are not Special Government Employees, and as permitted by 5 U.S.C. § 552a(b)(2)–(13) and the Internal Revenue Code. The Court entered the parties' proposed order on February 6. Order, ECF No. 13. Defendants later sought to modify the Order to allow Ryan Wunderly, who filled the position previously held by Mr. Elez after Mr. Elez's resignation on February 5, to exercise read only access, ECF No. 30, and the Court granted that request, ECF No. 32.

The Court held a hearing on Plaintiffs' preliminary injunction motion on February 24 and, the following day, ordered defendants to file the administrative record underlying the decisions challenged in this case on or before March 10. Feb. 25, 2025 Minute Order. In the meantime, the Court denied Plaintiffs' motion for a preliminary injunction, concluding that Plaintiffs failed to establish that they would suffer irreparable harm in the absence of injunctive relief. *See* Mem. Op. 36–44, ECF No. 42. Accordingly, the Court dissolved its prior order limiting access to Mr. Krause and Mr. Wunderly.

Defendants filed the certified administrative record on March 10, ECF No. 44, and, in response to Plaintiffs' objections, provided supplemental information on March 14, ECF No. 48. At Plaintiffs' request, the Court permitted limited discovery to supplement the administrative record. ECF No. 52. Discovery is now complete. *See* ECF No. 59.

## STANDARD OF REVIEW

Federal courts are courts of "limited subject-matter jurisdiction" and have the power "to decide only those cases over which Congress grants jurisdiction." *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 317 (D.C. Cir. 2012) (citing *Micei Int'l v. Dep't of Commerce*, 613 F.3d 1147, 1151 (D.C. Cir. 2010)). "Absent subject-matter jurisdiction over a case, the court must dismiss it." *Leopold v. Manger*, 630 F. Supp. 3d 71, 76 (D.D.C. 2022).

To survive a Rule 12(b)(1) motion, the party asserting subject matter jurisdiction bears "the burden of establishing it." *Jenkins v. Howard Univ.*, 123 F.4th 1343, 1347 (D.C. Cir. 2024) (quoting *Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006)). In considering assertions of subject matter jurisdiction, courts "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff[s] the benefit of all inferences that can be derived from the facts alleged.'" *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)). At the same time, however, courts "need not accept inferences drawn by a plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept a plaintiff's legal conclusions." *Arabzada v. Donis*, 725 F. Supp. 3d 1, 9 (D.D.C. 2024) (citing *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)).

To withstand a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Under *Iqbal* and *Twombly*, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "Plausibility" represents something less than "probability," but it does require "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citation omitted). If the well-pleaded facts of a complaint do not suggest more than the mere possibility of a violation, the complaint has failed to show that the plaintiff is entitled to relief and cannot survive application of Rule 12(b)(6). *Id.*

Likewise, a complaint cannot substitute conclusions of law and other conclusory assertions for well-pleaded allegations of fact and hope to withstand a motion to dismiss. In particular, conclusions of law are not to be accepted as true. *Id.* By the same token, "bare assertions . . . amount to nothing more than a formulaic recitation of the elements of a . . . claim[,] and therefore are not entitled to be assumed true." *Id.* at 698 (citation omitted).

In deciding a motion to dismiss under Rule 12(b)(6), courts may consider not only the well-pleaded allegations of the complaint, but also materials "incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned; these items may be considered by the district judge without converting the motion into one for summary judgment." *Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 867 n.* (D.C. Cir. 2008) (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed.)); *see also Marshall v. Honeywell Tech. Sols. Inc.*, 536 F. Supp. 2d 59, 65–66 (D.D.C. 2008) (document

referred to in complaint and central to plaintiff's claim may be considered under Fed. R. Civ. P. 12(b)(6)) (citing *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999)).

Rule 56(a) provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment." *Pro-Football, Inc. v. Harjo*, 284 F. Supp. 2d 96, 112 (D.D.C. 2003) (citation omitted). Rather, the dispute must regard a question of fact that is material, meaning that it is "capable of affecting the substantive outcome of the litigation." *Id.* That is determined by "look[ing] to the substantive law on which each claim rests." *Mori v. Dep't of the Navy*, 731 F. Supp. 2d 43, 45 (D.D.C. 2010) (citation omitted), *dismissing appeal*, 2010 WL 5371504 (D.C. Cir. 2010). The dispute must also be genuine, meaning that it is "supported by sufficiently admissible evidence such that a reasonable trier-of-fact could find for the nonmoving party." *Pro-Football*, 284 F. Supp. 2d at 112.

## ARGUMENT

## I.    Plaintiffs Lack Article III Standing.

Standing is a necessary component of Article III's case-or-controversy requirement and demands that plaintiffs have "a personal stake in the outcome of the controversy [so] as to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (citation omitted). In cases seeking to enjoin government action, standing also serves important separation-of-powers concerns, as ensuring federal court jurisdiction prevents courts from exercising "general legal oversight of the other branches of Government." *Murthy v. Missouri*, 603 U.S. 43, 76 (2024) (cleaned up); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021).

At its "irreducible constitutional minimum," the doctrine requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent, (2) a causal connection between the injury and defendants' challenged conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The party invoking federal court jurisdiction "bears the burden of establishing each of those elements." *Hecate Energy LLC v. FERC*, 126 F.4th 660, 665 (D.C. Cir. 2025).

Plaintiffs in this case are two labor unions and an advocacy organization. As such, they must demonstrate that they possess either associational standing to bring claims on behalf of their members, or organizational standing to sue in their own right. As the Court noted in its denial of Plaintiffs' preliminary injunction motion, Plaintiffs assert only associational standing. ECF No. 42 at 24 (citing Pls.' Reply at 14–20; Feb. 24 Tr. at 7:17–23).

To establish associational standing (and, indeed, any form of Article III standing), Plaintiffs must show that their individual members have suffered injury-in-fact—"actual or imminent, not speculative" harm, "meaning that the injury must have already occurred or be likely to occur soon." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). For injury to be imminent, it must be "certainly impending"; mere "allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). In other words, injury cannot be established through "a 'highly attenuated chain of possibilities' predicated on 'guesswork as to how independent decisionmakers will exercise their judgment.'" *Indus. Energy Consumers of Am. v. FERC*, 125 F.4th 1156, 1163 (D.C. Cir. 2025) (quoting *Clapper*, 568 U.S. at 410).

An injury-in-fact must have a "close relationship" to a "harm traditionally recognized as providing a basis for a lawsuit in American courts[.]" *TransUnion*, 594 U.S. at 417, 424 (citing

*Spokeo, Inc. v. Robins*, 578 U.S. 330, 340–341 (2016)). While Congress "may elevate harms that exist in the real world before Congress recognized them to actionable legal status," at the same time, Congress "may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." *Id.* at 426 (citations and quotations omitted). Congress may create "a statutory prohibition or obligation and a cause of action," but it may not override Article III's injury requirement. *Id.*; *see also Doe v. OPM*, 25-cv-234 (RDM), 2025 WL 513268, at *5 (D.D.C. Feb. 17, 2025) ("[N]ot every statutory violation results in the type of concrete injury-in-fact sufficient to support Article III standing.").

That need for an independent Article III injury is particularly important when considering intangible forms of injury, like the ones Plaintiffs assert in this case. Long before *TransUnion*, courts cautioned about according standing to those raising "only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large." *Lujan*, 504 U.S. at 573–74. *TransUnion* recognizes that "[v]arious intangible harms can . . . be concrete" but limits cognizable intangible injuries to those "with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," including when the plaintiff alleges harm related to the handling of her personal information. *TransUnion*, 594 U.S. at 425 (surveying common-law privacy torts and looking to "whether plaintiffs have identified a close historical or common-law analogue for their asserted injury").

Plaintiffs' theory of injury-in-fact appears to be members have provided various forms of information to Treasury with the expectation of confidentiality and privacy, and that Defendants' actions in allowing certain employees of the agency to access those records compromises the

confidentiality of that arrangement in a way that injures them. *See* ECF No. 28 at 12–13. But that is not enough for Article III. Of course, *uses* of confidential information that result in concrete injury can give rise to standing. In the *TransUnion* decision, individuals who had a credit report that classified them as a terrorist disseminated to a third-party business were deemed to have Article III standing to press claims because they "suffered a harm with a 'close relationship' to the harm associated with the tort of defamation." 594 U.S. at 432–33. Another example would be an actual data breach, where individuals access confidential information without authorization. *See, e.g.*, *In re OPM Data Sec. Breach Litig.*, 928 F.3d 42, 55 (D.C. Cir. 2019) (per curiam).

But Plaintiffs' challenge does not concern actual or imminent actions by Defendants that could be analogized to any of the situations noted above. They have not alleged that Defendants have released confidential information to injure or defame them, or intruded on the personal privacy of any particular individual, or that Defendants have any intent to do so. Nor have Plaintiffs even alleged that any member of the Treasury DOGE Team has ever actually accessed any of their members' data. Rather, Plaintiffs have asserted—and this Court concluded on a preliminary basis—that Plaintiffs' alleged injury is akin to the tort of intrusion upon seclusion and is therefore an injury-in-fact. *See* ECF No. 28 at 7–10, ECF No. 42 at 28–32. Defendants respectfully disagree.

In in its decision on Plaintiffs' preliminary injunction motion, the Court noted that *TransUnion* "recognizances that the harm arising from an 'intrusion upon seclusion' is an intangible injury sufficiently concrete to satisfy Article III," and that "Courts in this District and across the country have followed suit when assessing standing." ECF No. 48 at 29. While that is correct, the tort of intrusion upon seclusion is a poor fit for Plaintiffs' allegations, as a majority of a three-judge panel of the Fourth Circuit recently concluded in granting the government's motion to stay the preliminary injunction as to Treasury and other agencies in *American Federation of*

14

*Teachers*, another challenge to DOGE Teams' access to agency record systems. *See AFT*, 2025 WL 1023638, at \*5–6.[4]

As Judge Agee explained in his concurring opinion, joined by Judge Richardson, "[a]t its core, the harm contemplated by the common-law tort of intrusion upon seclusion includes an intrusion into an individual's private space." *Id.* at \*2. As Judge Agee correctly noted, other circuit decisions have "also concluded that the harm visited upon an individual by the intrusion upon seclusion must include some interjection into the private sphere." *Id*. Indeed, in *Gadelhak v. AT&T Services, Inc.*, 950 F.3d 458 (7th Cir. 2020) (Barret, J.)—which the Supreme Court cited in *TransUnion*—the court addressed the receipt of unwanted text messages sent to the plaintiffs' personal cell phones—*i.e.*, actual intrusion into the peace and tranquility of the plaintiffs' use of their personal property. *Gadelhak*, 950 F.3d at 462. The same is true of *Dickson v. Direct Energy, LP*, 69 F.4th 338 (6th Cir. 2023), where the court found that "invasion-of-privacy-like harm flow[s] from unwanted telephonic communications" in part because such communications "interject[] [the caller] into[the recipient's] private sphere"). Also in *Lupia v. Medicredit, Inc.*, 8 F.4th 1184 (10th Cir. 2021), the court found standing based on unwanted telephone communications because they were an "unwanted intrusion into [the plaintiff's] peace and quiet." *Id.* at 1192. And in *Six v. IQ Data Int'l, Inc.*, 129 F.4th 630 (9th Cir. 2025), the court explained that other decisions have "found that the harm caused by *unwanted communications* bears a close relationship to intrusion upon seclusion." *Id.* at 635.[5]

---

[4] At the request of Judge King, the full Fourth Circuit considered the panel's decision for initial rehearing *en banc* and voted 8-7 to deny the request.

[5] In its memorandum opinion denying Plaintiffs' motion for preliminary injunction, the Court also cited *Attias v. CareFirst, Inc.*, 344 F.R.D. 38 (D.D.C. 2023) (CRC), and *Pileggi v. Wash. Newspaper Publ'g Co.*, No. 23-cv-345, 2024 WL 324121 (D.D.C. Jan. 28, 2024) (BAH), for the point that *TransUnion* recognizes that privacy harm arising from an intrusion upon

Here, there is no such intrusion into Plaintiffs' members' private space, and therefore the tort of intrusion upon seclusion does not apply. Plaintiffs do not dispute that Treasury legally obtained their members' personal information, and that Treasury legally retains that information in data systems that are maintained by the agency. Moreover, when Plaintiffs' members provided their information to the government, they did so on the understanding that the information could be routinely used by agency employees and others within and outside the government to perform the types of activities that the DOGE Team members plan to undertake. The System of Record Notice that pertains to Treasury's payment record system states that the information will be used by Treasury employees and others for the "development of computer systems" and in connection with the "investigation of unauthorized or fraudulent activity." 85 Fed. Reg. 11776, 11779 (Feb. 27, 2020).

Treasury's relevant System of Record Notice further provides that the information will be "routine[ly]" shared with, among others, "federal or state agenc[ies], [their] employees, agents (including contractors of its agents), or contractors;" "financial agents" of the Treasury Department; and Treasury Department "contractors" for the purpose "of identifying, preventing, or recouping improper payments." *Id.* at 11,780. Given that Plaintiffs' members provided their

---

seclusion is an intangible injury sufficiently concrete to satisfy Article III. ECF No. 42 at 29 n.5. *Attias*, however, did not involve any allegations of intrusion upon seclusion, and the court mentioned the tort only in passing. 344 F.R.D. at 46 n.2. In *Pileggi*, the allegations involved the disclosure of information about the plaintiffs' video watching history on her personal device. 2024 WL 324121 at *1–3. Finally, in *Randolph v. ING Life Ins. Co. Annuity Co.*, 973 A.2d 702 (D.C. 2009), which this Court also cited, the plaintiffs' breach of privacy action was dismissed because there was no allegation that "the data involved [ ] were disclosed to *and viewed* by someone unauthorized to do so." *Id.* at 711. The same is true here; Plaintiffs have not alleged that any member of the DOGE Team has accessed the specific data of any of Plaintiffs' members. *See generally* Compl. *See also AFT*, 2024 WL 1023638 at *5 (Richardson, J., concurring) (describing the harm related to intrusion upon seclusion as "knowledge that a third party is engaged in *targeted* snooping" (emphasis added)).

information to a government agency on the understanding that it would be routinely used by agency employees and others to build and maintain computer systems and to investigate improper payments, disclosure of that information to DOGE Team members—who are themselves agency employees and who are performing those very tasks—cannot possibly qualify as "highly offensive," even if it was in some manner improper (which it was not). Indeed, Plaintiffs cannot dispute that their members' personal information *can* lawfully be accessed by employees of the agency and shared outside of the agency for any of the numerous purposes set forth in the Privacy Act and the agency's Statement of Record Notices. *See* 5 U.S.C. § 552a(b)(2)–(13).

Nor can Plaintiffs reasonably dispute that their members' personal information, located in government systems, can and is regularly accessed by agency employees and others. And, in practice, Plaintiffs' members would have no reason to know that a particular employee has accessed their information in the normal course of that employees' duties. *See TransUnion*, 594 U.S. at 438 (emphasizing that certain plaintiffs had not suffered an injury sufficient to support standing where they did not "even *kn[o]w*" their files contained inaccurate information).

For these reasons, access to Treasury data systems is not like access to a private bank account, as the Court previously concluded at the preliminary injunction stage. ECF No. 42 at 30–31 (citing *Wolf v. Regardie*, 553 A.3d 1213, 1217–18 (D.C. 1989). The accessing of Plaintiffs' information by DOGE Team members in no sense creates the kind of highly objectionable invasion of personal privacy that forms the core of the common law tort of intrusion upon seclusion.

Plaintiffs have also suggested harm in the form of an infringement of their members' "expectation" their information will remain private. ECF No. 28 at 12–13. That concern is echoed in the declarations Plaintiffs submitted in support of their request for emergency relief. *See, e.g.*, Declaration of Carol Rosenblatt ("Rosenblatt Decl."), ECF No. 16-2 ¶ 10 ("I have trusted the

17

government to maintain the privacy of my information and to only use my information for lawful purposes."); Declaration of Jeanette L. McElhaney, ECF No. 16-3 ¶ 10 (same); Declaration of Barbara Casey, ECF No. 16-4 ¶ 10 (same). This claim amounts to an allegation that Plaintiffs' members expected their information to be handled in a certain way. But that is not a concrete injury. And were it enough for a litigant to establish standing simply by alleging that the holder of her personal information used it in a manner contrary to her subjective expectations—despite the disclosed permissible uses of the data as explained in the relevant System of Record Notice—the limits the Supreme Court has carefully established to govern when disclosure of information constitutes injury-in-fact, including the requirement to identify a historical analogue, would be obliterated. *See generally TransUnion*, 594 U.S. 413. Plaintiffs' declarations also include statements that the individuals are "disturbed, anxious, and frustrated" that the government has violated their trust, in the view of the declarants. *See, e.g.*, Rosenblatt Decl. ¶ 10. Such feelings, however, are not sufficient to constitute a concrete harm. *See In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*, 45 F. Supp. 3d 14, 26 (D.D.C. 2014).

Finally, Plaintiffs have suggested that the allegedly "unauthorized" access to BFS systems harms Plaintiffs' members by "increasing the opportunity for further dissemination" of their personal information. ECF No. 8-1 at 15. This supposition is too speculative on its own to support standing, *see Clapper*, 568 U.S. at 410, and is contradicted by the declarations in the record regarding the extensive security mitigation measures Treasury has employed, *see* AR-0057–59, 0061–62; Gioeli Decl. ¶¶ 11–15; Krause Decl. ¶ 15.

**II.    Plaintiffs' Claims Should Be Dismissed for Failure to State a Claim or, Alternatively, Summary Judgment Should Be Entered in Defendants' Favor.**

**A.    Plaintiffs Fail to Establish Reviewable Final Agency Action.**

Only "final agency action" is reviewable under the APA. 5 U.S.C. § 704. That requirement has two distinct parts. *See Hill v. U.S. Dep't of the Interior*, 699 F. Supp. 3d 1, 18 (D.D.C. 2023). First, the thing being challenged must be "agency action" recognized by the APA, which defines the term to include a specific "rule, order, license, sanction, relief, or the equivalent[.]" 5 U.S.C. § 551(13). Such an action must be a "discrete" act, as plaintiffs are prohibited from leveling a "broad programmatic attack," *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004), against programs for which they are seeking "wholesale improvement . . . by court decree, rather than in the offices of the Department or the halls of Congress," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). As the *Lujan* Court explained, the APA is not intended to permit "general judicial review of the [an agency's] day-to-day operations." *Id.* at 899; *see also Jones v. U.S. Secret Serv.*, 701 F. Supp. 3d 4, 17 (D.D.C. 2023) (quoting *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006)) ("the term [agency action] is not so all-encompassing as to authorize us to exercise judicial review over everything done by an administrative agency."), *appeal filed*, No. 23-5288 (D.C. Cir. Dec. 7, 2023).

Second, agency action must be "final." The Supreme Court has laid out a two part test for finality, including that (1) "the action must mark the consummation of the agency's decisionmaking process," rather than being "of a merely tentative or interlocutory nature[;]" and (2) "the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow[.]" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). The APA expressly excludes "preliminary, procedural, or intermediate agency action[s] or ruling[s]." *Id.*

The challenged access decisions here simply do not qualify as final agency action. At most, the supposed "agency action" Plaintiffs identify is a loosely defined series of personnel decisions related to granting individual employees access to agency systems. Decisions related to vetting, training, and assessing employees' need for access to systems or information—about which Plaintiffs may raise—are precisely the type of day-to-day operational decisions and conduct that the Supreme Court in *Lujan* advised do not fall within the APA's ambit. *See Lujan*, 497 U.S. at 899; *AFT*, 2025 WL 1023638 at *5 (Richardson, J., concurring).

Moreover, concluding that the decisions at issue in this case are "agency action" would have untenable consequences. Agencies make thousands of personnel decisions every day of the type Plaintiffs challenge here, whether creating an e-mail account for an employee, staffing an employee on a particular matter, or ensuring that an employee has the relevant training and credentials to access systems or participate in programs. A court could not review such decisions without bringing within the scope of the APA virtually every aspect of an agency's relationship with its employees.

In addition, even if it qualifies as agency action, granting certain employees access to agency databases is not "final" agency action, because it is not an action through which "rights or obligations have been determined," or from which "legal consequences will flow." *Bennett*, 520 U.S. at 177–78. Plaintiffs' complaint fails to demonstrate how providing an employee with system access necessary to his or her job duties creates any rights, obligations, or legal consequences for Plaintiffs or their members. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016). There is no final agency action where the challenged act "impose[d] no obligations, prohibitions or restrictions on regulated entities," and "d[id] not subject them to new penalties or enforcement risks." *Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020). Plaintiffs are not regulated by internal

agency decisions to allow new employees access to the agency's own systems, nor have they identified any direct legal consequences that arise from those decisions.

The fact that such decisions could potentially lead to indirect, practical consequences for Plaintiffs' members does not change the analysis. Adverse effects "accompany many forms of indisputably non-final government action." *Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 645 (6th Cir. 2004). For example, "[i]nitiating an enforcement proceeding against a company . . . may have a devastating effect on the company's business, but that does not make the agency's action final." *Id.* What matters is that the alleged data access decisions here have no "direct and appreciable legal consequences" for plaintiffs. *See California Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 640 (D.C. Cir. 2019). That is fatal to Plaintiffs' APA claim.

Nor is this a case where Plaintiffs have identified some agency action or policy resulting in third-party disclosure of confidential information. Plaintiffs have attempted to bring their claims within the APA by asserting that Treasury implemented a "new policy" to "disregard[] [BFS's] privacy safeguards and authorize[] individuals associated with the so-called 'Department of Government Efficiency [ ] to access [BFS's] payment systems." ECF No. 8-1 at 1; *see also id.* at 14 (claiming a reversal of the "Department's longstanding policy fully protecting individuals' personal information"). But there is no such "policy." *See* Gioeli Decl. ¶ 23.

The D.C. Circuit has recognized that unauthorized third-party disclosures can have direct and immediate consequences for litigants. *See Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008). But review of data contained in internal agency systems by agency employees or transfer of data within the government for routine uses does not threaten the same immediate harms. Indeed, courts recognize that, without third-party disclosure, claims founded on internal disclosure of data do not even state a cognizable injury for standing purposes. *See Hunstein*

*v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1240, 1245–50 (11th Cir. 2022) (en banc) (collecting cases).

> **B.    Plaintiffs Cannot Assert Alleged Violations of the Privacy Act and the Internal Revenue Code on Behalf of Their Members Through the APA.**

The APA provides a vehicle for review only in circumstances where "there is no other adequate remedy." 5 U.S.C. § 704; *see also Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) (Section 704 "also makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action."). That is not the case here. The Privacy Act provides a "comprehensive remedial scheme" for injuries arising out of the inappropriate dissemination of private information about individuals. *Wilson v. Libby*, 535 F.3d 697, 703 (D.C. Cir. 2008) (citing *Chung v. Dep't of Justice*, 333 F.3d 273, 274 (D.C. Cir. 2003)).

This rule holds true where a statutory review scheme only provides for review of issues by certain parties; other parties are presumptively precluded from obtaining review of those issues under the APA. *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984) ("[W]hen a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded."); *see also Dew v. United States*, 192 F.3d 366, 372 (2d Cir. 1999). It is also true even where the plaintiff may not succeed on the merits of her claim under the alternative statutory review procedure; the existence of that procedure alone suffices. *See Rimmer v. Holder*, 700 F.3d 246, 261–62 (6th Cir. 2012); *Jones v. U.S. Dep't of Hous. & Urban Dev.*, No. 11 CIV. 0846 (RJD) (JMA), 2012 WL 1940845, at *6 (E.D.N.Y. May 29, 2012) (reasoning that an alternative was adequate "whether or not relief is ultimately granted").

Section 552a(g) of the Privacy Act establishes the narrow causes of action for which an "individual may bring a civil action against the agency." *See* 5 U.S.C. § 552a(g)(1). These causes of actions are:

>    (1) when an agency "makes a determination . . . not to amend an individual's record in accordance with his request," ("Amendment Action"), *id.* § 552a(g)(1)(A);
>
>    (2) when an agency refuses to comply with an individual's request for access to her records, ("Access Action"), *id.* § 552a(g)(1)(B);
>
>    (3) when the agency fails to maintain an individual's records "with such accuracy, relevance, timeliness, and completeness" as is necessary for a government action and "consequently a determination is made which is adverse to the individual" ("Benefits Action"), *id.* § 552a(g)(1)(C); or
>
>    (4) where the government "fails to comply with any other provision of this section . . . in such a way as to have an adverse effect on an individual," ("Other Action") *id.* § 552a(g)(1)(D).

Plaintiffs appear to plead an "Other Action." But the Privacy Act only provides for monetary damages for Other Actions, and then only for individuals. *See* 5 U.S.C. § 552a(g)(4); *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) (citing *Doe v. Stephens,* 851 F.2d 1457, 1463 (D.C.Cir.1988)) ("We have held that only monetary damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs[.]"). Prospective relief, such as that sought by Plaintiffs, is reserved for Amendment or Access Actions. 5 U.S.C. § 552a(g)(2), (3). The Privacy Act does not permit organizations to sue for injunctive relief over a decision to provide access to particular government employees.

Plaintiffs cannot circumvent the Privacy Act's carefully drawn constraints by raising purported Privacy Act violations through the APA. Denying Plaintiffs' attempt to obtain broader relief than that provided by the Privacy Act is consistent with the bedrock principle that "where [a] statute provides for certain special types of equitable relief but not others, it is not proper to imply a broad right to injunctive relief." *Parks v. IRS*, 618 F.2d 677, 684 (10th Cir. 1980) (citing

*Cell. Assocs., Inc. v. Nat'l Insts. of Health*, 579 F.2d 1155, 1161–62 (9th Cir. 1978)). Accordingly, the Court should dismiss Plaintiffs' APA claims to the extent they are premised on allegations that Defendants' actions violate the Privacy Act. *Cf. AFT*, 2025 WL 1023638 at *6 (Richardson, J., concurring) (stating that, on "first principles without binding authority," "determining whether Congress intended damages to be the exclusive remedy for Privacy Act violations is not a trivial question").

For similar reasons, it would be inappropriate to allow Plaintiffs to use the APA to create an end-run around the remedial scheme provided in the Internal Revenue Code for violations of 26 U.S.C. § 6103. Congress created a waiver of sovereign immunity for violations of § 6103 by authorizing only civil damages against the United States in 26 U.S.C. § 7431. Specifically, § 7431 authorizes a right of action against the United States if "any officer or employee of the United States knowingly, or by reason of negligence, discloses any return or return information . . . in violation of section 6103." 26 U.S.C. § 7431(a)(1). Damages are authorized in the sum of "the greater of" (a) $1,000 for each unauthorized disclosure of a return or return information, or (b) the actual damages sustained by the plaintiff plus punitive damages for willful disclosures or disclosures that result from gross negligence. *Id.* § 7431(c). Civil damages under § 7431 is the sole remedy that Congress provided for a violation of § 6103, and it does not authorize injunctive relief. *See generally id.*; *see also Henkell v. United States*, No. 96-2228, 1998 WL 41565, at *5 (E.D. Cal. Jan. 9, 1998) (explaining that § 7431 does not authorize injunctive relief).[6]

Given the civil damages available to individuals whose return information is disclosed in violation of § 6103—which is part of the complex statutory scheme Congress created in the

---

[6] In addition, however, Congress has imposed criminal penalties for willful violations of § 6103, which are punishable as a felony and by dismissal from Federal service.

Internal Revenue Code— there is another adequate remedy available, and Plaintiffs are not entitled to injunctive relief through the APA. *Cf. Agbanc Ltd. v. Berry*, 678 F. Supp. 804, 807 (D. Ariz. 1988) (concluding that § 7431 provides an adequate remedy at law that precludes equity jurisdiction).

**C.    Plaintiffs Cannot Prevail on Their Privacy Act Claim.**

Plaintiffs also cannot prevail on the merits of their argument that a Privacy Act violation has occurred. While the Privacy Act generally prohibits disclosure of covered records containing personal information absent consent, it authorizes disclosure of such records to "those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties." 5 U.S.C. § 552a(b)(1). Providing access to agency records to members of the Treasury DOGE Team falls within that authorization.

Members of the Treasury DOGE Team are (or were, with respect to Mr. Elez) employees of the agency for Privacy Act purposes. "[F]or purposes of" Title 5 of the U.S. Code, which includes the Privacy Act, "employee" "means an officer and an individual who is" first "appointed in the civil service by one of the following acting in an official capacity"; as relevant here, the ensuing list of potential appointers includes "the President" and "an individual who is an employee under this section." 5 U.S.C. § 2105(a)(1)(A), (D). An employee must also be "engaged in the performance of a Federal function under authority of law or an Executive act; and . . . subject to the supervision of an individual named by paragraph (1) of this subsection while engaged in the performance of the duties of his position." *Id.* § 2105(a)(2), (3). The relevant employees easily satisfy that definition.

Moreover, the employees at issue have a "need" to access the records contained in the relevant systems to perform their official duties. In creating a framework for agency DOGE Teams and USDS collaboration, the EO charged both groups with working to modernize technology and

coordinating on ways to "[m]aximize [e]fficiency and [p]roductivity." 90 Fed. Reg. at 8442. The EO instructs agency heads "to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems," and in turn requires USDS to "adhere to rigorous data protection standards." *Id.* § 4(b).

Given the purpose of the EO—to modernize technology—it necessarily follows that agency personnel seeking to improve agency systems would need access to them to undertake and consult on that modernization. *See AFT*, 2025 WL 1023638, at *6 (Richardson, J., concurring) ("[I]t does not stretch the imagination to think that modernizing and agency's software and IT systems would require administrator-level access to those systems, including any internal databases."). And specifically as reflected in the administrative record, the purpose of the DOGE Team's engagement is to, among other things, "[g]ain insight on money-in/money-out through the Fiscal Service payment systems while identifying efficiencies in the overall payment flow." AR-0057. *See also* AR-0060 ("System access as well as on-going discussions with subject matter experts are critical to understanding and verifying how these payment and accounting systems work."); Ex. A at 10 (describing why access to sensitive data is necessary to "understand the full end-to-end payment process"). It should be uncontroversial that—to understand how payments are made and improve efficiencies—employees must have access to the relevant payment systems. The "need" underlying the employees access here arises directly from the mandates of the EO and the complex functions DOGE Team employees intend to perform.

Furthermore, disclosure of payment records to other federal officials that occurred as a result of the Treasury DOGE Team's work to facilitate identification of payments that may have been improper under the President's Executive Orders, *see* Krause Decl. ¶¶ 17–20, Robinson Decl. ¶¶ 8–10, were permissible under published routine uses under the System of Record Notice. *See* 5

U.S.C § 552a(b)(3); 85 Fed. Reg. 11,776. Disclosure within the federal government that occurred in connection with the process to assist agencies in complying with the President's Executive Order on foreign aid, which was approved by Treasury leadership on January 26, 2025 and implemented between January 27, 2025 and February 10, 2025 (Krause Decl. ¶¶ 17–20; Robinson Decl. ¶¶ 8–10), was therefore permissible under the Routine Uses in the System of Record Notice. Routine Use 17 permits disclosure to a federal agency "for the purpose of identifying, preventing, or recouping improper payments to an applicant for, or recipient of, federal funds." 85 Fed. Reg. 11,780. Treasury identified payments that had not yet been certified by the submitting agency to the Department of State to facilitate the agency's identification of payments that were subject to the pause required by that Executive Order and, thus, may not have been proper for the payor agency to certify as well as payments that were entitled to a waiver and could properly be paid. *See* Krause Decl. ¶¶ 17–20. The process was implemented at the "pre-certification" or "pre-edit" phase, when other checks designed to identify potentially improper payments are performed, such as comparison of payments against the Do Not Pay working system. *See id*. Like with Do Not Pay process, Treasury identifies payments to provide relevant agencies the opportunity to determine whether to ultimately certify a payment for processing.

For similar reasons, to the extent that Plaintiffs may contend that payment information Mr. Elez provided to GSA employees on January 30, 2025 supports their claim, they would be incorrect. Although Treasury lacks sufficient information to determine with certainty, Mr. Elez's email was an intra-government communication regarding "USAID payments," and therefore likely would be covered by Routine Use 17. The communication also appears to be in service of the President's Executive Order on foreign aid. But more fundamentally, whether any specific communication—as opposed to the alleged "system" or "policy" Plaintiffs challenge, Compl.

¶¶ 48–51; ECF No. 8-1 at 1—was permissible under the Privacy Act does not call into question broader Treasury's decision to grant the Treasury DOGE Team access to BFS systems.

### D.    Plaintiffs Cannot Prevail on Their Internal Revenue Code Claim.

Plaintiffs also cannot show that Defendants have violated or will violate the Internal Revenue Code. Compl. ¶¶ 51–52. Plaintiffs' claim fails because an exception to the general rule of § 6103(a) applies for "[d]isclosure to certain Federal officers and employees for purposes of tax administration." 26 U.S.C. § 6103(h). Indeed, "officers and employees of the Department of the Treasury" may obtain returns and return information if their "official duties require such inspection or disclosure for tax administration purposes." *Id.* "Tax administration," in turn, is defined to include "the administration, management, conduct, direction, and supervision of the execution and application of the internal revenue laws." *Id.* § 6103(b)(4)(A)(i). The payment systems at issue in this case disburse the vast majority of government payments, including tax refunds. *See* Fiscal Service Overview, *available at* https://www.fiscal.treasury.gov/about.html (last visited Feb. 12, 2025).

The Treasury DOGE Team satisfied these statutory conditions for access to returns and return information. They are (or were, as to Mr. Elez) employees of the Treasury Department. AR-0001–24. And their "official duties" included serving as Treasury DOGE Team members who were "spearheading advances in Treasury's technology infrastructure, financial management systems, and cybersecurity initiatives," "overseeing the modernization of Treasury's legacy systems," and "collaborating with Treasury's Chief Information Officer (CIO) to help strengthen Treasury's cybersecurity protocols to protect its critical financial systems and mitigate risks." Krause Decl. ¶ 2; *see also* AR-0057–60. Indeed, some of the Treasury DOGE Team's duties related to GAO concerns regarding improper payments generally, and one of the programs GAO identified with a high risk of improper payments is IRS's Earned Income Tax Credit refunds.

28

Krause Decl. ¶ 8; AR-0060. Moreover, the returns and return information subject to the protections of § 6103 pass through (and are stored on) the very same systems that is the Treasury DOGE Team is responsible for improving. Just like all of the other Treasury employees, contractors, and others who work every day to maintain and improve the operation of these critical payment systems, they therefore had the requisite need to obtain § 6103 material in the exercise of their official duties.

### E. Granting of Data Access to Treasury Employees Was Not Arbitrary and Capricious.

Plaintiffs also cannot prevail on their claim that Defendants acted arbitrarily or capriciously. The gravamen of Plaintiffs' claim is that Defendants "implemented a system under which Elon Musk or other individuals associated with DOGE could access the Bureau's records for purposes other than those authorized by the Privacy Act, the Bureau's SORNs, and the Internal Revenue Code." Compl. ¶ 56. Plaintiffs further allege that, "[i]n particular, Defendants failed to consider their legal obligations under federal law, the harm that their actions would cause to the objectives that those statutes sought to achieve, or the harm caused to Plaintiffs' members or the general public." *Id.*

In large part, Plaintiffs' arbitrary and capricious claim is just a restatement of Plaintiffs' contrary to law arguments. Because it was lawful for the Treasury DOGE Team to access BFS systems, for the reasons explained above, the premise of Plaintiffs' claim is faulty. The administrative record demonstrates, moreover, that neither "Elon Musk" nor "others individuals associated with DOGE," Compl. ¶ 56—other than members of the Treasury DOGE Team—have been granted access to BFS systems. *See* AR-0057–62; *see also supra*.

There is also no basis for Plaintiffs' unsupported claim that Defendants failed to consider "the harm caused to Plaintiffs' members of the general public." Compl. ¶ 56. As described herein, Mr. Krause is, and Mr. Elez was, an employee of Treasury, and Plaintiffs cannot show how

employee access to BFS systems is inconsistent with any reasonable expectation interests. Treasury, moreover, thoughtfully considered the risk of granting access to BFS systems and put in place risk mitigation measures as a result. AR-0058–59, 0061–62; Gioeli Decl. ¶ 12–15.

Finally, to the extent the Treasury Department was required to explain its (nonexistent) change in position, it has done so here. The Treasury DOGE Team was tasked by Treasury leadership with implementing technical improvements in Treasury systems and to "[g]ain insight on money-in/money-out." AR-0057; Krause Decl. ¶ 2. Plaintiffs may disagree with the decision to grant access to the Treasury DOGE Team, but doing so was neither arbitrary nor capricious. *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43 (1983).

### F.    Plaintiffs Cannot Prevail on Their Excess of Statutory Authority Claim.

Ultra vires review is a "a doctrine of last resort," *Schroer v. Billington*, 525 F. Supp. 2d 58, 65 (D.D.C. 2007), and the equivalent of "a Hail Mary pass—and in court as in football, the attempt rarely succeeds," *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009). More specifically, ultra vires review of agency action is only available when an agency's error is "patently a misconstruction of [statute;]" "when the agency has disregarded a specific and unambiguous statutory directive[;]" or "when the agency has violated some specific command of a statute." *Griffith v. Fed. Labor Relations Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988) (internal citations and quotations omitted). "Garden-variety errors of law or fact are not enough." *Id.*

Both the Supreme Court and D.C. Circuit have made clear that an ultra vires claim is unavailable where an alternative remedial forum exists in which a plaintiff may pursue the challenge. *See Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991) (non-statutory review is available only when a party would be "wholly deprive[d] . . . of a meaningful and adequate means of vindicating its statutory rights"); *Lepre v. Dep't of Labor*, 275

F.3d 59, 72 (D.C. Cir. 2001) (a "critical" requirement for ultra vires review is "the lack of any alternative means of judicial review for the plaintiffs"); *see also Nyunt*, 589 F.3d at 449.

Under this standard, Plaintiffs free-standing excess of statutory authority claim fails. First, Plaintiffs' claims merely repackage their claims under the Privacy Act and the Internal Revenue Code brought through the APA. *See* Compl. ¶¶ 58–59. For the reasons explained above, Congress established a specific scheme for evaluating these claims. Because alternative forms of review were contemplated by Congress, ultra vires review is precluded.

Moreover, Plaintiffs have failed to plead a specific statutory bound that Defendants have allegedly exceeded. As discussed, the Treasury DOGE Team is comprised of Treasury employees. Plaintiffs have pointed to no statutory authority which prohibits their access. Providing Treasury employees with access to Treasury data is not the stuff of ultra vires review.

## CONCLUSION

For the above stated reasons, the Court should dismiss Plaintiffs' claims or, in the alternative, enter judgment in favor of Defendants.

Dated: April 11, 2025                           Respectfully submitted,

                                                YAAKOV M. ROTH
                                                Acting Assistant Attorney General
                                                Civil Division

                                                MARCIA BERMAN
                                                Assistant Director
                                                Federal Programs Branch

_/s/ Bradley P. Humphreys_
BRADLEY P. HUMPHREYS
Senior Trial Counsel
Federal Programs Branch
Civil Division, Department of Justice
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 305-0878
Bradley.Humphreys@usdoj.gov

_Counsel for Defendants_