# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Alliance for Retired Americans, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>Scott Bessent, in his official capacity as Secretary of the Treasury, et al.,<br><br>Defendants. | Civil Action No. 25-313 (CKK) |

## DECLARATION OF NANDAN M. JOSHI

I, Nandan M. Joshi, declare as follows:

1.     I am an attorney at Public Citizen Litigation Group and represent the plaintiffs in this action.

2.     Attached as **Exhibit A** is a true and accurate copy of a printout generated on April 24, 2025, of the webpage "Bureau of the Fiscal Service, Services for the General Public," located at https://www.fiscal.treasury.gov/public/.

3.     Attached as **Exhibit B** is a true and accurate copy of a printout generated on April 24, 2025, of the webpage "Bureau of the Fiscal Service, About US," located at https://www.fiscal.treasury.gov/about.html.

4.     Attached as **Exhibit C** is a true and accurate copy of a printout generated on April 24, 2025, of the webpage "Treasury Financial Experience, Payment Information Repository (PIR)," located at https://tfx.treasury.gov/taxonomy/term/10678.

5.     Attached as **Exhibit D** is a true and accurate copy of a printout generated on April 24, 2025, of the webpage "Bureau of the Fiscal Service, Payment Information Repository," located at https://fiscal.treasury.gov/pir/.

6.     Attached as **Exhibit E** is a true and correct copy of selected pages of U.S. Department of the Treasury, Office of Deputy Assistant Secretary for Privacy, Transparency, & Records, Privacy Act Handbook, TD P 25-04, located at https://home.treasury.gov/system/files/236/Privacy-Act-Handbook-Final.pdf.

7.     Attached as **Exhibit F** is a true and correct copy of selected pages of U.S. Department of the Treasury, Privacy Program Plan (ver. 1.1 Sept. 18, 2024), located at https://home.treasury.gov/system/files/236/Department-of-the-Treasury-Privacy-Program-Plan.pdf.

8.     Attached as **Exhibit G** is a true and correct copy of selected pages of National Institute of Standards and Technology Special Publication 800-53 Revision 5, Security and Privacy Controls for Federal Information Systems and Organizations (last updated Dec. 2020), located at https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-53r5.pdf.

9.     Attached as **Exhibit H** is a true and correct copy of Defendants' Objections and Responses to Plaintiffs' Requests for Admission, dated March 31, 2025.

10.     Attached as **Exhibit I** is a true and correct copy of the document produced pursuant to Response # 3 of Defendants' Revised Objections and Responses to Plaintiffs' Requests for Production, dated April 1, 2025. The exhibit is designated in Plaintiffs' Memorandum in support of their motion for summary judgment as "Elez Email to GSA" and is stamped with Bates ## Exped.Disc.25-cv313_DDC_UST 000007–000023.

11.     Attached as **Exhibit J** are a true and correct copies selected pages of the Privacy and Civil Liberties Impact Assessments (PCLIA) for the following systems of the Bureau of the Fiscal Service: Payment Automation Manager, Secure Payment System,

Automated Standard Application for Payments, International Treasury Services, Central Accounting and Reporting System, and Payment Information Repository. The PCLIAs for each of these systems is available from https://www.fiscal.treasury.gov/pia.html.

12.     Each of the foregoing exhibits was printed or downloaded on April 24, 2025.

Executed on April 25, 2025.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

/s/ Nandan M. Joshi
Nandan M. Joshi

DECLARATION OF NANDAN M. JOSHI

Exhibit A



*Official website of the United States Government*

U.S. DEPARTMENT OF THE TREASURY

Public

Menu | Index | Search



Services for:
# The General Public

 **News**       ? **FAQs**       👥 **Careers**

📖 **About**

🎧 **Contact us**       ⚠️ **Customer Alerts: Frauds and Scams**

🔍 **Useful Links for Economic Impact Payment Information**

Direct File is a new IRS service that **allows eligible people to prepare and file their tax return online, for free, directly** with the IRS – saving them time and money. Learn more and file your taxes at:    directfile.irs.gov



At the Bureau of the Fiscal Service, we collect revenue, delinquent debt, and disburse funds to millions of Americans ensuring their timely receipt of benefit payments. Our easy-to-set-up direct deposit programs streamline the government benefit payment process.

We also offer Treasury Hunt – a way for Americans to search for their matured savings bonds or any held interest payments on their Retail Treasury securities. It's an easy, quick way to discover if they or a family member have matured bonds.  Try      Treasury Hunt today.

**New Data Website**
    FiscalData.Treasury.gov is a new website from the Fiscal Service bringing together important federal financial datasets on one modern site designed with data scientists and analysts in mind. Explore datasets on topics such as debt, revenue, and spending, including the Monthly Treasury Statement and the Monthly Statement of Public Debt. Each dataset is available in fully machine-readable files, easily accessible APIs, and with comprehensive metadata. Stay tuned! This is just the beginning.
    FiscalData.Treasury.gov will continue to add more datasets, serving as the central website for public data.

We are excited to announce that Fiscal Data has just launched the new      Interest Expense and Average Interest Rates on the National Debt insight page that visualizes trends over time for interest expense and average interest rates on the national debt. This page is designed for those who want to better understand the growing importance of interest expense in relation to the national debt. This joins the      Savings Bond explainer page, Debt,      Deficit, and      Spending and      Revenue explainers and the      Currency Exchange Rates Converter tool and represents another step in Fiscal Data's journey to answer important questions about federal government finances in new ways.

*See also:*
Services For Government Agencies

Services For Business & Institutions

**New Video about Fiscal Service**



# I need help with...

## 1. Why my refund, paycheck, or federal benefit payment was reduced



### I have questions
Read FAQS



### My paycheck was reduced
Learn about wage garnishment



### I owe child support
Child support enforcement information



### I need to pay my debt
Pay my bill at pay.gov



Contact Us

# 2. Making a payment



**Tax payments**

Pay my taxes online at EFTPS.gov



**Student loan payments**

Learn how to pay student loans



**Bills from the government**

Pay online at pay.gov

# 3. Managing my federal benefits or tax refund



**Lost or stolen check**

Learn how to report missing checks



**Change personal information**

Update name, address, or bank account



**Direct Deposit**

Sign up to receive payments electronically



**Direct Express®**

Prepaid debit card for federal benefits

# 4. Financial Information, reports, and forms



Currency exchange rates



Treasury bills, notes, & savings bonds



**Financial Report of U.S. Government**



**FiscalData.Treasury.gov**



**Your Guide to America's Finances**

How much money did the federal government collect and spend in 2018?

# 5. Gifts to the U.S. Government



**How to make a gift to reduce the public debt**



**General gifts to the United States Government**



**All Reports & Statements**



**All Forms**

# 6. Military Stored Value Cards



[EagleCash](#)



[NavyCash](#)



[EZpay](#)

# [See All Programs & Services](#)

# Need Help?

Use the Contact Us link in the menu of the program you're interested in.

*Last modified 03/03/25*

**The General Public**

**Government Agencies**

**Business & Institutions**

Search Fiscal Service

 News

 Forms

 Training

 Careers

 Mailing Lists

 Reports

 Reference

 Events

 About

 Contact

Bureau of the Fiscal Service 2024

*Accessibility Statement* | *Data Quality* | *Freedom of Information Act* | *Privacy Policy* | *Privacy Impact Assessments*

## FISCAL SERVICE SITES

Direct Express®

Go Direct®

TreasuryDirect.gov

Treasury Hunt

EFTPS.gov

Pay.gov

Administrative Resource Center (ARC)

FiscalData.Treasury.gov

USAspending.gov

TFX.treasury.gov

## MORE GOVERNMENT SITES

USA.gov

USAJOBS.gov

OPM.gov

MyMoney.gov

Data.gov

Regulations.gov

PaymentAccuracy.gov

No Fear Act

Vote.gov

## TREASURY BUREAUS

The Alcohol and Tobacco Tax and Trade Bureau

Bureau of Engraving and Printing

Community Development Financial Institutions Fund

Financial Crimes Enforcement Network (FinCen)

Internal Revenue Service

Office of the Comptroller of the Currency

U.S. Mint

DECLARATION OF NANDAN M. JOSHI

Exhibit B

U.S. DEPARTMENT OF THE TREASURY



About Us

Menu    Index    Search



# Video about Fiscal Service



## Mission

Promote the financial integrity and operational efficiency of the federal government through exceptional accounting, financing, collections, payments, and shared services.

## Vision

Transform financial management and the delivery of shared services in the federal government.

## Values

We are guided by our commitment to *integrity, collaboration, accountability, learning,* and *excellence* in our dealings with each other and with those we support and serve.

# What we do…

**Collecting**
Provide citizens a variety of modern electronic options for paying federal taxes, charges, and fees. Minimize lockboxes and paper processing.

**Disbursing**
Create a seamless end-to-end process that is all-electronic from the initiating transaction through settlement: more agile, efficient, and resilient.

**Financing**
Meet the evolving financing needs of the U.S. government at the least cost over time by offering Treasury securities to investors through modern, secure, and reliable technology.

**Reporting**
Provide federal agencies and the American public information that is accurate, accessible, and transparent. Streamline the federal reporting process to reduce agency reporting burden.

**Servicing**
Provide customer-centric services and solutions to agencies that enable improved decision-making and high-performance through innovation, standardization, operational efficiency, and risk reduction.



… We Do Well.

**Data Through FY 2023**

## Collecting

- Collected nearly **$5.47 trillion** in federal revenue, with **99.9%** of receipts settled electronically.

- Increased adoption of e-Commerce digital collection options across federal agencies by **11%**.

- Collected **$4.3 billion** in delinquent debt. Over **$3.88 billion** was collected through the Treasury Offset Program (TOP) and **$425.9 million** was collected through the Cross- Servicing program.

## Disbursing

- Centrally disbursed **87.9%** of all federal payments.

- Securely disbursed nearly **1.3 billion** payments, totaling **$5.4 trillion**, at an electronic rate of **96.5%**. Payments were made **100%** on time.

- The Office of Payment Integrity identified **213,998** potential improper payments valued at **$652.7 million**, prevented **162,775** potential improper payments valued at **$154.9 million**, and recovered **21,723** improper payments valued at **$346.2 million**.

## Financing

- Conducted **416 auctions** and awarded **$20.17 trillion** in Treasury marketable securities to fund critical government operations and activities.

- Issued **$183.5 billion** in Treasury retail securities, redeemed **$243 billion** in Treasury securities.

- Made **$2.01 billion** in Judgment Fund payments.

## Reporting

- Accounted for and reported the **$33.17 trillion** public debt.

- Managed an average daily cash flow of **$205.4 billion.**

- Issued **99.6%** of government-wide accounting reports on time, including Daily Treasury Statements and Monthly Treasury Statements.

- Average number of pageviews per month for USAspending.gov was **774,479** in September 2023.

- **Sixteen** Fiscal Service datasets were migrated to modern format and made available to the public and agencies, bringing the total to **55**.

## Servicing

- Provided competitively priced information technology and administrative services (financial management, human resource, travel, and procurement) to 88 federal agencies as part of the Treasury Franchise Fund.

- Processed **$106 billion** of invoices through the Invoice Processing Platform (IPP).

- Collected over **$76.7 million** and processed **979,029** cases through the Centralized Receivables Service.

# Our People



## Timothy Gribben, Commissioner

Timothy (Tim) E. Gribben was appointed commissioner of the U.S. Department of the Treasury's Bureau of the Fiscal Service (Fiscal Service) on May 13, 2019. Mr. Gribben provides leadership, policy direction, and guidance for Fiscal Service's efforts to transform financial management and the delivery of shared services in the federal government and oversees bureau operations.

Prior to his current position, Tim served as the chief financial officer (CFO) and associate administrator for performance management at the Small Business Administration (SBA). Prior to joining SBA, Mr. Gribben was a manager at the U.S. Postal Service. In the private sector, Mr. Gribben spent over five years at a privately held technology firm as director of a business unit and two years with J.P. Morgan.

Mr. Gribben graduated from the College of William & Mary with a bachelor's degree in accounting and earned a Master of Business Administration degree from Duke University. In 2019 he was elected as a Fellow of the National Academy of Public Administration and in 2021 he received a Presidential Rank Award of Distinguished Executive.

## Other Executive Management

- **Matt Miller**, Deputy Commissioner, Financing and Operations

- **Joseph Gioeli**, Deputy Commissioner, Transformation and Modernization

- **Dara Seaman**, Associate Commissioner, Financial Operations

- **Amanda Kupfner**, Chief Strategy Integration Officer

- **Adam Goldberg**, Business Transformation Executive

- **Cait Gehring**, (Acting) Chief Customer Officer

- **Jeff Schramek**, Executive Director, Administrative Resource Center

- **Lillian Cheng**, Chief Counsel

- **Nate Reboja**, Chief Information Officer and Assistant Commissioner - Information and Security Services

- **Dan Berger**, Chief Financial Officer

- **Sandra Paylor Sanders**, Assistant Commissioner - Fiscal Accounting

- **Paul Deuley**, Managing Director, Service Delivery, Administrative Resource Center

- **Daniel Vavasour**, Managing Director, Management, Modernization, and Customer Care, Administrative Resource Center

- **Linda Chero**, Chief Disbursing Officer and Assistant Commissioner - Disbursing and Debt Management

- **Doug Anderson**, Assistant Commissioner - Retail Securities Services

- **Mike Linder**, Assistant Commissioner - Revenue Collections Management

- **David Copenhaver**, Assistant Commissioner - Wholesale Securities Services

- **Lori Santamorena**, Executive Director - Government Securities Regulations

- **Justin Marsico**, Chief Data Officer

- **Angela Jones**, Chief Human Resource Officer

# Our History

Right before World War II, in 1939, President Franklin Roosevelt began a reorganization of the executive department. The president consolidated all Treasury financing activities into a "Fiscal Service" under the direction of a fiscal assistant secretary.

These activities included accounts, deposits, bookkeeping, warrants, loans, currency, disbursements, surety bonds, savings bonds, and the public debt.

By 1940, the Fiscal Service consisted of the Bureau of Accounts, the Bureau of the Public Debt, and the Office of the Treasurer—all under the direction of the fiscal assistant secretary.

A 1974 reorganization of the Fiscal Service created the Bureau of Government Financial Operations, which consolidated most of the functions of the Office of the Treasurer.

In 1984, the Bureau of Government Financial Operations was renamed the Financial Management Service (FMS). The new name reflected Treasury's aim to achieve greater efficiency and economy in government financial management.

During this time, the Bureau of the Public Debt (BPD) continued to track, account for, and manage the various elements of the public debt structure first established by George Washington's Secretary of the Treasury, Alexander Hamilton.

On October 7, 2012, Treasury Secretary, Timothy Geithner issued Treasury Order 136-01 creating the Bureau of the Fiscal Service, consolidating the operations of the Bureau of the Public Debt and the Financial Management Service.

Last modified 01/23/25

**The General Public**

**Government Agencies**

**Business & Institutions**

Search Fiscal Service

 News

 Reports

 Forms

 Reference

 Training

 Events

 Careers

 About

 Mailing Lists

 Contact

Bureau of the Fiscal Service 2024

*Accessibility Statement | Data Quality | Freedom of Information Act | Privacy Policy | Privacy Impact Assessments*

## FISCAL SERVICE SITES

Direct Express®

Go Direct®

TreasuryDirect.gov

Treasury Hunt

EFTPS.gov

Pay.gov

Administrative Resource Center (ARC)

FiscalData.Treasury.gov

USAspending.gov

TFX.treasury.gov

## MORE GOVERNMENT SITES

USA.gov

USAJOBS.gov

OPM.gov

MyMoney.gov

Data.gov

Regulations.gov

PaymentAccuracy.gov

No Fear Act

Vote.gov

## TREASURY BUREAUS

The Alcohol and Tobacco Tax and Trade Bureau

Bureau of Engraving and Printing

Community Development Financial Institutions Fund

Financial Crimes Enforcement Network (FinCen)

Internal Revenue Service

Office of the Comptroller of the Currency

U.S. Mint

DECLARATION OF NANDAN M. JOSHI

Exhibit C



The Payment Information Repository (PIR) is a centralized information repository for federal payments that also serves as a tool for reporting the settlement of all government electronic disbursement to the Central Accounting Reporting System. For further information, refer to the PIR website.

**More Resources**

PIR

DECLARATION OF NANDAN M. JOSHI

Exhibit C



*Official website of the United States Government*

U.S. DEPARTMENT OF THE TREASURY

**PIR**
Payment Information Repository

Menu    |    Index    |    Search



# Payment Information Repository

The Payment Information Repository (PIR) holds information on all payments that both Treasury and Non-Treasury Disbursing Offices make. These offices put information about each payment into PIR. As a CARS reporter, they can then see their payment data and get analytics about their payments. Managers and executives in these agencies can use PIR to get information they need to make strategic business decisions.

**GET STARTED**

**Translate**

# Benefits of PIR

## For Federal Program Agencies



**One place to see payment information**

A single, web-based system to see both summary and detailed information about your agency's payments



**Business intelligence**

Information for managers and executives to inform strategic business decisions

## For Fiscal Service



**Improved data quality**

Better classification of federal payments, leading to better quality of financial information



**Better analysis**

Statistical analyses help Treasury manage the government's financial position more precisely and make informed decisions on payment trends

# Resources

### Standard Reporting Format (SRF)

Agencies use the SRF to send information about their payments to PIR.

For more information and the strict deadlines for reporting each payment, see our page on the Standard Reporting Format.

# Need Help?

    [Frequently Asked Questions](#)

For questions and problems

[816-414-2340](#)
[pir.help.desk@fiscal.treasury.gov](#)

For a copy of the Standard Reporting Format (SRF):

[FS.Agency.Outreach@fiscal.treasury.gov](#)

*Last modified 02/06/23*

# Payment Information Repository

A program of the Bureau of the Fiscal Service

**PIR MENU**

Home

Standard Reporting Format

FAQs

Getting Started

Contact Us

**RELATED LINKS**

Collections Information Repository

**The General Public**

**Government Agencies**

**Business & Institutions**

Search Fiscal Service



| | | |
|---|---|---|
| News | | Reports |
| Forms | | Reference |
| Training | | Events |
| Careers | | About |
| Mailing Lists | | Contact |

Bureau of the Fiscal Service 2024

*Accessibility Statement | Data Quality | Freedom of Information Act | Privacy Policy | Privacy Impact Assessments*

## FISCAL SERVICE SITES

Direct Express®

Go Direct®

TreasuryDirect.gov

Treasury Hunt

EFTPS.gov

Pay.gov

Administrative Resource Center (ARC)

FiscalData.Treasury.gov

USAspending.gov

TFX.treasury.gov

## MORE GOVERNMENT SITES

USA.gov

USAJOBS.gov

OPM.gov

MyMoney.gov

Data.gov

Regulations.gov

PaymentAccuracy.gov

No Fear Act

Vote.gov

## TREASURY BUREAUS

The Alcohol and Tobacco Tax and Trade Bureau

Bureau of Engraving and Printing

Community Development Financial Institutions Fund

Financial Crimes Enforcement Network (FinCen)

Internal Revenue Service

Office of the Comptroller of the Currency

U.S. Mint

DECLARATION OF NANDAN M. JOSHI

Exhibit E

**U. S. Department of the Treasury**

**Washington, D.C. 20220**

---

## The Office of the Deputy Assistant Secretary

### for

### Privacy, Transparency, & Records

---

### Privacy Act Handbook

### TD P 25-04

# I. Background, Definitions & References

## A. Introduction

The Office of Privacy, Transparency, & Records, is issuing this handbook to carry out the provisions of the Privacy Act of 1974, as amended, 5 U.S.C. 552a.  The handbook establishes the Department of the Treasury's guidelines and procedures for employees who maintain, collect, use, disseminate or amend records about individuals. Questions about this handbook or the Privacy Act should be directed to the Office of Privacy, Transparency, & Records at 202-622-0755 or via email at privacy@treasury.gov.  This handbook applies to all systems of records maintained by the Department of the Treasury. A system of records is "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual."  The term "*system of records*" is not limited to information stored on information systems and databases.  In the context of the Privacy Act, the term "system" refers to any grouping of records in paper files, information systems, or other electronic or digital mediums.

## B. Background

The Privacy Act of 1974, as amended, 5 U.S.C. 552a, Public Law 93-579 ("Privacy Act" or "the Act"), provides safeguards against the misuse of records Federal agencies maintain about individuals. In general, the Act requires Federal agencies to publish information explaining how records about individuals are collected, maintained, used, and disseminated by the Federal government. Subject to certain exceptions, the Privacy Act also permits individuals to gain access to their records which are maintained in a system of records and to seek amendment of any incorrect or incomplete information contained in those records.

Broadly stated, the purpose of the Act is to balance the government's need to maintain information about individuals with the rights of individuals to be protected against unwarranted invasions of their privacy stemming from Federal agencies' collection, maintenance, use and disclosure of personal information about them.

The historical context of the Act is important to an understanding of its purposes. In 1974, Congress was concerned about the Watergate scandal and allegations of illegal surveillance and investigation of individuals by Federal agencies. Congress was also concerned with potential abuses presented by the government's increasing use of computers to store and retrieve personal information by means of a single, universal personal identifier, such as an individual's social security number.

Specifically, the Act focuses on four policy objectives:

1) To establish a code of "fair information practice principles" (FIPPs) that require agencies to comply with statutory norms for collection, maintenance, and dissemination of records.
2) To restrict disclosure of any item, collection, or grouping of information about an individual maintained by agencies.
3) To grant individuals increased rights of access to records maintained about them.
4) To grant individuals the right to seek amendment of records maintained about them upon a showing that the records are not accurate, relevant, timely or complete.

For information on the processes related to requests for notification and access, requests for amendment and reviews of denials of amendment requests please see 31 CFR Subpart 1C (§1.26 & §1.27) [1] which contains the Treasury Privacy Act Regulations. These topics are not covered in this Handbook to avoid redundancy.

## C. Definitions

1) **Access.** Furnishing to or permitting review of records or a copy of records to the subject of the records or their authorized representative. Note: There is no provision in the Privacy Act for administrative appeal from denials of access. To address this gap in the law, it is Treasury's policy to provide maximum disclosure benefits by processing requests under both the Freedom of Information Act (FOIA) and the Privacy Act, thereby extending the FOIA appeal rights to also apply to access denials.

2) **Accounting of Certain Disclosures.** A record which gives a description of the Privacy Act records that have been disclosed to any person or organization external to the agency, the name and mailing address of the person or agency to whom the disclosure was made, the method and purpose of the disclosure, and the date of the disclosure. An accounting does not need to be kept of intra-agency disclosures or disclosures under the Freedom of Information Act.

3) **Agency.** The term includes "any executive department, military department, Government corporation, Government controlled corporation or other establishment in the executive branch of the Government (including the Executive Office of the President, or any independent regulatory agency." (5 U.S.C. 552 (e))

4) **Alteration to a System of Records.** Any change to an existing system of records including, but not limited to, adding new routine uses or modifying routine uses; increasing or changing the number or types of individuals on whom records are maintained; expanding the type or categories of information maintained; changing the manner in which records are organized or the manner in which records are indexed or retrieved so as to change the nature or scope of those records; changing the purpose for which the information is used; changing the equipment configuration (i.e., hardware, software, or both) on which the system is operated so as to create the potential for either greater or easier access; or causing a system of records to be withdrawn, suspended, canceled, terminated, and subsequently reinstated.

5) **Amendment.** A correction and/or addition to a record made pursuant to a request for change by the individual who is the subject of the records. A correction includes the removal of some word, phrase, sentence, paragraph, or page from the records, or altering an incorrect statement, date, etc. Addition may mean adding material that is furnished by the subject or a statement executed by the subject. Such a statement may or may not be sworn to or affirmed. As used throughout this handbook, the term "amendment" is meant to include both correction of records or addition to a record to make it accurate.

6) **Appeal.** A request for review of an agency decision to refuse to grant a requested amendment of a record.

7) **Appellate Official.** The individual designated by the bureau pursuant to Treasury Directive (TD) 25-04 to either affirm or reverse the initial determination denying amendment of a record under the Privacy Act, when that initial determination is appealed by the requester.

8) **Bureau.** A unit of the Department of the Treasury (sometimes referred to in this Handbook as "Components). The bureaus of the Department of the Treasury are:

---

[1] Please see Treasury Privacy Act Regulations for guidance on Requests for Amendment, Review of Denials of Amendment, and Disclosure of Records.

# IV. Publishing System of Records Notices

Summary: This chapter pertains to the drafting and publication of Privacy Act notices. The requirements of the Office of the *Federal Register* concerning Privacy Act notices and rulemaking documents are highlighted. The elements needed for a notice and report to OMB and Congress are explained.

## A. General

Information about individuals cannot be collected for inclusion in a system of records until Treasury publishes a notice of that system in the *Federal Register*.

A system of records may be operated exclusively by a Bureau or Office; however, Treasury's Departmental Offices is responsible for publishing the system notice in the *Federal Register*.

Each Bureau or Office is responsible for preparing the required reports and notices of proposals to establish or alter a system of records. The Bureau or Office must prepare these notices and reports in accordance with this handbook and the Office of Management and Budget Circular No. A-108, *Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act*. The Bureau or Office must prepare, for the signature of the Deputy Assistant Secretary for Privacy, Transparency, & Records (DASPTR), all required documentation necessary for submission to: (1) the Office of the Federal Register; (2) Congress, and (3) the Office of Management and Budget.

The Bureau or Office must ensure the completion and publication in the Federal Register of a system of records notice or altered system of records notice before maintaining (if a new system of records) or continuing to maintain (if altered) the system of records. An officer or employee of a Bureau or Office who willfully maintains a system of records without meeting the notice requirements of the Act may be found guilty of a misdemeanor and fined up to $5,000.

The public notice must be as simple and clear as possible while achieving the objective of informing the public of the nature and purpose of the system of records. Therefore, the Bureau or Office must exercise care in the tone, language, length, and amount of detail in the public notice posted in the Federal Register.

Each Bureau or Office responsible for creating a new system of records or altering an existing system of records must first have the required documentation reviewed and approved by the bureau's legal counsel (and any other Bureau or Office officials whose concurrence is required per Bureau/Office processes) before sending it to the Office of Privacy, Transparency, and Record's Privacy and Civil Liberties Team: (1) for initial review; and (2) approval of the final version of all system notices, reports, etc.

The final package the Bureau or Office sends to the Office of Privacy, Transparency, and Record's Privacy and Civil Liberties Team for signature must include a transmittal memorandum to the DASPTR from the head of the Bureau or Office establishing or altering the system of records, explaining the action taken and the reasons for the action.

## B. When to Publish a System of Records Notice

There are several different circumstances under which a notice of a system of records must be published:

1) When establishing or making significant/major alterations/modifications to a system of records, the Bureau or Office must publish a notice establishing or altering a system of records. This notice must include the following:

a) A preamble and notice;
b) A report to OMB and Congress; and
c) If the Bureau or Office is claiming exemptions from certain Privacy Act requirements for the system, a proposed rule and a final rule must be published in the *Federal Register* as part of the rulemaking process before that change becomes effective.

The template for drafting a notice of a new system of records can be found in Appendix B, Office of the Federal Register SORN Template – Full Notice.

2) Modifications that require notice are those that result in:
   a) New categories of records maintained;
   b) New categories of individuals on whom records are maintained;
   c) New recipients of the information not covered in the existing routine uses; or
   d) Changes to routine uses.

   The template for drafting a notice for a modified system of records can be found in Appendix B, Office of the Federal Register SORN Template – Notice of Revision.

3) When making minor changes to a system of records. A Bureau or Office must submit to the Office of Privacy, Transparency, & Records a notice to reflect minor modifications to an existing system of records before the changes become effective. The notice must be accompanied by a memorandum demonstrating that the modification is not significant and, therefore, does not require submission of the other documents listed in Section B.1. above.

4) To rescind a system of records notice. A notice may be rescinded because the system was submitted in error, is not subject to the Privacy Act, has been discontinued, or is a duplication of an existing system. If it is important that the public be informed as soon as possible of the rescindment, notice of the rescindment may be given by proper notice in the *Federal Register*. When time is not a factor, the rescindment may be part of the periodic updating of notices. Once rescinded, reinstatement of the same system will require a new system report.

   Each of the above documents are required to be prepared in draft form and submitted to the Office of Privacy, Transparency, & Records, Privacy and Civil Liberties for review and approval prior to submission of the final package to the DASPTR.

   A sample package of the above items is available upon request from the Office of Privacy, Transparency, & Record's Privacy and Civil Liberties team.

   The template for drafting a notice rescinding a SORN can be found in Appendix B, Office of the Federal Register Notice of Rescindment Template.

## C. Federal Register Notice Documents

1) Format and Content of a Preamble. Any document that the Department submits for publication in the *Federal Register* must comply with the requirements of the Office of the *Federal Register*'s "Document Drafting Handbook."

   The document begins with a series of headings to identify the issuing agency, the subject matter and, if appropriate, the CFR title to be amended. This is followed by the "preamble," which explains the purpose of the document being published, but must not contain any regulatory text. The last segment is the actual Privacy Act notice for a new or altered SORN or choosing to publish a revised SORN in its entirety.

Each Privacy Act notice or rule published in the Federal Register requires a preamble to inform the reader of the basis and purpose of the notice. Please see the preamble in Appendix C, which captions and associated text as required by the Office of the Federal Register.

## D.  Report to OMB and Congress Requirements

1) **Report on New Systems (Full Notice).** The report on a new system is intended to provide an opportunity for U.S. citizens and legal permanent residents to examine the effect the new system of records might have on them. Therefore, the report must include a discussion of confidentiality and security in such system and the extent to which the creation of the system will alter or change interagency or intergovernmental relationships related to information programs. The report should contain information which will meet these objectives. In applying the report criteria, a reasonable standard should be used to avoid excessive reporting of insignificant details which would have no meaningful Privacy Act information.

   A report on a new system must be submitted when the establishment of a new system of records, subject to the Privacy Act, is proposed.

   The template for drafting a full notice may be found at Appendix B, Office of the Federal Register SORN Template – Full Notice.

2) **Report on an Altered/Modified System.** The Bureau or Office must also draft a report when an alteration to an existing system meets any of the following criteria:
   a)  The alteration increases the number or changes the types of individuals on whom records are maintained. A change involving the number, rather than the types, of individuals about whom records are kept needs only to be reported when that change significantly alters the character and purpose of the system of records. Normal increases in historical files or other increases in the number of records in a file which can be attributed to normal growth patterns need not be reported. Examples of changes which do not need to be reported are increases in the cases opened because of greater efficiency; increases in the number of requests for services rendered from the public; and increases resulting from the continuous accumulation of records.
   b)  The alteration expands the type of categories of information maintained. For example, if an employee payroll file is expanded to include data on education and training, this would be considered an expansion of the type of categories of information maintained and would have to be reported.
   c)  The alteration changes the purpose for which the information is used.
   d)  The alteration changes the equipment configuration, hardware, and/or software that creates substantially greater access to the records in the system. For example, locating interactive terminals at regional offices for accessing a system formerly accessible only at the headquarters would require a report. A report is not required for a routine acquisition of equipment, as long as the use of the acquired equipment is consistent with the use of the existing system, does not involve a risk of improper access or does not cause greater access to the information. The use of automated equipment for preparing a sort or analysis of information maintained in a manual system, without creating a continuing storage or retrieval capacity, does not constitute a change in configuration.

When a change to an information technology installation, telecommunications network, or any other general changes in information collection, processing, dissemination, or storage that affects multiple systems of records is made, a single consolidated new or altered system report may be submitted with changes to existing notices and supporting documentation included in the submission.

3) The following questions may be helpful in determining if a report needs to be submitted because of significant changes to the system of records:

a) Is this information presently included in an existing system of records?

Yes _____ If yes, identify the system of records and answer the following questions.

No _____ If no, see the section about reviewing existing or creating and new SORN:

(1) Will there be an increase or change in the number or types of individuals on whom records are maintained? If so, explain.
(2) Will the type or categories of information maintained be expanded? If so, explain.
(3) Will the nature or the scope of these records be changed by altering the manner in which the records are organized, indexed, retrieved, etc.? If so, explain.
(4) Will this alter the purpose for which the information is used? If so, explain.
(5) What is the current method of access to the system of records?
(6) How are the records currently stored?
(7) Will this be changed? If so, briefly explain how.

## E. Format and Content of the Report

The report consists of a narrative statement and supporting documentation for review and approval by the Office of Privacy, Transparency & Records Privacy Act Officer. The statement should refer to information in the supporting documentation rather than restating this information.

The narrative statement should be brief, typically not exceeding four single-spaced pages, and should contain the following:

1) **Introduction.** Give background information. For example, for altered system, provide information on when the system was originally established, the citation to the original notice in the *Federal Register*, and the last republication date, if different.

For a new system, state why the system is needed. Note: If no changes to existing rules are required, this fact should be stated in the Introduction. If a new system of records or an alteration to an existing system will require the publication of a proposed and final rule amending 31 CFR 1.36, this fact should be disclosed as part of the report.

2) **Purpose.** For a new system, explain what the system will include and how it will be used. For a revised system, explain the necessity for revision. If the system is to be automated, explain in detail why this system is being automated and on what basis that determination was made (for example, the need for rapid retrieval as a result of a time-measurement study).

3) **Authority.** Identify the specific statutory provision or Executive Order that authorizes the maintenance of the system of records. The Privacy Act of 1974 is <u>not</u> authority for maintaining a system of records.

4) **Probable Effect on Individual Privacy or Other Rights.** This is an evaluation of the probable or potential effect of the proposed new or altered/modified system of records on the privacy or

other personal rights of individuals. How will the proposed new or altered system of records impact an individual's privacy? For example, will the modified system result in the collection of records that could potentially result in a reduction of salary, loss of eligibility in a Federal program, or cause the individual to be subject to administrative or civil proceedings or possible incarceration because of a violation of a criminal law? If no adverse effect is anticipated, a statement should be made regarding the system's minimal effect on individual privacy.

5) **Security Provided for this System.** Do not limit this item to physical security. Include such things as the personnel who will have access and the title of the individual who determines the personnel access and, if applicable, the criteria for that determination. Provide a brief description of the steps taken by the agency to minimize the risk of unauthorized access to the system of records. Since a more detailed assessment of the risks and specific administrative, technical, procedural, and physical safeguards established is to be made available to the Office of Management and Budget upon request, the assessment should be accomplished now and a copy provided to the Office of Privacy, Transparency, & Records.

6) **Compatibility of Routine Uses of Proposed System.** Explain how each proposed routine use (i.e., disclosures outside the agency) satisfies the compatibility requirement of subsection (a)(7) of the Act. For altered systems, this requirement pertains only to any newly proposed routine uses or any routine use to which an amendment is being proposed that increases the availability of Privacy Act records or amends the manner in which the records may be used.

7) **Office of Management and Budget (OMB) Requirements.** Provide OMB control numbers, expiration dates, and titles of any OMB-approved information collection requirements contained in the system of records. For example:

Title/Form Control Number Expiration Date

Suspicious Activity Report/ 1506-0001 4/30/06

TDF-90-22.47

If the request for OMB clearance of an information collection is pending, simply state the title of the collection and the date it was submitted for OMB clearance.

## F. Timing

1) The timing for submitting the report, notice and proposed rule to the Office of Privacy, Transparency, & Record's Privacy Act Officer for review and approval is determined by:
   a) the date on which the bureau proposes to issue the data collection forms and/or instructions (the report must be submitted far enough in advance (120 days is recommended; anything less than 90 days puts completion by your deadline at risk) to allow internal review and OMB approval before any data is collected and maintained in a system of records); and/or
   b) the date on which the bureau begins to maintain information on individuals in the new or altered system (e.g., if the bureau or office is obtaining the records from another federal agency or Treasury information system, the necessary documents (e.g., modification of the existing Treasury SORN or a new (or modified) Treasury SORN for records obtained from outside Treasury) should be submitted for approval at least 90 days before the records are transferred to the new information system).

2) The review and approval process involve three stages:
   a) **Departmental Review and Approval.**

(1) **Draft Review**: Bureaus and offices should submit drafts of the report, preamble and notice, and any proposed rule to the Office of Privacy, Transparency, & Record's (PTR) Privacy Act Officer at least 120 days before the system of records is to be implemented to avoid delays.

(2) **Final clearance in PTR and OMB/OIRA**: After the draft documents are reviewed, the bureau or office must submit final documents, along with the transmittal memo and risk assessment, to the  Office of Privacy, Transparency, & Record's Privacy Act Officer no less than 120 days before the maintenance of the system of records or the date on which the alteration to the system is to be made in order to avoid delays in maintaining the records (e.g., OMB has 30 days to review SORNs and may unilaterally extend that review period for an additional 6 days; that process alone could consume up to 60 days). This permits the Office of Privacy, Transparency, & Records to conduct the administrative and legal reviews necessary before signature by the Deputy Assistant Secretary for Privacy, Transparency, & Records.

b) **Congressional and Office of Management and Budget review.** After the Deputy Assistant Secretary for Privacy, Transparency, & Records signs the documents, the Treasury Privacy Act Officer will submit the report, a copy of the system of records notice, and any proposed rule to Congress and the Office of Management and Budget.  If OMB provides any comments or other feedback, the bureau or office must address those issues before the documents receive OMB approval for publication in the Federal Register.

c) **Public review and comment (no exemptions claimed).** After OMB approval, the Office for Privacy, Transparency, & Record's Privacy Act Officer will submit the OMB approved new or altered system notice for publication in the *Federal Register* no less than 30 calendar days before maintenance of records in the new system of records or implementation of proposed alterations to an existing system of records

d) **Public review and comment (exemptions claimed).** If a bureau plans to exempt a system of records from certain Privacy Act provisions, the proposed regulation must provide for a 30-day comment period for the public. Separate publication of the final rule follows at a future date.

## G. Inventory of the Department's Systems of Records

Treasury is no longer required to publish the existing notices of systems of records in their entirety in the Federal Register every three years.  Instead, Bureau Privacy and Civil Liberties Officers are asked to review their system notices to make necessary changes as needed, in keeping with continuous monitoring requirements. Treasury bureaus must periodically review their systems of records notices to ensure that they accurately describe the system.  The Office of the Federal Register compiles and publishes a complete listing of all agencies' systems of records in the Federal Register's biennial compilation of system notices.

Treasury also maintains its inventory of Privacy Act systems of records on its Privacy Act web page.

DECLARATION OF NANDAN M. JOSHI

Exhibit F





**Department of the Treasury Privacy Program Plan**

Version: 1.1
Date: 18 September 2024

protect organizational operations (including mission, functions, image, and reputation), organizational assets, individuals, other organizations, and the Nation from a diverse set of threats including hostile cyber-attacks, natural disasters, structural failures, and human errors.

As required by NIST, the ASM/CPCLO, working in conjunction with the Treasury's Chief Information Officer (CIO) and other Treasury privacy stakeholders, identified a set of NIST controls to be implemented as common controls across Treasury. These common controls are the primary mechanism for ensuring the consistent Treasury-wide implementation of privacy requirements.

### 3.1 Privacy Controls

Privacy controls are the operational, technical, and management safeguards used to maintain the integrity, confidentiality, and security of PII maintained in federal information systems. The Privacy Act, Section 208 of the E-Government Act, and OMB policies impose collection, maintenance, use, and disposal requirements for executive branch agencies that maintain PII. Privacy controls are based on the Fair Information Practice Principles (FIPPs) embodied in the Privacy Act. The FIPPs provide the foundation and guiding principles for Treasury's privacy program controls.

At Treasury, the FIPPs are embodied in the following set of principles:

1. **Openness/Transparency**: Treasury will be transparent and provide notice to the public regarding its collection, use, sharing, and maintenance of PII.

2. **Individual Participation**: Treasury will involve the individual about whom information is collected in the process of collecting and using PII and, to the extent practicable and necessary, seek individual consent for the collection, use, sharing, and maintenance of PII. Treasury will also provide mechanisms for appropriate access, correction, and redress regarding Treasury's use of PII.

3. **Purpose Specification**: Treasury will specifically articulate the authority that permits the collection of PII and the purpose or purposes for which the PII is intended to be used.

4. **Collection Limitation/Data Minimization**: Subject to applicable exemptions, Treasury will only collect PII that is directly relevant and necessary to accomplish the specified purposes and only retain PII for as long as is necessary to fulfill the purposes specified in applicable notices.

5. **Use Limitation**: Treasury will use PII solely for the purposes specified in required notices (e.g., SORNs, PCLIAs, PAS, and CMAs). Sharing of PII outside the Department will be done in a manner compatible with the purpose for which the PII was originally collected.

6. **Data Quality/Integrity**: Treasury will, to the extent practicable and consistent with the purposes for which the information is used (e.g., using it to make or not make determinations about individuals), ensure that PII is accurate, relevant, timely, and complete.

7. **Security/Safeguards**: Treasury will protect PII (in all media) through appropriate security safeguards against risks such as loss, unauthorized access or use, destruction, modification,

or unintended or inappropriate disclosure.

8. **Accountability/Auditing**: Treasury will be accountable for complying with these principles to the extent required by law, providing training to all employees and contractors who potentially have access to PII, and auditing the actual use of PII to demonstrate compliance with these principles and all applicable privacy protection requirements.

There are eight privacy control families, each aligning with one of the FIPPs. Each family consists of one or more privacy controls, and each control contains one or more requirements. Treasury compliance with the NIST SP 800-53 Rev. 5 is detailed under the column titled "How Treasury Meets the Privacy Control" in Appendix C. Compliance with all privacy controls is required at the agency, bureau, office, program, and information system level. The ASM/CPCLO, PTR, and all Treasury privacy stakeholders assist the bureaus and offices, to the greatest extent possible, in uniformly implementing the controls.

Table 3.2 (in Section 3.2 below) summarizes the classes and families in the security control catalog and the associated family identifiers. The objectives of the privacy program controls are to:

- Protect PII collected, used, maintained, shared, and disposed of by programs and information systems;

- Provide a structured set of privacy controls that help organizations enforce requirements resulting from federal privacy legislation, policies, regulations, directives, standards, and guidance;

- Establish a relationship between these controls to enforce privacy and security requirements within federal information systems, programs, and organizations;

- Demonstrate the applicability of the NIST Risk Management Framework (RMF) in the selection, implementation, assessment, and monitoring of privacy controls used in federal information systems, programs, and organizations; and

- Promote closer cooperation between privacy and security officials to help achieve the objectives of senior leaders in enforcing the requirements in federal privacy legislation, policies, regulations, directives, standards, and guidance.

## 3.2 Program Management Controls

OMB Circular A-130 and NIST SP 800-53 Rev. 5 provide significant assistance to federal agencies in implementing privacy requirements consistently throughout the organization. At Treasury, the ASM/CPCLO, working with Treasury privacy stakeholders, designates which privacy controls the agency will treat as program management, common, information system-specific, or hybrid controls. Privacy Program Management controls are generally implemented at the agency/departmental level and are essential for managing the privacy programs across the organization. These controls are designed to facilitate privacy compliance with applicable federal laws, EOs, directives, policies, regulations, and standards across the organization. They also are designed to complement programmatic, organization-wide information security requirements.

DECLARATION OF NANDAN M. JOSHI

Exhibit G

**NIST Special Publication 800-53**
**Revision 5**

# Security and Privacy Controls for Information Systems and Organizations

**JOINT TASK FORCE**

This publication is available free of charge from:
https://doi.org/10.6028/NIST.SP.800-53r5



NIST Special Publication 800-53
Revision 5

# Security and Privacy Controls for Information Systems and Organizations

**JOINT TASK FORCE**

This publication is available free of charge from:
https://doi.org/10.6028/NIST.SP.800-53r5

**September 2020**
INCLUDES UPDATES AS OF 12-10-2020; SEE PAGE XVII



**U.S. Department of Commerce**
*Wilbur L. Ross, Jr., Secretary*

**National Institute of Standards and Technology**
*Walter Copan, NIST Director and Under Secretary of Commerce for Standards and Technology*

usage in their privacy impact assessment and make determinations that are in alignment with their privacy program plan.

Related Controls:  AU-6, AU-7, CA-7, IR-8, SI-4.

**(13)** ACCOUNT MANAGEMENT │ DISABLE ACCOUNTS FOR HIGH-RISK INDIVIDUALS

**Disable accounts of individuals within [*Assignment: organization-defined time period*] of discovery of [*Assignment: organization-defined significant risks*].**

Discussion:  Users who pose a significant security and/or privacy risk include individuals for whom reliable evidence indicates either the intention to use authorized access to systems to cause harm or through whom adversaries will cause harm. Such harm includes adverse impacts to organizational operations, organizational assets, individuals, other organizations, or the Nation. Close coordination among system administrators, legal staff, human resource managers, and authorizing officials is essential when disabling system accounts for high-risk individuals.

Related Controls:  AU-6, SI-4.

References:  [SP 800-162], [SP 800-178], [SP 800-192].

## AC-3    ACCESS ENFORCEMENT

Control:  Enforce approved authorizations for logical access to information and system resources in accordance with applicable access control policies.

Discussion:  Access control policies control access between active entities or subjects (i.e., users or processes acting on behalf of users) and passive entities or objects (i.e., devices, files, records, domains) in organizational systems. In addition to enforcing authorized access at the system level and recognizing that systems can host many applications and services in support of mission and business functions, access enforcement mechanisms can also be employed at the application and service level to provide increased information security and privacy. In contrast to logical access controls that are implemented within the system, physical access controls are addressed by the controls in the Physical and Environmental Protection (PE) family.

Related Controls:  AC-2, AC-4, AC-5, AC-6, AC-16, AC-17, AC-18, AC-19, AC-20, AC-21, AC-22, AC-24, AC-25, AT-2, AT-3, AU-9, CA-9, CM-5, CM-11, IA-2, IA-5, IA-6, IA-7, IA-11, MA-3, MA-4, MA-5, MP-4, PM-2, PS-3, PT-2, PT-3, SA-17, SC-2, SC-3, SC-4, SC-12, SC-13, SC-28, SC-31, SC-34, SI-4, SI-8.

Control Enhancements:

**(1)** ACCESS ENFORCEMENT │ RESTRICTED ACCESS TO PRIVILEGED FUNCTIONS

[Withdrawn: Incorporated into AC-6.]

**(2)** ACCESS ENFORCEMENT │ DUAL AUTHORIZATION

**Enforce dual authorization for [*Assignment: organization-defined privileged commands and/or other organization-defined actions*].**

Discussion:  Dual authorization, also known as two-person control, reduces risk related to insider threats. Dual authorization mechanisms require the approval of two authorized individuals to execute. To reduce the risk of collusion, organizations consider rotating dual authorization duties. Organizations consider the risk associated with implementing dual authorization mechanisms when immediate responses are necessary to ensure public and environmental safety.

Related Controls:  CP-9, MP-6.

**(3)** ACCESS ENFORCEMENT │ MANDATORY ACCESS CONTROL

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

Enforce [*Assignment: organization-defined mandatory access control policy*] over the set of covered subjects and objects specified in the policy, and where the policy:

(a)  Is uniformly enforced across the covered subjects and objects within the system;

(b)  Specifies that a subject that has been granted access to information is constrained from doing any of the following:

(1)  Passing the information to unauthorized subjects or objects;

(2)  Granting its privileges to other subjects;

(3)  Changing one or more security attributes (specified by the policy) on subjects, objects, the system, or system components;

(4)  Choosing the security attributes and attribute values (specified by the policy) to be associated with newly created or modified objects; and

(5)  Changing the rules governing access control; and

(c)  Specifies that [*Assignment: organization-defined subjects*] may explicitly be granted [*Assignment: organization-defined privileges*] such that they are not limited by any defined subset (or all) of the above constraints.

Discussion:  Mandatory access control is a type of nondiscretionary access control. Mandatory access control policies constrain what actions subjects can take with information obtained from objects for which they have already been granted access. This prevents the subjects from passing the information to unauthorized subjects and objects. Mandatory access control policies constrain actions that subjects can take with respect to the propagation of access control privileges; that is, a subject with a privilege cannot pass that privilege to other subjects. The policy is uniformly enforced over all subjects and objects to which the system has control. Otherwise, the access control policy can be circumvented. This enforcement is provided by an implementation that meets the reference monitor concept as described in AC-25. The policy is bounded by the system (i.e., once the information is passed outside of the control of the system, additional means may be required to ensure that the constraints on the information remain in effect).

The trusted subjects described above are granted privileges consistent with the concept of least privilege (see AC-6). Trusted subjects are only given the minimum privileges necessary for satisfying organizational mission/business needs relative to the above policy. The control is most applicable when there is a mandate that establishes a policy regarding access to controlled unclassified information or classified information and some users of the system are not authorized access to all such information resident in the system. Mandatory access control can operate in conjunction with discretionary access control as described in AC-3(4). A subject constrained in its operation by mandatory access control policies can still operate under the less rigorous constraints of AC-3(4), but mandatory access control policies take precedence over the less rigorous constraints of AC-3(4). For example, while a mandatory access control policy imposes a constraint that prevents a subject from passing information to another subject operating at a different impact or classification level, AC-3(4) permits the subject to pass the information to any other subject with the same impact or classification level as the subject. Examples of mandatory access control policies include the Bell-LaPadula policy to protect confidentiality of information and the Biba policy to protect the integrity of information.

Related Controls:  SC-7.

(4)  ACCESS ENFORCEMENT | DISCRETIONARY ACCESS CONTROL

Enforce [*Assignment: organization-defined discretionary access control policy*] over the set of covered subjects and objects specified in the policy, and where the policy specifies that a subject that has been granted access to information can do one or more of the following:

(a)  Pass the information to any other subjects or objects;

(c)  **Ensures the content associated with the filtering metadata has successfully completed filtering; and**

(d)  **Transfers the content to the destination filter pipeline.**

Discussion:  The processes transferring information between filter pipelines have minimum complexity and functionality to provide assurance that the processes operate correctly.

Related Controls:  None.

References:  [SP-800-160-1], [SP 800-162], [SP 800-178], [IR 8112].

## AC-5    SEPARATION OF DUTIES

Control:

a.  Identify and document [*Assignment: organization-defined duties of individuals requiring separation*]; and

b.  Define system access authorizations to support separation of duties.

Discussion:  Separation of duties addresses the potential for abuse of authorized privileges and helps to reduce the risk of malevolent activity without collusion. Separation of duties includes dividing mission or business functions and support functions among different individuals or roles, conducting system support functions with different individuals, and ensuring that security personnel who administer access control functions do not also administer audit functions. Because separation of duty violations can span systems and application domains, organizations consider the entirety of systems and system components when developing policy on separation of duties. Separation of duties is enforced through the account management activities in AC-2, access control mechanisms in AC-3, and identity management activities in IA-2, IA-4, and IA-12.

Related Controls:  AC-2, AC-3, AC-6, AU-9, CM-5, CM-11, CP-9, IA-2, IA-4, IA-5, IA-12, MA-3, MA-5, PS-2, SA-8, SA-17.

Control Enhancements:  None.

References:  None.

## AC-6    LEAST PRIVILEGE

Control:  Employ the principle of least privilege, allowing only authorized accesses for users (or processes acting on behalf of users) that are necessary to accomplish assigned organizational tasks.

Discussion:  Organizations employ least privilege for specific duties and systems. The principle of least privilege is also applied to system processes, ensuring that the processes have access to systems and operate at privilege levels no higher than necessary to accomplish organizational missions or business functions. Organizations consider the creation of additional processes, roles, and accounts as necessary to achieve least privilege. Organizations apply least privilege to the development, implementation, and operation of organizational systems.

Related Controls:  AC-2, AC-3, AC-5, AC-16, CM-5, CM-11, PL-2, PM-12, SA-8, SA-15, SA-17, SC-38.

Control Enhancements:

**(1)  LEAST PRIVILEGE | AUTHORIZE ACCESS TO SECURITY FUNCTIONS**

**Authorize access for [*Assignment: organization-defined individuals or roles*] to:**

(a)  **[*Assignment: organization-defined security functions (deployed in hardware, software, and firmware)*]; and**

(b)  **[*Assignment: organization-defined security-relevant information*].**

Discussion: Security functions include establishing system accounts, configuring access authorizations (i.e., permissions, privileges), configuring settings for events to be audited, and establishing intrusion detection parameters. Security-relevant information includes filtering rules for routers or firewalls, configuration parameters for security services, cryptographic key management information, and access control lists. Authorized personnel include security administrators, system administrators, system security officers, system programmers, and other privileged users.

Related Controls: AC-17, AC-18, AC-19, AU-9, PE-2.

(2) LEAST PRIVILEGE | NON-PRIVILEGED ACCESS FOR NONSECURITY FUNCTIONS

**Require that users of system accounts (or roles) with access to [*Assignment: organization-defined security functions or security-relevant information*] use non-privileged accounts or roles, when accessing nonsecurity functions.**

Discussion: Requiring the use of non-privileged accounts when accessing nonsecurity functions limits exposure when operating from within privileged accounts or roles. The inclusion of roles addresses situations where organizations implement access control policies, such as role-based access control, and where a change of role provides the same degree of assurance in the change of access authorizations for the user and the processes acting on behalf of the user as would be provided by a change between a privileged and non-privileged account.

Related Controls: AC-17, AC-18, AC-19, PL-4.

(3) LEAST PRIVILEGE | NETWORK ACCESS TO PRIVILEGED COMMANDS

**Authorize network access to [*Assignment: organization-defined privileged commands*] only for [*Assignment: organization-defined compelling operational needs*] and document the rationale for such access in the security plan for the system.**

Discussion: Network access is any access across a network connection in lieu of local access (i.e., user being physically present at the device).

Related Controls: AC-17, AC-18, AC-19.

(4) LEAST PRIVILEGE | SEPARATE PROCESSING DOMAINS

**Provide separate processing domains to enable finer-grained allocation of user privileges.**

Discussion: Providing separate processing domains for finer-grained allocation of user privileges includes using virtualization techniques to permit additional user privileges within a virtual machine while restricting privileges to other virtual machines or to the underlying physical machine, implementing separate physical domains, and employing hardware or software domain separation mechanisms.

Related Controls: AC-4, SC-2, SC-3, SC-30, SC-32, SC-39.

(5) LEAST PRIVILEGE | PRIVILEGED ACCOUNTS

**Restrict privileged accounts on the system to [*Assignment: organization-defined personnel or roles*].**

Discussion: Privileged accounts, including super user accounts, are typically described as system administrator for various types of commercial off-the-shelf operating systems. Restricting privileged accounts to specific personnel or roles prevents day-to-day users from accessing privileged information or privileged functions. Organizations may differentiate in the application of restricting privileged accounts between allowed privileges for local accounts and for domain accounts provided that they retain the ability to control system configurations for key parameters and as otherwise necessary to sufficiently mitigate risk.

Related Controls: IA-2, MA-3, MA-4.

**(6)** LEAST PRIVILEGE | PRIVILEGED ACCESS BY NON-ORGANIZATIONAL USERS

**Prohibit privileged access to the system by non-organizational users.**

Discussion:  An organizational user is an employee or an individual considered by the organization to have the equivalent status of an employee. Organizational users include contractors, guest researchers, or individuals detailed from other organizations. A non-organizational user is a user who is not an organizational user. Policies and procedures for granting equivalent status of employees to individuals include a need-to-know, citizenship, and the relationship to the organization.

Related Controls:  AC-18, AC-19, IA-2, IA-8.

**(7)** LEAST PRIVILEGE | REVIEW OF USER PRIVILEGES

**(a) Review [*Assignment: organization-defined frequency*] the privileges assigned to [*Assignment: organization-defined roles or classes of users*] to validate the need for such privileges; and**

**(b) Reassign or remove privileges, if necessary, to correctly reflect organizational mission and business needs.**

Discussion:  The need for certain assigned user privileges may change over time to reflect changes in organizational mission and business functions, environments of operation, technologies, or threats. A periodic review of assigned user privileges is necessary to determine if the rationale for assigning such privileges remains valid. If the need cannot be revalidated, organizations take appropriate corrective actions.

Related Controls:  CA-7.

**(8)** LEAST PRIVILEGE | PRIVILEGE LEVELS FOR CODE EXECUTION

**Prevent the following software from executing at higher privilege levels than users executing the software: [*Assignment: organization-defined software*].**

Discussion:  In certain situations, software applications or programs need to execute with elevated privileges to perform required functions. However, depending on the software functionality and configuration, if the privileges required for execution are at a higher level than the privileges assigned to organizational users invoking such applications or programs, those users may indirectly be provided with greater privileges than assigned.

Related Controls:  None.

**(9)** LEAST PRIVILEGE | LOG USE OF PRIVILEGED FUNCTIONS

**Log the execution of privileged functions.**

Discussion:  The misuse of privileged functions, either intentionally or unintentionally by authorized users or by unauthorized external entities that have compromised system accounts, is a serious and ongoing concern and can have significant adverse impacts on organizations. Logging and analyzing the use of privileged functions is one way to detect such misuse and, in doing so, help mitigate the risk from insider threats and the advanced persistent threat.

Related Controls:  AU-2, AU-3, AU-12.

**(10)** LEAST PRIVILEGE | PROHIBIT NON-PRIVILEGED USERS FROM EXECUTING PRIVILEGED FUNCTIONS

**Prevent non-privileged users from executing privileged functions.**

Discussion:  Privileged functions include disabling, circumventing, or altering implemented security or privacy controls, establishing system accounts, performing system integrity checks, and administering cryptographic key management activities. Non-privileged users are individuals who do not possess appropriate authorizations. Privileged functions that require protection from non-privileged users include circumventing intrusion detection and

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

prevention mechanisms or malicious code protection mechanisms. Preventing non-privileged users from executing privileged functions is enforced by AC-3.

Related Controls:  None.

References:  None.

## AC-7   UNSUCCESSFUL LOGON ATTEMPTS

Control:

a. Enforce a limit of [*Assignment: organization-defined number*] consecutive invalid logon attempts by a user during a [*Assignment: organization-defined time period*]; and

b. Automatically [*Selection (one or more): lock the account or node for an* [*Assignment: organization-defined time period*]; *lock the account or node until released by an administrator; delay next logon prompt per* [*Assignment: organization-defined delay algorithm*]; *notify system administrator; take other* [*Assignment: organization-defined action*]] when the maximum number of unsuccessful attempts is exceeded.

Discussion:  The need to limit unsuccessful logon attempts and take subsequent action when the maximum number of attempts is exceeded applies regardless of whether the logon occurs via a local or network connection. Due to the potential for denial of service, automatic lockouts initiated by systems are usually temporary and automatically release after a predetermined, organization-defined time period. If a delay algorithm is selected, organizations may employ different algorithms for different components of the system based on the capabilities of those components. Responses to unsuccessful logon attempts may be implemented at the operating system and the application levels. Organization-defined actions that may be taken when the number of allowed consecutive invalid logon attempts is exceeded include prompting the user to answer a secret question in addition to the username and password, invoking a lockdown mode with limited user capabilities (instead of full lockout), allowing users to only logon from specified Internet Protocol (IP) addresses, requiring a CAPTCHA to prevent automated attacks, or applying user profiles such as location, time of day, IP address, device, or Media Access Control (MAC) address. If automatic system lockout or execution of a delay algorithm is not implemented in support of the availability objective, organizations consider a combination of other actions to help prevent brute force attacks. In addition to the above, organizations can prompt users to respond to a secret question before the number of allowed unsuccessful logon attempts is exceeded. Automatically unlocking an account after a specified period of time is generally not permitted. However, exceptions may be required based on operational mission or need.

Related Controls:  AC-2, AC-9, AU-2, AU-6, IA-5.

Control Enhancements:

(1) UNSUCCESSFUL LOGON ATTEMPTS | AUTOMATIC ACCOUNT LOCK

[Withdrawn: Incorporated into AC-7.]

(2) UNSUCCESSFUL LOGON ATTEMPTS | PURGE OR WIPE MOBILE DEVICE

**Purge or wipe information from [*Assignment: organization-defined mobile devices*] based on [*Assignment: organization-defined purging or wiping requirements and techniques*] after [*Assignment: organization-defined number*] consecutive, unsuccessful device logon attempts.**

Discussion:  A mobile device is a computing device that has a small form factor such that it can be carried by a single individual; is designed to operate without a physical connection; possesses local, non-removable or removable data storage; and includes a self-contained power source. Purging or wiping the device applies only to mobile devices for which the organization-defined number of unsuccessful logons occurs. The logon is to the mobile

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

DECLARATION OF NANDAN M. JOSHI

Exhibit H

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ALLIANCE FOR RETIRED AMERICANS, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 1:25-cv-00313-CKK |
| SCOTT BESSENT, *et al.*, | |
| Defendants. | |

## DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFFS' REQUESTS FOR ADMISSION

Pursuant to Federal Rules of Civil Procedure 26 and 36, and to the Local Rules of the United States District Court for the District of Columbia, Defendants—Scott Bessent, in his official capacity as Secretary of the Treasury, Department of the Treasury, and Bureau of the Fiscal Service (Bureau)—provide the following responses to Plaintiffs' requests for admission, as served on March 20, 2025, following modification of Plaintiffs' discovery requests by the Court's March 20, 2025 Memorandum Opinion and Order, ECF No. 52 (Discovery Order).

### General Objections

1.      The following general objections apply to, and are incorporated in, each individual response.

2.      Defendants object to providing any discovery at all at this time, as Defendants have not yet filed a motion to dismiss and have not answered the amended complaint; there has been no conference of the parties, as required by Rule 26(f) and Local Civil Rule 16.3(b).

3.    Defendants object to the definitions in Plaintiffs' requests to the extent that the definitions conflict with or purport to expand upon the Defendants' obligations under the Federal Rules of Civil Procedure, the Local Rules for the United States District Court for the District of Columbia, or the Court's Discovery Order.

4.    Defendants object to each and every interrogatory to the extent that it is deemed to require disclosure of matters subject to the attorney-client privilege, the attorney work product doctrine, other applicable privileges, or any statutory or regulatory restriction on disclosure.

5.    Defendants object to the term "Access," as used throughout Plaintiffs' discovery requests, because the phrase "directly read, review, copy, download or otherwise interact with records that are in an agency system" in Plaintiffs' definition of that term is vague and ambiguous. Defendants further object that the terms "directly," "records," and "system" are undefined and ambiguous.  Defendants will interpret "records" and "system" as those terms are used in the Privacy Act, 5 U.S.C. § 552a.

6.    Defendants object to the definition of "Bureau Systems" as used in Plaintiffs' discovery requests as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it includes systems that do not contain the Plaintiffs' "records" as defined by the Privacy Act or Federal Tax Information, as defined in the Internal Revenue Code. Defendants will interpret the term to refer to any electronic payment record, payment system, or payment database maintained by, or under the control of, the Bureau that contain the Plaintiffs' members' "records," as defined by the Privacy Act, or Federal Tax Information as defined by the Internal Revenue Code.

7.    Defendants object to the definition of "Personal Information" as used in Plaintiffs' discovery requests as overbroad, unduly burdensome, and not proportional to the needs of the case

to the extent that it includes information that is not a "record" as used in the Privacy Act or Federal Tax Information as defined in the Internal Revenue Code that is associated with Plaintiffs' members. Defendants will interpret "Personal Information" to be Plaintiffs' members' records as used in the Privacy Act or Federal Tax Information as defined by the Internal Revenue Code.

8.      Defendants object to the term "records," as used throughout Plaintiffs' discovery requests, as vague and ambiguous. Defendants will interpret the terms "record" and "records" as used in the Privacy Act, 5 U.S.C. § 552a.

9.      Defendants object to the definition of "Treasury DOGE Team" as vague, ambiguous, overbroad, unduly burdensome, and not proportional to the needs of the case as it includes individuals "whether or not an employee, charged with carrying out implementation of Executive Order 14158." Defendants will interpret the term to include the Treasury DOGE Team members identified in the declaration of Kari Mencl filed on March 5, 2025, in *State of New York v. U.S. Department of the Treasury*, No. 1:25-cv-1144-JAV (S.D.N.Y), at ECF 98-4, and Todd Newnam, a new addition to the Treasury DOGE Team.

10.     Defendants object to the definition of "USDS" as overbroad and ambiguous to the extent that it requires Treasury to identify whether individuals have an employment relationship with the United States DOGE Service. Defendants will interpret the term to consist of the United States DOGE Service, the United States DOGE Service Temporary Organization, and individuals who Treasury knows to have an employment relationship with the U.S. DOGE Service or the U.S. DOGE Service Temporary Organization because they correspond with Defendants from an email address with the domain "@doge.eop.gov."

11.     Defendants reserve the right to amend, supplement, or alter these objections at any time.

12.      Nothing contained in the following specific objections and responses constitutes a waiver of any applicable objection or privilege as to the requested discovery.

## Reservation of Rights

The foregoing general objections and the following responses are based on the Defendants' interpretation of Plaintiffs' requests and information reasonably available to Defendants as of today.  Defendants reserve the right to supplement these objections or responses if Plaintiffs purport to interpret their requests differently than Defendants or if Defendants discover new information supporting additional objections or responses.  Defendants also reserve the right to object to the admissibility of any information contained herein on the grounds of relevance, proportionality, accessibility, materiality, or any other appropriate ground.

## Responses to Specific Requests for Admission

**Request No. 1:**  Admit that an account included in the "dbrdwr" group, referred to at ECF 48-1, at 18, has write access to Bureau Systems.

**Response:**  Subject to and without waiving the foregoing objections, Defendants respond as follows:  Denied.  The names "dbrdwr" and "dbrdonly" refer to operating system (Unix) user groups.  Both groups were created on January 30, 2025, and Marko Elez was the only member of either.  He was added to the dbrdwr group on January 31 and then removed on February 1.  He was then added to the dbrdonly group on February 1.  Neither group grants any access to any specific database, only to the operating system (Unix).  This operating system group membership is needed to grant specific user access to specific databases—in this case the Secure Payment System (SPS).  Access to the SPS database was issued at the user level to Mr. Elez incorrectly as read-write on February 5, and then corrected on February 6, as discussed in the Declaration of Joseph Gioeli III, ECF No. 24-2 ¶ 20.

4

**Request No. 2:**  Admit that an account included in the "dbrdonly" group, referred to at ECF 48-1, at 18, does not have write access to the Bureau Systems.

**Response:**  Subject to and without waiving the foregoing objections, Defendants respond as follows:  Admitted that Mr. Elez had only read-only access, except as to the SPS database between February 5 and February 6.  The names "dbrdwr" and "dbrdonly," however, are not indicative of system access.  *See* Defendants' response to Request No. 1.

**Request No. 3:**  Admit that Marko Elez has not provided the attestation statement referred to in the Engagement Plan and paragraph 14 of Joseph Gioeli's declaration, ECF 24-2.

**Response:**  Subject to and without waiving the foregoing objections, Defendants respond as follows:  Admitted.


Dated: March 31, 2025                    Respectfully submitted,

                                         YAAKOV M. ROTH
                                         Acting Assistant Attorney General
                                         Civil Division

                                         MARCIA BERMAN
                                         Assistant Director
                                         Federal Programs Branch

                                         */s/ Bradley P. Humphreys*
                                         BRADLEY P. HUMPHREYS
                                         Senior Trial Counsel
                                         Civil Division, Federal Programs Branch
                                         United States Department of Justice
                                         1100 L Street NW
                                         Washington, DC 20005
                                         Telephone: (202) 305-0878
                                         Bradley.Humphreys@usdoj.gov

                                         *Attorneys for Defendants*

DECLARATION OF NANDAN M. JOSHI

Exhibit I



**From:** IMCEAEX-
_O=EXCHANGELABS_OU=EXCHANGE+20ADMINISTRATIVE+20GROUP+20+28FYDIBOHF23SPDLT+29_
CN=RECIPIENTS_CN=B8D7F1EF4E4A44AF8A8DF350D54E333A-578EBE49-
61@NAMP110.PROD.OUTLOOK.COM <IMCEAEX-
_O=EXCHANGELABS_OU=EXCHANGE+20ADMINISTRATIVE+20GROUP+20+28FYDIBOHF23SPDLT+29_
CN=RECIPIENTS_CN=B8D7F1EF4E4A44AF8A8DF350D54E333A-578EBE49-
61@NAMP110.PROD.OUTLOOK.COM>
**Sent:** Thursday, January 30, 2025 3:11 PM
**To:** luke.farritor@gsa.gov
**Cc:** jeremy.lewin@gsa.gov
**Subject:** USAID Payments

password is "payments"

**From:**     IMCEAEX-
              _O=EXCHANGELABS_OU=EXCHANGE+20ADMINISTRATIVE+20GROUP+20+28FYDIBOHF23SPDLT+29_CN=RECIPIENTS_CN=B8D7F1EF4E4A44AF8A8DF350D54E333A-
              578EBE49-61@NAMP110.PROD.OUTLOOK.COM
**To:**       luke.farritor@gsa.gov
**Cc:**       jeremy.lewin@gsa.gov
**Subject:**  USAID Payments
**Attachments:** usaid.xlsb

password is "payments"

## USAID Payments

| PAYMENT DATE | VOLUME | AMOUNT |
|---|---:|---:|
| 01.22.2025 | 211 | $34,829,740.71 |
| 01.23.2025 | 154 | $ 11,065,780.51 |
| 01.24.2025 | 208 | $ 27,684,527.82 |
| TOTAL | 573 | $73,580,049.04 |

## USAID  Payments
## Payment Date:  01/22/25

| PAYEE NAME | METHOD | AMOUNT |
|---|---|---|
| | ACH | $11,089,167.00 |
| | ACH | $5,000,000.00 |
| | ACH | $1,893,044.25 |
| | ACH | $1,695,521.52 |
| | ACH | $1,554,291.00 |
| | ACH | $1,430,356.74 |
| | ACH | $1,354,815.00 |
| | ACH | $1,323,600.04 |
| | ACH | $1,165,080.00 |
| | ACH | $805,615.00 |
| | ACH | $779,211.51 |
| | ACH | $412,844.12 |
| | ACH | $400,000.00 |
| | ACH | $365,569.20 |
| | ACH | $323,743.74 |
| | ACH | $321,397.45 |
| | ACH | $317,214.80 |
| | ACH | $308,937.93 |
| | ACH | $294,363.87 |
| | ACH | $280,009.36 |
| | ACH | $261,132.00 |
| | ACH | $255,481.82 |
| | ACH | $250,781.06 |
| | ACH | $241,850.96 |
| | ACH | $231,006.35 |
| | ACH | $220,851.00 |
| | ACH | $218,839.00 |
| | ACH | $200,815.37 |
| | ACH | $171,292.88 |
| | ACH | $157,290.75 |
| | ACH | $135,187.00 |
| | ACH | $125,000.00 |
| | ACH | $114,218.00 |
| | ACH | $100,494.90 |
| | ACH | $91,649.42 |
| | ACH | $87,584.91 |
| | ACH | $76,407.64 |
| | ACH | $75,207.20 |
| | ACH | $69,011.19 |

| | | |
|---|---|---|
| ACH | $57,227.31 |
| ACH | $51,003.36 |
| ACH | $48,526.26 |
| ACH | $28,122.81 |
| ACH | $23,490.44 |
| ACH | $23,123.15 |
| ACH | $22,461.31 |
| ACH | $21,748.62 |
| ACH | $19,781.79 |
| ACH | $15,579.26 |
| ACH | $15,312.14 |
| ACH | $14,663.00 |
| ACH | $14,253.04 |
| ACH | $13,648.68 |
| ACH | $12,012.00 |
| ACH | $11,980.70 |
| ACH | $11,900.00 |
| ACH | $10,328.25 |
| ACH | $9,283.14 |
| ACH | $7,653.72 |
| ACH | $7,175.00 |
| ACH | $7,007.43 |
| ACH | $6,082.24 |
| ACH | $5,813.87 |
| ACH | $5,000.00 |
| ACH | $4,988.73 |
| ACH | $4,922.89 |
| ACH | $4,718.00 |
| ACH | $4,456.83 |
| ACH | $4,340.87 |
| ACH | $4,267.93 |
| ACH | $4,264.77 |
| ACH | $4,234.10 |
| ACH | $4,104.46 |
| ACH | $4,080.00 |
| ACH | $3,995.65 |
| ACH | $3,759.84 |
| ACH | $3,600.00 |
| ACH | $3,276.00 |
| ACH | $3,258.00 |
| ACH | $3,245.80 |
| ACH | $3,048.77 |
| ACH | $3,040.00 |
| ACH | $2,969.11 |
| ACH | $2,737.00 |
| ACH | $2,420.70 |
| ACH | $2,390.47 |

| | |
|---|---|
| ACH | $2,283.52 |
| ACH | $2,245.37 |
| ACH | $2,227.79 |
| ACH | $2,200.00 |
| ACH | $2,199.11 |
| ACH | $2,040.50 |
| ACH | $2,005.19 |
| ACH | $2,000.00 |
| ACH | $1,984.42 |
| ACH | $1,975.00 |
| ACH | $1,933.58 |
| ACH | $1,859.08 |
| ACH | $1,821.74 |
| ACH | $1,772.37 |
| ACH | $1,707.05 |
| ACH | $1,666.75 |
| ACH | $1,651.14 |
| ACH | $1,520.00 |
| ACH | $1,499.00 |
| ACH | $1,465.30 |
| ACH | $1,449.03 |
| ACH | $1,424.67 |
| ACH | $1,403.32 |
| ACH | $1,360.84 |
| ACH | $1,329.20 |
| ACH | $1,282.35 |
| ACH | $1,214.40 |
| ACH | $1,192.16 |
| ACH | $1,170.37 |
| ACH | $1,150.75 |
| ACH | $1,145.07 |
| ACH | $1,124.64 |
| ACH | $1,088.93 |
| ACH | $1,010.31 |
| ACH | $980.50 |
| ACH | $977.10 |
| ACH | $971.01 |
| ACH | $969.74 |
| ACH | $883.77 |
| ACH | $866.37 |
| ACH | $824.81 |
| ACH | $806.54 |
| ACH | $760.71 |
| ACH | $745.77 |
| ACH | $700.06 |
| ACH | $646.15 |
| ACH | $642.22 |

| | |
|---|---|
| ACH | $632.10 |
| ACH | $615.80 |
| ACH | $608.38 |
| ACH | $591.89 |
| ACH | $577.16 |
| ACH | $575.51 |
| ACH | $550.00 |
| ACH | $529.27 |
| ACH | $517.20 |
| ACH | $505.77 |
| ACH | $495.00 |
| ACH | $493.20 |
| ACH | $489.00 |
| ACH | $460.30 |
| ACH | $460.29 |
| ACH | $420.00 |
| ACH | $409.34 |
| ACH | $402.14 |
| ACH | $393.10 |
| ACH | $391.60 |
| ACH | $390.00 |
| ACH | $367.50 |
| ACH | $334.24 |
| ACH | $332.82 |
| ACH | $329.28 |
| ACH | $304.72 |
| ACH | $304.21 |
| ACH | $294.13 |
| ACH | $293.15 |
| ACH | $262.16 |
| ACH | $254.34 |
| ACH | $249.56 |
| ACH | $232.99 |
| ACH | $225.10 |
| ACH | $216.85 |
| ACH | $215.00 |
| ACH | $208.56 |
| ACH | $208.00 |
| ACH | $205.00 |
| ACH | $205.00 |
| ACH | $201.82 |
| ACH | $188.13 |
| ACH | $187.50 |
| ACH | $186.15 |
| ACH | $184.30 |
| ACH | $165.78 |
| ACH | $164.92 |

| | | |
|---|---|---|
| | ACH | $159.05 |
| | ACH | $158.00 |
| | ACH | $146.70 |
| | ACH | $140.00 |
| | ACH | $138.03 |
| | ACH | $137.17 |
| | ACH | $124.61 |
| | ACH | $123.28 |
| | ACH | $120.64 |
| | ACH | $107.42 |
| | ACH | $96.54 |
| | ACH | $93.43 |
| | ACH | $92.76 |
| | ACH | $83.88 |
| | ACH | $69.00 |
| | ACH | $67.70 |
| | ACH | $64.35 |
| | ACH | $63.75 |
| | ACH | $63.71 |
| | ACH | $63.42 |
| | ACH | $62.76 |
| | ACH | $60.00 |
| | ACH | $57.83 |
| | ACH | $53.19 |
| | ACH | $46.90 |
| | ACH | $39.75 |
| | ACH | $33.00 |
| | ACH | $31.81 |
| | ACH | $31.62 |
| | ACH | $11.94 |
| | ACH | $11.09 |
| | **211 payments** | **$34,829,740.71** |

# USAID  Payments
## Payment Date:  01/23/25

| PAYEE NAME | METHOD | AMOUNT |
|---|---|---|
| | ACH | $3,193,956.31 |
| | ACH | $1,056,876.36 |
| | ACH | $1,054,813.64 |
| | ACH | $550,205.46 |
| | ACH | $465,966.37 |
| | ACH | $461,722.52 |
| | ACH | $442,296.00 |
| | ACH | $362,044.29 |
| | ACH | $333,341.68 |
| | ACH | $246,916.13 |
| | ACH | $233,871.51 |
| | ACH | $220,052.69 |
| | ACH | $201,402.00 |
| | ACH | $200,000.00 |
| | ACH | $181,250.00 |
| | ACH | $166,924.00 |
| | ACH | $148,278.00 |
| | ACH | $143,482.00 |
| | ACH | $141,388.28 |
| | ACH | $122,008.09 |
| | ACH | $116,499.00 |
| | ACH | $95,857.93 |
| | ACH | $95,206.00 |
| | ACH | $93,974.25 |
| | International | $  92,000.00 |
| | ACH | $65,702.69 |
| | ACH | $59,703.42 |
| | ACH | $58,201.08 |
| | ACH | $50,203.12 |
| | ACH | $45,849.85 |
| | ACH | $28,973.16 |
| | ACH | $25,624.12 |
| | International | $  25,599.55 |
| | ACH | $18,842.80 |
| | ACH | $17,099.54 |
| | ACH | $15,915.56 |
| | ACH | $13,572.63 |
| | ACH | $13,392.00 |
| | ACH | $12,504.00 |

| | | |
|---|---|---|
| | ACH | $10,343.22 |
| | ACH | $9,238.00 |
| | ACH | $8,821.07 |
| | ACH | $8,700.00 |
| | ACH | $8,345.00 |
| | ACH | $8,145.00 |
| | ACH | $6,975.06 |
| | ACH | $6,675.00 |
| | ACH | $6,658.21 |
| | ACH | $6,140.00 |
| | ACH | $5,940.35 |
| | ACH | $5,900.41 |
| | ACH | $5,891.97 |
| | ACH | $4,858.80 |
| | ACH | $4,785.96 |
| | ACH | $4,551.38 |
| | ACH | $4,448.40 |
| | ACH | $3,659.25 |
| | ACH | $3,191.94 |
| | ACH | $3,180.57 |
| | ACH | $2,703.10 |
| | ACH | $2,600.90 |
| | ACH | $2,415.59 |
| | ACH | $2,400.00 |
| | ACH | $2,400.00 |
| | ACH | $2,200.00 |
| | ACH | $2,200.00 |
| | ACH | $2,028.35 |
| | ACH | $2,013.49 |
| | ACH | $1,862.42 |
| | ACH | $1,762.04 |
| | ACH | $1,682.00 |
| | ACH | $1,615.50 |
| | ACH | $1,452.40 |
| | ACH | $1,307.07 |
| | ACH | $1,300.00 |
| | ACH | $1,200.33 |
| | ACH | $1,059.20 |
| | ACH | $960.00 |
| | ACH | $943.80 |
| | ACH | $920.00 |
| | ACH | $891.40 |
| | ACH | $862.56 |
| | ACH | $848.69 |
| | ACH | $840.00 |
| | ACH | $818.04 |
| | ACH | $803.00 |

| | | |
|---|---|---|
| | ACH | $780.31 |
| | ACH | $733.33 |
| | ACH | $729.26 |
| | ACH | $728.22 |
| | ACH | $698.89 |
| | ACH | $694.54 |
| | ACH | $680.82 |
| | ACH | $675.00 |
| | ACH | $652.28 |
| | ACH | $643.03 |
| | ACH | $630.00 |
| | ACH | $625.08 |
| | ACH | $625.08 |
| | ACH | $610.69 |
| | ACH | $600.00 |
| | ACH | $590.78 |
| | ACH | $560.77 |
| | ACH | $560.71 |
| | ACH | $556.48 |
| | ACH | $535.89 |
| | ACH | $524.17 |
| | ACH | $508.65 |
| | ACH | $500.00 |
| | ACH | $500.00 |
| | ACH | $500.00 |
| | ACH | $457.38 |
| | ACH | $451.18 |
| | ACH | $443.40 |
| | ACH | $418.98 |
| | ACH | $415.68 |
| | ACH | $400.00 |
| | ACH | $400.00 |
| | ACH | $392.07 |
| | ACH | $350.00 |
| | ACH | $347.11 |
| | ACH | $340.14 |
| | ACH | $331.97 |
| | ACH | $330.53 |
| | ACH | $322.57 |
| | ACH | $319.80 |
| | ACH | $300.00 |
| | ACH | $295.72 |
| | ACH | $279.98 |
| | ACH | $278.32 |
| | ACH | $250.00 |
| | ACH | $247.00 |
| | ACH | $240.83 |



| | |
|---|---|
| ACH | $236.46 |
| ACH | $235.56 |
| ACH | $224.94 |
| ACH | $208.96 |
| ACH | $208.00 |
| ACH | $200.00 |
| ACH | $197.50 |
| ACH | $152.90 |
| ACH | $131.18 |
| ACH | $126.03 |
| ACH | $120.00 |
| ACH | $118.34 |
| ACH | $105.00 |
| ACH | $103.52 |
| ACH | $99.00 |
| ACH | $76.29 |
| ACH | $49.95 |
| ACH | $35.00 |
| ACH | $26.00 |
| ACH | $10.84 |
| ACH | $2.90 |
| **154 payments** | **$11,065,780.51** |

# USAID  Payments
# Payment Date:  01/24/25

| PAYEE NAME | METHOD | AMOUNT |
|---|---|---|
| | ACH | $7,427,512.29 |
| | ACH | $4,862,461.37 |
| | ACH | $1,460,435.16 |
| | ACH | $1,170,707.82 |
| | ACH | $1,027,287.96 |
| | ACH | $942,416.00 |
| | ACH | $859,933.27 |
| | International | $   534,255.00 |
| | ACH | $526,526.00 |
| | ACH | $444,073.72 |
| | ACH | $431,660.14 |
| | ACH | $428,365.88 |
| | ACH | $350,000.00 |
| | ACH | $346,813.62 |
| | ACH | $330,772.49 |
| | ACH | $326,240.56 |
| | ACH | $308,037.98 |
| | ACH | $306,443.12 |
| | ACH | $303,158.99 |
| | ACH | $299,353.55 |
| | ACH | $298,254.12 |
| | ACH | $292,092.75 |
| | ACH | $284,298.45 |
| | ACH | $273,233.52 |
| | ACH | $266,135.09 |
| | ACH | $248,794.93 |
| | ACH | $220,127.68 |
| | ACH | $185,894.50 |
| | ACH | $176,394.46 |
| | ACH | $171,666.00 |
| | ACH | $162,027.80 |
| | ACH | $135,353.56 |
| | ACH | $126,873.67 |
| | ACH | $123,554.22 |
| | ACH | $111,641.48 |
| | ACH | $106,768.60 |
| | ACH | $91,507.08 |
| | International | $    90,000.00 |
| | ACH | $88,514.35 |
| | ACH | $88,238.93 |

| | |
|---|---|
| ACH | $81,288.00 |
| ACH | $80,658.44 |
| ACH | $73,705.13 |
| ACH | $70,000.00 |
| ACH | $69,505.63 |
| ACH | $67,369.30 |
| ACH | $60,077.72 |
| ACH | $55,287.13 |
| ACH | $52,572.20 |
| ACH | $46,656.03 |
| ACH | $43,914.30 |
| ACH | $38,276.88 |
| ACH | $37,045.76 |
| ACH | $34,730.40 |
| ACH | $32,564.27 |
| ACH | $30,064.85 |
| ACH | $24,261.51 |
| ACH | $23,081.50 |
| ACH | $22,401.46 |
| ACH | $21,909.00 |
| ACH | $20,000.00 |
| ACH | $18,801.98 |
| ACH | $18,443.00 |
| ACH | $16,870.43 |
| ACH | $16,709.36 |
| ACH | $16,392.00 |
| ACH | $15,000.00 |
| ACH | $14,960.32 |
| ACH | $14,724.47 |
| ACH | $13,519.60 |
| ACH | $10,983.00 |
| ACH | $10,707.30 |
| ACH | $10,371.92 |
| ACH | $9,410.74 |
| ACH | $9,070.35 |
| ACH | $8,242.50 |
| ACH | $8,119.38 |
| ACH | $7,775.47 |
| ACH | $7,505.81 |
| ACH | $7,141.33 |
| ACH | $7,036.25 |
| ACH | $6,655.06 |
| ACH | $6,520.00 |
| ACH | $6,063.00 |
| ACH | $5,984.00 |
| ACH | $5,833.33 |
| ACH | $5,292.16 |

| | |
|---|---|
| ACH | $4,961.40 |
| ACH | $4,668.79 |
| ACH | $4,457.21 |
| ACH | $4,320.00 |
| ACH | $4,291.52 |
| ACH | $4,204.85 |
| ACH | $4,144.66 |
| ACH | $3,947.58 |
| ACH | $3,876.50 |
| ACH | $3,716.60 |
| ACH | $3,644.34 |
| ACH | $3,622.81 |
| ACH | $3,542.13 |
| ACH | $3,525.75 |
| ACH | $3,202.10 |
| ACH | $3,190.11 |
| ACH | $3,165.98 |
| ACH | $3,159.45 |
| ACH | $3,105.56 |
| ACH | $3,024.83 |
| ACH | $2,995.08 |
| ACH | $2,884.67 |
| ACH | $2,880.88 |
| ACH | $2,706.31 |
| ACH | $2,661.51 |
| ACH | $2,532.00 |
| ACH | $2,387.06 |
| ACH | $2,382.97 |
| ACH | $2,369.45 |
| ACH | $2,358.03 |
| ACH | $2,312.50 |
| ACH | $2,266.56 |
| ACH | $2,076.18 |
| ACH | $2,052.91 |
| ACH | $2,034.06 |
| ACH | $2,032.29 |
| ACH | $1,926.34 |
| ACH | $1,811.40 |
| ACH | $1,809.84 |
| ACH | $1,787.94 |
| ACH | $1,746.93 |
| ACH | $1,710.00 |
| ACH | $1,707.26 |
| ACH | $1,699.36 |
| ACH | $1,697.30 |
| ACH | $1,680.22 |
| ACH | $1,669.90 |

| | |
|---|---|
| ACH | $1,658.81 |
| ACH | $1,656.56 |
| ACH | $1,632.05 |
| ACH | $1,593.36 |
| ACH | $1,584.35 |
| ACH | $1,485.56 |
| ACH | $1,465.65 |
| ACH | $1,414.48 |
| ACH | $1,316.90 |
| ACH | $1,315.73 |
| ACH | $1,312.31 |
| ACH | $1,292.46 |
| ACH | $1,291.67 |
| ACH | $1,291.67 |
| ACH | $1,281.74 |
| ACH | $1,265.92 |
| ACH | $1,230.39 |
| ACH | $1,230.26 |
| ACH | $1,223.22 |
| ACH | $1,122.27 |
| ACH | $1,107.45 |
| ACH | $1,107.45 |
| ACH | $1,089.39 |
| ACH | $1,041.80 |
| ACH | $1,033.33 |
| ACH | $1,033.33 |
| ACH | $1,029.18 |
| ACH | $991.65 |
| ACH | $984.63 |
| ACH | $984.63 |
| ACH | $976.16 |
| ACH | $959.00 |
| ACH | $957.10 |
| ACH | $957.10 |
| ACH | $954.99 |
| ACH | $952.87 |
| ACH | $944.40 |
| ACH | $921.82 |
| ACH | $914.26 |
| ACH | $911.12 |
| ACH | $885.11 |
| ACH | $780.25 |
| ACH | $770.97 |
| ACH | $756.98 |
| ACH | $739.34 |
| ACH | $666.64 |
| ACH | $622.43 |



| | |
|---|---:|
| ACH | $559.73 |
| ACH | $509.05 |
| ACH | $500.00 |
| ACH | $473.40 |
| ACH | $463.31 |
| ACH | $408.11 |
| ACH | $404.25 |
| ACH | $275.00 |
| ACH | $260.32 |
| ACH | $246.05 |
| ACH | $243.09 |
| ACH | $225.82 |
| ACH | $209.99 |
| ACH | $205.00 |
| ACH | $196.93 |
| ACH | $196.93 |
| ACH | $185.50 |
| ACH | $177.75 |
| ACH | $173.63 |
| ACH | $143.10 |
| ACH | $138.00 |
| ACH | $99.50 |
| ACH | $80.00 |
| ACH | $68.25 |
| ACH | $29.45 |
| ACH | $28.95 |
| ACH | $8.47 |
| **208 payments** | **$27,684,527.82** |

DECLARATION OF NANDAN M. JOSHI

Exhibit J

"

# Privacy and Civil Liberties Impact Assessment
### Template version 4.4



## Payment Automation Manager

## July 11, 2019

### Bureau Certifying Official
David J. Ambrose
Chief Security Officer and Chief Privacy Officer
Bureau of the Fiscal Service
Department of the Treasury

The mission of the Bureau of the Fiscal Service (Fiscal Service) is to promote the financial integrity and operational efficiency of the federal government through exceptional accounting, financing, collections, payments, and shared services.

This Privacy and Civil Liberties Impact Assessment (PCLIA) is a public document and will be made available to the general public via the Fiscal Service Privacy and Civil Liberties Impact Assessment (PCLIA) webpage (PCLIA WEBPAGE).

| **Section 5.2(p)** ☐ Yes ☐ No ☒ N/A Where feasible and appropriate, does the process for disseminating corrections or amendments include notifying the individual whose information is corrected or amended? |
| --- |

## Section 5.3: Information sharing within the Department of the Treasury

| **Internal Information Sharing** |
| --- |

| **Section 5.3(a)** ☒ Yes ☐ No Is PII maintained in the system or by the project shared with other Treasury bureaus? <br><br> **Section 5.3(b)** ☒ Yes ☐ No Does the Treasury bureau or office that receives the PII limit access to those Treasury officers and employees who have a need for the PII in the performance of their official duties (i.e., those who have a "need to know")? |
| --- |

| **Memorandum of Understanding (MOU)/Other Agreements Limiting Treasury's Internal Use/Disclosure of PII** |
| --- |

| **Section 5.3(c)** ☐ Yes ☒ No ☐ N/A Is any of the PII maintained in the system or by the project subject to the requirements of a Memorandum of Understanding or other agreement (e.g., agreement with another federal or state agency that provided the information to the Treasury or subject to an international agreement or treaty) that limits or places conditions on Treasury's internal use, maintenance, handling, or disclosure of the PII? |
| --- |

## Section 5.4: Information sharing with external (i.e., outside Treasury) organizations and individuals

| **External Information Sharing** |
| --- |

| **Section 5.4(a)** ☒ Yes ☐ No Is PII maintained in the system or by the project shared with agencies, organizations, or individuals external to Treasury? |
| --- |

| **Accounting of Disclosures** |
| --- |

| **Section 5.4(b)** ☒ Yes ☐ No ☐ N/A With respect to records maintained in the system or by the project that are subject to the Privacy Act, do you maintain a paper or electronic log or other record of the date, nature, and purpose of each disclosure (not including intra-agency disclosures and FOIA disclosures) of a record to any person or to another agency (outside of Treasury) and the name and address of the person or agency to whom the disclosure is made? *See* 5 U.S.C § 552a(c). |
| --- |

# Privacy and Civil Liberties Impact Assessment
**Template version 5.0**



## Secure Payment System (SPS)

## March 22, 2021

### Bureau Certifying Official
David J. Ambrose

Chief Security Officer and Chief Privacy Officer

Bureau of the Fiscal Service

Department of the Treasury

The mission of the Bureau of the Fiscal Service (Fiscal Service) is to promote the financial integrity and operational efficiency of the federal government through exceptional accounting, financing, collections, payments, and shared services.

This Privacy and Civil Liberties Impact Assessment (PCLIA) is a public document and will be made available to the general public via the Fiscal Service Privacy and Civil Liberties Impact Assessment (PCLIA) webpage (https://www.fiscal.treasury.gov/pia.html).

## Section 5.1(a)

1. ☐ The system or project maintains information obtained from individuals and organizations who are not federal personnel or an agency of the federal government (i.e., outside the federal government).

2. ☐ The project or system involves a new collection of information in identifiable form for 10 or more persons from outside the federal government.

3. ☐ The project or system completed an Information Collection Request ("ICR") and received OMB approval.

4. ☒ The project or system did not complete an Information Collection Request ("ICR") and receive OMB approval because while the system maintains information from Federal contractors, no new collection of information is required because all data are acquired from an existing source within Treasury.

## Section 5.2: Records Management - NARA/Federal Records Act Requirements

Records retention schedules determine the maximum amount of time necessary to retain information in order to meet the needs of the project or system.  Information is generally either disposed of or sent to the National Archives and Records Administration (NARA) for permanent retention upon expiration of this period. If the system has an applicable SORN(s), check the "Policies and Practices for Retention and Disposal of Records" section.

## Section 5.2(a)

1. ☒ The records used in the system or by the project are covered by a NARA's General Records Schedule (GRS).

2. ☐ The records used in the system or by the project are covered by a NARA approved Treasury bureau Specific Records Schedule (SRS).

## Section 5.3: E-Government Act/NIST Compliance

The completion of Federal Information Security Management Act (FISMA) Security Assessment & Authorization (SA&A) process is required before a federal information system may receive Authority to Operate (ATO) or Acceptable to Use (ATU).

## Section 5.3(a)

1. ☒ The system is a federal information system subject to FISMA requirements.

2. ☒ The system completed a SA&A and received an ATO or ATU.

3. ☐ This is a new system has not yet been authorized to operate.

4. ☒ The system or project maintains access controls to ensure that access to PII maintained is limited to individuals who have a need to know the information in order to perform their official Fiscal Service duties.

5. ☒ All Treasury/Fiscal Service security requirements are met when disclosing and transferring information (e.g., bulk transfer, direct access by recipient, portable disk, paper) from the Treasury system or project to internal or external parties.

6. ☒ This system or project maintains an audit log of system users to ensure they do not violate the system and/or Treasury/Fiscal Service rules of behavior.

7. ☒ This system or project has the capability to identify, locate, and monitor individuals or groups of people other than the monitoring of system users to ensure that they do not violate the system's rules of behavior.

## Section 5.4: Section 508 of the Rehabilitation Act of 1973

When Federal agencies develop, procure, maintain, or use Electronic and Information Technology (EIT), Section 508 of the Rehabilitation Act of 1973 as amended requires that individuals with disabilities (including federal employees) must have access and use (including privacy policies and directives as well as redress opportunities) that is comparable to that which is available to individuals who do not have disabilities.

### Section 5.4(a)

1. ☐ The project or system will **not** involve the development, procurement, maintenance or use of EIT as that term is defined in Section 508 of the Rehabilitation Act of 1973 as amended?

2. ☒ The project or system **will** involve the development, procurement, maintenance or use of EIT as that term is defined in Section 508 of the Rehabilitation Act of 1973 as amended?  If checked:
   a) ☒ The system or project complies with all Section 508 requirements, thus ensuring that individuals with disabilities (including federal employees) have access and use (including access to privacy and civil liberties policies) that is comparable to that which is available to individuals who do not have disabilities.
   b) ☐ The system or project is not in compliance with all Section 508 requirements.

"

# Privacy and Civil Liberties Impact Assessment
**Template version 4.4**



# Automated Standard Application for Payments (ASAP)

## 6/18/2019

### Bureau Certifying Official
David J. Ambrose
Chief Security Officer and Chief Privacy Officer
Bureau of the Fiscal Service
Department of the Treasury

The mission of the Bureau of the Fiscal Service (Fiscal Service) is to promote the financial integrity and operational efficiency of the federal government through exceptional accounting, financing, collections, payments, and shared services.

This Privacy and Civil Liberties Impact Assessment (PCLIA) is a public document and will be made available to the general public via the Fiscal Service Privacy and Civil Liberties Impact Assessment (PCLIA) webpage (PCLIA WEBPAGE).

**Section 5.2(o)** ☐ Yes ☐ No  ☒ N/A  Where feasible and appropriate, is there a process in place for disseminating corrections of or amendments to the PII maintained in the system or by the project to all internal and external information-sharing partners?

**Section 5.2(p)** ☐ Yes ☐ No ☒ N/A Where feasible and appropriate, does the process for disseminating corrections or amendments include notifying the individual whose information is corrected or amended?

## Section 5.3: Information sharing within the Department of the Treasury

| Internal Information Sharing |
|---|

**Section 5.3(a)** ☐ Yes ☒ No Is PII maintained in the system or by the project shared with other Treasury bureaus?

**Section 5.3(b)** ☒ Yes ☐ No Does the Treasury bureau or office that receives the PII limit access to those Treasury officers and employees who have a need for the PII in the performance of their official duties (i.e., those who have a "need to know")?

| Memorandum of Understanding (MOU)/Other Agreements Limiting Treasury's Internal Use/Disclosure of PII |
|---|

**Section 5.3(c)** ☐ Yes ☒ No ☐ N/A Is any of the PII maintained in the system or by the project subject to the requirements of a Memorandum of Understanding or other agreement (e.g., agreement with another federal or state agency that provided the information to the Treasury or subject to an international agreement or treaty) that limits or places conditions on Treasury's internal use, maintenance, handling, or disclosure of the PII?

## Section 5.4: Information sharing with external (i.e., outside Treasury) organizations and individuals

| External Information Sharing |
|---|

**Section 5.4(a)** ☐ Yes ☒ No Is PII maintained in the system or by the project shared with agencies, organizations, or individuals external to Treasury?

| Accounting of Disclosures |
|---|

**Section 5.4(b)** ☐ Yes ☐ No ☒ N/A With respect to records maintained in the system or by the project that are subject to the Privacy Act, do you maintain a paper or electronic log or other record of the date, nature, and purpose of each disclosure (not including intra-agency

# Privacy and Civil Liberties Impact Assessment
### Template version 6.0



## International Treasury Services (ITS)

## 2/20/2024

### Bureau Certifying Official
David J. Ambrose
Chief Security Officer and Chief Privacy Officer
Bureau of the Fiscal Service
Department of the Treasury

The mission of the Bureau of the Fiscal Service (Fiscal Service) is to promote the financial integrity and operational efficiency of the federal government through exceptional accounting, financing, collections, payments, and shared services.

This Privacy and Civil Liberties Impact Assessment (PCLIA) is a public document and will be made available to the public based on privacy policy.
See all publicly viewable Fiscal Service PCLIA documents at:
https://www.fiscal.treasury.gov/pia.html.

## Section 5.2: Records Management - NARA/Federal Records Act Requirements

Records retention schedules determine the maximum amount of time necessary to retain information in order to meet the needs of the project or system.  Information is generally either disposed of or sent to the National Archives and Records Administration (NARA) for permanent retention upon expiration of this period. If the system has an applicable SORN(s), check the "Policies and Practices for Retention and Disposal of Records" section.

### Section 5.2(a)

1. ☒ The records used in the system or by the project are covered by a NARA's General Records Schedule (GRS).

2. ☐ The records used in the system or by the project are covered by a NARA approved Treasury bureau Specific Records Schedule (SRS).

## Section 5.3: E-Government Act/NIST Compliance

The completion of Federal Information Security Management Act (FISMA) Security Assessment & Authorization (SA&A) process is required before a federal information system may receive Authority to Operate (ATO) or Acceptable to Use (ATU).

### Section 5.3(a)

1. ☒ The system is a federal information system subject to FISMA requirements.

2. ☒ The system completed an SA&A and received an ATO or ATU.

3. ☐This is a new system that has not yet been authorized to operate.

4. ☒The system or project maintains access controls to ensure that access to PII maintained is limited to individuals who have a need to know the information in order to perform their official Fiscal Service duties.

5. ☒All Treasury/Fiscal Service security requirements are met when disclosing and transferring information (e.g., bulk transfer, direct access by recipient, portable disk, paper) from the Treasury system or project to internal or external parties.

6. ☒This system or project maintains an audit log of system users to ensure they do not violate the system and/or Treasury/Fiscal Service rules of behavior.

7. ☐This system or project has the capability to identify, locate, and monitor individuals or groups of people other than the monitoring of system users to ensure that they do not violate the system's rules of behavior.

# Privacy and Civil Liberties Impact Assessment



## Central Accounting Reporting System (CARS)

### October 8, 2021

**Bureau Certifying Official**
David J. Ambrose
Chief Security Officer and Chief Privacy Officer
Bureau of the Fiscal Service
Department of the Treasury

The mission of the Bureau of the Fiscal Service (Fiscal Service) is to promote the financial integrity and operational efficiency of the federal government through exceptional accounting, financing, collections, payments, and shared services.

This Privacy and Civil Liberties Impact Assessment (PCLIA) is a public document and will be made available to the general public via the Fiscal Service Privacy and Civil Liberties Impact Assessment (PCLIA) webpage (https://www.fiscal.treasury.gov/pia.html).

**Section 5.1(a)**

1. ☐ The system or project maintains information obtained from individuals and organizations who are not federal personnel or an agency of the federal government (i.e., outside the federal government).

2. ☐ The project or system involves a new collection of information in identifiable form for 10 or more persons from outside the federal government.

3. ☐ The project or system completed an Information Collection Request ("ICR") and received OMB approval.

4. ☒ The project or system did not complete an Information Collection Request ("ICR") and receive OMB approval *because while the system maintains information from Federal contractors, no new collection of information is required because all data are acquired from an existing source within Treasury.*

**Section 5.2: Records Management - NARA/Federal Records Act Requirements**

Records retention schedules determine the maximum amount of time necessary to retain information in order to meet the needs of the project or system.  Information is generally either disposed of or sent to the National Archives and Records Administration (NARA) for permanent retention upon expiration of this period. If the system has an applicable SORN(s), check the "Policies and Practices for Retention and Disposal of Records" section.

**Section 5.2(a)**

1. ☒ The records used in the system or by the project are covered by a NARA General Records Schedule (GRS).

2. ☐ The records used in the system or by the project are covered by a NARA approved Treasury bureau Specific Records Schedule (SRS).

**Section 5.3: E-Government Act/NIST Compliance**

The completion of Federal Information Security Management Act (FISMA) Security Assessment & Authorization (SA&A) process is required before a federal information system may receive Authority to Operate (ATO) or Acceptable to Use (ATU).

**Section 5.3(a)**

1. ☒ The system is a federal <u>information system</u> subject to FISMA requirements.

2. ☒ The system completed a SA&A and received an ATO or ATU.

3. ☐ This is a new system has not yet been authorized to operate.

4.  ☒  The system or project maintains access controls to ensure that access to PII maintained is limited to individuals who have a need to know the information in order to perform their official Fiscal Service duties.

5.  ☒  All Treasury/Fiscal Service security requirements are met when disclosing and transferring information (e.g., bulk transfer, direct access by recipient, portable disk, paper) from the Treasury system or project to internal or external parties.

6.  ☒  This system or project maintains an audit log of system users to ensure they do not violate the system and/or Treasury/Fiscal Service rules of behavior.

7.  ☐  This system or project has the capability to identify, locate, and monitor individuals or groups of people other than the monitoring of system users to ensure that they do not violate the system's rules of behavior.

## Section 5.4: Section 508 of the Rehabilitation Act of 1973

When Federal agencies develop, procure, maintain, or use Electronic and Information Technology (EIT), Section 508 of the *Rehabilitation Act of 1973* (as amended in 1998) requires that individuals with disabilities (including federal employees) must have access and use (including privacy policies and directives as well as redress opportunities) that is comparable to that which is available to individuals who do not have disabilities.

## Section 5.4(a)

1.  ☐  The project or system will **not** involve the development, procurement, maintenance or use of EIT as that term is defined in Section 508 of the *Rehabilitation Act of 1973* (as amended in 1998)?

2.  ☒  The project or system **will** involve the development, procurement, maintenance or use of EIT as that term is defined in Section 508 of the *Rehabilitation Act of 1973* (as amended in 1998)?  *If checked:*

    ☒  The system or project complies with all Section 508 requirements, thus ensuring that individuals with disabilities (including federal employees) have access and use (including access to privacy and civil liberties policies) that is comparable to that which is available to individuals who do not have disabilities.

    ☐  The system or project is not in compliance with all Section 508 requirements.

"

# Privacy and Civil Liberties Impact Assessment
### Template version 4.4



# Payment Information Repository (PIR)

## April 6th, 2020

### Bureau Certifying Official
David J. Ambrose
Chief Security Officer and Chief Privacy Officer
Bureau of the Fiscal Service
Department of the Treasury

The mission of the Bureau of the Fiscal Service (Fiscal Service) is to promote the financial integrity and operational efficiency of the federal government through exceptional accounting, financing, collections, payments, and shared services.

This Privacy and Civil Liberties Impact Assessment (PCLIA) is a public document and will be made available to the general public via the Fiscal Service Privacy and Civil Liberties Impact Assessment (PCLIA) webpage (PCLIA WEBPAGE).

used to make an adverse determination about an individual's rights, benefits, and/or privileges (regardless of if it is an exempt system of records)?

---

| **Accuracy, Completeness, and Timeliness of Information Received from the Source** |

**Section 5.2(n)** ☒ Yes ☐ No  Did Treasury or the bureau receive any guarantee, assurance, or other information from any information source(s) regarding the accuracy, timeliness and completeness of the information maintained in the system or by the project?

---

| **Disseminating Notice of Corrections of or Amendments to PII** |

**Section 5.2(o)** ☐ Yes ☐ No  ☒ N/A  Where feasible and appropriate, is there a process in place for disseminating corrections of or amendments to the PII maintained in the system or by the project to all internal and external information-sharing partners?

**Section 5.2(p)** ☐ Yes ☐ No ☒ N/A Where feasible and appropriate, does the process for disseminating corrections or amendments include notifying the individual whose information is corrected or amended?

## Section 5.3: Information sharing within the Department of the Treasury

---

| **Internal Information Sharing** |

**Section 5.3(a)** ☐ Yes ☒ No Is PII maintained in the system or by the project shared with other Treasury bureaus?

**Section 5.3(b)** ☒ Yes ☐ No Does the Treasury bureau or office that receives the PII limit access to those Treasury officers and employees who have a need for the PII in the performance of their official duties (i.e., those who have a "need to know")?

---

| **Memorandum of Understanding (MOU)/Other Agreements Limiting Treasury's Internal Use/Disclosure of PII** |

**Section 5.3(c)** ☐ Yes ☒ No ☐ N/A  Is any of the PII maintained in the system or by the project subject to the requirements of a Memorandum of Understanding or other agreement (e.g., agreement with another federal or state agency that provided the information to the Treasury or subject to an international agreement or treaty) that limits or places conditions on Treasury's internal use, maintenance, handling, or disclosure of the PII?

## Section 5.4: Information sharing with external (i.e., outside Treasury) organizations and individuals