UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Alliance for Retired Americans, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>Scott Bessent, in his official capacity as Secretary of the Treasury, et al.,<br><br>　　　　Defendants. | Civil Action No. 25-313 (CKK) |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS AND PLAINTIFFS' STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS**

Pursuant to Local Civil Rule 7(h), Plaintiffs hereby respond to Defendants' Statement of Material Facts Not in Dispute and submit their Statement of Additional Material Facts Not in Dispute.

**Response to Defendants' Statement of Material Facts**

1.　　Admitted.

2.　　Admitted.

3.　　Admitted.

4.　　Admitted.

5.　　Admitted.

6.　　Admitted.

7.　　Admitted to the extent the statement purports to describe the terms of the EO, under which the USDS and the Temporary Organization sit within the Executive Office of the President and are nominally headed by the USDS Administrator, who reports to the White House Chief of

Staff. The actual structure, management, and operation of the USDS and the Temporary Organization, including the question whether Elon Musk has served as the de facto head of the USDS, the Temporary Organization, or DOGE, is the subject of pending litigation. *See*, *e.g.*, *New Mexico v. Musk*, No. 1:25-cv-429 (D.D.C.); *J. Doe 4 v. Musk*, No. 8:25-cv-462 (D. Md.).

    8.    Admitted.

    9.    Admitted.

    10.    Section 4(a) of the EO imposes no duties on the USDS directly. It provides that: "Among other things, the USDS Administrator shall work with Agency Heads to promote inter-operability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization." Section 4(b) provides that "USDS shall adhere to rigorous data protection standards." Admitted to the extent Defendants' statement is consistent with the above-quoted provisions of the EO; otherwise, denied.

    11.    The first sentence of section 4(b) of the EO imposes a duty to agency heads to "take all necessary steps, in coordination with the USDS Administrator and to the maximum extent permitted by law, to ensure USDS has full and prompt access to all" of the records identified in Defendants' statement. Admitted to the extent Defendants' statement is consistent with the above-quoted provision of the EO; otherwise, denied.

    12.    Admitted.

    13.    Admitted.

    14.    Admitted.

    15.    Admitted that Mr. Krause's position at the Treasury Department was created to effectuate the mission of DOGE. Denied as to the remainder of the statement as to Mr. Krause's job duties at the time his position was created. Mr. Krause's hiring papers identify various job

responsibilities for Mr. Krause, which do not match Mr. Krause's description of his job responsibilities that he submitted in his declaration. AR[1] 15, 21; Wenzler Decl. ¶ 6, ECF 24-3; Krause Decl. ¶¶ 2–4, ECF 24-1.

16. Admitted.

17. Admitted.

18. Admitted.

19. Admitted that Mr. Krause states that his role at the Treasury Department is to make it more effective, more efficient, and more responsive to the policy goals of the current Administration. Denied to the extent that Defendants suggest that AR 21 confirms Mr. Krause's statement as to his current role. Also denied to the extent Defendants' statement implies that Mr. Krause has no other roles at the Treasury Department.

20. Admitted that Mr. Krause states that his role at the Treasury Department is to better identify improper and fraudulent payments. Denied to the extent that Defendants suggest that AR 21 confirms Mr. Krause's statement as to his current role. The DOGE Executive Order does not mention identifying improper and fraudulent payments as one of its purposes. 90 Fed. Reg. 8441.

21. Denied. Mr. Krause could obtain personal data and other information from the Bureau's payment systems through means other than "so-called 'over the shoulder' access to review activity others performed in the system or data accessed from the system." Mr. Krause received information from the Bureau's systems through screenshots and through requests for information made to Bureau personnel. Gioeli Decl. ¶ 4; Defs.' Responses to Interrog. #1, at 6, #6, at 14.

---

[1] "AR" refers to the administrative record docketed at ECF 44-1. "Supp. AR" refers to the supplemental administrative record docketed at ECF 48-1. The page identified by the Bates stamp on the AR and Supp. AR are used for page numbering.

22. Admitted.

23. Admitted.

24. Admitted.

25. Admitted that the statement reflects how Mr. Krause describes Mr. Elez's role. Denied to the extent that the statement indicates that AR 22–23 confirms Mr. Krause's description.

26. Admitted.

27. Admitted.

28. Denied to the extent that the Southern District of New York has permitted Ryan Wunderly to access the Bureau's systems. *See* Opinion and Order, ECF No. 139, *State of New York v. Treasury*, No. 25-cv-1144 (S.D.N.Y. Apr. 11, 2025). Otherwise, admitted.

29. Admitted.

30. Admitted.

31. Admitted.

32. Admitted.

33. Denied to the extent the statement suggests that Defendants have adequately explained the need for the Treasury DOGE Team's access to sensitive data. Otherwise, admitted.

34. Denied to the extent the statement suggests that (1) Defendants considered the risk to individual privacy of granting the Treasury DOGE Team access to Bureau systems under the payment processing engagement plan, (2) Defendants considered the risk to individual privacy of granting the Treasury DOGE Team access to personal data outside of the payment processing engagement plan, or (3) the mitigation measures applied to the Treasury DOGE Team's access to data outside of the payment processing engagement plan. Defs.' Response to Interrog. #1, at 6;

Gioeli Decl. ¶ 18; Defs.' Response to Interrog. #6, at 14; *see* Elez Email to GSA (Ex. I); Ambrose Decl. ¶ 12, ECF 48-2. Otherwise, admitted.

35. Denied to the extent the statement suggests that (1) Defendants considered the risk to individual privacy of granting the Treasury DOGE Team access to Bureau systems under the payment processing engagement plan, (2) Defendants considered the risk to individual privacy of granting the Treasury DOGE Team access to personal data outside of the payment processing engagement plan, or (3) the mitigation measures applied to the Treasury DOGE Team's access to data outside of the payment processing engagement plan. Defs.' Response to Interrog. #1, at 6; Gioeli Decl. ¶ 18; Defs.' Response to Interrog. #6, at 14; *see* Elez Email to GSA (Ex. I); Ambrose Decl. ¶ 12, ECF 48-2. Otherwise, admitted.

**Plaintiffs' Statements of Material Facts**

36. Plaintiff Alliance for Retired Americans (the Alliance) is a grassroots advocacy organization with 4.4 million members, spread across all 50 states. Fiesta Decl. ¶ 2, ECF 8-2. The Alliance's members include former teachers, industrial workers, state and federal government workers, construction workers, and community leaders. *Id.* The Alliance's mission involves advocating on behalf of its members at the federal, state, and local levels on issues such as retirement security and consumer protection. *Id.* ¶ 3.

37. The Alliance has members who receive monthly Social Security retirement payments from Treasury and who receive other forms of retirement and health-related benefits, such as Railroad Retirement Benefits, pension income for government service, disability and workers compensation benefits, federal black lung benefits, and veteran's benefits. *Id.* ¶ 4. The Alliance's members also pay federal income taxes or receive refunds, including during the current tax season. *Id.* ¶ 5.

38. For example, Carol Rosenblatt, who has been a member of the Alliance since 2021, currently receives monthly Social Security payments by direct deposit into her bank account and expects to pay a deficiency for last year's income taxes through an electronic funds transfer. Rosenblatt Decl. ¶¶ 2, 4–6, ECF 16-2. Ms. Rosenblatt has not consented to giving DOGE access to her personal information stored in Treasury records. *Id.* ¶ 9.

39. The privacy of her personal information is very important to Ms. Rosenblatt. *Id.* ¶ 10. She has trusted the government to maintain the privacy of her information and to use it only for lawful purposes. *Id.* She is disturbed, anxious, and frustrated that the government has violated her trust by giving DOGE access to her information without her consent. *Id.*

40. Plaintiff American Federation of Government Employees, AFL-CIO (AFGE), is a labor organization and unincorporated association that represents approximately 800,000 federal civilian employees through its affiliated councils and locals in every state in the United States. Kelley Decl. ¶ 1, ECF 8-3. AFGE members include nurses, border patrol agents, correctional officers, scientists, health care workers, civilian employees in the Department of Defense, employees of the Social Security Administration, and more. *Id.*

41. AFGE's mission involves advocating on behalf of its members and seeking to promote dignity, safety, and fairness for government employees. *Id.* ¶ 3.

42. AFGE's members include individuals who are currently employed with the federal government and receive salaries and wages from Treasury, as well as individuals who have retired from federal service and receive pension benefits from Treasury. *Id.* ¶ 4. AFGE's members also pay federal income taxes or receive refunds, including in the current tax season. *Id.* ¶ 5.

43. For example, Jeanette McElhaney has been an AFGE member since 1977. McElhaney Decl. ¶ 2, ECF 16-3. As a retiree and former civilian employee of the United States

Air Force, she regularly receives monthly retirement annuity and Social Security benefits from the government by monthly direct deposit into her bank account. *Id.* ¶¶ 4–5. She also expects to receive a refund for last year's income taxes through an electronic funds transfer. *Id.* ¶ 6. Ms. McElhaney has not consented to giving DOGE access to her personal information stored in Treasury records. *Id.* ¶ 9.

44. The privacy of her personal information is very important to Ms. McElhaney. *Id.* ¶ 10. She has trusted the government to maintain the privacy of her information and to use it only for lawful purposes. *Id.* She is disturbed, anxious, and frustrated that the government has violated her trust by giving DOGE access to her information without her consent. *Id.*

45. Plaintiff Service Employees International Union (SEIU) is a labor union of approximately 2 million diverse workers who provide public, healthcare, and property services throughout the United States, Canada, and Puerto Rico. Ury Decl. ¶ 2, ECF 8-4. Among SEIU's members are approximately 80,000 United States federal-sector employees, spread across 43 states and the District of Columbia, and 30,000 retiree members. *Id.* ¶¶ 2–4.

46. SEIU's mission involves advocating on behalf of its members and seeking to improve the lives of workers and their families and to promote an equitable society and economy. *Id.* ¶ 3.

47. SEIU's members include individuals who receive salaries, wages, and pension benefits disbursed by Treasury and individuals who pay federal income taxes or receive refunds, including in the current tax season. *Id.* ¶¶ 4–5.

48. For example, Barbara Casey has been an SEIU member since 1999, and she is a retiree who receives monthly Social Security payments from the federal government by direct

deposit into her bank account. Casey Decl., ¶¶ 2, 4–5, ECF 16-4. Ms. Casey also expects to pay a tax deficiency for last year's income taxes through electronic funds transfer. *Id.* ¶ 6.

49. Henrietta Jenkins has been an SEIU member since approximately 2000, and she receives monthly Social Security payments from the federal government by direct deposit into her bank account. Jenkins Decl. ¶¶ 2, 4–5, ECF 16-5. Ms. Jenkins expects that she will pay a tax deficiency for last year's income taxes through electronic funds transfer. *Id.* ¶ 6.

50. Pia Morrison has been an SEIU member since 2004. ECF Morrison Decl. ¶ 2, ECF 16-6. Ms. Morrison pays federal income taxes and expects to pay a tax deficiency for last year's income taxes through electronic funds transfer. *Id.* ¶ 4.

51. Patrice Peterson has been an SEIU member since 2001, and she is a retiree who receives monthly Social Security payments from the federal government by direct deposit into her bank account. Peterson Decl. ¶¶ 2, 4–5, ECF 16-7.

52. Susan Tousignant has been an SEIU member since 1981, and she is a retiree who receives monthly Social Security payments from the federal government by direct deposit into her bank account. Tousignant Decl. ¶¶ 2, 4–5, ECF 16-8.

53. Ms. Casey, Ms. Jenkins, Ms. Morrison, Ms. Peterson, and Ms. Tousignant all find the privacy of their personal information very important, and none of them have consented to giving DOGE access to their personal information that is stored in Treasury records. Casey Decl. ¶¶ 9–10; Jenkins Decl. ¶¶ 9–10; Morrison Decl. ¶¶ 7–8; Peterson Decl. ¶¶ 8–9; Tousignant Decl. ¶¶ 8–9. All of them have trusted the government to maintain the privacy of their information and to use it only for lawful purposes, and all of them are disturbed, anxious, and frustrated that the government has given DOGE access to their information without their consent. Casey Decl. ¶ 10; Jenkins Decl. ¶ 10; Morrison Decl. ¶ 8; Peterson Decl. ¶ 9; Tousignant Decl. ¶ 9.

54. The Bureau of the Fiscal Service (Bureau) is the component within the Department of the Treasury responsible for collecting revenue and debt from individuals and disbursing funds to individuals. Treas. Order 136-01 (Oct. 7, 2012), *published*, 78 Fed. Reg. 31629 (May 24, 2013); Robinson Decl. ¶ 2, ECF 24-4.

55. In fiscal year 2023, the Bureau collected $5.47 million in federal revenue and disbursed $5.46 trillion, or 87.8% of the U.S. Government's payments. Robinson Decl. ¶ 2, ECF 24-4; Ex. B to Joshi Decl.

56. To engage in its collections and payment responsibilities, the Bureau maintains sensitive personal information about individuals, including names, Social Security numbers, addresses, banking information, and tax records. 85 Fed. Reg. 11776 (Feb. 27, 2020).

57. The Bureau operates several systems to engage in its payment activities. Gioeli Decl. ¶¶ 6–10, ECF 24-2.

58. The Payment Automation Manager (PAM) is the primary system used by the Bureau to process payments for disbursements. *Id*. ¶ 6.

59. The Secure Payment System (SPS) is used by agencies to create, certify, and submit individual payment files to Treasury and for "one-time large dollar amount transactions." *Id*. ¶ 8

60. The Automated Standard Application for Payments (ASAP) is a payment system that is initiated by the recipient and allows recipients to draw down funds. *Id.* ¶ 7.

61. The International Treasury Services (ITS) is used to make international payments, including Social Security payments for Americans living abroad. *Id.* ¶ 9.

62. The Central Accounting and Reporting System (CARS) is used to record financial data on agency spending and enable agency reporting for accounting purposes. *Id.* ¶ 10.

63. The Bureau operates a Payment Information Repository System (PIRS) that is a centralized system that holds information on all payments that both Treasury and Non-Treasury Disbursing Offices make. Exs. C and D to Joshi Decl.; Defs.' Response to Interrog. #1, at 6, ECF 61-2.

64. The Bureau published a System of Records Notice (SORN) in 2020 that describes the personal information that the Bureau collects on individuals in carrying out its payment and collections activities. 85 Fed. Reg. 11776.

65. The Treasury Department has published a Privacy Act Handbook that sets out the agency's guidelines and procedures for employees that use and disseminate records on individuals. Ex. E to Joshi Decl.

66. The Privacy Act Handbook requires a SORN to be published when making major alterations or modifications to a system of records. *Id*.

67. The Privacy Act Handbook requires the agency to send a report to Congress and to the Office of Management and Budget (OMB) when altering a system of records in a way that changes the purpose for which the information is used or that permits substantially greater access to the system of records. *Id*.

68. The Privacy Act Handbook recognizes that a system of records is altered if it creates the potential for either greater or easier access. *Id*.

69. The report required by the Privacy Act Handbook requires the Treasury Department to examine the probable or potential effect of its change on the privacy or other personal rights of individuals, describe which employees will be granted access, and identify steps to minimize the risk of unauthorized access. *Id*.

70. One purpose of this report is to allow citizens and residents to examine how their privacy may be affected by a change in agency policy toward a system of records. *Id*.

71. The Privacy Act Handbook forbids any change to a system of records that is not significant enough for a SORN or a report to Congress and OMB to be made without first providing notice to the Office of Privacy, Transparency, & Records, accompanied by a memorandum demonstrating that a SORN and a report are not required. *Id*.

72. The Treasury Department has published a Privacy Program Plan to implement OMB Circular A-130 that sets out how the agency will manage personally identifiable information (PII). Ex. E to Joshi Decl.

73. The Privacy Program Plan is based on Fair Information Practice Principles embodied in the Privacy Act. *Id*.

74. The Privacy Program Plan requires the Treasury Department to be transparent about the use and sharing of PII. *Id*.

75. The Privacy Program Plan specifies that the Treasury Department will not use PII except as specified in notices that it is required to make, prohibits sharing that is not compatible with the purpose for which the PII was originally collected, and requires the Treasury Department to protect PII through appropriate security safeguards. *Id*.

76. The safeguards that the Privacy Program Plan implements are derived from National Institute of Standards and Technology (NIST) Special Publication (SP) 800-53 Rev. 5. *Id*. NIST guidelines incorporate security principles such as "separation of duties," which protects against abuse by not dividing functions and missions among multiple individuals or roles, and "least privilege," which ensures that personnel do not receive more access privileges than necessary to satisfy a business need. *Id*.; Ex. G to Joshi Decl.

77. The Privacy Act requires that the employees of an agency have a "need to know" before an agency may disclose personal information to them without the consent of the individual whose record is disclosed. 5 U.S.C. § 552a(b)(1).

78. The Bureau has published Privacy and Civil Liberties Impact Assessments for its PAM, SPS, ASAP, ITS, CARS, and PIRS systems that recognize that personal information cannot be disclosed internally without a need to know. Ex. J to Joshi Decl.

79. President Trump established the DOGE by issuing Executive Order 14158 on January 20, 2025. 90 Fed. Reg. 8441.

80. Executive Order 14158 directs agency heads to establish a DOGE Team at each agency, after consulting with USDS. *Id*.

81. DOGE Team Leads must coordinate their work with USDS. *Id*.

82. DOGE Team Leads must advise their agency leadership on implementing the President's DOGE agenda. *Id*.

83. Executive Order 14158 does not include a definition of the "DOGE agenda." *Id*. The Executive Order states that the DOGE agenda is to be achieved by "modernizing Federal technology and software to maximize governmental efficiency and productivity." *Id*.

84. Executive Order 14158 requires agency heads to "take all necessary steps, in coordination with the USDS Administrator and to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems." *Id*.

85. Executive Order 14158 does not mention fraud, waste, or abuse, and does not mention payment processing or improper payments. *Id*.

86. The Trump transition team assigned Thomas Krause to the Treasury Department as part of the "day 1 team" before President Trump's inauguration. Supp. AR 1. He began work at the Treasury Department on January 23, 2025. Krause Decl. ¶ 11, ECF 24-1.

87. Mr. Krause is the DOGE Team Lead for Treasury. *Id*. ¶ 2. In that role, he coordinates his work with USDS and DOGE, he provides them with regular updates, and he receives policy direction from USDS and DOGE. *Id*. ¶ 4.

88. Mr. Krause was hired by the Treasury Department as a consultant. AR 15; Wenzler Decl. ¶ 3, ECF 24-3. His consultancy request form described the services he would provide as leading IT modernization efforts by implementing emerging technologies such as AI, blockchain, and cloud computing while ensuring compliance with federal IT policies, overseeing the modernization of legacy systems, integrating real-time analytics, automation, and enhanced data-sharing capabilities across agencies, strengthening cybersecurity protocols, and fostering public-private partnerships with financial institutions, technology firms, and regulatory agencies. AR 15.

89. Mr. Krause's appointment paperwork states that his job duties are to execute the Bureau's mission of promoting the financial integrity and operational efficiency of the federal government through exceptional accounting, financing, collections, payments, and shared services, including but not limited to (1) Operational Resiliency; (2) Advancing Governmentwide Payment Integrity; (3) Critical Modernization Programs; (4) Improving the Payment Experience; and (5) TreasuryDirect User Credential Costs. AR 21; Wenzler Decl. ¶ 6, ECF 24-3.

90. Marko Elez was assigned to the Treasury DOGE Team before the inauguration. AR 28. He began work at the Treasury Department on January 21, 2025. AR 4; Wenzler Decl. ¶ 9, ECF 24-3. He served as a confidential adviser to Mr. Krause. AR 22.

91. Marko Elez resigned from his role at Treasury on February 6, 2025. Gioeli Decl. ¶ 22, ECF 24-2.

92. The Treasury DOGE Team currently consists of Thomas Krause, Todd Newnam, Ryan Wunderly, Linda Whitridge, Sam Corcos, and Gavin Kliger. Defs.' Response to Interrog. #1, at 6, ECF 61-2.

93. The Treasury DOGE Team has initiated four projects to implement Executive Order 14158 that rely on access to personal information. *Id*. #2, at 7–8. These projects are payment process engagement; implementing Executive Order 14169, 90 Fed. Reg. 8619; reviewing of the Internal Revenue Service's vendor contracts, and reviewing human resources at the Treasury Department. *Id*.

94. DOGE wanted Mr. Krause at the Treasury Department quickly to work on the payment processing review. Krause Decl. ¶ 11, ECF 24-1. Mr. Krause developed a work plan for that project. AR 60; Katz Decl. ¶ 4, ECF 48-1.

95. The day after Mr. Krause began work at the Treasury Department, the Bureau developed an "engagement plan" to support "the USDS/DOGE team during their 4–6-week engagement to understand payment processes and opportunities." AR 57. The engagement plan recognized that the Treasury DOGE Team's access to the Bureau's systems could have "catastrophic consequences" if the access disrupted technical operations. AR 44-1.

96. The engagement plan required the Treasury DOGE Team to attest that Bureau information has been properly destroyed and that no known or suspicious unauthorized access has occurred. *Id*. at 59. The engagement plan was "initiated" on January 26, 2025. Krause Decl. ¶ 13, ECF 24-1.

97. Between January 28 and January 30, Mr. Elez and Mr. Krause were in Kansas City, where the Federal Reserve Bank of Kansas City hosts and maintains several Bureau payment systems, to do a "deep dive" into the Bureau's systems. AR 56; Krause Feb. 10 Decl. ¶ 7, ECF 15-1.

98. Between January 29 and January 31, the Treasury DOGE Team requested that Mr. Elez receive access to the PAM, SPS, ASAP, CARS, and ITS.gov databases. AR 62; Defs.' Response to Interrog. #5, at 13, ECF 61-2; Supp. AR 7.

On February 3, the Treasury Department gave Mr. Elez access to Bureau systems. AR 61; Defs.' Response to Interrog. #5, at 13, ECF 61-2. On February 3, he was provided read-only access to PAM, and on February 4 and 5, he accessed the PAM database and SPS. Gioeli Decl. ¶¶ 18–19, ECF 24-2.

99. In his role as a DOGE Team member, Mr. Elez received access to multiple systems and data records, which was a level of access broader in scope than what has occurred in the past. Gioeli Decl. ¶ 13, ECF 24-2.

100. Mr. Elez's level of access was risky. *Id*. ¶ 12. The Bureau developed mitigation strategies to reduce these risks. *Id*. ¶ 11.

101. Mr. Elez could view and query personal information on Bureau systems to which he was granted access. *Id*. ¶ 17.

102. Mr. Krause has been granted "over the shoulder" access to the Bureau's payment systems and source code. *Id*. ¶ 4. This access limits an individual to viewing a computer system through screen sharing or while near another person who has access to the system. Gioeli NY Decl. ¶ 9, *New York v. U.S. Dep't of the Treasury*, No. 1:25-cv-1144-JAV (S.D.N.Y. Mar. 5, 2025), ECF 98-2.

103. Despite being limited to over-the-shoulder access, Mr. Krause was given access to screenshots of payment systems data or records. Gioeli Decl. ¶ 4, ECF 24-2.

104. Between January 28 and February 5, 2025, Mr. Krause and Mr. Elez obtained payment data from Bureau staff that was retrieved from PIRS. Defs.' Response to Interrog. #1, at 6, ECF 61-2.

105. Mr. Krause and Mr. Elez have obtained access to personal information in connection with implementing Executive Order 14169. Defs.' Response to Interrog. #2, at 7; Krause Decl. ¶¶ 17–20; Robinson Decl. ¶¶ 7–16.

106. On January 28, Mr. Krause received an email that he requested containing a spreadsheet entitled "USAID Payment request payment dates 1.21 through 1.24 updated." This file contained payment data about USAID payments, including the name of the payee. Defs.' Response to Interrog. #6, at 14, ECF 61-2.; Ex. I to Joshi Decl.

107. Mr. Krause emailed the information to Mr. Elez on January 30. Mr. Elez emailed the spreadsheet to two individuals at the U.S. General Services Administration (GSA). Defs.' Response to Interrog. #6, at 14–15, ECF 61-2; Ambrose Decl. ¶ 12, ECF 48-2. GSA has no role under Executive Order 14169. 90 Fed. Reg. 8619.

108. On February 4 and 5, Mr. Elez copied records directly from the PAM database that contained personal information of the recipients of federal funds. *See* Defs.' Response to Interrog. #6, at 14–15, ECF 61-2; Gioeli Decl. ¶ 18, ECF 24-2.

109. Mr. Krause sees his role as making the Treasury Department more responsive to the policy goals of this Administration. Krause Decl. ¶¶ 4, 6, ECF 24-2.

110. Defendants have given the Treasury DOGE Team access to personal information in the Bureau's records without publishing a revised SORN in the Federal Register, providing a

16

report to Congress, or preparing a memorandum for the Office of Privacy, Transparency, & Records. Katz Decl., ECF 44-1 (certifying completeness of administrative record); Katz Decl. ¶ 10 (certifying completeness of administrative record).

Dated: April 25, 2025                            Respectfully submitted,

/s/ Nandan M. Joshi
Nandan M. Joshi (DC Bar No. 456750)
Nicolas Sansone (DC Bar No. 1686810)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

Norman L. Eisen (DC Bar No. 435051)
State Democracy Defenders Fund
600 Pennsylvania Avenue SE
#15180
Washington, DC 20003