**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ALLIANCE FOR RETIRED AMERICANS, *et al.*,<br><br>            *Plaintiffs*,<br><br>    v.<br><br>SCOTT BESSENT, *in his official capacity as Secretary of the Treasury*, *et al.*,<br><br>            *Defendants*. | Case No. 1:25-cv-00313-CKK |

**DEFENDANTS' COMBINED REPLY IN SUPPORT OF THEIR MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT, AND OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 1

I.      Plaintiffs Lack Article III Standing................................................................................. 1

II.     Plaintiffs' Claims Should Be Dismissed for Failure to State a Claim or, in the
        Alternative, Summary Judgment Should Be Entered in Defendants' Favor. .................... 9

        A.      Plaintiffs Fail to Establish Reviewable Final Agency Action. ............................... 9

        B.      Plaintiffs Cannot Assert Alleged Violations of the Privacy Act and the
                Internal Revenue Code on Behalf of Their Members Through the APA. ............ 12

        C.      Plaintiffs Cannot Prevail on Their Privacy Act Claim......................................... 13

        D.      Plaintiffs Cannot Prevail on Their Internal Revenue Code Claim........................ 18

        E.      Granting of Data Access to Treasury Employees Was Not Arbitrary and
                Capricious. ....................................................................................................... 18

        F.      Plaintiffs Cannot Prevail on Their Excess of Statutory Authority Claim............. 19

CONCLUSION.................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Am. Fed'n of Labor & Congress of Indus. Orgs. v. Dep't of Labor*,
   --- F. Supp. 3d ---, 2025 WL 1129227 (D.D.C. Apr. 16, 2025)............................................ 2, 6

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*,
   --- F. Supp. ---, 2025 WL 1141737 (D. Md. Apr. 17, 2025)........................................... 2

*Am. Fed'n of State, Cnty, and Mun. Emps. v. Soc. Sec. Admin.*,
   No. 25-1411, 2025 WL 1249608 (4th Cir. Apr. 30, 2025)......................................... 4

*Am. Fed'n of Teachers v. Bessent*,
   No. 25-1282, 2025 WL 1023638 (4th Cir. Apr. 7, 2025)................................. 2, 6, 14

*Anglers Conservation Network v. Pritzker*,
   139 F. Supp. 3d 102 (D.D.C. 2015) ........................................................ 17

*Bennett v. Spear*,
   520 U.S. 156 (1997)........................................................................ 10

*Bigelow v. Dep't of Def.*,
   217 F.3d 875 (D.C. Cir. 2000) .................................................... 14, 16

*Block v. Cmty. Nutrition Inst.*,
   467 U.S. 340 (1984)........................................................................ 11

*Chrysler Corp. v. Brown*,
   441 U.S. 281 (1979)........................................................................ 9

*Clapper v. Amnesty Int'l, USA*,
   568 U.S. 398 (2013)................................................................. 6, 7, 8

*Dep't of Agric. Rural Development Rural Housing Serv. v. Kirtz*,
   601 U.S. 42 (2024)........................................................................ 12

*Dickson v. Direct Energy, LP*,
   69 F.4th 338 (6th Cir. 2023) ........................................................ 3

*Doe v. Chao*,
   540 U.S. 614 (2004)........................................................................ 7

*Feldman v. Star Trib. Media Co.*,
   659 F. Supp. 3d 1006 (D. Minn. 2023)........................................ 5

*Fox v. Gov't of the Dist. of Columbia*,
   794 F.3d 25 (D.C. Cir. 2015) ................................................ 17, 18

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
   460 F.3d 13 (D.C. Cir. 2006) ................................................................................ 8

*Gadelhak v. AT&T Servs., Inc.*,
   950 F.3d 458 (7th Cir. 2020) ............................................................................... 3

*Grosdidier v. Chairman, Broad Bd. of Governors*,
   560 F.3d 495 (D.C. Cir. 2009) ........................................................................... 11

*Hastings v. Judicial Conference of U.S.*,
   770 F.2d 1093 (D.C. Cir. 1985) ......................................................................... 11

*Hearst Radio, Inc. v. FCC*,
   167 F.2d 225 (D.C. Cir. 1948) ............................................................................. 8

*Hill v. Dep't of Defense*,
   981 F. Supp. 2d 1 (D.D.C. 2013) ....................................................................... 16

*In re Nickelodeon Consumer Privacy Litig.*,
   827 F.3d 262 (3d Cir. 2016) ................................................................................. 5

*In re Sci. Applications Int'l Corp Backup Tape Data Theft Litig.*,
   45 F. Supp. 3d 14 (D.D.C. 2014) ..................................................................... 7, 8

*In re Zappos.com, Inc.*,
   108 F.Supp.3d 949 (D. Nev. 2015) ...................................................................... 8

*Indep. Equip. Dealers Ass'n v. EPA*,
   372 F.3d 420 (D.C. Cir. 2004) ............................................................................. 8

*Jeffries v. Volume Servs. Am. Inc.*,
   928 F.3d 1059 (D.C. Cir. 2019) ........................................................................... 6

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ............................................................................................. 8

*New York v. Trump*,
   --- F. Supp. 3d ---, 2025 WL 1095147 (S.D.N.Y. Apr. 11, 2025) ................... 16, 17

*Patel v. Facebook*,
   932 F.3d 1264 (9th Cir. 2019) ............................................................................. 5

*Salazar v. Nat'l Basketball Ass'n*,
   118 F.4th 533 (2d Cir. 2024) ............................................................................... 5

*Salazar v. Paramount Global*,
   133 F.4th 642 (6th Cir. 2025) ............................................................................. 5

*Six v. IQ Data Int'l, Inc.*,
 129 F.4th 630 (9th Cir. 2025) ................................................................. 3

*Spokeo, Inc. v. Robins*,
 578 U.S. 330 (2016) ................................................................................. 2

*TransUnion LLC v. Ramirez*,
 594 U.S. 413 (2021) ........................................................................ *passim*

*U.S. Army Corps of Eng'rs v. Hawkes Co.,*
 578 U.S. 590 (2016) ............................................................................... 10

*Venetian Casino Resort, LLC v. EEOC*,
 530 F.3d 925 (D.C. Cir. 2008) ........................................................... 9, 10

*Welborn v. Internal Revenue Serv.*,
 218 F. Supp. 3d 64 (D.D.C. 2016) ........................................................ 7, 8

*Westcott v. McHugh*,
 39 F. Supp. 3d 21 (D.D.C. 2014) ........................................................... 11

*Wilson v. Libby*,
 535 F.3d 697 (D.C. Cir. 2008) ............................................................... 11

**Statutes**

5 U.S.C. § 551 ................................................................................................. 8, 9

5 U.S.C. § 551 .................................................................................................... 8

5 U.S.C. § 552a ......................................................................................... *passim*

5 U.S.C. § 704 .................................................................................................. 12

26 U.S.C. § 6103 .............................................................................................. 17

**Regulations**

85 Fed. Reg. 11,776 (Feb. 27, 2020) ............................................................... 4

Exec. Order No. 14,158, 90 Fed. Reg. 8,441 (Jan. 20, 2025) ........................ 15

Exec. Order No. 14,243, 90 Fed. Reg. 13,681 (Mar. 25, 2025) ................ 14, 15

**INTRODUCTION**

Plaintiffs ask this Court to superintend the day-to-day operations of the Treasury Department by deciding which officials within the agency have sufficient "need" to access agency data systems. But Plaintiffs' claims are untenable for multiple reasons.

First, Plaintiffs lack Article III standing to bring such a case in federal court, as they have not alleged an injury-in-fact similar to the harms courts vindicated at common law. Plaintiffs suffer no cognizable Article III injury when an agency grants particular employees access to records containing information Plaintiffs' members provided to the government and which is routinely accessed by other employees performing similar work. Second, a decision to provide system access lacks the characteristics of "final agency action" that can be challenged under the Administrative Procedure Act ("APA"), and Plaintiffs cannot cure that problem by alleging that they are challenging an operational judgment that, by its nature, does not result in legal consequences to anyone. Third, Plaintiffs cannot utilize the APA to seek forms of relief that Congress did not authorize within the comprehensive remedial schemes of the Privacy Act or the Internal Revenue Code. Plaintiffs also fail to make out a violation of the APA, the Privacy Act, or the Internal Revenue Code, and their ultra vires claim is similarly lacking in merit. Accordingly, the Court should grant Defendants' motion to dismiss or, in the alternative, enter summary judgment in Defendants' favor. And the Court should deny Plaintiffs' cross-motion for summary judgment.

**ARGUMENT**

I.   **Plaintiffs Lack Article III Standing.**

Plaintiffs fail to establish standing because they have not identified a concrete injury under the standards the Supreme Court set out in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021). Plaintiffs agree that the only injury they have alleged is an intangible harm to their members'

1

privacy interests, and that those kinds of harms are only sufficiently concrete for purposes of standing if "the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 417 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)); *see also* Mem. in Supp. of Pls.' Cross-Motion for Summ. J. & Opp'n to Defs.' Mot. to Dismiss or, in the Alternative, for Summ. J. ("Pls.' Mot.") 16–17, ECF 63.

As anticipated, Plaintiffs base their alleged injury primarily in the common-law tort of intrusion upon seclusion. Pls.' Mot. 16–17 (citing Restatement (Second) of Torts § 652B (1977)). But that tort is not analogous to Plaintiffs' alleged injury for the reasons Defendants already explained, and Defendants respectfully disagree with this Court's previous conclusion that the tort can serve as a basis for standing here. Defs.' Mem. in Support of Mot. to Dismiss or, in the Alternative, for Summ. J. ("Defs.' Mot.") 13–17, ECF 61-1. As Judge Agee explained in the Fourth Circuit's panel decision in *American Federation of Teachers v. Bessent*, No. 25-1282, 2025 WL 1023638 (4th Cir. Apr. 7, 2025)—which addressed nearly identical claims against Treasury—"the harm contemplated by the common-law tort of intrusion upon seclusion includes intrusion into an individual's private space." *Id.* at * 2 (Agee, J., concurring). [1] And, indeed, as Defendants explained

---

[1] Defendants acknowledge that two other courts—besides this Court and the district court in *American Federation of Teachers*—have concluded that similar standing allegations are sufficiently analogous to the tort of intrusion upon seclusion in other cases addressing DOGE teams' access to agency data. *See Am. Fed'n of Labor & Congress of Indus. Orgs. v. Dep't of Labor*, --- F. Supp. 3d ----, 2025 WL 1129227, at *8 (D.D.C. Apr. 16, 2025); *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO (AFSCME) v. Soc. Sec. Admin.*, --- F. Supp. ----, 2025 1141737, at *27–42 (D. Md. Apr. 17, 2025). Those decisions are incorrect for the reasons stated herein and in Defendants' opening brief. Defendants also note that, in *AFSCME*, the government filed an application to the United States Supreme Court on April 30 for a stay of the preliminary injunction pending consideration of the government's appeal to the Fourth Circuit and, if the Fourth Circuit affirms the injunction, pending the timely filing and disposition of a petition for a writ of certiorari and any further proceedings in the Supreme Court. *See* Application for Stay, *Soc. Sec. Admin. v.*

in their opening brief, other circuit decisions addressing the tort of intrusion upon seclusion involve some unwanted intrusion into the plaintiffs' private space, such as an email, text message, or phone call. *See* Defs.' Mot. 15–16 & n.5 (citing, *e.g.*, *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458 (7th Cir. 2020) (Barrett, J.); *Dickson v. Direct Energy, LP*, 69 F.4th 338 (6th Cir. 2023); *Six v. IQ Data Int'l, Inc.*, 129 F.4th 630 (9th Cir. 2025)).

Plaintiffs ignore these cases, noting only that "the government draws no principled line between the annoyance of receiving an unwanted text message . . . and being made 'disturbed, anxious, and frustrated' by having one's personal information exposed to those who should not have it." Pls.' Mot. 18 (citing Decl. of Carol Rosenblatt ¶ 10, ECF 16-2). But the Restatement itself defines the tort as "an intentional interference with" a person's "solitude or seclusion, either as to his person or as to his private affairs or concerns, of a kind that would be highly offensive to a reasonable man." And the Restatement provides examples that would meet that high standard, including "physical intrusion into . . . the plaintiff's room in a hotel" or his home; "use of the defendant's senses . . . to oversee or overhear the plaintiff's private affairs"; and "opening [the plaintiff's] private and personal mail [or] searching his safe or his wallet." *Id.* § 652B(b). As Judge Richardson explained in his concurrence in *American Federation of Teachers*, Plaintiffs' alleged injury is "different in kind, not just in degree, from the harm inflicted" by snooping "reporters, detectives, and paparazzi." *Id.* at *4 (Richardson, J., concurring). It in no way resembles those situations, let alone rises to the level of "highly offensive" conduct. Restatement § 652B(a). Treasury personnel here are not surreptitiously invading Plaintiffs' members' private space or

---

*Am. Fed'n of State, Cnty. and Mun. Emps., AFL-CIO*, No. 24A1063 (May 2, 2025). The government also requested an administrative stay of the *AFSCME* court's preliminary injunction pending the Supreme Court's consideration of the government's stay application. *Id.* The Chief Justice called for a response from the plaintiffs by May 12 at 4 p.m.

monitoring their private communications. Instead, Treasury undisputedly obtained Plaintiffs' members' personal information legally, and it legally retains that information in agency data systems that are accessed daily by any number of unchallenged Treasury employees.

Put differently, the tort of intrusion upon seclusion "guards against the unease of having one's 'private concerns' specifically targeted by another's investigation or examination." *Am. Fed'n of State, Cnty, and Mun. Emps. v. Soc. Sec. Admin.*, No. 25-1411, 2025 WL 1249608, at *7 (4th Cir. Apr. 30, 2025) (Richardson, J., dissenting). "[T]he tort addresses narrow, individualized scrutiny—not general impersonal oversight." *Id.* Yet, Plaintiffs do not allege that they have been subjected to any such targeted snooping, nor do they even allege that any member of the Treasury DOGE Team has even seen their specific personal information.

Moreover, as Defendants explained in their opening brief, when Plaintiffs' members provided their information to the government, they did so on the understanding that the information would routinely be used by agency employees and others within and outside the government to perform the types of activities that the Treasury DOGE Team members plan to undertake. *See* Defs.' Mot. 16–17. Plaintiffs cannot establish concrete injury in these circumstances.

Indeed, Plaintiffs do not dispute that their personal information can lawfully be accessed by employees of the agency and shared outside of the agency for any of the numerous purposes set forth in the Privacy Act and the agency's System of Record Notice. *See* 5 U.S.C. 552a(b)(1)–(13); 85 Fed. Reg. 11,776, 11,779 (Feb. 27, 2020). Nor do Plaintiffs dispute that agency employees can and do regularly access their personal information, located in government systems. In practice, as Plaintiffs acknowledge, *see* Pls.' Mot. 17, they would have no reason even to know that a particular employee has accessed their information in the normal course of that employee's duties. *See TransUnion*, 594 U.S. at 438 (certain plaintiffs had not suffered an injury sufficient to support

standing where they did not "even kn[o]w" their files contained inaccurate information). Far from constituting a highly objectionable invasion of personal privacy, Treasury DOGE Team members who access Plaintiffs' members' information are doing the same thing that other agency employees routinely and properly do. Plaintiffs merely dislike that a specific subset of Treasury employees can access this data. That constitutes no injury at all, let alone a cognizable Article III injury.

Plaintiffs' arguments to the contrary are unconvincing. They cite several cases for the proposition that, "[w]here an individual has a statutory right to keep certain information private, courts have accordingly recognized that the individual has standing to sue when that information is shared in alleged violation of the law." Pls.' Mot. 17. In each of Plaintiffs' cited cases, however, there was some third-party dissemination of information that caused injury to the plaintiffs, or some collection of information to which the defendant was allegedly not entitled. *See Salazar v. Paramount Global*, 133 F.4th 642, 646–48 (6th Cir. 2025) (alleging disclosure of plaintiff's private video-viewing history to Facebook); *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 540–44 (2d Cir. 2024) ("One intangible harm that readily qualifies as concrete is the *public* disclosure of private facts." (emphasis added)), *cert petition filed*, No. 24-994 (U.S. Mar. 14, 2025); *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 272–74 (3d Cir. 2016) (concluding sufficient allegation of intrusion upon seclusion through cookies that allowed Google to track children's web browsing); *Patel v. Facebook*, 932 F.3d 1264, 1273 (9th Cir. 2019) (addressing collection of biometric data); *Feldman v. Star Trib. Media Co.*, 659 F. Supp. 3d 1006, 1013–16 (D. Minn. 2023) (finding standing based on alleged sharing of video-viewing information with Facebook). Plaintiffs' inability to cite *any* authority finding standing on similar facts—aside from those addressing DOGE teams' data access, where the law is still developing—should caution against accepting Plaintiffs' novel theory of standing.

Plaintiffs attempt to explain away their inability to allege that any member of the Treasury DOGE Team has ever viewed their specific information, stating that "Plaintiffs' suit for declaratory and injunctive relief aims to *prevent* unlawful access." Pls.' Mot. 17. Plaintiffs' request for prospective relief, however, does not relieve them of the obligation to identify a concrete actual injury, or a certainly impending, imminent future injury, sufficient for Article III. *See TransUnion*, 594 U.S. at 443 ("No concrete harm, no standing."); *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 410 (2013). Plaintiffs also point to the Treasury DOGE Team's "thorough review" of payment transactions—suggesting that the scope of the Team's work makes viewing of Plaintiffs' members' specific data non-speculative. Pls.' Mot. 18. Defendants disagree that Plaintiffs have sufficiently alleged that their members' data will be accessed by the Treasury DOGE Team. Even if that were so, however, as Judge Richardson explained in *American Federation of Teachers*, "[e]ach plaintiff's information is one row in various databases that are millions upon millions of rows long," 2025 WL 1023638, at *5, further underscoring that intrusion upon seclusion is not an appropriate common-law analogue to Plaintiffs' alleged injury.

Plaintiffs also raise additional theories of standing as fall backs. Pointing to Judge Bates's decision on the government's motion to dismiss in *American Federation of Labor, AFL-CIO v. Department of Labor*, Plaintiffs contend that the tort of "breach of confidence" can serve as an alternative common-law analogue. Pls.' Mot. 21–22 (citing *Am. Fed'n of Labor*, 2025 WL 1129227, at *9). That tort "lies where a person offers private information to a third party in confidence and the third party reveals that information to another." *Am. Fed'n of Labor*, 2025 WL 1129227, at *9 (quoting *Jeffries v. Volume Servs. Am. Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019)). The problem for Plaintiffs is that Judge Bates's decision was in the context of a motion to dismiss, and the court was required at that stage of the litigation to accept as true the plaintiffs' allegations

that agency information was being disclosed to a "third party." *See Am. Fed'n of Labor*, 2025 WL

1129227 at *9. Here, by contrast, there has been factual development, and Plaintiffs do not dispute

that members of the Treasury DOGE Team are employees of the agency; there is no evidence of a

disclosure of Plaintiffs' members' information to a "third party." In addition, as explained above,

the information at issue was provided with the expectation that the government would use it, and

Plaintiffs provide no other examples of the tort being applied to intra-governmental disclosures of

the sort at issue in this case. The Court should thus reject Plaintiffs' alternative "breach of

confidence" theory of standing.

　　　　Plaintiffs also continue to argue standing based on the alleged increased risk of further

dissemination of their members' personal information. Pls.' Mot. 22. But that alleged harm—*i.e.*,

that any specific information regarding Plaintiffs' members will be disclosed in some way—is

much too speculative to support standing given Supreme Court precedent. *See, e.g.*, *Clapper*, 568

U.S. at 410; *see also Welborn v. Internal Revenue Serv.*, 218 F. Supp. 3d 64, 77 (D.D.C. 2016)

(rejecting alleged harm of increased threat of future identity theft and fraud as a result of a data

breach as too speculative under *Clapper*). The possibility of unauthorized use is inherent whenever

granting access to a data system, but Treasury has employed extensive mitigation measures to

reduce that risk, AR-0057–59, 0061–62; Decl. of Joseph Gioeli III. ("Gioeli Decl.") ¶¶ 11–15,

ECF 24-2; Declaration of Thomas H. Krause, Jr. ("Krause Decl.") ¶ 15, ECF 24-1, and Plaintiffs

provide nothing to suggest there is any non-speculative reason to believe their members' data is at

risk.[2]

---

[2] Plaintiffs' reliance on Mr. Elez's unauthorized transmission of data to bolster this theory
of standing, *see* Pls.' Mot. 22, should be rejected.  Treasury has attested that Treasury DOGE Team
members now receive briefings to avoid similar noncompliance with policy before being granted
access to BFS systems. *See* Declaration of David Ambrose ¶ 12, *New York v. U.S. Dep't of*

Finally, Plaintiffs contend that their members' subjective "disturb[ance], anxi[iety], and frustrat[ion]" regarding the DOGE Team's access to data itself amounts to concrete injury. Pls.' Mot. 16, 22–23. Plaintiffs base that argument in the Supreme Court's decision in *Doe v. Chao*, 540 U.S. 614 (2004), which addressed the distinction in the Privacy Act between "adverse affect" (*i.e.*, injury) and "actual damages," *see id.* at 618–23. That case, however, involved the known disclosure of the plaintiff's Social Security number, and the Court did not analyze standing in any detail. *See id.* at 617–18. Subsequent decisions interpreting *Chao*—including *In re Science Applications International Corp (SAIC) Backup Tape Data Theft Litigation*, 45 F. Supp. 3d 14 (D.D.C. 2014)—have held that emotional distress is not sufficient when, as here, "disclosure and access of Plaintiffs' personal information is anything but certain." *SAIC*, 45 F. Supp. 3d at 29; *see also Welborn*, 218 F. Supp. 3d at 77–78 ("An 'objectively reasonable likelihood' of future harm does not establish standing in the present time, despite legitimate anxiety that ill might befall an individual." (quoting *Clapper*, 568 U.S. at 410)); *In re Zappos.com, Inc.*, 108 F. Supp. 3d 949, 954–55 (D. Nev. 2015) (finding no standing where the last four digits of credit card numbers of 24 million customers were stolen, without allegations of unauthorized purchases or other signs of misuse).

For all the reasons above and stated in Defendants' opening brief, Plaintiffs lack standing.

---

*Treasury*, No. 1:25-cv-1144—JAV (S.D.N.Y.), ECF 116-1. Plaintiffs' brief, elsewhere, faults Treasury for not imposing specific mitigation measures as to Mr. Elez's access that Plaintiffs would prefer. *See* Pls.' Mot. 12. The Court should not entertain Plaintiffs' attempt to micromanage internal agency operations.

## II.    Plaintiffs' Claims Should Be Dismissed for Failure to State a Claim or, Alternatively, Summary Judgment Should Be Entered in Defendants' Favor.

### A.    Plaintiffs Fail to Establish Reviewable Final Agency Action.

To qualify as "agency action," the action must be an "agency rule, order, license, sanction, relief, or the equivalent." 5 U.S.C. § 551(13). While that definition is construed expansively, courts have long recognized that this definition of agency action "is not so all-encompassing as to authorize us to exercise 'judicial review [over] everything done by an administrative agency.'" *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (alteration in original) (quoting *Hearst Radio, Inc. v. FCC*, 167 F.2d 225, 227 (D.C. Cir. 1948)). As the Supreme Court has emphasized, the APA does not permit "general review of [an agency's] day-to-day operations." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990). Nor does the APA authorize agencies to oversee "the common business of managing government programs." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006).

Agency decisions to grant employees access to internal agency systems do not fall within the definition of agency action. 5 U.S.C. § 551(13). Indeed, the only conceivable match within the definition for what Plaintiffs challenge is an "order." *Id.* But no one would naturally describe the routine decision to allow access to internal databases as the "disposition . . . of an agency in a matter." 5 U.S.C. § 551(6) (definition of "order"). Instead, Treasury's decision to grant access to information systems is precisely the type of day-to-day operational decision and conduct that the Supreme Court in *Lujan* advised do not fall within the APA's review.

Plaintiffs attempt to distinguish *Lujan* by recharacterizing Treasury's granting of access to the DOGE Team as "a discrete agency decision" to "effectuate the mission" of Executive Order 14,158. Plaintiffs, however, do not meaningfully respond to Defendants' argument that such an expansive understanding of agency action would subject virtually every aspect of agencies' day-

to-day management of internal operations to APA review. *See* Defs.' Mot. 20. Plaintiffs also fail to

acknowledge that their logic would apply any time an agency granted access to an information

system—*i.e.*, an aggrieved litigant could argue (as Plaintiffs do here) that access was granted to

"effectuate" any policy decision the litigant found disagreeable.

Plaintiffs, moreover, identify no case where a court has concluded that anything like the

agency activity at issue here is reviewable. Just as for their standing argument, Plaintiffs attempt

to analogize this case to ones involving external disclosures of private information (Pls. Mot. 23–

24) that look nothing like the actions involved in this case. An agency decision to adopt a *policy*

of disclosing information, *see Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 931 (D.C. Cir.

2008), or to *grant* a third party's request to view government records under the Freedom of

Information Act, *see Chrysler Corp. v. Brown*, 441 U.S. 281, 317–18 (1979), bears no relationship

to the facts of this case. Finding no support in the text of the APA or case law (again, outside of

ongoing cases addressing DOGE teams' data access), Plaintiffs' arguments that the challenged

access decisions are agency action should be rejected.

The challenged access decisions are also not "final" within the meaning of the APA. The

decisions to grant access to the Treasury DOGE Team did not "'alter[] the legal regime to which

the agency action is subject,'" as Plaintiffs contend. Pls.' Mot. 26 (quoting *Bennett v. Spear*, 520

U.S. 156, 178 (1997)). Nothing about Treasury's privacy policies or protections has changed, and

Plaintiffs' assertion that Treasury had in place any "policies" that would have prevented similar

access to what the Treasury DOGE Team received to modernize BFS systems is spurious.  The

agency merely determined to grant access to its employees to its own data systems, after

determining that such access was appropriate. AR-0057–62; Gioeli Decl. ¶ 23. And Plaintiffs

continue to fail to demonstrate how doing so created any rights, obligations, or legal consequences

for Plaintiffs or their members. *See U.S. Army Corps of Eng'rs v. Hawkes Co.* 578 U.S. 590, 597 (2016).

Plaintiffs rely on Judge Bates's decision in *American Federation of Labor*, which in turn relied on *Venetian Casino Resort*. Pls.' Mot. 27–28. *Venetian Casino Resort*, however, is not analogous to this case, as explained in the government's opening brief. Defs.' Mot. 21–22. That case involved a "disclosure policy" that the agency had formally memorialized in several versions of an agency compliance manual over many years. *Venetian Casino Resort*, 530 F.3d at 928. The policy authorized agency employees to disclose confidential information to third parties in certain circumstances. *Id.* Those disclosures to third parties, once accomplished, had immediate material consequences for the plaintiff. *Id.* And the agency there did not seriously dispute that it had adopted such a policy; it argued only that the agency's internal compliance manual was not itself final agency action because it was "merely a guidance document that does not affect its own or the public's legal obligations." *Id.* at 931. This case has none of those features, and *Venetian Casino Resort* is therefore distinguishable.

The effects here of the agency's access decisions—if any—are indirect. And, as Defendants previously explained, adverse effects accompany many forms of indisputably non-final government action. Defs.' Mot. 21. Plaintiffs have no real response, except to offer a circular argument that Treasury's decision to grant its employees access to data systems must be final agency action, because otherwise it would not be reviewable. Pls.' Mem. at 28–29. But the APA does not provide catch-all judicial review for anything an agency does, regardless of whether it qualifies as final agency action.

**B.    Plaintiffs Cannot Assert Alleged Violations of the Privacy Act and the Internal Revenue Code on Behalf of Their Members Through the APA.**

Plaintiffs cannot smuggle alleged violations of the Privacy Act or the Internal Revenue Code when the APA does not provide redress. Defs.' Mot. 22–25. The argument is straightforward. The D.C. Circuit has recognized, as to the Privacy Act, that the statute sets forth a "comprehensive remedial scheme," akin to the Freedom of Information Act, the Civil Rights Act of 1964, and the Civil Service Reform Act ("CSRA"). *Wilson v. Libby*, 535 F.3d 697, 703 (D.C. Cir. 2008). That scheme permits certain forms of injunctive relief and, by implication, precludes all others. *See, e.g.*, *Hastings v. Judicial Conference of U.S.*, 770 F.2d 1093, 1104 (D.C. Cir. 1985) ("[E]ven if a claim of a violation of the Privacy Act could be made out, appellant would not be entitled to the declaratory and injunctive relief he seeks, such relief not being among those expressly made available to remedy past disclosures made in violation of the Privacy Act.").

In the face of comprehensive statutes, litigants are not permitted to "circumvent the [scheme's] requirements and limitations by resorting to the catchall APA," even when "the plaintiff cannot prevail in a claim" under the scheme. *Grosdidier v. Chairman, Broad Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009) (discussing the CSRA); *see also Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984). Multiple decisions by this Court have reaffirmed this principle by dismissing APA claims alleging violations of the Privacy Act. *See, e.g.*, *Westcott v. McHugh*, 39 F. Supp. 3d 21, 33 (D.D.C. 2014).

The Supreme Court's decision in *Department of Agriculture Rural Development Rural Housing Service v. Kirtz*, 601 U.S. 42 (2024), which this Court discussed in its denial of Plaintiffs' motion for a preliminary injunction, ECF 42 at 35, is not to the contrary, as Plaintiffs assert, *see* Pls.' Mot. 31. *Kirtz* is not an APA case, and the Court concluded with respect to the Privacy Act only that the statute did not displace independent obligations under the Fair Credit Reporting Act.

*See* 601 U.S. at 63. The APA, on the other hand, requires courts to consider whether there is an adequate alternative remedy, *see* 5 U.S.C. § 704, and here there are such remedies both as to the Privacy Act and the Internal Revenue Code. *See* Defs.' Mot. 22–25.

### C.    Plaintiffs Cannot Prevail on Their Privacy Act Claim.

Even if Plaintiffs' Privacy Act claim were justiciable, it would still fail on the merits. Plaintiffs accept, as they must, that the statute expressly authorizes disclosure of covered records to "those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties." 5 U.S.C. § 552a(b)(1). Plaintiffs, moreover, do not dispute that the Treasury DOGE Team members qualify as employees of the agency for purposes of that exception. Instead, Plaintiffs question whether the Treasury's DOGE Team's mandate as set out in Executive Order 14,158 is sufficient to explain the need for access to personal information specifically. Pls.' Mot. 37.

Plaintiffs' argument falters on several fronts. First, Plaintiffs' understanding of the Privacy Act runs headlong into the text of the statute. As noted, the statute allows employees to access a "record" if they have "a need for the record in the performance of their duties." 5 U.S.C. § 552a(b)(1). The relevant unit of analysis, then—under the plain text of the exception—is whether the employee needs access to "the record." "Record," in turn, is defined as "any item, collection, or grouping of information about an individual . . . that contains his name" or other personally identifiable information. *Id.* § 552a(a)(4). So, if an employee needs to access a "collection, or grouping of information about an individual," *id.*, that is all that the plain text of the statue requires.

Plaintiffs seek to create a new standard—Treasury must demonstrate that its employees need to access "the personal information itself" contained in those records, rather than the records. Pls.' Mot. 37. But because the statute defines "record" as a grouping, item, or collection of

information that *contains* personal information, not the personal information itself, nothing in the text of the statute authorizes the additional layer of "need" review that Plaintiffs insist on.

That conclusion is further bolstered by common sense. Under Plaintiffs' view, it is difficult to imagine how an employee would ever be authorized to look at an agency record that contains personally identifiable information. Suppose, for example, that a form includes a person's name, age, height, and weight, in addition to other information. Under Plaintiffs' approach, unless an employee can demonstrate a particularized "need" to know the person's height and weight, the employee would be prohibited from accessing the record. That kind of supervision of internal agency access has no basis in the text of the statute and would result in an unworkable system under which employees performing all kinds of basic tasks would be prohibited from doing so, or only authorized to do so after engaging in a protracted process to determine what specific portions within a record should be available.

Moreover, notwithstanding Plaintiffs' arguments to the contrary, the employees at issue have a "need" to access the records contained in Treasury systems to perform their official duties. 5 U.S.C. § 552a(b)(1). Courts have explained that access is consistent with that requirement if "the official examined the record in connection with the performance of duties assigned to him and [if] he had to do so in order to perform those duties properly." *Bigelow v. Dep't of Def.*, 217 F.3d 875, 877 (D.C. Cir. 2000).

That standard is plainly met here. The Treasury DOGE Team was established to "moderniz[e] Federal technology and software to maximize governmental efficiency and productivity." Establishing and Implementing the President's Executive Order 14,158, 90 Fed. Reg. at 8441 (Jan. 20, 2025) ("USDS EO"); *see id.* §4, 90 Fed. Reg. at 8441–42. Specifically, Executive Order 14,158 directs the undertaking of a "Software Modernization Initiative to improve

14

the quality and efficiency of government-wide software, network infrastructure, and information technology . . . systems," and it requires agency heads to work with USDS to "promote inter-operability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization." *Id.* § 4(a), 90 Fed. Reg. at 8441.

The Executive Order thus focuses on modernizing the federal government's technology infrastructure. Consistent with that effort, the Executive Order instructs agency heads "to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems," and in turn requires USDS to "adhere to rigorous data protection standards." USDS EO § 4(b), 90 Fed. Reg. at 8442. The Executive Order thus provides agency personnel working pursuant to that Order with a "need" to access records and systems of records under the Privacy Act in order to do their jobs properly. *See Bigelow*, 217 F.3d at 877. As the motions panel noted in *American Federation of Teachers*, "it does not stretch the imagination to think that modernizing an agency's software and IT systems would require administrator-level access to those systems, including any internal databases." 2025 WL 1023638, at *6 (Richardson, J., concurring). Indeed, it is difficult to imagine how agency personnel seeking to modernize agency systems could do so *without* access to the systems themselves. *See* AR-0057 (describing the scope of engagement); ECF 61-2 at 10–11 (describing the Treasury DOGE Team's need for access). Such access is necessarily required to assess the state of the systems and to "improve [their] quality and efficiency." USDS EO § 4(a), 90 Fed. Reg. at 8442.

It is likewise plain that DOGE team members investigating whether the government has made improper expenditures require access to the records detailing the relevant payments. To assess the propriety of any payment, an analyst needs to know the details surrounding that payment, including information about the recipient of that payment, the amount of the payment,

the payment's purpose, and so forth. It is hard to understand how such investigative work could be performed without access to the relevant payment records. Plaintiffs contend, to the contrary, that "nothing in [Executive Order 14,158] refers to halting improper payments." Pls.' Mem. 37. Defendants dispute that investigating improper payments is not covered by Executive Order 14,158's direction to "moderniz[e]" government technology systems. Pls.' Mot. 36. But lest there be any doubt, the President separately directed agency heads to ensure that "Federal officials designated by the President or Agency Heads (or their designees) have full and prompt access to all unclassified agency records, data, software systems, and information technology systems" for exactly these purposes. Exec. Order No. 14,243 § 3, 90 Fed. Reg. 13,681 (Mar. 25, 2025).

Plaintiffs' remaining Privacy Act arguments are easily disposed of. Plaintiffs devote a substantial portion of their merits brief to arguing that Defendants violated the Privacy Act by failing to publish a "new [Systems of Record Notice ('SORN')]" describing the Treasury DOGE Team's access. Pls.' Mot. 33–34. The Court should reject that argument out of hand. There has been no change to any Treasury system of record or any new routine use that would require publication of a new SORN under the Privacy Act. *See* 5 U.S.C. § 552a(e)(4), (11). And for the same reason, Treasury did not violate any of its internal policies, as Plaintiffs contend. *See* Pls.' Mot. 6–7, 33–34. Rather, what Plaintiffs challenge is Treasury's decision to grant access to existing systems of record to specific employees. To the degree Plaintiffs contend that the agency must publish a new SORN, or submit a report, each time a new employee—or group of employees—accesses Treasury systems, such insistence finds no basis in the Privacy Act. The same is true of Plaintiffs' claims that Treasury was required to notify Congress and OMB under 5 U.S.C. § 552a(r). Pls.' Mot. 34. Because there has been no change to any Treasury system of records, no advance notice of employee access was required.

Plaintiffs also contend that the evolution of Mr. Krause's job duties over time somehow "erode[s]" Defendants' "ability to enforce the need-to-know limitation." Pls.' Mot. 36. As discussed above and in Defendants' opening brief, however, Mr. Krause and the other DOGE Team members' need flows from the President's Executive Order. But if that were somehow not enough—and putting aside that Mr. Krause has only ever had "over the shoulder" access to data systems—the additional information in the administrative record regarding Mr. Krause's role at Treasury only confirms his need for broad access to Treasury's data systems. *See* AR-0021; ECF 61-2 at 10. The Privacy Act, obviously, includes no restriction on whether an official's duties may change over time, and the decision in *Hill v. Department of Defense*, 981 F. Supp. 2d 1, 13 (D.D.C. 2013), which Plaintiffs cite, confirms that job functions are themselves sufficient to establish need. *Id.* at 13; *see also Bigelow*, 217 F.3d at 877. Further, Plaintiffs' complaints ignore the practical reality that agency appointees are onboarded in any transition period, and that their duties may change over time. The Court should reject Plaintiffs' attempt to micromanage the agency's internal personnel decisions.

Finally, if there were any doubt on the question whether DOGE employees are similarly situated to other employees at Treasury, a recent decision from the Southern District of New York partially dissolving a preliminary injunction against Treasury is instructive. *See New York v. Trump*, --- F. Supp. 3d ----, 2025 WL 1095147 (S.D.N.Y. Apr. 11, 2025). In that case, after considering detailed declarations submitted in support of the motion to dissolve, the court concluded that the Treasury DOGE Team member at issue, Ryan Wunderly, had been treated just like any other Treasury employee in every relevant way. He received the same training as other employees, *id.* at *8–9, went through the same vetting process, *id.* at *9–10, reported to Treasury personnel, *id.* at *10, and was subject to mitigation procedures to ensure data is not misused, *id.* at

17

*11. The district court therefore dissolved the preliminary injunction to allow the employee access to Treasury systems. *Id.* Treasury has since sought dissolution of the preliminary injunction in its entirety based on submissions that the remaining members of the Treasury DOGE Team are similarly situated. *See* Mot. to Vacate Prelim. Inj., *New York v. Trump*, No. 1:25-cv-01144-JAV (S.D.N.Y. May 1, 2025), ECF 140.

### D.    Plaintiffs Cannot Prevail on Their Internal Revenue Code Claim.

Plaintiffs also cannot prevail on their claim that granting the Treasury DOGE Team access to the agency's systems violates the Internal Revenue Code—and, indeed, Plaintiffs devote only a single paragraph of their brief arguing to the contrary. Pls.' Mot. 38.[3] As Defendants have explained, the Internal Revenue Code specifically allows for the disclosure of return information to "officers and employees of the Department of Treasury" for "the purposes of tax administration." And the payment systems at issue in the case—those that the Treasury DOGE Team is responsible for improving—are those that disburse tax refunds. Defs.' Mot. 28. Plaintiffs do not dispute—and therefore effectively concede—that Treasury DOGE Team members satisfy the statutory conditions for access to returns and return information contained in 26 U.S.C. § 6103(h). Accordingly, the Court should conclude that Defendants have not acted contrary to the Internal Revenue Code. *See Anglers Conservation Network v. Pritzker*, 139 F. Supp. 3d 102, 116 n.10 (D.D.C. 2015) (explaining that "an argument not raised in an opening brief is forfeited" (citing *Fox v. Gov't of the Dist. of Columbia*, 794 F.3d 25, 29–30 (D.C. Cir. 2015))).

---

[3] Although Plaintiffs do briefly reference the Internal Revenue Code, the discussion appears as part of Plaintiffs' Privacy Act arguments. *See* Pls.' Mot. 38 (concluding that the alleged "unfettered access" to tax records "is exactly the type of threat to Americans' personal affairs that the Privacy Act prohibits"). Accordingly, Plaintiffs appear to have abandoned any independent claim under the Internal Revenue Code.

18

### E.    Granting of Data Access to Treasury Employees Was Not Arbitrary and Capricious.

Plaintiffs' arbitrary and capricious claim is meritless for the reasons stated in Defendants' opening brief. *See* Defs.' Mot. 29–30. The administrative record and other materials before the Court demonstrate that Treasury thoughtfully considered the risks before granting access to agency systems. And while Plaintiffs clearly disagree with Treasury's decision to grant access, Plaintiffs cannot demonstrate that the agency failed to consider the relevant issues or to explain its decision. The administrative record shows precisely the opposite. *See* AR-0057–62; *see also* Krause Decl. ¶ 2; Gioeli Decl. ¶¶ 12–15.

Plaintiffs' argument boils down to a claim that Treasury "ignored the privacy risks" associated with granting access. Pls.' Mot. 39; *see also id.* at 40 (claiming that "Defendants acted arbitrarily by failing to consider the privacy implications of their actions"). Yet, the agency did consider the privacy (and other) risks, and put in mitigation measures as a result. *See* AR-0057–62; Krause Decl. ¶ 2; Gioeli Decl. ¶¶ 12–15. Plaintiffs are unsatisfied, because Treasury DOGE Team members still received read-only access to payment systems and records that contain personal information. But that complaint is essentially a restatement of Plaintiffs' Privacy Act arguments— which fail for the reasons Defendants have explained—and does not make the agency's decision arbitrary or capricious.

### F.    Plaintiffs Cannot Prevail on Their Excess of Statutory Authority Claim.

For the reasons explained in Defendants' opening brief, Plaintiffs cannot make out an independent excess of statutory authority claim. *See* Defs.' Mot. 30–31. Plaintiffs make no effort to defend Count III of their Complaint, except to say that, if the Court concludes the APA does not provide for review, the Court should issue an injunction under its "inherent authority." Pls.' Mot. 32–33. Plaintiffs' argument ignores, however, that Congress established specific statutory

remedies in both the Privacy Act and the Internal Revenue Code. And for the reasons Defendants have explained, the proper recourse—if Plaintiffs' members are aggrieved in any concrete way—is for Plaintiffs' members to seek the prescribed statutory relief. An *ultra vires* claim is not an open-ended avenue for litigants to ask federal courts to micromanage data access at federal agencies, and the Court should enter judgment in Defendants favor on Count III of the complaint.

## CONCLUSION

For the above stated reasons, the Court should dismiss Plaintiffs' claims or, in the alternative, enter judgment in favor of Defendants, and the Court should deny Plaintiffs' cross-motion for summary judgment.

Dated: May 9, 2025          Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

MARCIA BERMAN
Assistant Director
Federal Programs Branch

*/s/ Bradley P. Humphreys*
BRADLEY P. HUMPHREYS
Senior Trial Counsel
Federal Programs Branch
Civil Division, Department of Justice
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 305-0878
Bradley.Humphreys@usdoj.gov

*Counsel for Defendants*