**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Alliance for Retired Americans, et al.,

        Plaintiffs,

        v.

Scott Bessent, in his official capacity as
Secretary of the Treasury, et al.,

        Defendants.

Civil Action No. 25-313 (CKK)

**REPLY IN SUPPORT OF PLAINTIFFS' CROSS-MOTION
FOR SUMMARY JUDGMENT**

Norman L. Eisen
(DC Bar No. 435051)
Democracy Defenders Fund
600 Pennsylvania Avenue SE
#15180
Washington, DC 20003

Nandan M. Joshi
(DC Bar No. 456750)
Nicolas Sansone
(DC Bar No. 1686810)
Allison M. Zieve
(DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

May 23, 2025

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................... 1

ARGUMENT ............................................................................................................................ 2

    I.      Plaintiffs Have Standing ............................................................................................ 2

    II.     Plaintiffs challenge final agency action. ................................................................... 9

    III.    The APA affords Plaintiffs an avenue for relief ...................................................... 12

    IV.    Defendants' action is unlawful and arbitrary. .......................................................... 14

CONCLUSION ....................................................................................................................... 19

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Federation of Labor & Congress of Industrial Organizations*
  *v. Department of Labor,*
— F. Supp. 3d —, 2025 WL 1129227 (D.D.C. Apr. 16, 2025).......................................... 3, 4, 7, 11

*American Federation of Government Employees, AFL-CIO*
  *v. Office of Personnel Management,*
— F. Supp. 3d —, 2025 WL 996542 (S.D.N.Y.  Apr. 3, 2025).................................................. 7

*Bennett v. Spear,*
  520 U.S. 154 (1997) ............................................................................................................... 11, 12

*Block v. Community Nutrition Institute,*
  467 U.S. 340 (1984) ....................................................................................................................... 14

*Broughton v. McClatchy Newspapers, Inc.,*
  588 S.E.2d 20 (N.C. App. 2003) .................................................................................................... 4

*Chrysler Corp. v. Brown,*
  441 U.S. 281 (1979) ...................................................................................................................... 10

*Clapper v. Amnesty International USA,*
  568 U.S. 398 (2013) ........................................................................................................................ 6

*Department of Agriculture Rural Development Rural Housing Service v. Kirtz,*
  601 U.S. 42 (2024) ........................................................................................................................ 13

*Department of Homeland Security v. Regents of the University of California,*
  591 U.S. 1 (2020) ......................................................................................................................... 19

*Doe v. Chao,*
  540 U.S. 614 (2004) ........................................................................................................................ 9

*FCC v. Prometheus Radio Project,*
  592 U.S. 414 (2021) ...................................................................................................................... 18

*Gadelhak v. AT&T Services., Inc.,*
  950 F.3d 458 (7th Cir. 2020) .......................................................................................................... 4

*Grosdidier v. Chairman,*
  560 F.3d 495 (D.C. Cir. 2009)...................................................................................................... 14

*Hastings v. Judicial Conference of the U.S.*,
    770 F.2d 1093 (D.C. Cir. 1985) ................................................................... 13

*In re Science Applications International Corp Backup Tape Data Theft Litigation*,
    45 F. Supp. 3d 14 (D.D.C. 2014) ................................................................ 8, 9

*Jeffries v. Volume Services of America Inc.*,
    928 F.3d 1059 (D.C. Cir. 2019) ..................................................................... 6

*LaRoque v. Holder*,
    650 F.3d 777 (D.C. Cir. 2011) ...................................................................... 5

*Mittleman v. U.S. Treasury*,
    773 F. Supp. 442 (D.D.C. 1991) .................................................................. 14

*Motor Vehicle Manufacturers Ass'n of U.S., Inc.*
    *v. State Farm Mutual Automobile Insurance Co.*,
    463 U.S. 29 (1983) ..................................................................................... 19

*National Federation of Federal Employees. v. Weinberger*,
    818 F.2d 935 (D.C. Cir. 1987) ...................................................................... 9

*Nayab v. Capital One Bank (USA), N.A.*,
    942 F.3d 480 (9th Cir. 2019) ........................................................................ 5

*New York v. Trump*,
    — F. Supp. 3d —, 2025 WL 573771 (S.D.N.Y. Feb. 21, 2025) ............................... 18

*New York v. Trump*,
    — F. Supp. 3d —, 2025 WL 1095147 (S.D.N.Y. Apr. 11, 2025) ............................. 18

*Parks v. IRS*,
    618 F.2d 677 (10th Cir. 1980) ...................................................................... 7

*Persinger v. Southwest Credit Systems, L.P.*,
    20 F.4th 1184 (7th Cir. 2021) ...................................................................... 2

*Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget*,
    400 U.S. 62 (1970) ..................................................................................... 11

*Randolph v. ING Life Insurance & Annuity Co.*,
    973 A.2d 702 (D.C. 2009) ............................................................................ 4

*Salazar v. Paramount Global*,
    133 F.4th 642 (6th Cir. 2025) .................................................................... 2, 3

*Schweiker v. Chilicky,*
    487 U.S. 412 (1988) ................................................................................ 13

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) .................................................................................. 6

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) .......................................................................... 2, 3, 6

*U.S. Department of Justice v. Reporters Committee for Freedom of Press,*
    489 U.S. 749 (1989) .................................................................................. 4

*Venetian Casino Resort, LLC v. EEOC,*
    409 F.3d 359 (D.C. Cir. 2005) ................................................................ 11

*Venetian Casino Resort, LLC v. EEOC,*
    530 F.3d 925 (D.C. Cir. 2008) ....................................................... 9, 10, 11

*Westcott v. McHugh,*
    39 F. Supp. 3d 21 (D.D.C. 2014) ........................................................... 14

*Whitman v. American Trucking Ass'ns,*
    531 U.S. 457 (2001) .................................................................................. 9

*Wilson v. Libby,*
    535 F.3d 697 (D.C. Cir. 2008) .......................................................... 12, 13

*Wolf v. Regardie,*
    553 A.2d 1213 (D.C. 1989) ..................................................................... 4

**Statutes**

5 U.S.C. § 551(4) ........................................................................................... 9

5 U.S.C. § 551(13) ......................................................................................... 9

5 U.S.C. § 552a(a)(4) ................................................................................... 18

5 U.S.C. § 551a(b) .......................................................................................... 7

5 U.S.C. § 551a(b)(1) ............................................................................... 7, 16

5 U.S.C. § 552a(e)(4) ................................................................................... 14

5 U.S.C. § 552a(e)(11) ................................................................................. 14

5 U.S.C. § 552a(r) ........................................................................................... 15

5 U.S.C. § 704 ................................................................................................ 12

26 U.S.C. § 6103 ............................................................................................ 17

26 U.S.C. § 6103(h)(1) ................................................................................... 17

**Other Authorities**

Executive Order 14,243, 90 Fed. Reg. 13861 (Mar. 25, 2025) ..................... 17

Restatement (Second) of Torts § 652B(b) (1977) ............................................ 4

**INTRODUCTION**

After establishing the Department of Government Efficiency (DOGE) by executive order, President Trump directed federal agencies to invite DOGE Teams into their ranks and to give them access to agency databases. Defendants acted promptly to implement the President's directive. Without stopping to consider the privacy implications of their actions, Defendants decided to grant the Treasury DOGE Team full access to personal information stored in the records of the Bureau of the Fiscal Service (Bureau). The level of access granted was unprecedented, and because DOGE Team members had no fixed job responsibilities, no effective limits were established on their ability to obtain whatever personal information they wished from the Bureau's systems.

Whether couched in terms of reviewability or the merits, Defendants' response to Plaintiffs' claims largely boils down to the contention that the presidentially initiated, White House managed, all-of-government DOGE initiative involves a workaday, run-of-the-mill human resources decision that courts cannot review. That is wrong. To implement the DOGE Executive Order, policy choices were made at the highest levels of the Department of the Treasury. And, just as courts have authority to review other agency actions affecting individual interests, this Court has the authority to review the choices at issue here and to set them aside if they are unlawful or arbitrary. The Court should do so here. In their rush to pursue "governmental efficiency," Defendants failed to comply with their statutory obligations to protect individual privacy and their duty to make decisions that are not arbitrary and capricious. The Court should grant Plaintiffs' cross-motion for summary judgment and enjoin Defendants from permitting the Treasury DOGE Team to access personal information in the Bureau's systems.

**ARGUMENT**

## I.    PLAINTIFFS HAVE STANDING.

Defendants do not dispute that Plaintiffs challenge a violation of their members' statutorily protected privacy rights, that the violation results from Defendants' actions giving DOGE access to Bureau records, and that the violation could be redressed by an injunction barring Defendants from providing such access. Defendants dispute only whether such an invasion of privacy gives rise to an "injury in fact" for purposes of Article III standing. It does. Defendants' actions in violation of federal laws that protect individual privacy bear a "close relationship" to the intrusions upon seclusion and breaches of confidence that were traditionally recognized as injurious in themselves under the common law. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). What is more, despite Defendants' contention that the violation of Plaintiffs' members' privacy is "the only injury [Plaintiffs] have alleged," Defs.' Reply 1, ECF 65, this violation also creates follow-on injuries for Plaintiffs' members, such as an increased risk of unauthorized dissemination and emotional distress. Any of these injuries would be alone sufficient to satisfy Article III.

**A.** As this Court has already preliminarily concluded, *see* Prelim. Inj. Mem. Op. 29, ECF 42, Defendants' violations of Plaintiffs' members' statutory privacy rights are analogous to the "traditionally recognized" tort of intrusion upon seclusion and so constitute a constitutionally cognizable injury in themselves. *TransUnion*, 594 U.S. at 425. Defendants "respectfully disagree" with that conclusion, Defs.' Reply 2, but their attempts to distinguish Defendants' statutory violations from a common-law intrusion upon seclusion miss the point. *TransUnion* does not require that a statutory violation be "an exact duplicate" of a common-law tort to establish Article III injury. *TransUnion*, 594 U.S. at 424; *see also Salazar v. Paramount Glob.*, 133 F.4th 642, 647 (6th Cir. 2025) (holding that standing does not require "an element-by-element match" with a common-law claim); *Persinger v. Sw. Credit Sys., L.P.*, 20 F.4th 1184, 1192 (7th Cir. 2021)

(observing that "[w]hether [plaintiff] would prevail in a lawsuit for common law invasion of privacy is irrelevant" for standing). Rather, Article III requires only that "the asserted harm" caused by a statutory violation be "sufficiently analogous to a traditional harm recognized by law." *Salazar*, 133 F.4th at 647.

Arguing that a common-law intrusion upon seclusion is not analogous to a violation of the Privacy Act or the Internal Revenue Code, Defendants argue that unauthorized access to Plaintiffs' members' data is not the kind of "intrusion into the plaintiffs' private space" covered by the tort. Defs.' Reply 3. This argument turns on whether Plaintiffs' members' Bureau records should be considered to be in a "private space" entitled to protection against intrusion. Congress answered that question in the affirmative by enacting laws that protect those records from unauthorized disclosure. *See TransUnion*, 594 U.S. at 425 (recognizing that Congress may "elevate [harms] to the status of legally cognizable injuries"); *Am. Fed'n of Labor & Congress of Indus. Orgs. v. Dep't of Labor*, — F. Supp. 3d —, 2025 WL 1129227, at *8 (D.D.C. Apr. 16, 2025) (*AFL-CIO*) (explaining that in the Privacy Act Congress designated a new "sphere of seclusion" encompassing the sensitive personal and financial information that is shared with the government). This Court must "afford due respect" to that decision. *TransUnion*, 594 U.S. at 425.

Moreover, contrary to Defendants' suggestion, the sphere of privacy that Congress has created around certain personal and financial records is not a departure from the spheres of privacy traditionally recognized at the common law. Citing examples from the Restatement (Second) of Torts, Defendants suggest that the tort of intrusion upon seclusion requires a physical invasion into a person's residence or property or an attempt to hear or witness a person's private activities. *See* Defs.' Reply 3. But other examples from the Restatement, which Defendants omit, include "examining [one's] private bank account" and unauthorized "inspection of [one's] personal

3

documents." Restatement (Second) of Torts § 652B(b) (1977). Intrusion upon seclusion has thus historically encompassed accessing private records containing sensitive personal information without authorization. *See, e.g.*, *Wolf v. Regardie*, 553 A.2d 1213, 1217–18 (D.C. 1989) (explaining that examining a private bank account can be an "invasion intrinsic in the tort of intrusion upon seclusion"); *Broughton v. McClatchy Newspapers, Inc.*, 588 S.E.2d 20, 27 (N.C. App. 2003) (explaining that "unauthorized prying into confidential personal records" constitutes intrusion); *cf. U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 763 (1989) (recognizing that privacy encompasses "the individual's control of information concerning his or her person").

Defendants also minimize the gravity of the privacy violations at issue, arguing that DOGE's activities do not resemble a common-law intrusion upon seclusion because they are not "highly offensive," and because they resemble "general impersonal oversight," not "investigation" or "snooping." Defs.' Reply 3–4 (citations omitted). Article III, however, requires only that a statutory violation create an injury similar to the *type* of injury recognized at common law, not that it match the *degree* of injury. Pls.' Mem. 20, ECF 62-1; *see Gadelhak v. AT&T Servs., Inc.,* 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.); *cf. AFL-CIO*, 2025 WL 1129227, at \*8 (explaining that even if unauthorized exposure of one's data "may not seem as grave" as an intrusion upon seclusion that involves physical surveillance of one's private movements, it "nevertheless pose[s] the same *kind* of harm that common law courts recognize" (citation omitted)). In any event, Defendants admit that the DOGE Team's "investigative work" at Treasury requires Team members to "know the details" of any given payment, including the recipient, amount, and purpose. Defs.' Reply 15–16. As other courts have recognized, "unauthorized viewing of personal information … can constitute an intrusion that *is* highly offensive to any reasonable person."

*Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 710 (D.C. 2009) (emphasis added); *see Nayab v. Cap. One Bank (USA), N.A.,* 942 F.3d 480, 492 (9th Cir. 2019) (unauthorized access to a credit report can be "highly offensive" because it contains "highly personal information"). At a minimum, then, the DOGE Team's access to personal and financial information belongs to the same category of intrusion that was actionable at common law, irrespective of how Defendants characterize its severity.

Further trying to downplay the intrusive nature of unauthorized access to personal information, Defendants emphasize that other Treasury personnel lawfully collected and can and do access Plaintiffs' members' data. *See* Defs.' Reply 4–5, 7. When assessing standing, however, the Court must "assume [Plaintiffs] will prevail on the merits" of their claims, *LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011), and, therefore, that the DOGE Team's access to and use of Plaintiffs' members' data is *not* authorized by the statutes that permit the data to be "routinely … used by agency employees" otherwise, Defs.' Reply 4. As Plaintiffs previously emphasized, whether *other* Treasury personnel have *lawful* access to this data has no bearing on whether DOGE's *unlawful* access constitutes an injury. *See* Pls.' Mem. 20. Only by assuming that DOGE access is lawful can Defendants argue that Plaintiffs' cited cases involving "[the] collection of information to which the defendant was allegedly not entitled" are inapposite. Defs.' Reply 5. In fact, the DOGE Team's gaining access to a "collection of information to which [it] is allegedly not entitled" is precisely the intrusion that creates Plaintiffs' injury. *Id.*

Unable to persuasively rebut the analogy between review of Plaintiffs' members' Bureau records and an intrusion upon seclusion that would be actionable at common law, Defendants stress the lack of evidence that "the Treasury DOGE Team has ever viewed the[] specific information" of any particular individual. Defs.' Reply 6. But Defendants admit that Plaintiffs' members would

have "no reason even to know that a particular employee has accessed their information." *Id.* at 4. Only Defendants have that information. And even if DOGE has not yet viewed Plaintiffs' members' specific information, the risk of an imminent intrusion into Plaintiffs' privacy creates standing to seek forward-looking injunctive relief.

Defendants cite *Clapper v. Amnesty International USA*, 568 U.S. 398, 410 (2013), to contest the imminence of the risk that the DOGE Team will view Plaintiffs' members' records. *See* Defs.' Reply 6. *Clapper*, however, is a case in which the plaintiffs had "no actual knowledge" about whether the government was interested in accessing their communications. 568 U.S. at 411. Here, by contrast, DOGE has already been granted access to Treasury systems containing Plaintiffs' members' data so that it can conduct a "thorough review." Defs.' Response to Pls.' Interrog. #3, at 10, ECF 61-2; *see also* Defs.' Reply 15. It does not require a "chain of contingencies," *Clapper*, 568 U.S. at 410, to suppose that DOGE, if not enjoined by this Court, will examine Plaintiffs' members' data exactly as it intends. Defendants note that each individual's Treasury record makes up only "one row" among millions of rows of personal information. Defs.' Reply 6. As the Supreme Court has recognized, however "[t]he fact that an injury may be suffered by a large number of people does not … make that injury a nonjusticiable generalized grievance." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 n.7 (2016).

For all these reasons, and as explained in Plaintiffs' earlier memorandum, Plaintiffs' privacy harms here have the requisite "close relationship" to the common-law tort of intrusion upon seclusion to support standing. *TransUnion*, 594 U.S. at 425.

**B.** Defendants' unlawful disclosure of Plaintiffs' private information to DOGE also bears a close relationship to the common-law tort of breach of confidence and constitutes a concrete injury on that additional basis. *Jeffries v. Volume Servs. Am. Inc.*, 928 F.3d 1059, 1064 (D.C. Cir.

2019) (observing that the injury in a breach-of-confidence case "occurs when the plaintiff's trust in the breaching party is violated, whether or not the breach has other consequences").

Defendants urge this Court to reject this theory of injury because the breach-of-confidence tort contemplates the defendant's disclosure of private information to a third party and, according to Defendants, DOGE personnel are Treasury employees, not a third party. *See* Defs.' Reply 7. The Privacy Act, however, bars agency personnel from disclosing records to *"any* person" absent written authorization or consent. 5 U.S.C. § 552a(b) (emphasis added). And the statute makes clear that there is no automatic exception for intra-agency disclosures. *See, e.g.*, *id.* § 552a(b)(1) (authorizing disclosure to agency personnel "who have a need for the record in the performance of their duties"); *see also Parks v. IRS*, 618 F.2d 677, 683 (10th Cir. 1980) (holding that there was "no problem of lack of standing" where plaintiffs challenged an unauthorized, intra-agency disclosure under the Privacy Act because plaintiffs had "suffered a personal invasion"). For purposes of the Privacy Act, then, agency employees who have no legitimate need to review an individual's records *are* third parties. Indeed, courts have expressly found DOGE to resemble any other "unauthorized third party … granted access to plaintiff's legally protected data." *American Fed. of Gov't Emps., AFL-CIO v. Off. of Personnel Mgmt.*, — F. Supp. 3d —, 2025 WL 996542, at *7 (S.D.N.Y.  Apr. 3, 2025); *see also AFL-CIO*, 2025 WL 1129227, at *9 (characterizing an agency's disclosure to DOGE as an "unconsented, unprivileged disclosure to a third party"). This Court should do the same.

**C.** Defendants' statutory violations are analogous to common-law intrusions upon seclusion and breaches of confidence, and so are injurious in themselves under Article III. What is more, those violations also create concrete downstream injuries that are likewise sufficient to support standing. Granting DOGE unauthorized access to Treasury records creates a risk that

Plaintiffs' members' personal and financial data will be disseminated. Although Defendants claim that the risk of further dissemination is speculative, the record says otherwise. The DOGE Team has *already* been granted an unprecedented level of access to Plaintiffs' members' information. Gioeli Decl. ¶ 13, ECF 24-2. And ex-DOGE team member Marko Elez *already* improperly forwarded personal information outside of Treasury at least once. Pls.' Mem. 37. Despite admitting that Mr. Elez "may have taken part" in disseminating information outside of Treasury "as part of the new State Department review process," Defendants have been unable to identify what went wrong. Defs.' Reply 6–7 & n.2. Defendants argue that internal mitigation measures and briefings will avoid similar unauthorized transmissions, but as this Court has previously recognized, Defendants have often failed to properly implement these measures as planned. Prelim. Inj. Mem. Op. 13. Moreover, none of the mitigation measures restrict DOGE employees' ability to view and process any sensitive personal information they wish to access. Gioeli Decl. ¶¶ 11–17. Given DOGE's poor track record of safeguarding personal data and the opacity that surrounds DOGE's intentions, the risk that Plaintiffs' members' personal information could be further disseminated is troublingly real.

In addition, Plaintiffs' members are "disturbed, anxious, and frustrated" at DOGE's intrusion into their privacy, *see, e.g.*, Decl. of Carol Rosenblatt ¶ 10, ECF 16-2, and this emotional distress is yet another injury that creates standing. Defendants argue that emotional distress is insufficient for standing when "disclosure … is anything but certain." Defs.' Reply 8 (citing *In re Science Applications International Corp Backup Tape Data Theft Litigation*, 45 F. Supp. 3d 14, 29 (D.D.C. 2014) (*SAIC*)). In *SAIC*, though, the plaintiffs' information had not "been exposed in a way that would facilitate easy, imminent access," in part because their information was "locked inside tapes that require some expertise to open and decipher." *SAIC*, 45 F. Supp. 3d at 29. By

contrast, Defendants have already given the DOGE Team access to the sensitive personal information of millions of people, including Plaintiffs' members. As in *Doe v. Chao*, 540 U.S. 614 (2004), where the plaintiff's Social Security number was included in various documents sent to multiple parties, Plaintiffs' members' information is "actually exposed" to potential readers. *SAIC*, 45 F. Supp. 3d at 29. As in *Doe*, then, the emotional distress that Plaintiffs' members feel as a result of this exposure is "injury enough to open the courthouse door." *Doe*, 540 U.S. at 625.

## II.    PLAINTIFFS CHALLENGE FINAL AGENCY ACTION.

Defendants concede that the definition of "agency action" under the APA is "construed expansively." Defs.' Reply 9. They nonetheless contend that their decision to adopt a policy that grants DOGE Team members access to personal information stored in the Bureau's systems does not fall within the definition's broad sweep. Defendants' arguments are meritless.

Defendants first argue that their policy does not fall within the statutory definition of "agency action" because it is not "an agency rule, order, license, sanction, relief, or the equivalent." *Id.* (quoting 5 U.S.C. § 551(13)). The Supreme Court, however, has observed that this definition "is meant to cover comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). And in its coverage of agency "rule[s]," 5 U.S.C. § 551(13), the definition includes "agency statement[s] … designed to implement, interpret, or prescribe" agency "policy." *Id.* § 551(4). Review is not limited to written policies. *See Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008) (explaining that a written document is "relevant insofar as it illuminates the nature of the policy" but that an agency "[takes] final action by adopting [a] policy, not by including it" in the document). Without citing authority, Defendants claim that the APA excludes policies related to an agency's "internal operations" from review. Defs.' Reply 10. *But see Nat'l Fed. of Fed. Emps. v. Weinberger*, 818 F.2d 935, 941 n.11 (D.C. Cir. 1987) (holding that an agency policy of requiring

employees to submit to drug testing was "clearly an 'agency action' within the meaning of the APA's judicial review provisions"). Defendants' decision to grant the DOGE Team access to the personal information of private citizens, however, is not simply a matter of Treasury's internal operations. To the contrary, that decision acts on the public as much as would an agency's decision to disclose such information to any other entity who should not have it. Just like any other challenged disclosure policy, then, the policy at issue here is reviewable agency action. *See*, *e.g.*, *Chrysler Corp. v. Brown*, 441 U.S. 281, 318–19 (1979) (holding that a "decision to disclose" certain reports was "reviewable agency action"); *Venetian Casino Resort, LLC*, 530 F.3d at 931 (holding that adoption of a policy allowing disclosure of confidential information was final agency action).

Defendants also characterize the policy as a "day-to-day operational decision" that is exempt from review. Defs.' Reply 9. That characterization is untethered from reality. The decision to grant DOGE access to the Bureau's records was not a routine managerial decision to grant a specific individual access to certain records to facilitate completion of a particular work assignment. Rather, top decisionmakers at the agency adopted a policy granting members of the Treasury DOGE Team unfettered access to personal information in the Bureau's records. Defendants themselves admit that "[a]n agency decision to adopt a *policy* of disclosing information" is reviewable under the APA. *Id.* at 10 (citing *Venetian Casino Resort*, 530 F.3d at 931). Defendants contend that this principle concerns only policies related to "*external* disclosures," *id.*, but they identify nothing in the APA or in the case law to support this limitation. Plaintiffs, in contrast, have cited several decisions holding that the APA permits review of "an agency's policy of allowing DOGE access to agency records." Pls.' Mem. 24.

Defendants next argue that their policy, even if "agency action," is not "final." Defs.' Reply 10–11. Yet they do not contend that their decision to grant Treasury DOGE Team members access to Treasury records systems is "tentative or interlocutory." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). And they cannot credibly dispute that it is a decision that establishes "rights or obligations." *Id.* (quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatl.*, 400 U.S. 62, 71 (1970)). After all, the action establishes the Treasury DOGE Team members' right to access certain records, and it purports to extinguish Plaintiffs' members' right to exclude the Treasury DOGE Team members from those records. *See AFL-CIO*, 2025 WL 1129227, at *13 (stating that the decision to grant DOGE access to personal information "determine[s] the rights of those whose information is being disclosed and the obligations of the agency defendants").

In response, Defendants contend that the policy has only "indirect" effects on Plaintiffs' members and suggest that any "material consequences" of the policy may not be "immediate." Defs.' Reply 11. They offer no support, however, for their contention that these considerations affect the action's finality, rather than the "legal consequences" that flow from the action. *See Bennett*, 520 U.S. at 178. And "a policy of permitting [agency] employees to disclose confidential information without notice is surely … 'one by which [the public's] rights [and the agency's] obligations have been determined.'" *Venetian Casino Resort*, 530 F.3d at 931 (quoting *Venetian Casino Resort, LLC v. EEOC*, 409 F.3d 359, 367 (D.C. Cir. 2005)). Although Defendants again claim that *Venetian Casino Resort* is distinguishable because it involved "disclosures to third parties," Defs.' Reply 11, this argument "gloss[es] over [P]laintiffs' core contention: that giving [DOGE] personnel access to agency systems amounts to unlawful disclosure, government employees or not," *AFL-CIO*, 2025 WL 1129227, at *13.

Ultimately, then, Defendants are left to argue that "[n]othing about Treasury's privacy policies or protections has changed" and that Defendants did not depart from those policies and protections in granting the Treasury DOGE Team access to the Bureau's records. Defs.' Reply 10. But whether Defendants' new policy of granting the DOGE Team such access is consistent with the Privacy Act and the agency's policies is a merits issue. For purposes of the antecedent question of whether Defendants took final agency action, their decision to grant the DOGE Team access in the first place "alter[ed] the legal regime," *Bennett*, 520 U.S. at 178, in a way that has affected Plaintiffs' members' privacy rights.

## III.    THE APA AFFORDS PLAINTIFFS AN AVENUE FOR RELIEF.

The APA creates a cause of action for equitable relief from final agency action that is contrary to law, provided that "there is no other adequate remedy in a court." 5 U.S.C. § 704. Ignoring this statutory language and the wealth of authority holding that the Privacy Act's remedial scheme does not foreclose an APA remedy, *see* Pls.' Mem. 30 (citing cases), Defendants make no effort to explain why the Privacy Act's *ex post* damages remedy, and the Act's narrow forms of injunctive relief providing for the amendment or production of a person's records, are "adequate" substitutes for forward-looking relief against disclosure of Treasury records. Instead, Defendants double down on their argument that, because the Privacy Act's remedial scheme has been described as "comprehensive," it categorically supplants APA relief in all cases. Defs.' Reply 12 (quoting *Wilson v. Libby*, 535 F.3d 697, 703 (D.C. Cir. 2008)). But this Court has already preliminarily concluded that "the Privacy Act is not the kind of comprehensive and 'exclusive' remedial statute that impliedly displaces related remedies under other statutes," Prelim. Inj. Mem. Op. 35, and Defendants' continued incantation of the word "comprehensive" does not make it otherwise.

The Supreme Court's unanimous decision in *Department of Agriculture Rural Development Rural Housing Service v. Kirtz*, 601 U.S. 42 (2024), makes clear that the Privacy Act is capable of "coexist[ing] harmoniously" with other statutes that create "overlapping legal obligations." *Id.* at 63. Defendants emphasize that "*Kirtz* is not an APA case," Defs.' Reply 12, but that observation is beside the point. Defendants' position is that because the Privacy Act's remedial scheme is comprehensive, it "by implication[] precludes all others." *Id. Kirtz*, however, recognized that Congress had "supplement[ed]" the Privacy Act's remedies "with additional remedies under the [Fair Credit Reporting Act (FCRA)]." 601 U.S. at 63. If the Privacy Act is capable of coexisting with FCRA remedies, Defendants offer no reason why it cannot coexist with APA remedies.

The case law on which Defendants rely does not support their argument. In *Wilson*, for example, the D.C. Circuit held that the Privacy Act's remedial scheme counseled against a judicially created damages remedy because where "'Congress has provided what it considers adequate remedial mechanisms …,' courts should not 'create[] additional … remedies.'" 535 F.3d at 705 (brackets in original; quoting *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988)). Here, though, *Congress* has created an APA remedy that is available when other statutory remedies prove inadequate, and *Wilson*'s principles of judicial restraint cast no light on how to interpret the congressionally enacted language of the APA. Meanwhile, *Hastings v. Judicial Conference of the U.S.*, 770 F.2d 1093 (D.C. Cir. 1985), rejected a plaintiff's Privacy Act claim seeking declaratory and injunctive relief that was not "expressly made available" under that Act. *Id.* at 1104. The decision did not address an APA claim or opine on the scope of the APA remedy.

Of course, Congress may elect to preclude APA relief for claims that final agency action has violated particular statutes. *See Grosdidier v. Chairman*, 560 F.3d 495, 497 (D.C. Cir. 2009)

(holding that the Civil Service Reform Act "is the exclusive avenue" for challenges to certain "agency employment actions"); *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 348 (1984) (detailing a "complex and delicate administrative scheme" that precluded other avenues of judicial relief). The problem for Defendants is that Congress did not do so in the Privacy Act. And while Defendants contend that "[m]ultiple decisions by this Court" have held that the Privacy Act's remedies displace APA relief, Defs.' Reply 12, the sole case they cite involved a situation in which the plaintiff sought an order requiring the government to amend his records—precisely the sort of relief that *is* available under the Privacy Act. *See Westcott v. McHugh*, 39 F. Supp. 3d 21, 25–26 (D.D.C. 2014); *see id.* at 33 (describing the plaintiff's APA claim as "simply a restatement of [his] Privacy Act claims" (brackets in original; quoting *Mittleman v. U.S. Treasury*, 773 F. Supp. 442, 449 (D.D.C. 1991))). Under those circumstances—unlike the circumstances of this case—an injunction under the Privacy Act clearly provides an adequate alternative to APA relief.[1]

## IV.    DEFENDANTS' ACTION IS UNLAWFUL AND ARBITRARY.

**A.** As Plaintiffs have explained, Pls.' Mem. 33–35, the Privacy Act does not permit federal agencies to change how they protect individuals' personal information willy-nilly. Rather, when making a significant change, an agency must provide the public with notice of the change by publishing a system of records notice (SORN) in the Federal Register, 5 U.S.C. § 552a(e)(4), (11), and must provide Congress and the Office of Management and Budget a report on the change "to permit an evaluation of the probable or potential effect of such proposal on the privacy or other

---

[1] As Plaintiffs have argued, the Court may award injunctive relief under a nonstatutory cause of action if APA relief is unavailable. Pls.' Mem. 32–33. Although Defendants reiterate their position that the Privacy Act and the Internal Revenue Code preclude other forms of redress, Defs.' Reply 19–20, Plaintiffs have explained that these statutes provide for damages remedies for past violations and do not preclude this Court from exercising its equitable authority to prevent future harm. Pls.' Mem. 33.

rights of individuals," *id.* § 552a(r). In accordance with these statutory requirements, Defendants' privacy policies spell out their duties under the Privacy Act when seeking to make significant changes to the purpose for which information is used or the personnel who will have access to the system. *See* U.S. Dep't of Treas., Off. of Deputy Ass't Sec. for Privacy, Transparency, & Records, Privacy Act Handbook, TD P 25-04, at 7, 23–24, ECF 62-2, Ex. E (Privacy Act Handbook). Under those policies, even a "minor" change to the system must be documented so its privacy impact can be assessed. *Id.* at 21. There is no dispute that, in their zeal to implement the President's DOGE Executive Order, Defendants granted the Treasury DOGE Team full access to the Bureau's records without complying with these privacy safeguards.

Defendants argue that they did not need to comply with these requirements because there "has been no change to any Treasury system of record" and because agencies do not need to conduct a privacy analysis "each time a new employee—or group of employees—accesses Treasury systems." Defs.' Reply 16. The question here, however, is not whether a new SORN or report to Congress is required for *each instance* that a DOGE Team member accesses personal information in the Bureau's records. Rather, the question is whether Defendants' *initial decision* to implement the DOGE Executive Order by opening up their records to the DOGE Team involved a change in "the purpose for which the information is used," "equipment configuration … so as to create the potential for either greater or easier access," or "the personnel who will have access." Privacy Act Handbook 7, 24. Here, it is clear that Defendants did not simply hire people to fill open slots in their existing system. Instead, they revamped their operations to implement the DOGE Executive Order and moved quickly to ensure that the DOGE Team had full access to the Bureau's systems to carry out the DOGE agenda. *See* Pls.' Mem. 9–13*,* 34–35. Defendants acknowledge that, because of their decisions, the DOGE Team gained access to "data records [that]

15

was broader in scope than what had occurred in the past." Defs.' Response to Pls.' Statement of Undisputed Material Facts #99, ECF 65-1. These actions triggered Defendants' duty to comply with their Privacy Act responsibilities.

Defendants cannot circumvent those responsibilities by hiring DOGE Team members and giving them expansive and vague job duties that, in Defendants' words, "evol[ve] … over time." Defs.' Reply 17. Although Defendants are correct that the Privacy Act does not prevent an agency from changing an employee's job duties, *see id.*, the Act does constrain an agency's ability to diminish privacy protections *carte blanche*. Defendants' suggestion that the Privacy Act has no role to play when it comes to agency personnel is refuted by their own Privacy Act Handbook, which requires the agency to take account of changes that affect security, including "personnel who will have access." Privacy Act Handbook 24. Moreover, as Plaintiffs have explained, other policies implementing Privacy Act principles apply specifically to access to agency records by agency employees. *See* Pls.' Mem. 6–7, 36 (citing U.S. Dep't of Treas., Privacy Program Plan (ver. 1.1 Sept. 18, 2024), ECF 62-2, Ex. F). Defendants do not attempt to grapple with this showing.

The DOGE Team's ever-shifting responsibilities also make it impossible to effectively comply with the need-to-know exception to the bar on disclosure, 5 U.S.C. § 551a(b)(1). The record shows how the description of DOGE Team Lead Thomas Krause's job duties have evolved over a short period of time. *See* Pls.' Mem. 9–10, 36. Defendants appear to settle on the DOGE Executive Order's objective of modernizing technology as their preferred explanation of the DOGE Team's mission. Defs.' Reply 15. But they fail to connect that objective with the need for the DOGE Team to have unfettered access to individuals' personal information. They assert, for instance, that it is "difficult to imagine how agency personnel seeking to modernize could do so

*without* access to the systems themselves." *Id*. But that assertion says little about whether the DOGE Team has a need to know the personal and sensitive information stored on the Bureau's systems in order to modernize them.

Perhaps recognizing that fact, Defendants rely on the DOGE Team's supposed need for access to personal information to investigate "improper payments." Defs.' Reply 16. That objective, however, is not specified in the DOGE Executive Order and, contrary to Defendants' contention, *see id.*, it is not subsumed under the goal of modernizing technology. Indeed, Defendants initially looked to the President's executive order halting foreign aid payments to justify the DOGE Team's investigation of improper payments. *See* Pls.' Mem. 13. They now rely on a different executive order, issued on March 20, 2025, that seeks to eliminate "waste, fraud, and abuse," but that does not mention DOGE. Defs.' Reply 16 (citing Exec. Order 14243, 90 Fed. Reg. 13861 (Mar. 25, 2025)). This executive order—which specifically directs agencies to "review" their "system of records notices" and recommend "whether any should be eliminated or modified"—does not retroactively excuse Defendants' failure to comply with their privacy obligations when implementing the DOGE Executive Order two months earlier.[2]

Defendants make two other points, but neither justifies their actions. First, they assert that the need-to-know exception is satisfied if an agency official has a need to access a "collection or

---

[2] The March 20 executive order also cannot apply to tax information, which is subject to heightened privacy protections that preclude sharing except as authorized by Congress. *See* Pls.' Mem. 38; 26 U.S.C. § 6103. Defendants have justified the DOGE Team's access to tax data by contending that the DOGE Team has been granted "tax administration" duties under section 6103(h)(1). Defs.' Mem. 28, ECF 61-1. Defendants have failed to explain how "tax administration" is linked to the goal of modernizing technology. To the extent that "tax administration" is connected to the goal of reducing "improper payments," *see* Pls.' Mem. 38, the question whether Defendants have complied with section 6103 merges with the question of their compliance with the Privacy Act. Contrary to Defendants' contention, *id.* at 18, Plaintiffs do not concede that the "Treasury DOGE Team members satisfy the statutory condition for access" under section 6103(h)(1).

grouping of information about an individual," as opposed to "personal information" specifically. Defs.' Reply 13 (quoting 5 U.S.C. § 552a(a)(4)'s definition of "record"). Under the Privacy Act's definition of "record," however, personal information is protected against unauthorized disclosure regardless of whether it is accessed as an "item," a "collection," or a "grouping." 5 U.S.C. § 552a(a)(4). For purposes of Plaintiffs' claims, the distinction between a "record" and the personal information it contains is immaterial.

Second, Defendants cite the New York court's decision to partially dissolve a preliminary injunction that prevents DOGE Team members from accessing Bureau records in order to allow a newly hired team member, Ryan Wunderly, to do so. *See* Defs.' Reply 17–18 (citing *New York v. Trump*, — F. Supp. 3d —, 2025 WL 1095147 (S.D.N.Y. Apr. 11, 2025)). That court's preliminary injunction, however, was not based on the plaintiff states' Privacy Act claims. *See New York v. Trump*, — F. Supp. 3d —, 2025 WL 573771, at *15–*16 (S.D.N.Y. Feb. 21, 2025) (concluding that the plaintiffs' Privacy Act claims were unlikely to succeed because the Privacy Act applies only to records about individuals). Rather, the court there had found that "the agency's processes for permitting the Treasury DOGE Team access to critical [Bureau] payment systems, with full knowledge of the serious risks that access entailed, was arbitrary and capricious." *Id.* at *21. In partially lifting that injunction, the court concluded that Defendants had addressed the court's concerns with respect to Mr. Wunderly. *See* 2025 WL 1095147, at *8. Defendants have made no similar showing here with respect to their Privacy Act obligations.

**B.** In granting the DOGE Team access to the Bureau's records, Defendants had a duty to "reasonably consider[] the relevant issues and reasonably explain[] the[ir] decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). As Plaintiffs' have explained, Defendants ignored "an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State*

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), by giving short shrift to the privacy risks associated with the unfettered access they granted to the DOGE Team, *see* Pls.' Mem. 39.

Defendants repeat their argument that the "mitigation measures" they implemented took account of privacy risks. *See* Defs.' Reply 19. They do not, however, identify any constraints imposed on the DOGE Team's authority to access personal information to ensure adequate protection of privacy interests. If Defendants had adhered to their own privacy policies, there would have been, at a minimum, an internal memorandum assessing the privacy risks created by with the DOGE Team's access to sensitive Bureau systems. *See* Privacy Act Handbook 21. Instead, Defendants failed to consider those privacy concerns, depriving the public and the courts of the reasonable explanation for their actions that the APA demands. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020).

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' cross-motion for summary judgment.

May 23, 2025                                         Respectfully submitted,

                                                    /s/ Nandan M. Joshi
                                                    Nandan M. Joshi (DC Bar No. 456750)
                                                    Nicolas Sansone (DC Bar No. 1686810)
                                                    Allison M. Zieve (DC Bar No. 424786)
                                                    Public Citizen Litigation Group
                                                    1600 20th Street NW
                                                    Washington, DC 20009
                                                    (202) 588-1000

                                                    Norman L. Eisen (DC Bar No. 435051)
                                                    Democracy Defenders Fund
                                                    600 Pennsylvania Avenue SE
                                                    #15180
                                                    Washington, DC 20003